**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

RONNIE QUALLS,

    Plaintiff,

      v.

FRANCIS ("MICKEY") ROACHE,
DANIEL KEELER, KENNETH TAYLOR,
DENNIS HARRIS, TIMOTHY MURRAY,
DAVID PEREZ, JOHN HARDEN,
CLIFTON HAYNES, AND
THE CITY OF BOSTON

    Defendants.

C.A. NO: 1:23-CV-10435-GAO

**PLAINTIFF'S RESPONSES TO DEFENDANTS DANIEL KEELER, DENNIS HARRIS, JOHN HARDEN, AND CLIFTON HAYNES' STATEMENT OF MATERIAL FACTS**

1. During the early morning hours of October 3, 1992, brothers Ronald "Dallas" Price ("Dallas") and Roosevelt "Tony" Price ("Tony") were shot in a parking lot near 1111 Harrison Ave, in Boston, MA. Exhibit H, BPD Initial Reports.

**Plaintiff's Response:** Admitted.

2. Dallas and Tony both later died from the gunshot wounds. Exhibit H, BPD Initial Reports.

**Plaintiff's Response:** Admitted.

3. Eyewitnesses later identified Ronnie Qualls as the killer. Exhibit M, LeRoyal Holmes Interview Notes.

**Plaintiff's Response:** Denied to the extent that witnesses were only shown a Qualls photo array. Junior Williams photo was finally shown to witnesses over nine (9) months after the murders. Exhibit M is the *second* statement of a single witness, LeRoyal Holmes, identifying Qualls out of the only photo array Keeler and Harris showed him, which was a photo array of Qualls. Holmes did not identify Qualls in his first statement on the night of the murders. Donna Carrington, the only eyewitness that did not have an open criminal case or warrant, did not identify Qualls from his photo array. (Ex. 1 – Photo Array Identifications)

4. Boston Police Officers John Harden and Clifton Haynes, along with other Boston Police Officers, responded to the shooting. Exhibit G, Harden and Haynes Reports.

1

**Plaintiff's Response:** Admitted.

5. Officers Harden, Haynes, and their respective partners were approached by Tony Price, who told them that he had been "shot by a man named Junior who drives a blue Ford Escort, that lives at Columbia Pt., and has a sister who lives on Ruggles Street." Id, at p. 2.

**Plaintiff's Response:** Admitted.

6. Officers Harden and Haynes memorialized these statements in their own individual reports. Id.

**Plaintiff's Response:** Admitted.

7. Soon thereafter, a homicide investigation squad led by Lt. Det. Timothy Murray, and also consisting of Sgt. Det. Daniel Keeler and Det. Dennis Harris, were assigned to the case. Exhibit H, BPD Initial Reports, at p. 2.

**Plaintiff's Response:** Admitted to the extent that Keeler and Harris were immediately assigned to the case and responded to the scene and the hospital immediately after the shooting. Exhibit 2 – Keeler Dep. 22:7–9, 24:21–24, 62:15–23, Ex. 3 – Harris Dep. 58:14–59:1)

8. Detective Harris and Lt. Det. Murray interviewed James Earl "Junior" Williams later that morning. Exhibit K, Interview of Junior Williams.

**Plaintiff's Response:** Admitted.

9. Williams described the events of the night and told detectives that he had dropped Mr. Qualls off near the location of the shooting, just before it happened. Id.

**Plaintiff's Response:** Admitted to the extent that this is what Williams stated in the recorded portion of his first statement. Williams was questioned by Keeler and Harris prior to any recording. (Ex. 2 – Dep. Keeler) Williams later gave additional statements with several conflicting accounts of the evening. Ex. 4 – Williams Statements.

10. Det. Harris took into evidence a grey sweatshirt with three small blood stains, belonging to Williams. Exhibit L, Crime Lab Report, at p. 1.

**Plaintiff's Response:** Admitted to the extent that a sweatshirt, worn by Junior Williams on the night of the murders had visible blood staining and was collected by detective Harris. Exhibit L, Crime Lab Report. Harris Dep. p. 58 1–10;

11. The blood stains were subsequently tested by the BPD Crime Lab and were determined to be "Type B" blood. Exhibit A, Trial Testimony of BPD Criminalist Donald Hayes, at 173:24-174:2; Exhibit L, Crime Lab Report.

**Plaintiff's Response:** Admitted.

12. No further blood tests were performed because the sample size was too small. Exhibit A, at 174:8-16.

**Plaintiff's Response:** Denied. Hayes testified that he was *unsure* if further testing could be completed, not that the sample was conclusively too small to complete further testing. Hays also testified that no additional testing was even attempted. Exhibit A, at 174:8-16.

13. On day two of Mr. Qualls' first criminal trial, ADA Miller stated that police had driven witnesses to court to remove defaults. Exhibit E, Qualls Criminal Trial Transcript, Day 2, at 3:4-4:5.

**Plaintiff's Response:** Admitted.

14. In responding to Defendants' discovery requests, Mr. Qualls alleged that witnesses were bribed or coerced to testify. Exhibit D, Plaintiff's Answers to Interrogatories, at p. 3.

**Plaintiff's Response:** Admitted.

15. Mr. Qualls stated that the victim clearly identified Junior Williams immediately after the shooting. Id. at p. 1.

**Plaintiff's Response:** Admitted.

16. At his deposition, Mr. Qualls testified that allowing witnesses to sit together violated his constitutional rights. Exhibit F, Plaintiff's Deposition Transcript at 124:19-125:1.

**Plaintiff's Response:** Agreed to the extent that Plaintiff testified that allowing witnesses to sit together, "to cook their story up, to put the story he [Keeler] wants together". Exhibit F, Plaintiff's Deposition Transcript at 124:19-125:1.

17. Mr. Qualls also testified that photo arrays were unconstitutional. Id., at 130:13-131:4.

**Plaintiff's Response:** Admitted.

18. Mr. Qualls testified that his photograph being in the array made it unconstitutional. Id. at 142:5-143:10.

**Plaintiff's Response:** Denied. Plaintiff testified that showing a photo array with his picture in the middle reflected the array's highly suggestive nature and Defendants' failure to show witnesses a photo array of Junior Williams, who was identified as the shooter in the dying declaration of Tony Price, was a constitutional violation. Def's Ex. F – Plaintiff's Deposition Transcript p. 142:5-143:10.

19. Plaintiff testified that Detective Keeler's decision to arrest him despite the dying declaration violated §1983. Id., at 143:11-18.

**Plaintiff's Response:** Admitted to the extent that this is Plaintiff's testimony.

20. Plaintiff testified that Officers Haynes and Harden failed to act to have him exonerated. Id., at 98:7-18, 106:17-107:18.

**Plaintiff's Response:** Admitted to the extent that this is Plaintiff's testimony.

3

21. Detective Keeler testified that he had no memory of driving witnesses to court. Exhibit B, Keeler Deposition at 60:12-62:3.

**Plaintiff's Response:** Admitted to the extent that this is Keeler's testimony, denied as to Keeler's that lack of recollection disproves the occurrence.

22. Detective Keeler testified that the DA handled lodging for witnesses. Id., at 130:19-23.

**Plaintiff's Response:** Denied. Plaintiff disputes this characterization as incomplete; the homicide squad coordinated with the DA regarding witness accommodations.  Exhibit 3 - Harris Dep. p. 78, 14-19.

23. Detective Keeler testified that Lt. Murray made charging decisions. Id., at 135:15-136:8.

**Plaintiff's Response:** Admitted to the extent that this is Keeler's testimony.

24. Detective Keeler testified that a separate unit handled lab testing. Id., at 28:9-16.

**Plaintiff's Response:** Admitted.

25. Detective Harris testified he had no memory of Keeler driving witnesses to court. Exhibit C, Harris Deposition at 79:15-22.

**Plaintiff's Response:** Admitted to the extent that this is the testimony of Harris, denied as to Harris's lack of recollection disproves the occurrence.

26. Detective Harris confirmed that the DA provided lodging for some witnesses. Id., at 78:14-19.

**Plaintiff's Response:** Admitted to the extent that Harris testified that the DA would arrange for lodging for out of state witnesses but none of the eyewitnesses in the Qualls case were out of state. Exhibit 3 - Harris Dep. p. 78, 14-19.

27. Detective Harris testified that arrest decisions were made collectively by Murray, McNally, and the DA's office. Id., at 97:10-23.

**Plaintiff's Response:** Admitted to the extent that this is what Harris testified to.

28. Detective Harris testified that detectives identified items to be tested by the BPD Crime Lab. Id., at 58:2-7.

**Plaintiff's Response:** Admitted.  Exhibit 3 - Harris Dep. p. 58, 2-7.

29. Defendant Clifton Haynes passed away on May 3, 2024. Exhibit J, Death Certificate.

**Plaintiff's Response:** Admitted.

30. Mr. Haynes' counsel notified the Court and Plaintiff's counsel of Mr. Haynes' death during a status conference on October 8, 2024. See ECF No. 35.

**Plaintiff's Response:** Admitted.

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

30. Shortly after 4 am, the night of the shooting, Detective Daniel Keeler pulled Williams over in his dark Ford Escort, the same vehicle described by witnesses. Exhibit. 5 – Trial Testimony - TI, Day 6 at 213:19-220:6.

31. Detective Montgomery testified that Dallas told him, "that's the guy that shot at me" after his heated confrontation with Junior at the bar the night of the murders. Exhibit. 5 – Trial Testimony - pg. 109-110 – T1, Day 2

32. On February 5, 2020, ADA David Lewis represented to the Court that Qualls was falsely accused and convicted, and Junior Williams was responsible for the Price murders: "Boston Police Department and the District Attorney's Office for Suffolk County *got the wrong guy.* They were supposed to get Williams and instead they got Qualls." Ex. 5 – Hearing on Joint Motion to Vacate Conviction 2/5/20, Pg. 21:7-19

33. The widespread corruption and unethical and unconstitutional behavior of the BPD Homicide Unit in the 1980's and 1990s is well known and is well documented in several studies. Exhibit 6 – Shannon Report and St. Clair Report.

34. The St. Clair Report stemmed from the failure of the City of Boston and the BPD to cooperate or address findings of a "pattern of civil rights violations by the BPD Homicide division" Exhibit 6 Shannon Report and St. Clair Report, pg. 63

35. The Shannon Report found corroborated witness accounts of routine civil rights violation by the BPD Homicide Unit including the use of coercion, threats, and offers to dismiss open criminal matters in order to coerce testimony that fit the narrative the BPD wanted. Exhibit 6 Shannon Report and St. Clair Report, pg. 64

36. The report concluded that "the operation of the homicide unit during this investigation is disturbing as a matter of both community relations and good police practice." Exhibit 6 Shannon Report and St. Clair Report, pg. 65

37. Despite the findings and multiple recommendations of the AG's Report, no steps were taken by the BPD or the City of Boston to correct or resolve the widespread policy/custom of civil rights violations by the BPD Homicide Unit nor was any disciplinary action pursued and the 1992 St Clair Report documented the continued, widespread custom/policy of civil rights violations by the BPD and the continued lack of training, supervision, accountability, or discipline for egregious, repeated ethical and legal violations used by the Homicide Unit to secure wrongful convictions. Exhibit 6 Shannon Report and St. Clair Report

38. In 2004 the Suffolk County District Attorney's office formed a task force to review the Boston Police Department's investigative process and recommend appropriate changes in the means and manner of investigation by the Boston Police. The task force found that,

5

**"the number of erroneous convictions has been disturbing and unacceptable for anyone interested in the fair administration of justice in Boston."** (Ex. 6 – Suffolk Eyewitness Task Force Report)


Respectfully submitted,

The Plaintiff, Ronnie Qualls,
By his attorney


  *s/Kelsey R. Rose*
Kelsey R. Rose, BBO # 692102
BALLIN & ASSOCIATES, LLC
16 Chestnut Street, Suite 130
Foxborough, MA 02035-1464
(508) 543-3700
Date: 10/15/2025          KRose@ballinlaw.com


## CERTIFICATE OF SERVICE

I, Kelsey R. Rose, hereby certify that on this 15th day of October, I served a copy of the foregoing document via ECF and electronic mail to all counsel of record in this action.


*/s/ Kelsey R. Rose*

Kelsey R. Rose