Page 1

VOLUME:  I
PAGES:  1 - 144
EXHIBITS:  1 - 15

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 1:23-CV-010435-GAO

-----------------------------------x
RONNIE QUALLS,

      Plaintiff,

v.

FRANCIS ("MICKEY") ROACHE,
DANIEL KEELER, KENNETH TAYLOR,
DENNIE HARRIS, TIMOTHY MURRAY,
DAVID PEREZ, JOHN HARDEN,
CLIFTON HAYNES, AND THE CITY
OF BOSTON
      Defendants.
-----------------------------------x

DEPOSITION OF DANIEL KEELER, taken on behalf of the Plaintiff, pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Jessica F. Story, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at Boston City Hall, 1 City Hall Square, Boston, Massachusetts, on Thursday, April 24, 2025, commencing at 10:47 a.m.



APPEARANCES:


Kelsey R. Rose, Esq.
Jason Stone Injury Lawyers
235 Friend Street, Suite 301
Boston, Massachusetts 02114
KRR@StoneInjury.com
Attorney for the Plaintiff


Adam D. Johnson, Esq. &
Nicole Gemba, Esq.
City of Boston Law Department
City Hall, Room 615
Boston, Massachusetts 02201
Adam.johnson@boston.gov
Attorneys for the Defendants



I N D E X

Deposition of:                              Page

DANIEL KEELER

Examination by Ms. Rose                      5, 137

Examination by Mr. Johnson                   130



Exhibits                                      Page

1        Photo Array                     51
2        Photo Array                     51
3        October 27, 1993 Trial
         Transcript                      58

4        Reports from Officer Haynes
         and Officer Osgood              67
5        Report from Officer Haynes      75
6        Statement from Leroyal Holmes   76
7        Holmes Photo Array,
         October 5, 1992                 76

8        Holmes Photo Array,
         June 29, 1993                   76
9        Williams Statement -
         October 3, 1992                 97

10       Williams Statement              98

11       Williams Statement              98

12       Report to Officer Murray        101

13       Interoffice Memo from O'Brien   101

14       Trial Transcript Excerpts -
         Trial 1                         111
15       Trial Transcript Excerpts -
         Trial 2                         111


MAGNA
LEGAL SERVICES

P R O C E E D I N G S

MR. JOHNSON:  I guess I'll tell you now I want an electronic copy.

DANIEL KEELER, a witness called on behalf of the Plaintiff, first having been satisfactorily identified by his Massachusetts driver's license, then duly sworn, on oath deposes and says as follows:

EXAMINATION BY MS. ROSE:

Q.  Good morning.

A.  Good morning.

Q.  My name is Kelsey Rose and I am the attorney for Mr. Qualls in this case.  Can you state your name for the record.

A.  My name is Daniel Keeler.  The last name is spelled K-e-e-l-e-r.

Q.  And where do you currently reside?

MR. JOHNSON:  I'm going to object to that just based on --



Page 6

MS. ROSE:  Oh.  We don't need the real address.  Can we do --

Q.  Well, you currently reside in Florida, correct?

A.  I do, correct.

MR. JOHNSON:  I'm sorry to interrupt.

MS. ROSE:  Go ahead.

MR. JOHNSON:  Usual stipulations?

MS. ROSE:  Yes.  I'm sorry.  Usual stipulations.

Can we go off for a second.

(Discussion off the record.)

Q.  (By Ms. Rose) So you currently live in Florida. How long have you been in Florida?

A.  A number of years.

Q.  Are you kind of like a snowbird or are you full-time in Florida?

A.  I'd rather answer questions to this case. Mr. Qualls is a convicted murderer.  I'm not going to give him any information on myself.

Q.  Okay.  So Mr. Qualls is not going to read this deposition.

A.  Okay.

Q.  But these are just kind of general background questions.



Page 7

A.    He will have access to the transcript I would imagine. I'm hesitant to provide a convicted murderer any information on myself.

Q.    Okay. Well, I'm going to have to ask you some background questions.

A.    Go ahead.

MR. JOHNSON: Why don't we do this. If there's a question that you ask and Mr. Keeler doesn't feel comfortable answering it.

MS. ROSE: Sure.

MR. JOHNSON: We can put them in and deal with it afterwards. If you think there's any need to get a judge, to get a judge --

MS. ROSE: Obviously if it's something I don't need on the record, I honestly don't need a schedule of when he's in Florida, so I can skip over stuff if it's not --

MR. JOHNSON: And the reason is just because of the nature of the case, who Mr. Keeler is and what he did for a career, being a homicide detective.

MS. ROSE: Yeah. Sure.

MR. JOHNSON: If there's questions he doesn't feel comfortable answering, if we can


MAGNA
LEGAL SERVICES

Page 8

just skim over it, you and I can talk about it afterwards, and if we ever do have to get a court order to answer a question we'll deal with it at that point.

Is that okay?

MS. ROSE:  Yeah.

MR. JOHNSON:  All right.

MS. ROSE:  I think so.

MR. JOHNSON:  So to the extent that any time Mr. Keeler doesn't feel comfortable answering a question, I'll just object so that way it's on the record and we can come back to it later.

MS. ROSE:  Yeah.  Depending on what it is.  I might fight you on it a little bit if it's something that I need that is relevant.

MR. JOHNSON:  Not a problem.

MS. ROSE:  This kind of stuff is not important.

Q.    (By Ms. Rose) Okay.  Did you live in Massachusetts for a time?

A.    Yes, I did.

Q.    Did you grow up in Massachusetts?

A.    I did.



Q.   Okay.  Where were you born?

A.   Quincy.

Q.   And did you grow up in Quincy?

A.   No.

Q.   Where did you grow up?

A.   I grew up around the city.

Q.   Just different areas?

A.   Yes.

Q.   Where did you go to high school?

A.   Pardon me?

Q.   Where did you go to high school?

A.   Boston Technical High.

Q.   Where is that or where was that?

A.   It was on Townsend Street in Roxbury.

Q.   And college?

A.   I graduated.  I have a bachelor's degree from Curry College and a master's from Curry College in criminal justice.

Q.   Both in criminal justice?

A.   Yes.

Q.   Do you have an idea, just generally, when you got the bachelor's, when you got the master's?

A.   In '90s, in the '90s.

Q.   Okay.  Both in the '90s sometime?


MAGNA
LEGAL SERVICES

A.    Yeah.

Q.    Okay.  And at some point did you join the Boston Police Department?

A.    I did.

Q.    Do you know approximately when?

A.    '79, I believe.

Q.    1979 sometime.  And what was your position when you started?

A.    Patrolman.

Q.    Okay.  And what were kind of the duties for a patrolman?

A.    Typical duties.  Answering 911 calls.

Q.    I assume there's, like a dispatcher that answers them and then you respond to them?

A.    I respond to them.  It was in various districts throughout the city.

Q.    Do you remember which districts you were in?

A.    4, 14, 3.  Various districts.

Q.    Okay.  And how about, when you first started as patrolman, do you remember where you were?

A.    We rotated.  In the first year run you rotated throughout the various districts.

Q.    And how long, if you know, were you a patrolman?

A.    I was promoted in '87.


MAGNA
LEGAL SERVICES

Q.  So from '79 to '87 you were a patrolman?

A.  Yes.

Q.  And then what were you, what was the rank you were promoted to?

A.  Sergeant.

Q.  And what are the duties for a sergeant?

A.  Patrol supervisor.  Responding to various incidents that your presence may be requested by a patrol officer.

Q.  Okay.  And do you know how long you were a sergeant?

A.  I was a sergeant until I retired.

Q.  Okay.  When did you retire?

A.  February of 2015.

Q.  Okay.  And at some point were you in the homicide division?

A.  Yes.

Q.  Okay.  When did that start?

A.  I believe in '92.

Q.  And so you were still a sergeant but you were a sergeant in the homicide division?

A.  Sergeant detective in homicide.

Q.  Sergeant detective.  So there were two ranks that you had.  You were a patrolman, then you


MAGNA
LEGAL SERVICES

Page 12

were a sergeant, but it sounds like there was other roles within that in terms of, like being assigned to homicide division and being a detective.

Can you tell me a little bit about that?

A.   Yes.  Tell you a little bit about it?

Q.   Yeah.  Just maybe just, like the different roles that you had, if you were in --

A.   Detectives would investigate crimes.

Q.   Okay.  And when did you become a detective?

A.   '92.

Q.   Okay.  So when you joined the homicide division you became a sergeant detective?

A.   Yes.

Q.   Okay.  Are there other kinds of detective or is it all sergeants?

A.   Sergeant detectives is a rank throughout the department.  Sergeant detectives typically supervise detectives.

Q.   Okay.  And you were never just a regular detective; you were a sergeant detective?

A.   No.  Sergeant detective.

Q.   Okay.  And were you in the homicide division from '92 to when you retired?



A.  No.  I transferred back to a division in 2004.

Q.  What division was that?

A.  District 4.

Q.  And what area is that?

A.  That's the South End, Back Bay, Fenway section for the city.

Q.  And what was your role there?

A.  General investigations.

Q.  And what kind of work did you do in general investigations?

A.  Anything from robberies to serious incidents.

Q.  Any murders?

A.  No.

Q.  Assaults?

A.  Assault?

Q.  Yeah.

A.  Yes.

Q.  Okay.  And then did you stay there until you retired or were there any other moves?

A.  No.  I came down to city hall for a year.

Q.  When was that; do you know?

A.  Probably around the end of '13 into '14.

Q.  What did you do in city hall?

A.  I was in charge of security of the various



Page 14

buildings throughout the city.

Q.   Is that the last position you had before you retired?

A.   Yes, it was.

Q.   Okay.  And why did you retire?  Was it just the end of your career?

A.   Age.  Age requirement.

Q.   And what's the age requirement for --

A.   65.

Q.   Is it, it's mandatory?

A.   Yes.

Q.   I think I have your birthday.  Do you know how old you were when you joined the force in 1979?

A.   No.

Q.   I think you were born in 1951?

A.   Correct.

Q.   Okay.  So you were about 27, 28?

A.   Yeah.

Q.   When you joined?

A.   Right in that ballpark.

Q.   What kind of work did you do before you joined the police department?

A.   I did various jobs.

Q.   Do you recall?



Page 15

A.  I was a fireman for a year and a half, two
    years, you know.

Q.  Anything else you can recall?

A.  No.

Q.  What prompted you to join the Boston Police
    Department?

A.  When did I join?

Q.  No.  What prompted you?  Why did you decide to
    join?

A.  No particular reason.  I took the civil service
    exam and I got offered the job and decided to
    try it and take it.

Q.  Did you have any friends or family members that
    were in the Boston Police Department when you
    joined?

A.  No.

Q.  So when you were a patrolman -- so you started
    as patrolman.  What kind of training do you have
    when you first started the Boston Police
    Department?

A.  The Boston Police Academy.  It covers a myriad
    of subjects.

Q.  Does it cover investigating crimes?

A.  I'm sure there were courses that dealt with


MAGNA
LEGAL SERVICES

Page 16

that, yes.

Q.   Okay.  And is it, is it like a written exam?  Is it physical exams?

A.   The police academy?

Q.   Yeah.

A.   It's a series of exams throughout the academy.

Q.   How long did it last?

A.   You know what, the timing, it was far more brief than it is now.  I'd only be speculating if I guessed.  Right now it's, it involves a year. It was far less than that then.

Q.   And you had various written tests throughout that?

A.   Yes.

Q.   And then, you know, was there a final exam that you had to pass or anything like that?

A.   The series were dealt with cumulatively, you know.  They had, you had to pass this phase, pass the next phase, you know, and if you didn't pass those phases you wouldn't advance.

Q.   And did you have any difficulty passing through the academy?

A.   No.

Q.   And so you passed and were able to become an



MAGNA
LEGAL SERVICES

Page 17

officer?

A.   Correct.

Q.   And that was 1979?

A.   Correct.

Q.   And what kind of training did you have once you joined the force?

A.   Periodically you'd go through training.  I went through other training when I was in the homicide unit, you know, attending various seminars and schools.

Q.   Was there any kind of formal training?  So let's talk about just when you first got out of the academy and were a patrolman.  Was there any kind of formal training on the job?

A.   Initially in homicide, no.  I had, I had the ability to respond to any homicide scene I wanted to see how the various squads reacted to the incidents they were dealing with, and that was great experience.

Q.   Okay.  So you're talking about when you were a homicide detective?

A.   Correct.

Q.   Okay.  So I just was asking about initially as a patrolman when you got out of the academy, was



Page 18

there any kind of formal training?

A.   Yes.  You'd go back through the academy if there were changes that had to be dealt with and have you acquainted with those changes, you know, you deal with that.  It was a constant process.

Q.   Okay.  Was there, do you remember at the beginning when you first joined as a patrolman, was there a handbook or a guidebook or anything like that?

A.   That's 43 to 50 years ago.  I would not have that.

Q.   Okay.

A.   Available now.

Q.   All right.  And how about when you joined the homicide division?  Was there any -- I know you said you could respond to any homicide and you kind of got on the job training that way, but was there any formal training when you --

A.   There were academies.  I mean, academies.  There were various seminars that you could always go to and apply for and go to.  Several.

Q.   Do you know, did you go to different seminars?

A.   I went to several different ones.  Off the top of my head I don't remember numbers, dates and



MAGNA
LEGAL SERVICES

when, you know.

Q. Maybe I can ask this differently. Were there certain, either courses or seminars or milestones you had to hit in order to become a detective?

A. Detectives there is an exam for. Sergeants and everything else there's a period of time that, for lack of a better term, an assessment period, you know. Then you get a rating. It's called a rating.

Q. So that would be something that you would kind of go and actively try to do? If you want to be a detective you have to go and take the exam and be rated?

A. Detectives and supervisor detectives is completely different process.

Q. Okay. Can you explain to me the process.

A. The detectives, there's an exam for detectives now, assessment period, this and that. Sergeant detectives' criteria were getting -- their unit commanders would seek you out depending upon what your performance was. There's no set criteria that I'm aware of.

Q. Okay. And so when you were a patrolman, I



Page 20

assume that you wanted to become a sergeant and you wanted to become a detective, sergeant detective?

MR. JOHNSON: Objection to the form. You can answer if you know.

A. Yeah. I took an exam for sergeant. I passed that, eventually migrated up to homicide unit.

Q. Okay. Was that something that you actively pursued as joining?

A. No.

Q. Did somebody ask you to join it?

A. I was in an anticrime unit in Roxbury and I was an active, active sergeant. There was an opening in homicide and I was asked if I wanted to go.

Q. What was, can you tell me a little about the anticrime unit in Roxbury?

A. Anticrime unit's a plainclothes unit. I supervised other plainclothes officers that were in it. And we mainly patrol areas that were high crime areas within, you know, that geographical district.

Q. What kind of crimes were you dealing with mostly?


MAGNA
LEGAL SERVICES

Page 21

A.   Violent crimes.  Guns, drugs.

Q.   When you say violent crimes, are you talking about drug related crimes that involve violence or just drug deals?

A.   Everything.  There was no set protocol, you know.

Q.   Okay.  So when you became, or actually when you joined the homicide division, that was, what district was that?

A.   What date?

Q.   No.  What district?  Sorry.

A.   What?

Q.   District.

A.   It isn't a district.  Homicide's citywide.

Q.   Okay.  Is that still true today?

A.   It is.

Q.   Okay.

         MR. JOHNSON:  Objection to that question.

Q.   That's what you mean by you could respond to any homicide?

A.   It's broken up.  There are two -- there are six squads, one, three, five days, two, four and six nights.  And there are areas of time that the protocol within the department is, there's an


MAGNA
LEGAL SERVICES

Page 22

incident that's life-threatening, the 911 call would dispatch officers to that scene.

If they determine that the scene or the crime was life-threatening to the individual, they would then call for the notifications that, make the notifications it's life-threatening.

Operations would then call the homicide unit, and wherever the duty team was would then respond to that scene.

Q. Okay. And so were you assigned to a partner or a team when you were in the homicide division?

A. I had a team.

Q. And do you recall, let's say in 1992, who was in your team?

A. In '92?

Q. '92, yeah.

A. You know, I'm not, to be perfectly honest with you, I'm not sure at the time whether I was initially in cold case and whether that was with a cold case team.

Q. I have your testimony from both trials so that might be helpful.

A. The reason I say that is I know Lieutenant Murray was there.



Page 23

Q. Yeah.

A. And he was on the cold case squad so he would have been the supervisor.

Q. Okay. So you're talking about Timothy Murray?

A. Yes.

Q. And was he, was he your supervisor?

A. He would have been, yes.

Q. In 1992?

A. Yes.

Q. Would he be your supervisor the entire time you were there?

A. No.

Q. Okay. When did he stop being your supervisor?

A. I have no idea.

Q. Okay. He presumably was in the homicide division before you?

A. Yes.

Q. Okay. But let's say '92, '93, he was your supervisor?

A. I'm not sure. I don't want to speculate when I went into a squad. So I'm not sure when I took, when I took another squad or when Tim -- I think he remained in cold case.

Q. Okay. And what was -- were you ever in cold



Page 24

case?

A.    I was.

Q.    And what was the cold case about?

A.    Cold case were cold cases.

Q.    Okay.  And so how would they, you know, how long did they have to be unsolved to be cold?

A.    I don't think there was any established timeframe on that.  I mean, you know, if you're in an active squad, cases build up and, you know, there might be ones that you thought were more solvable that you'd get from that squad, take a look at that and you go over it and then -- there was no set protocol that I recall of when it went to cold case.

Q.    Okay.  Was the -- so obviously this case is about Ronnie Qualls and the murder of, murders of the Price brothers.  Do you recall that?

A.    Yes.

Q.    Was that ever a cold case?

A.    No.  That was an active case.  If you recall looking at the scene.

Q.    Yeah.

A.    We arrived that night.  Now, I don't know why we got it that night.  There could have been, like



Case 1:23-cv-10435-GAO    Document 63-2    Filed 10/16/25    Page 25 of 145

Page 25

a squad was off or there was something going on. I'm not sure the reasoning behind it.

Q. So at that time -- so this happened in October of 1992?

A. A-huh.

Q. You were in cold case so you would primarily be responding to cold cases?

A. Well, you don't respond to a cold case.

Q. Investigating a cold case?

A. You respond to an active case.

Q. Right. Were you primarily investigating cold cases?

A. Yes.

Q. So you were not getting calls to respond to active cases?

A. No. But there may be a situation where a squad for whatever reason needed a night off or could have been actively involved in a trial. There's several reasons. For whatever reason I'm assuming we had the duty that night, that, something.

Q. Okay. That's, you and Murray were both assigned to cold case at this time?

A. And Harris and Doyle, too.



Page 26

Q.   And Dennis Harris?

A.   Yes.

Q.   And Doyle.  What's Doyle's first name?

A.   James Doyle.

Q.   James Doyle.  Can you recall anybody else that would have been assigned at that point?

A.   No.

Q.   So how frequently did you work with Tim Murray?

A.   I was in the squad so I'd work with him all the time.

Q.   So would you be on the same schedule?  So every day you'd be --

A.   Yes.  Yes.

Q.   Okay.  So every squad has the same schedule for each person in the squad?

A.   Depending upon what squad you're in, days, nights, rotating schedules.

Q.   Okay.  But you and Murray were together most of the time?

A.   When I was in that squad.

Q.   All right.  Was there anybody else that was on that same schedule in that squad?

A.   Yeah.  Harris and Doyle would have been on that same schedule.


MAGNA
LEGAL SERVICES

Page 27

Q. Okay.  So Murray, Harris, Doyle and you?

A. Yes.

Q. Okay.  Do you recall getting a notification about this shooting that night?

A. Not off the top of my head, no.

Q. Okay.  Do you recall any other times that you, while you were on the cold case unit that you got a call to respond to a kind of active homicide investigation?

A. We're talking 32 years ago.  It could have happened.  Probably did happen.

Q. Okay.

A. But I have no specific memory of it.

Q. Okay.  But that wasn't, like a frequent thing that would happen at that time?

A. You know, it all depends on the, you know, what schedules were or, you know, there could have been another squad that was on trial.  You know, a lot of them were on trial.  They're demanding trials, and you know, could you cover this squad that night, you know.  Those are situations that, the frequency which I cannot recall.

Q. So at this time when you were, let's say when you were in the homicide unit when you would


MAGNA
LEGAL SERVICES

Page 28

respond to a homicide or you'd investigate a homicide, you know, how far did your role go? Getting evidence?  Taking statements?

Can you tell me a little bit about how much you would do?

A.   Well, you'd treat it as a normal homicide. You'd go to the scene.  You would investigate the case.

Q.   And when you say investigate the case, you go to the scene, would you be taking pictures?

A.   No.  That's a separate unit within the department.

Q.   Okay.  So there's a separate unit to take pictures.  I assume all the lab testing is someone else, as well?

A.   Yes.

Q.   Okay.  Would you collect evidence?

A.   You could on occasion, depending upon what the situation was.

Q.   If there was evidence that needed to be collected, would some --

A.   It all depends on procedure.  If the ID unit was there, if you called on a crime scene unit, they were there.  They'd photograph it.  Mark it,



Page 29

photograph it and collect it.

Q.  Was there a standard protocol that the Boston police had?

A.  I don't recall an SOP at the time, but there were rules and regulations that would have, you know, had an SOP procedure.

Q.  Okay.  What kind of rules and regulations were there?

A.  Well, it's, that was 32 years ago so I would hesitate to quote or give an opinion on an SOP 32 years ago.

Q.  Okay.  Sorry.  You said an SOP at the time but then you said rules and regulations.  Are those two separate things in your mind?

A.  Well, standard operating procedures could be incorporated in rules and regulations.

Q.  Okay.

A.  They're -- guidelines would be the best term.

Q.  So there were guidelines for the homicide unit?

A.  Yeah.  And guidelines are suggestions.  I mean each and every scene is a little bit different so they kind of give you a roadmap if you would.

Q.  Were these written guidelines?

A.  Oh, yeah.



Page 30

Q. And did you, you know, did everybody get these when they joined the homicide unit?

A. Pardon me?

Q. Did everybody get a copy of these written --

A. I don't know.  I can't speak for everybody.

Q. Did you get a copy?

A. I got a copy of the rules and regulations when you come on the job.

Q. Were these specific to the homicide unit?

A. I don't recall that.  I mean it's, it's evolving.  I mean back in '79, I mean you're comparing the Flintstones to the Jeffersons. Okay.  Or the Jetsons.  There was no DNA.  There was no, there was nothing like that, so.

Q. Yeah.  All right.  Well, let's focus on 1992 at least forward when you were in the homicide unit.  So at that point were there specific guidelines, like written guidelines for the homicide unit?

A. I don't know what the, what the protocol was at the time.

Q. Okay.  Do you remember, you know, specific SOPs coming out about --

A. I don't.  It's, you know, once again, it's 32



Page 31

years ago that we're discussing this.

Q.   Do you remember --

MS. ROSE:  Strike that.

Q.   So at some point you went and got a bachelor's degree in criminal justice and then a master's in criminal justice?

A.   Yes.

Q.   Was that right in a row, the two of those?

A.   Yeah.  Right around the same timeframe, yeah.

Q.   I think you said it was in the '90s sometime?

A.   I believe so.  Could have been later.  Could have went into the 2000s.  Yeah.  Not a problem. If it wasn't in the '90s, you know.

Q.   Do you know if it was after this, the Price shooting?

A.   Oh, yes.  It was certainly after that.

Q.   Okay.  Is there a reason why you went and got a bachelor's and a master's?

A.   Educational incentive within our contract.

Q.   Were there things you learned in the, getting those, those degrees about, you know, procedures or constitutional rights, that kind of thing?

A.   Oh.  Well, all of those areas were covered, I mean in a master's degree.  You know, it wasn't,


MAGNA
LEGAL SERVICES

it wasn't Ding Dong High.  They certainly
covered some of those areas.

Q.    Were there things that you didn't know before?

A.    Sure.

Q.    What kind of things?

A.    It's called learning.  I don't know what I did
know before I knew.

Q.    Okay.

A.    You know.

Q.    But before that you hadn't taken any formal
criminal justice classes, had you?

A.    Police academy.

Q.    Okay.  The police academy.  Anything else
besides that?

A.    Not off the top of my head.

Q.    Okay.  When you were in the police academy did
they teach you about, you know, proper procedure
in order to keep things --

A.    Yes.  Absolutely.

Q.    -- constitutional?  That kind of stuff?
Constitutional law?

A.    Sure.  There was constitutional law.

Q.    Searches and seizures?

A.    I'm sure it was covered.



Q.   Okay.  And then questioning witnesses, Miranda rights, that kind of thing?

A.   Not so much in the police academy because their main focus was patrol.

Q.   Okay.

A.   I'm sure that at some points in time there was probably some kind of a class that dealt with that.

Q.   Okay.  Did you feel like you had training on that before you joined the homicide unit?

A.   Yes.

Q.   Okay.  And where would you have gotten that training?

A.   I would say it was on the job, you know, that, you know, from when I was in patrol.  And you'd learn from mentors that were around and taking reports, doing things.  Watching how others did it.

Q.   Was there ever kind of rules and regulations or SOPs about discipline on the job?

A.   Could you be more specific?

Q.   So I'm trying to get at were there reasons why, you know, an officer or a detective would get disciplined for any reason?



Page 34

A.    Well, I'm sure there were reasons for that.

Q.    Right.  Right.  All right.  Were you ever disciplined on the job at any point?

MR. JOHNSON:  Objection to the form.  I think it's a little too broad.  Maybe you should define discipline.

Q.    I guess formal discipline.

A.    Pardon me?

Q.    Were you ever formally disciplined on the job?

MR. JOHNSON:  I'll object again, but Dan, you can answer.

THE WITNESS:  Pardon me?

MR. JOHNSON:  I'm objecting to the form of the question because I think it's too broad, but if you have an answer you can give it.

A.    I'd have to go back and look at the records.

Q.    Okay.  Do you recall off the top of your head any type --

A.    I don't recall anything.

Q.    Do you recall any times that you were ever suspended from work while you were at the BPD?

A.    No.  I don't recall.

Q.    Do you recall, was there kind of an escalating scale for officers that were disciplined?


MAGNA
LEGAL SERVICES

Page 35

A.   What?

          MR. JOHNSON:  Objection.

Q.   You know, so if there was -- so my understanding of how this all works is there, you know, sometimes there's outside complaints or things are investigated and there's things that are, you know, the complaint can be sustained or not sustained.

          If it's not sustained I assume that that doesn't lead to anything, but if there's, let's say an officer with multiple complaints that are sustained and they're disciplined, do you know kind of what that process is?

A.   No, I don't.  I was never in internal affairs.

Q.   Okay.  Is internal affairs the branch that would investigate that kind of thing?

A.   Yes.

Q.   Okay.  We were talking about some on-the-job training that you had in terms of learning how to question people, learning about, you know, search and seizures and that kind of thing.

          Do you recall any of the specific officers or detectives or sergeants that trained you on the job?



Page 36

A.    No.  As I said, I could go and watch how the other squads -- you know, there was no training, not another sergeant detective to train me, no.

Q.    Okay.  And so how would you know what those units were doing was correct?

A.    How would I know what?

Q.    What they were doing was correct.  So if you're watching other units and learning what they're doing, how do you know what they're doing is accurate or correct?

A.    It wasn't a situation of incorrect.  It would be like you, counselor, going in and see how someone did their closing arguments or something.

Q.    Right.

A.    And you do that, or how they put their case together.  I'd see how different guys reacted to the scene, temperament, other issues and, you know, you could learn from that.

Q.    Sure.  But I think, you must understand there are constitutional limits to certain things that police can do.  You understand that, right?

A.    I do.

Q.    Okay.  So what I'm saying when I say incorrect



Page 37

or correct, you know, how did you know what you were watching was, you know, constitutionally allowed or not allowed?

A.   Well, I think the rule of thumb would be you treat people as you would want to be treated.

        But in terms of Constitution and, I mean someone's taken into custody, you give them their rights under Miranda.  There are certain things you do.  There's promises, rewards, inducements, there's all of that.  You should incorporate and have knowledge of it and act accordingly.

Q.   Okay.  You just mentioned promises, inducements, and what was the other thing?

A.   That would be rewards.  PRIs.

Q.   Can you tell me a little bit about that?

A.   Just, just how you handle yourself when you're speaking to individuals.

Q.   And would you be talking about, you know, witnesses?

A.   Witnesses, suspects, yeah.  It's not necessarily witnesses.  It's mainly suspects when we're dealing with the Constitution.

Q.   Right.  But promises, rewards and inducements


MAGNA
LEGAL SERVICES

Page 38

could apply to both, right?

A.   You'd have to ask me a specific question.

Q.   Okay.

A.   On that.  Okay.

Q.   So if you -- so we're talking about promises.  I mean I guess you could make a promise to either a suspect or a witness?

A.   The rule of thumb would be this.  Treat people with respect.

Q.   Okay.  And how does that rule apply to, you know, promises, rewards and inducements?

A.   Could you give me a specific question, counselor.

Q.   Sure.  Sure.  Okay.  So when, you know, what kind of promises were you able to make if you were in the homicide --

A.   I didn't make promises.

Q.   Okay.  What about rewards?

A.   I didn't give rewards.

Q.   What about inducements?

A.   "Tell the truth.  You're going to be better off, because one way or the other we're going to find out what happened."

Q.   Okay.  So that would be your form of an


MAGNA
LEGAL SERVICES

Page 39

inducement is just tell the truth?

A.   No.

          MR. JOHNSON:  Objection.

A.   That's not an inducement.

Q.   Okay.

A.   It's a common sense principle that you would take.

Q.   Yep.  And so when you mentioned promises, rewards and inducements, what were you referring to if those aren't things that you did?

A.   What was I referring to?

Q.   Yeah.

A.   General guidelines.

Q.   Okay.  Are those things that were, you were allowed to do?

A.   Counselor, be specific.  If you have a question for me and you have something you want to ask me, attach specificity to it and then I'll answer.

Q.   Well, I'm just asking you about, you brought it up in a general sense, so in a general sense as a homicide --

A.   I'm saying to you we're moving from general sense into specifics.  You have something


MAGNA
LEGAL SERVICES

Page 40

specific.

Q. Right.

A. If I recall it, I'll be more than happy to answer it.

Q. Right. So I think you just testified that you were not, you weren't giving out, you weren't promising people anything?

MR. JOHNSON: Objection to the form, and it's a slight mischaracterization of the testimony.

Q. You can restate it if that wasn't what you testified to.

A. Pardon me? Is there a question?

Q. No. There was a question, but if you --

A. What was the question then?

Q. So the question was, so I thought that you had testified previously, which we could probably pull it up, but that you were not able to give promises, rewards or inducements?

A. I didn't say that. You said that.

Q. Okay. So you brought up promises, rewards and inducements in a general sense. You didn't bring up a specific sense of that. So where did that fit in with your job?



Page 41

MR. JOHNSON:  Objection to the form.

A.  Is there a question?  Where did that fit in?

Q.  Yeah.

A.  It's just there.  Okay.  You always, you know, when you end a conversation it always comes out. It comes up in court a lot.  "Did you promise to do this?  Did you tell my client nothing would happen to him?"  I mean, you know, the typical questions that a defense attorney might ask you.

Q.  Okay.  So let's be specific about in this case, in the Price murders case.

A.  Yeah.

Q.  Did you personally make any promises to anybody in that case?

A.  None that I recall, no.

Q.  Did you make any, were you -- did you offer any rewards to anyone in that case?

A.  No.

Q.  And did you try to induce anyone in any sort of way in the case?

A.  Let me, let me say this.

MR. JOHNSON:  I'm going to object to the form of the question.  I think it's broad, but you can answer it however you're willing to



Page 42

answer.

THE WITNESS: Okay.

A.    When you're investigating homicides, in many cases there's always a safety concern for the witnesses. In this case here there were two people murdered.

So, I mean, you know, people are nervous. They're generally apprehensive. Promise something, yeah. We'll do whatever we can to keep you safe, you know. That's usually a, it's something you're confronted with all the time.

Q.    Okay. All right. So beyond safety, I mean I understand that that's kind of part of any witness situation, that there might be safety concern and they might be, you know, moved or put into witness protection or something like that.

I guess more specifically do you recall in this case any time that you or any other BPD officer provided any witness with money?

MR. JOHNSON: Objection to, one, the form of the question. Two, as to, the objection to form is because any other BPD officer in the case. I don't --


MAGNA
LEGAL SERVICES

Page 43

MS. ROSE:  I can split it up.

MR. JOHNSON:  Yeah.  If you can split it up.  I won't object if you ask him if he ever gave money.

MS. ROSE:  I'm just saying if he knows.

MR. JOHNSON:  You can ask that.

Q.  (By Ms. Rose) So did you personally ever give money to any witnesses in this case?

A.  Not that I recall, no.

Q.  Are you aware of any other BP officer that gave any money to a witness --

A.  No.

Q.  Just let me finish the question.

Are you aware of any special favors that were done for any witnesses in this case?

A.  No.

Q.  What about, are you aware of any promises that were made to any witnesses in this case?

A.  No.

Q.  Okay.  How about, do you recall in this case was there any, were there any convictions that witnesses had or open cases that witnesses had that were -- sorry.  I'm going to ask that again.



MAGNA

LEGAL SERVICES

Page 44

So in this case we have quite a few witnesses and there were a number of them that had open cases at the time. So do you recall any of those open cases being dismissed in return for their testimony?

A. Not that I recall.

Q. Was that a, was that a common thing; if someone would testify, that the police would help them get an open case dismissed?

A. No.

Q. Did you ever drive any of these witnesses to court?

A. I could have. It's 32 years ago. I just don't remember.

Q. Is that a common thing that would happen back then is that you would drive a witness to court?

A. It wasn't standard procedure. Could it have happened, yeah.

Q. Do you recall ever driving a witness to court to help them get an open case dismissed?

A. No.

Q. Are you aware of any other BPD officer that drove someone to court to get an open case dismissed?



Page 45

MR. JOHNSON: Objection. You can answer if you know.

A.  I'm aware of what I, what I did.

Q.  Okay. That's all I'm asking.

A.  I'm not aware of what everyone else did.

Q.  Okay. So let's, we're focussed on, let's say '92 when this investigation was happening. I know it went into '93, so the '92, '93 time period. I'm trying to get kind of the way things were because I know it's different now than how it used to work.

So in this case, well, let's use Junior as an example. You're familiar with Junior Williams on this case?

A.  What was that?

Q.  Do you remember Junior Williams? He was --

A.  I know the name, but do I remember him, no. He could be sitting in the room right now I wouldn't recognize him.

Q.  I guess, so generally speaking if somebody, you know, were involved in a crime or peripherally involved in a crime, would it be common for the police or the prosecutor to, you know, give them leniency or give them a deal because they



Page 46

provided testimony about a different person?

MR. JOHNSON:  Objection to the form.

A.    Your question is?

Q.    So my question is -- I can do it for this case.

So in this case Junior Williams was allegedly involved in this crime as the driver. He came and gave a few statements to the police and then was, you know, charged with a lesser crime than murder.

I'm just asking in general at this point, was that a decision that the police would make or was that the prosecutor's down the road?

MR. JOHNSON:  Objection.  If you know you can answer.

A.    Are you specifically speaking about Junior Williams or -- you used the term in general.

Q.    Yeah.  So I mean, I'm generally trying to figure out how this used to work back then, but if you want specifics.  So if you can answer it generally, great.  If you can't, I can --

A.    I can't.

Q.    I can live with it.

So in this case he was, ended up being charged with accessory before the fact and



Page 47

accessory after the fact, which in one of the e-mails it said that was a crime that was made up, but.

When you had a, you know, a witness that was also involved in a crime like Junior, would the police -- would you be the person deciding what kind of leniency they would get?

A.  We're detectives.  That's decided by district attorneys or judges.  And there's nothing common about homicides.  They're all individual.

So if you have something specific you want to ask me and I can recall it, I'd be more than happy to answer.  We don't determine outcomes.  The Court does that.

Q.  Right.  So for this case Murray was your supervisor, right?

A.  Yes.

Q.  So would he lead the investigation?

A.  Yes.  He would have been in charge.

Q.  So he would have decided, you know, when you're going to talk to a witness, who you're going to talk to?

A.  He would have been advised of it, but I mean initially you don't -- go ahead.



Page 48

Q. What I'm trying to get at is would he make kind of the schedule of we're going to talk to this witness today, or?

A. It isn't micromanaged like that in the beginning.

Q. And were you with him most of the time or was it different pairs of you?

A. Different, different pairs.

Q. Okay. Okay. Would he be the person deciding on, you know, telling you and Harris to go somewhere or you and Doyle to go somewhere?

A. It all depends on what the situation is at the time.

Q. There were quite a few photo arrays that were done in this case with different witnesses and suspects. At this point, so in 1992 had you received any, received any formal training on the proper way to do photo arrays?

A. Yeah. There's a general way to do it, the number of arrays that, the number of photos involved. You don't want to get, you know, get anything that really jumps out, you know, that could be challenged, so-to-speak.

Q. Okay. So at that point there was a standard



Page 49

number that you had to put out?

A.    I believe so.

Q.    Do you know what it was?

A.    I'm not sure.

Q.    Okay.

A.    At the time.

Q.    And then when, you were saying something that doesn't jump out.  Are you saying that, you know, the pictures you're showing had to be an array of similar looking people?

A.    Exactly.

Q.    So if you had a light skinned suspect and a dark skinned suspect, you wouldn't --

A.    I'm not going to get into color tones because computers, black and white, a number of things. I'm not getting into color tones.  You wouldn't want to put a white guy in with five minority individuals, so.  One guy without a beard with others that did, stuff like that.

Q.    Right.  That makes sense to me.

So in this case I don't know if you recall what anyone looked like.  It's my understanding that Junior Williams was a very dark skinned black man?


MAGNA
LEGAL SERVICES

Page 50

A.    I can't recall what his complexion was.

Q.    So let's say for the purpose of this question, we'll say that he -- actually, I probably have a picture of him, actually.

And it's my understanding that Ronnie Qualls is a light skinned black male.  If you had a dark skinned black male and a light skinned black male, would you put them in the same array?

A.    I'm not, I'm not going to speculate on -- I'd rather deal with a specific question you have for me on a specific array.

Q.    Okay.  In 1992 I think, I think it was a lot of Polaroids.  Does that sound familiar?

A.    I'd be guessing here.

Q.    Do you recall if the arrays that you showed people were in color?

A.    I don't recall, no.

Q.    So I'm just going to show you this.  I won't mark it yet because we may not need it, but.  So these are --

MR. JOHNSON:  I would object to that.  If you're going to show him I would ask that we mark it.



Page 51

MS. ROSE:  Sure.  That's fine.  I can mark them.  Yeah.  Let's mark 1 and 2.

(Exhibits No. 1-2 ID marked.)

Q.  Exhibit 1, so my understanding is this was used at the first trial.  It was an exhibit in the first trial.  It's a few pages of --

A.  This was what?

Q.  This was an exhibit in the first trial but it was apparently an array that was used in this case.

A.  Yeah.

Q.  One of the people in it is Ronnie Qualls.  Does that look familiar to you at all?

A.  No.  And can I ask you who compiled this array?

Q.  I got that from the file that said it was --

A.  Okay.  But I mean, I would hesitate -- when you're compiling an array there is an area where who compiled that array, who set it up.  I'd be very uncomfortable commenting on any array that was compiled by somebody else of 32 years later saying I recognize this man here.

Q.  Okay.  So you don't, you don't recall compiling that array?

A.  I don't know who compiled it.


MAGNA
LEGAL SERVICES

Page 52

Q. Okay.

A. I'd have to go to the system.

Q. Okay.

A. At least to refresh my memory if I want to comment on it.

Q. Okay.  And this one, Exhibit 2, is another array that was also an exhibit in the trial.

A. And my answer would be the same on that.

Q. Okay.

A. Who compiled it, who did it.

Q. So just not, specifically, you know, back in 1992, are these the types of pictures that would be in an array?

A. You know, for the record, the one thing I am comfortable in saying, these photos are very grainy.

Q. Yeah.

A. They're just not depicted well.

Q. Right.

A. This wouldn't be the type of arrays that would be shown.

Q. Right.

A. There would be far more clarity.

Q. Yeah.  That was kind of what I'm getting at.


MAGNA
LEGAL SERVICES

Page 53

I'm assuming they were not shown like this.  I
assume --

A.  I'm just looking at them and --

Q.  Yeah.

A.  It's just --

Q.  Well, I mean they're black and white copies
from --

A.  Yeah.

Q.  -- 30 years ago.

So when you were on the job showing an
array, and I know you don't remember the
specific arrays in this case, but would you be
showing color photos?

A.  I don't know at the time.

Q.  Okay.

A.  You know.

Q.  Would it be better quality than what --

A.  It would be safe to say.

Q.  Okay.  Definitely better quality than that.

And so if it was a case that you were
investigating, would you often put together the
arrays?

A.  No.  It all depends.  I mean that's why I'm
saying you got to realize this is 32 years ago.



Page 54

I did a number of homicides in between and a number of arrays and everything else.

So I'm 74 years old.  Sometimes I forget where my car keys are.  So I'm not going to comment on, I mean it's -- at my age I'm lucky if I can remember what I wore yesterday, never mind 32 years ago.

Q.  And I don't want you to testify to anything you don't know, but you know, some of these questions are just, you know, generalized questions that if you can answer, great.  If you can't answer them, you can't answer them.

But, so there would be something in the file that would tell us who compiled the arrays?

A.  I don't know what's in the file.  BPD records may be able to help you there.

Q.  Typically when you were in homicide there would be some way to tell who compiled it?

A.  Yeah.  You'd sign on to conduct an array.

Q.  Okay.

A.  To construct an array.

Q.  Do you remember in this case --

A.  Would you like these back?

Q.  Sure.



MAGNA
LEGAL SERVICES

Page 55

Do you remember in this case if there was a number of witnesses that were shown an array for Qualls that was shown a different array for Williams?  Do you recall if it was the same array shown each time?

A.  I do not.

MR. JOHNSON:  I will, I'm going to object to that question because I think there were quite a few different times the photo arrays were shown.  I don't think Mr. Keeler was involved in each one of those.

MS. ROSE:  Okay.

MR. JOHNSON:  So I can object to -- it's not objectionable to form.  I don't want to be --

MS. ROSE:  Yeah.

MR. JOHNSON:  There's no --

MS. ROSE:  Well, I mean he doesn't know, so.

Q.  (By Ms. Rose) So, I mean typically if you were investigating a murder where you had to, you know, show a photo array to a number of different people, would you personally use the same photo array each time or would you switch



Page 56

it up?

A.    In my head, multiple -- everything was a little bit different.  There may have been a circumstance that something changed.  So specifically on this.

Q.    Yeah.

A.    I don't know how many arrays were used in this case and who compiled them.  You'd have to go to the records to, you know, accurately determine that.

Q.    Right.  I just mean, like in general is it pretty standard to use the same set of photos for each witness or is it standard to switch it up or it depends on the person?

A.    Every situation is different.  Homicides develop differently.  So I mean, going back to SOP and guidelines, they're guidelines.

Q.    Okay.  So when you say they're guidelines, I think you were saying that they're suggestions.  They're not, like hard rules?

A.    Suggestions, yeah.

Q.    At the time were there hard rules about how you're supposed to present an array?

A.    We talked about that earlier.  I mean you're



Page 57

trying to get at a similarity in there, you know. You won't want to orchestrate something where this guy jumps out. He's got red hair and everyone else has got black hair. You know, i mean common sense should prevail.

Q. Right. Yeah. And that would be common sense to me as well, but I'm asking if there was, you know, is there a hard rule about that and if somebody wasn't doing that would they be disciplined for not doing that correctly?

A. That's in an area that's --

Q. Okay. But you don't recall any hard rules that said you need to do these arrays a certain way?

A. Well, you do arrays a certain way in how you constructed them.

Q. Okay.

A. You wouldn't -- I mean let's not get ridiculous. You don't point and say is that the guy we're talking about here.

Q. Right. So there's --

A. The standard thing would be if there's someone that we've been discussing, I'm going to show you a set of photo arrays. Tell me if you recognize anybody in here.



Page 58

Q.   Okay.  And that's generally how you would do photo arrays?

A.   That's general.  And then if they did identify somebody you would say who, the person that you identified, can you tell me why you're identifying or what he did or what you observed him doing, and then you'd have him sign the back of the photo array.

Q.   Okay.

     MS. ROSE:  All right.  I don't need any, I just need the first page of this.  So I'm going to put in the first page of this.  I think it's day 2 of the trial, first trial.

     MR. JOHNSON:  Can we just mark on --

     MS. ROSE:  I can do the first.  It's double-sided.  I'll just do these two.  All four pages I guess.  So it's got the cover sheet.

     Can we mark this as Exhibit 3.

     (Exhibit No. 3 ID marked.)

Q.   Okay. So this is Exhibit 3.  So I kept the cover page on.  It's double-sided but it is the first jury trial.  This is October 26, 1993.  It's day 2.

     So I'll let you look at that but I'm just



Page 59

going to ask you specific questions about the first comments on there.  Okay.

So the only thing that I want to ask about here is on page 3, the second page was page 3, it says "Whereupon, the proceedings were reconvened at 10:14 o'clock a.m., without the jury."

It says, "Ms. Miller:  Before we proceed, there are a few things I wanted to make sure were on the record.  I informed Mr. Moscardelli this morning that the Commonwealth is making attempts to relocate two of the witnesses in this case, Fred Monroe and Mattie Buford, who live together."

Do you recall any of the witnesses in this case being relocated?

A.  Relocated.  I don't.  I know there were concerns.

Q.  Okay.

A.  I just don't have a specific memory of it.

Q.  Okay.  So you don't recall any of the witnesses being relocated?

A.  I don't have a specific memory of that.

Q.  Okay.  Is that something that the police would



Page 60

be involved in?

A.  Commonly in these cases there's always concerns for witnesses' safety.

Q.  Okay.  Okay.  Then it goes on to say, "In addition, I would like the record to reflect that the Commonwealth has informed Mr. Moscardelli that, while the case has been pending, Ms. Buford was taken, driven by police to Roxbury District Court where she removed a default and Mr. Fred Monroe was driven to Boston Municipal Court where he removed a default."
     Does that refresh your memory at all about any witnesses?

A.  No.

Q.  Okay.  You don't recall driving anyone to court?

A.  No.

Q.  That wasn't common for you to do?

A.  What?

Q.  Was that a common thing that you would do?

A.  Commonly what?

Q.  So --

A.  Remove a default?

Q.  Well, driving a witness to court to remove a default.



Page 61

A.   It could have occurred.  I mean it just, you --
because as you well know, you wouldn't want
someone appearing in a courtroom with a default
on them.  So if you removed a default with a
further promise to appear, that could have been
done.

Q.   Okay.  Why wouldn't you want someone appearing
in court with a default?

A.   Because they'd be subject to arrest, right, if
you have a default in front of you in the court.
But on the other hand, if someone's going to
testify and you know there was a default, that
would be just a procedural matter where you'd
come into the court, be recognized by the Court,
and agree to appear in a future date.

Q.   Okay.  Okay.  So removing the default just means
that the default is removed.  It doesn't dismiss
the whole case?

A.   Well, it is -- I'm reading what it says.

Q.   Yes.

A.   A default was removed.  There was nothing about
a dismissal in there.

Q.   Right.  So at this point we're just talking
about driving someone to court and removing a



Page 62

default, but you don't have any memory of that?

A.   No.

Q.   Okay.  That's all I had about that one.

Do you remember Officer Perez and Harden?

A.   Not off the top of my head.

Q.   Okay.  Would it help if I could give you a first name?

A.   Go ahead.

Q.   I'll find it and figure it out.

What about Driscoll or Silva for a photographer?

A.   No.  No.

Q.   Okay.  What do you remember about this case?  Do you remember responding to the scene?

A.   I don't think I went to the scene.  I think I might have went to the hospital.

Q.   Okay.  Do you remember when you, how you were first notified about it?

A.   Through operations.

Q.   Okay.  And where did you go from there?

A.   I think I went to the hospital.

Q.   Okay.  And that's, it was Boston City Hospital at the time?

A.   Yes.


MAGNA
LEGAL SERVICES

Page 63

Q.   Now it's BMC?

A.   Yes.

Q.   Okay.  What did you do at the hospital?

A.   I remember seeing the Geo Tracker in the circle there.  I remember it because it was shot up.

Q.   Okay.

A.   I remember meeting with Donna Carrington.

Q.   At the hospital?

A.   Yeah.

Q.   Okay.  Anything else?

A.   I remember learning that one man had passed away.

Q.   Did you learn that the other man was still in surgery, or?

A.   I don't recall.  I know ultimately that they both died.

Q.   Okay.

A.   I just don't remember the specifics or the timeframe of it.

Q.   But you were aware there were two victims?

A.   I later became aware of that, yes.

Q.   Were you aware there was two people shot?

A.   Yes.

Q.   Okay.  And do you recall what you and Donna


MAGNA
LEGAL SERVICES

Page 64

talked about, what the conversation was?

A.   What the conversation was?

Q.   Yeah.

A.   Donna was distraught.

Q.   Okay.  Sorry.  When you showed up and the Geo Tracker was outside, was it taped off or was it just there?

A.   I don't recall that specifically.

Q.   Okay.  And who went with you to the --

A.   I was by myself there.

Q.   Okay.  Do you know where any of your other partners were?

A.   Specifically, no.

Q.   Okay.  But they would have been working that night?  Were they working that night; do you recall?

A.   Yes.

Q.   Okay.  Okay.  So you talked to Donna.  Did you ask Donna questions?

A.   Yes.

Q.   What did you ask Donna?

A.   I have no memory of what I asked her.

Q.   Do you know what she said to you?

A.   No.



Page 65

Q. Okay. And what did you do next after that?

A. Well, after the hospital I can't recall specifically what I did. You know, I can't recall whether I requested transportation for individuals. Could have been. I just don't recall.

Q. Okay. Do you recall talking to anybody else at the hospital?

A. I do not.

Q. Okay. Do you recall any other officers or detectives?

A. I do not.

Q. Okay. What's the next thing you recall in this case? All right. I'll take you through this. I know it's a long time ago.

Did you, did you check out the, you know, go look inside the Geo Tracker when it was at the hospital?

A. I just don't recall what I did.

Q. Okay.

A. I mean I very well could have. I don't recall it.

Q. Okay. Do you know if you ever went to the scene?



**MAGNA**
LEGAL SERVICES

Page 66

A.   I think I may have.  I just don't have specific recollection and I don't want to say I did when I don't --

Q.   Yep.

A.   -- have exact memory.

Q.   Do you remember Officer Clifton Haynes?

A.   I know the name.

Q.   Okay.

A.   I don't --

Q.   Do you recall him directly?

A.   No.

Q.   Okay.  So it's our understanding from the file that Officer Haynes responded to the scene and that he ran into one of the victims coming in from inside an apartment on Harrison Ave.  He was bleeding from the right side and he told Haynes that he was shot by someone named Junior.

     Do you recall hearing that in this case?

A.   No.

     MS. ROSE:  Okay.  I'm going to try to find a better copy of this because I wrote on this one and I know there's, like a real copy of it and I want to put it in, but.

     (Attorney Gemba enters the deposition.)


MAGNA
LEGAL SERVICES

Page 67

MS. ROSE:  All right.  So this is 3558 for you.

MR. JOHNSON:  What was that?  I'm sorry.

MS. ROSE:  Sorry.  I don't have a bigger copy of it.

MR. JOHNSON:  What is it?

MS. ROSE:  So it's the, it's Osgood and Haynes.

MR. JOHNSON:  What's the Bates number?

MS. ROSE:  Yeah.  3559 and 3558.

(Exhibit No. 4 ID marked.)

Q.  (By Ms. Rose) Unfortunately these are small versions of this.  One of the people that was involved in investigating was Sergeant Kenneth Taylor.  Do you remember Sergeant Taylor?

A.  Sergeant who?

Q.  Kenneth Taylor.

A.  Yeah.  He was a patrol supervisor over in Roxbury.

Q.  Okay.  What about Michael Osgood?

A.  No idea.

Q.  And then Clifton Haynes I think --

A.  He was a patrolman over there.

Q.  Okay.  So I'm going to have you look at this.



Page 68

The one in the corner here is, the bottom of it says 3558.  It's signed by Osgood.  And then on the other side it's 3559.  It's signed by Clifton Haynes.

You can read that one and the other one.

A. I regret I didn't bring my glasses.

Q. I can show it to you on a screen if that's easier.

A. Okay.  Good.

Q. Because we have so many documents I've been printing them like that.

A. I left home this morning without my phone and my glasses were attached to the back.

So who authored this report here?

Q. So one is Osgood and one is Haynes.  I'll put it up.

A. I have no recollection of Osgood.

Q. Okay.

A. Or Haynes.  But your question to me about their report?

Q. Yeah.  Just, eventually it mentions you and talking to you about it.  So you know, in general when officers would go and, well, actually, let's stay in this case.



Page 69

You know, Haynes responded to the scene, talked to one of the victims and a few other people.  Do you recall him coming to talk to you about those conversations?

A.    No, I do not.

Q.    Okay.  Would you have reviewed his notes or anything he wrote about those interactions?

MR. JOHNSON:  Objection.  You can answer if you know.

A.    I could have.  I don't have any specific memory of it.

Q.    Okay.  You know, typically when you're investigating a homicide would it be important to check in with either the officers or look over their notes?

A.    These are referred to as Form 26s.  If an officer responds to a scene they would make out a report on what they did.

Q.    Okay.

A.    Typically would you see it, yes.

Q.    Okay.

A.    Do I have a specific memory of this 32 years ago, I do not.

Q.    Okay.  All right.  So this is a bigger version



Page 70

here of the first one which is 3558.

MR. JOHNSON:  So, sorry.  Go ahead.  Just for the record I'll object to showing things on the screen that can't be marked exhibits.  I can't stop you from showing it to him.  I just want to note my objection.

MS. ROSE:  Okay.

MR. JOHNSON:  So if we can just identify everything that you show by Bates number.

MS. ROSE:  I will identify by Bates number but, like, all right.  Yeah.  I mean I can read it all in, too.

Q.  All right.  So that I'm going to have you follow along with 3588.  I'm going to read it in because it's on Exhibit 4.  I just want to make we're looking at the same exact thing.

This says to Deputy Superintendent Pervis Ryans, Commander Area B, and it says from P.O. Michael J. Osgood.  Then subject is homicide at 1111 Harrison Ave.

It says, "Sir, I respectfully submit that on 10/3/92 while assigned to the B103A car with P.O. Clifton R. Haynes, ID 10541, responded to a call with the B637 and 638A for a report of a


MAGNA
LEGAL SERVICES

Page 71

woman screaming someone was shot at 1111 Harrison Ave.

"On arrival with Officer Haynes I observed two unidentified females screaming that someone was shot.  At this time Officer Haynes and myself observed a black male walking out of 1111 Harrison Ave. bleeding from his right side stating that he had been shot.

"Officer Haynes at this time attempted to gather information on the incident while I attempted to ascertain the location of the crime scene.  The information gathered by Officer Haynes was turned over to the B637 and 638A."

Did I read that all correctly?

A.   Your question is what?

Q.   Did I read that correctly?

A.   A little hard time even seeing that.  I'm not going to dispute it, how you read it.

MS. ROSE:  Well, if he can't read anything directly in front of him then --

A.   Do you have -- I can see following along what you said there.

Q.   I'm just saying it because he's objecting to --

A.   No.  I can see what you read there.  And your


MAGNA
LEGAL SERVICES

Page 72

question for me is what?

Q. My question is did I read it correctly, because I'm reading it into the record.

A. Yes.

Q. I did. Okay. Do you recall seeing this report from Officer Osgood?

A. I don't have a direct recollection of that.

Q. Okay. Is it typical that you would review the Form 26s on a murder that you investigated?

A. Yes.

Q. Okay. The next one is also on the backside of Exhibit 4. And that is, actually, I can ask you if this is another Form 26.

So looking at this, it's Bates number 3559.

A. Whose this one?

Q. Is that another Form 26?

A. Yes.

Q. Okay. And this one is from Clifton Haynes?

A. Yeah.

Q. And the date is 10/3/92 and the area is B2. It says at the top, to Deputy Superintendent Pervis Ryans, Commander Area B, from P.O. Clifton R. Haynes. Subject, homicide, 1111 Harrison Ave.,



Roxbury.

It says, "Sir, I respectfully submit that on Saturday, 10/3/92 at about 2:19 a.m. Officer Osgood and myself in unit B103A responded to a radio call at 1111 Harrison Ave. to assist the B637 and 638A for someone shot in the hallway.

"On arriving at the scene I observed two unidentified females screaming that someone was shot.  I observed a black male walking from inside 1111 Harrison Ave. bleeding from the right side.  He stated that he was shot by a guy named Junior who was the passenger of a black Escort.  He also stated that Junior lives in Columbia Point.

"I also spoke to a Jackie Greer who lives at 1106 Harrison Ave, apartment 10, ph number 442-7326.  She stated that she heard about four or five shots and when she looked outside she observed Tony on the sidewalk in a red and white Jeep pulling off.

"Also I tried to interview a Leroy Holmes who might have been the operator of the Jeep, about six-four with a purple and black coat and dark pants.  Address unknown at this time."


MAGNA
LEGAL SERVICES

Page 74

Did I read that all correctly?

A.   Yeah.

Q.   Do you recall seeing this document?

A.   I may have.  I don't have specific recollection.

Q.   Okay.  And so in this one it talks about one of the victims identifying the person that had shot them?

A.   Yes.

Q.   Okay.  Would that be something that you would think is important for you to know in your investigation?

A.   Yes.

Q.   Okay.  Do you recall hearing that in this investigation?

A.   I don't recall it, no.

Q.   Why would that be important for you to know?

A.   Well, you get the information provided to you by a witness, it's something you'd look into.

Q.   Okay.  Do you recall looking into that?

A.   I don't have a specific recollection of it.

Q.   Okay.  Do you have a specific recollection of when you first started to look at Ronnie Qualls as a suspect in this case?

A.   No.


MAGNA
LEGAL SERVICES

Page 75

Q.   Do you recall what evidence there was to make you look in his direction?

A.   Well, in any case it's the totality of the evidence that leads to it.

Q.   Okay.  Do you recall talking to Junior Williams about this case?

A.   I don't.

MS. ROSE:  Okay.  This one's a, actually a better copy.  I can put this in.  This is 3559.

Can I put this in as Exhibit 5.

(Exhibit No. 5 ID marked.)

Q.   So I'm, we don't need to go over this again but I just wanted to show you this, Exhibit 5, but it's actually --

A.   Thank you.

Q.   So it's, the Bates number is 3559 which we just went over on the backside of Exhibit 4.

MR. JOHNSON:  3559, that was Officer Haynes?

MS. ROSE:  Yeah.  The Haynes report.  But I just wanted to make it in there.  It's bigger and you can read it.

Q.   Do you remember talking to a witness in this



case named Leroyal Holmes?

A.   Yes.

Q.   Okay.  What do you recall about him?

A.   I don't recall the specifics on him.  The name comes to mind on Leroyal.

Q.   Okay.

A.   He was a witness to the shooting, I believe.

Q.   Yeah.  I will put this whole thing in as Exhibit 6.

(Exhibit No. 6 ID marked.)

MR. JOHNSON:  Can I see it?

MS. ROSE:  Yep.  I think we put all these in on Holmes the other day.

MR. JOHNSON:  Okay.  So this is all going to be Exhibit 7?

MS. ROSE:  Yeah.  I think can do it --

MR. JOHNSON:  No.  I don't mind.

MS. ROSE:  It's just easier.  It's one packet.

MR. JOHNSON:  This is the Harris report and then the photo ID, right?

MS. ROSE:  Yeah.  Yeah.

(Exhibits No. 7-8 ID marked.)

Q.   (By Ms. Rose) All right.  So for the first thing



Page 77

that, I marked this as Exhibit 6.

A.   I think you did 5 first.

Q.   Oh, yeah.  I did 5 first.  This was just a repeat of 4.

A.   Okay.

Q.   I just want a bigger copy in case you need to go over it.

So 6 --

A.   6.

Q.   6 is, my understanding is this is a statement from Leroyal Holmes that was conducted by you and Dennis Harris?

A.   Yeah.

Q.   Does that seem accurate?

A.   Yeah.

Q.   Do you remember this?

A.   No.

Q.   Okay.  So this, at the top it says October 3, 1992, 7 a.m.  So it's my understanding that the shooting happened in the early morning hours, 2 a.m.-ish?

A.   Yeah.

Q.   And then, you know, Junior and Leroyal were brought back to the station.  Do you recall



MAGNA
LEGAL SERVICES

Page 78

having them at the station for a certain period of time before the questioning started?

A.  No.

Q.  Was that typical that that would happen?

A.  Typical of what?

Q.  That there would be, you know, hours where a witness would be waiting?

A.  No homicide is typical.

Q.  Okay.

A.  Every homicide is different.

Q.  Okay.  So when there's a homicide, do you think it's important to get statements from people right away?

        MR. JOHNSON:  Objection to the form, but you can answer.

A.  You always see statements from witnesses, you know, but there are so many outside factors that interfere.  To have a specific timeline on it is unrealistic.

Q.  Right.  Do you recall in this case there being time periods where, you know, a lag from when someone was brought into the station versus when their statement was taken?

A.  I don't recall the statement, never mind the



MAGNA

LEGAL SERVICES

time periods.

Q.    Right.

A.    I mean, listen, you had two men murdered.  It was, it was horrific.  It was tragic.  You know, the emotions are frayed at something like this.

Q.    Right.

A.    I mean if you're taking Williams, you don't put him in the same basket that you put Leroyal Holmes in.

Q.    What does that mean?

A.    Well, you've got a possible suspect and you've got a witness.

Q.    Right.  So you wouldn't want them in the same room?

A.    Absolutely not.

Q.    Would it surprise you that he testified that he was in the same room with him?

A.    That who testified?

Q.    That Leroyal Holmes testified to that.

A.    Room.  Let's put it this way.  Homicide was a big open space with cubicles divided everywhere.  Okay.  So the same room, yeah.

Q.    Okay.

A.    Okay.



Page 80

Q. So when you say you wouldn't put them in the same basket, what do you mean by that?

A. Well, because the situation at the time as I understand it, didn't Junior Williams plead out to being an accessory or was convicted on that?

Q. Yes.

A. Well, that speaks for itself.  Leroyal Holmes is a witness, isn't he?

Q. Yep.

A. Didn't he identify your client?

Q. Eventually, yeah.

A. Yeah.  Well, I mean there's a difference there.

Q. Yeah.  No.  I agree.

A. There's a different basket.

Q. I agree.  I wouldn't want them together.  That's why I was surprised because he testified that he was with Junior before he was questioned, but.
     So do you remember questioning Leroyal Holmes at all in this case?

A. I don't have a specific memory but this tape will speak for itself.

Q. Okay.  Do you recall talking to him before the tape was turned on?

A. I do not.



Page 81

Q. Okay. Is that typically something that would happen?

A. What?

Q. Typically would that happen, would you be talking to somebody before you start recording?

A. Yes.

Q. And why would that happen?

A. Well, in any homicide, on any homicide I've dealt with, they're not coming through the door saying I can't wait to talk to you about what happened. There's all of the roadmaps. There's fear. Typically most homicides people do not want to get involved.

So you got to, you know, assure them of different things. Safety. What are their concerns. We try to deal with them. They're all different. So typically before going on tape, yes, you talk to them.

Q. Okay. Do you recall in this case, well, with Leroyal Holmes did you talk to him and try to make him feel safe or make him feel like he should talk?

A. That would be normal. Just witnessed two people murdered.



Page 82

Q.   And if he was a witness, you couldn't hold him there, right?

A.   Correct.  He wasn't under arrest.

Q.   Okay.  You couldn't have made him stay there until 7 a.m.?

A.   I would think not.

Q.   Okay.  Do you have any recollection of whether he was willing to give a statement?  Unwilling to give a statement?

A.   Well, I mean the statement speaks for itself. Is there anything there that says I was held here against my will?

Q.   No.  No.

A.   Okay.  See.

Q.   I'm not saying that.  I'm really getting at kind of the time period of when, you know, there's quite a big gap between when he was brought in till the statement was taken, so.

A.   So you've got people being treated.  People murdered.  You've got cars.  You've got evidence.  You've got detectives, you know, dealing with multiple issues.

Q.   Okay.

A.   Those, those things can't wait.  They have to be


MAGNA
LEGAL SERVICES

Page 83

dealt with, you know, on a timely fashion.  And you know, witnesses or percipient witness, whatever it might be, are back at homicide.

Q.   When you have -- in this case you have a witness Leroyal and you have a suspect Junior.  You would want to keep them separate, right?

A.   Yes.

Q.   And would you think that Leroyal would feel intimidated if he knew that Junior was there?

A.   Would I think what?

Q.   If Leroyal would feel intimidated knowing Junior was there?

MR. JOHNSON:  Objection as to how he felt.  You can answer.

A.   That's objective.  I don't know what was in Leroyal's head.

Q.   Right.  But, I mean you know why you would want to keep them separated?

A.   Yeah.

Q.   Because he might be scared of him?

A.   Well, you're saying that.  I said I don't know what is in his head was my answer.

Q.   Right.  Well, why would you want to keep them separated then?



Page 84

A.   Well, you want to keep them separate because one person's a witness and the other person's possibly a suspect.

Q.   Right.  So is that to make sure their testimony is independent?

A.   There are a myriad of reasons.

Q.   I mean --

A.   Most driven by common sense why you would want to keep them separate.

Q.   Right.  And my common sense would say he might be afraid of someone if he saw them murder somebody.

        MR. JOHNSON:  Objection.

A.   I can't argue with that.

Q.   Yeah.  I'm not asking you to specifically say what was in his head, but as an officer there's reasons why you do certain things, and it is kind of common sense.

A.   Yeah.  Yeah.

Q.   Okay.  So common sense says you don't want to put --

A.   No.

Q.   -- a witness to a murder with the person that potentially murdered someone?


MAGNA
LEGAL SERVICES

Page 85

A.  Yes.

Q.  Okay.  And do you recall, I mean we can go through it, but I mean, he doesn't give Ronnie's name in this statement.  Do you recall, do you recall after this interview if you knew who Ronnie was, or?

A.  Who what?

Q.  Ronnie Qualls was.

A.  Well, eventually he became identified as our suspect.

Q.  Okay.  Did you show Leroyal any photos on 10/3 when you first brought him in?

A.  Does this reflect, does this statement reflect photos being shown?

Q.  No photos.

A.  Okay.  Then I will go by the statement.

Q.  Okay.  And the next one is Number 7.  Exhibit 7 is when you did show -- or that's 7, right.  When photos were shown to Leroyal on 10/5, two days after he was questioned.  I believe it was you, Harris and Murray that were there?

A.  Yep.

Q.  Okay.  Do you recall that at all?

A.  I don't recall it, but I'll go by this report.



Page 86

Q. Okay. So if you want to take a minute to review that and I might ask you some questions about it.

A. Go ahead.

Q. Okay. So do you remember going to meet Leroyal Holmes at his house?

A. I'll go by the report.

Q. So you did meet him at his house?

A. Yeah.

Q. Or at a house. Not at the station.

Okay. And do you know why there was a photo array of Ronnie Qualls shown to him at this point?

MR. JOHNSON: Objection.

A. I don't have a direct recollection of it.

Q. Okay. Because we covered in Exhibit 5 that Clifton Haynes had stated that one of the victims said a guy named Junior had shot him.

Is there a reason why you wouldn't have done a photo array of Junior at that time?

A. Well --

MR. JOHNSON: Objection. Sorry. Let me just object to the fact that you're asking why this witness didn't do a photo array, but I



Page 87

think the photo array was done by somebody else, wasn't it?

MS. ROSE:  Not till Junior, not until 1993.  No.  It says photos were shown by all three of them.

MR. JOHNSON:  Okay.  Never mind.

MS. ROSE:  Okay.  Yeah.  He was there for that one.

Q.  (By Ms. Rose) Do you have a memory of who actually laid the photos down at this point?

A.  Do I have a memory of what?

Q.  Of actually, I mean it was you, Harris and Murray according to the report.  Do you know who actually put the photos down?

A.  No.

Q.  Okay.  Neither do I, so.  But you were there for it.

A.  Yes.

Q.  According to the report.

So do you know why there was only a photo array of Ronnie Qualls shown and not a photo array of Junior Williams?

A.  I do not.  I would suggest to you that it's an evolving situation in any homicide.  So they had



MAGNA
LEGAL SERVICES

Page 88

the information developed along the scene, along the time line that reflected to it.

I would make note of the fact that Clifton Haynes' report is an initial report where you get names, you gather evidence, you compile evidence. And that, if you would, one thing in a lot of cases leads to another.

Q. Right.

A. You know, and I think this report here that I have in my hand which is 7 kind of chronologically states what Holmes said and what Holmes developed, and crucially in the end asked who is this man, who do you identify him as, and he ended up identifying him as the man who pointed the weapon at him. He identifies him as the man he saw outside the car shooting into the car.

Q. Right.

A. Okay. And my understanding is that it leads to this interview with Leroyal Holmes. He doesn't identify Williams as the shooter. He clearly identifies your client.

Q. But he didn't, he wasn't shown any photos of Junior.


MAGNA
LEGAL SERVICES

Page 89

A. Well, as I said in this here, there's no, there's no further evidence other than what Clifton Haynes says in the very initial report, a timely report from the scene. Raw evidence. Raw that Williams, who I believe was driving the car, right? Isn't that what the evidence shows? Isn't that what he pled out to?

Q. He pled out to accessory before and after, but there are conflicting reports that he was driving, but, yeah. Generally that's what they presented at trial.

But I mean, the statement is coming from the victim. The victim knew Junior Williams. He was familiar with him. He knew who he was. It wasn't like a stranger. He gave some very specific details. He lives in Columbia Point. His sister lives at Ruggles.

A. And the statement is given within an hour of his death.

Q. Before he died.

A. An hour of his death, I mean.

Q. So I mean, there's reasons why those hearsay statements come in, dying declaration comes in, because it tends to be more truthful.



Page 90

MR. JOHNSON:  Objection to it not being a question.

MS. ROSE:  It's not a question, but.

MR. JOHNSON:  Okay.

MS. ROSE:  Just explaining.

A.  I'm not a lawyer.  I'll defer to all the lawyers in the room.

Q.  Right.  But would you think that, you know, an eyewitness identification from the victim who knows the shooter would be kind of a strong piece of evidence?

A.  On any homicide case, which they're all different, you deal with the totality of the evidence.

Q.  Right.

A.  Somebody may say something.  Someone may see something.

Q.  Right.

A.  I mean there are many things that deal with. That's why you don't jump right away.  That's why you do it.

And I think the evidence in this case clearly showed that your client was convicted of a double homicide, and to this day he stands a



Page 91

convicted felon of a double homicide.  To this day.

Q.  I don't think so.

A.  Oh.  I -- absolutely he does.  There was never a retrial.

Q.  No.  It got vacated.

A.  What?

Q.  It got vacated.

A.  Vacated by a woke DA who became a U.S. attorney and had to resign in disgrace.  Let's be honest here.

Q.  It was vacated by a judge.

MR. JOHNSON:  I'm going to object and ask questions and answer them instead of having an argument.

MS. ROSE:  No.  I'm not going to argue about it.  I'm just informing him because it wasn't -- it doesn't matter.

MR. JOHNSON:  It doesn't matter.  We're in a deposition.  Can we please ask questions and have them answered and not argue with each other.

MS. ROSE:  I'm not arguing.  He was giving me information.  I was correcting it.



Page 92

Q.   (By Ms. Rose) So what I'm asking is it seemed like totality of the circumstances.  I get what you're saying.

Wouldn't it make more sense to show a photo array of Qualls and then a photo array of Junior who is potentially a suspect, and then let's say Leroyal Holmes kicks him out?  That would be better for you, right?

A.   I don't agree with that.

Q.   Okay.  Can you explain it?

A.   Well, it's the totality of the evidence, counsel.  It's, raw information is given at the scene but it's what's developed afterwards on interviews.

Q.   Well, why wouldn't you show a photo array of a potential suspect?

A.   Let me, let me say this to you.  I'll go by factual.  We know what occurred.

Q.   Yes.

A.   Williams was convicted, pled out, whatever the case may be to an accessory to the crime. Ronnie Qualls was convicted of the shooting. Okay.  So that's, it speaks for itself.

Why didn't we show it at the time.



Page 93

Evidence was switching.  You know, it was more developed.  Clifton Haynes is within minutes of what happened.  You know, so it all --

Q.  Right.

A.  It's a flowing situation.

Q.  Are you aware of any statements from the victim taking back his statement that it was Junior?

A.  Which victim is that?

Q.  The victim that stated it was Junior.  The other victim I think never --

A.  He couldn't take it back.  He died.

Q.  Right.  So, I mean I don't know what developed on that front.  I mean what developed to make you think that that wasn't true?

A.  That it wasn't Junior?

Q.  Yeah.  That it wasn't Junior.

A.  Well, I mean eyewitnesses to the crime.

Q.  Okay.

A.  That's what developed.

Q.  But the eyewitnesses weren't shown photos of Junior.

A.  It's, the case proceeded.  My understanding is that, that Qualls became more of a focus on it.  Okay.  Eyewitness identified him as the shooter.


MAGNA
LEGAL SERVICES

Page 94

Q.   Right.  What I'm asking is why did Qualls become more of a focus and --

A.   My answer would be because of the witnesses that developed.

Q.   Right.  But those witnesses were only shown Qualls' picture.

A.   Yes.  Because Williams is, my understanding as it developed, Williams I think made statements.

Q.   He did, yeah.  But he's, he's an accessory.  So I mean it's very possible that an accessory might not be totally truthful about it.

A.   Well, I would, I would go by my limited understanding now of what happened.  Didn't Williams, did he plead out?  Was there a trial?  I'm not sure what occurred there.  But his, he -- didn't he do time for this by his action in it?

Q.   Yeah.  But not life.  It's very different than a murder conviction, right?

     MR. JOHNSON:  Objection.

A.   Well, it is, because in one situation there's a shooter.  In another condition it may be a driver.

Q.   Right.  But you understand that there's a, you


MAGNA
LEGAL SERVICES

Page 95

know, there's joint venture.  There's different ways that they could plead it.

MR. JOHNSON:  I'm going to object to the relevance of all of this.

A.   I'm not going to debate with you.  If you have a specific question -- I answered your question as to the best of my ability at this time.

Q.   Right.  So do you recall questioning Junior Williams at all?

A.   I do not.

Q.   Okay.  I'm going to represent to you that there were three different statements that Junior Williams gave and he did not testify at trial. And his statements vary quite a bit.

So in your experience as a homicide detective, what --

MS. ROSE:  Actually, strike that.

Q.   Actually, you know what, let's go over this.

A.   Do you need this?

Q.   We can just put all the marked ones --

A.   Okay.  Thank you.

Q.   This is marked.  So this is Exhibit Number 8, and staple this.  It is, I will let you review it, but another photo array that was shown to



Page 96

Leroyal Holmes on 6/29/93, and you're listed as one of the investigators but I don't believe you were there, but you can tell me once you reviewed this if that was something you were present for or not.

A.    I just go to the first statement.  I wasn't there.

Q.    Okay.  Perfect.

Do you recall in this case when witnesses were going to be shown photos of Junior Williams?

A.    I do not.

Q.    Okay.  Do you have any idea why they would be shown pictures of Junior Williams this far after the --

A.    I do not.

Q.    Okay.  And this was done at 11 p.m. at a house of detention.  Is that typical, that officers would go to do that that late in a --

A.    Everything's different in a homicide case.  I just note that they're not detectives.

Q.    Do you have any idea, this isn't -- I thought of this specifically the other day.  So it says a house of detention located on Somerset Street,



Page 97

but then it mentions the Nashua Street Jail.
Are those different or were they the same?

A.   I'm not sure.

Q.   You don't remember?  Nashua Street Jail is the one that's still there, right?

A.   Yes.

Q.   Overlooking the water?

A.   Yes.  Lovely view.

Q.   Nice.

          MS. ROSE:  I guess I'll put these in separately, the Junior statements.

               (Exhibit No. 9 ID marked.)

Q.   So this is Exhibit 9.  It is the first statement from Junior Williams.  It was Saturday, October 3, 1992 at 11:07 a.m.

          And it says conducting this interview is Detective Dennis Harris, Boston police homicide unit.  Present is Lieutenant Detective Timothy Murray.

          So I'm guessing you were not present for that one?

A.   If it says.

Q.   If it says that you weren't present for that, and then Dennis Harris.



Page 98

It talked about the fact that he filled out a Miranda form at 5 a.m.  In your experience is that typical, that they fill out a Miranda form at 5 a.m. and then get questioned at 11 a.m.?

A.  There's nothing typical about a homicide.  I wasn't there for it, so.

Q.  Okay.

A.  I wouldn't be able to address it.

Q.  Okay.  All right.  This is statement number 2 that you were present for, and that will be Exhibit 10.

(Exhibit No. 10 ID marked.)

MS. ROSE:  This is 11.

(Exhibit No. 11 ID marked.)

Q.  That one you were also present for, according to the record.

So do you recall taking any statements from Junior Williams?

A.  No.

Q.  Okay.  Would you have reviewed the first statement if you were going to take the second and third?

A.  I could have.



Q. Okay.  Do you know why there were multiple statements taken?

A. A lot of times in homicides people aren't truthful.

Q. Okay.

A. As evidence evolves there may be evidence that would contradict a statement.

Q. Right.  I think that's a lot of what happened in Junior's statements here.

So how do you determine who's being truthful, when they're truthful, when they're not truthful?

A. I don't think there's any way of accurately determining that.

Q. Okay.

A. You might develop evidence that's contradictory to what they're saying.

Q. Right.

A. Maybe you confront them with that as it goes along.

Q. Okay.  You know, as you got the second statement and the third statement, there's conflicting information.  Is that something that would concern you?



Page 100

A.    Well, yeah.  From first to second to third.
Normally people don't gravitate to situations
that are going to place them in jail.

Q.    Right.  And they wouldn't actively want to tell
you things that would put them in jail?

A.    There's no Mensa society meetings in the
jailhouses.

Q.    That's probably true.

Okay.  Do you know if you had ever dealt
with Junior prior to?

A.    Not that I recall.

Q.    Okay.  I believe there was testimony that you
had, I don't know if you were a patrolman or a
detective in Charlestown at any point?

A.    Yeah.  I worked over there for a little while.

Q.    Were you ever familiar with -- there was a
murder in 1988.  It was, Paul Mahoney was the
victim and one of the Price brothers was the
offender?

A.    No.

Q.    Okay.

A.    I wouldn't have -- I would have been in Roxbury
at that time.

Q.    Okay.  Do you recall there being inconsistencies


MAGNA
LEGAL SERVICES

between the different witnesses' statements in this case?

A. No, not specifically.

Q. Okay. Would that be something that would concern you in general in an investigation?

A. Well, you always get different statements. As I said, you know, there's a, there's an overwhelming reluctance to cooperate in a homicide investigation.

Q. Throughout this investigation there was, you know, quite a few witnesses that knew each other. Would you ever instruct those kind of witnesses not to talk to each other about a case or not to hang out together?

MR. JOHNSON: Objection to "kind of."

A. I don't have a specific recollection of that.

(Recess taken.)

(Exhibits No. 12-13 ID marked.)

Q. (By Ms. Rose) So 12, this is, it's a report to Timothy Murray from Officers Perez and Officer Harden. So if you could take a look through



that, that would be great.

            MS. ROSE:  I think it's in yours as 3560.

            MR. JOHNSON:  Okay.

Q.  All right.  So we can put this -- basically what I want to focus on is was this a Form 26, what you were talking about before?

A.  Can I see the author, please.

Q.  Yep.

A.  Go ahead.

Q.  Okay.  Do you know if this is Form 26?

A.  It's not your traditional 26.  It looks like it's something to Murray.

Q.  Okay.  Is there a name for this kind of report?

A.  No.

Q.  Okay.  But it's to Murray from Officers Perez and Officer Harden.  I think you said you don't remember them?

A.  No, I don't.

Q.  Okay.  But it looks like, based on what they're saying, that they had responded to the scene initially, yes?

A.  Yes.

Q.  And it says Mr. Price was suffering from a gunshot wound to the right side of the chest.


MAGNA
LEGAL SERVICES

Mr. R. Price stated to the above officers that he was shot by a man named Junior who drives a blue Ford Escort that lives in Columbia Point and has a sister who lives on Ruggles Street.

So this looks like he, you know, this victim said this to Officers Perez and Officer Harden.  Is that what your understanding of this report is?

A.   That's what the report states.

Q.   So that would be different than the report we went over earlier.  There was --

A.   Which report is that?

Q.   The report, it was Exhibit 5.  That was a report of Clifton Haynes.

A.   Yeah.

Q.   Where Clifton Haynes said this victim told him that he had been shot by someone named Junior who lives in Columbia Point.

So you have, according to these reports, Clifton Haynes and Officers Perez and Officer Harden all saying the same thing, right?

A.   Correct.

Q.   Okay.  Would that be an important information for you to know as you go forward in this



investigation?

A.  Those are reports that would go into the totality of the evidence.

Q.  Right.

A.  And in all of these situations you go where the evidence takes you.

Q.  Right.

A.  Its twists and turns.

Q.  So this is -- I assume that you trust what your fellow officers were saying, right?

MR. JOHNSON:  Objection.

A.  I would emphasize to you that this is the very initial stages of the investigation.

Q.  Right.  All I'm saying is that these reports are consistent with each other, right?

A.  Yes.

Q.  And you wouldn't have any reason to think that they weren't accurately stating what they heard, right?

A.  No.

Q.  Okay.  So when you have officers that are giving reports that are corroborating each other, would you find those to be, you know, pretty reliable reports?



A.    I'm not disputing what's said there.

Q.    Okay.  And you're not disputing that they heard what they're saying they heard?

A.    No.

Q.    The next one is Exhibit 13.

            MS. ROSE:  This is for you.  But there's some of my markings on it, too, but I didn't want to give him the tiny version.

A.    Your question is?

Q.    Yes.  So my question on this is -- so this is, so there's an initial date of October 3, 1992 and then another date of October 13th.  Do you know what those two dates are?

A.    What those two dates are?

Q.    Yeah.

A.    Well, the initial part of it appears to be the responding DAs on the night of the incident.

Q.    Okay.

A.    Okay.

Q.    And then date, would this October 13th date be the date that this was written?

A.    Oh.  I don't know.  I didn't author that report.

Q.    Okay.

A.    I don't know when it was written.



Page 106

Q.   Okay.  It says date of incident's 10/3, and it's obviously, you know, it's about this murder, right?

A.   Yes.

Q.   It's about this case?  Okay.  So what I want to point you to is, it's again from --

A.   It's from William O'Brien.  It's an interoffice memo.

Q.   Okay.  So this is describing, so this is the ADA O'Brien saying I spoke to Officer Haynes who said that upon arriving at the scene he encountered a black male coming from inside.  He writes 111 Harrison but I believe it's the 1111 in the other reports.  Bleeding from the right side.

He told P.O. Haynes that he was shot by someone named Junior who was a passenger in a black Escort.  Victim Roosevelt Price also said that Junior is from Columbia Point.

Officer Haynes also spoke to Jackie Greer who stated that she heard about four or five shots.  Looked outside and saw Tony on the sidewalk in a red and white Jeep pulling off.

And then it says on October 5, 1992 I



Page 107

spoke to Sergeant Dan Keeler who informed me that it was at, that it was ascertained that Junior was someone named Jimmy Williams.

Do you remember talking to the ADA?

A.  No, I don't.

Q.  Do you know if, does Junior Williams and Jimmy Williams mean the same thing to you?

A.  I don't recall that.

Q.  Okay.  And then it says, he also told me that the shooter is believed to be Ronnie Qualls and that a warrant had been sought in Roxbury court for him.

Do you remember talking about that?

A.  No.

Q.  Do you have any idea why your attention changed from Junior to Qualls?

A.  Well, the first part of it appears to be totem pole hearsay from what I can gather from that. The second part, it's an interoffice memo that didn't go to the police department.  It's to Ralph Martin.  So I'd be very reluctant to respond to any part of that.

Q.  Okay.  So I'm just asking about your part in this.  So you don't recall --


MAGNA
LEGAL SERVICES

Page 108

A.    I don't recall the conversation with the ADA
      there.
Q.    Okay.  But this description of what Haynes, the
      ADA's description of what Haynes is saying is
      consistent with this prior report that we went
      over, right?
A.    I'm not going to engage in totem pole hearsay
      with you.  Okay.  He said, she said and then
      someone else said.
Q.    Junior, Columbia Point, those are both mentioned
      in both, right?
A.    Counsel, I'm reluctant on memory things.  I'm
      certainly not going to engage with you in
      conversation on that.
Q.    Okay.  Well, I mean it's not memory.  I can put
      them out in front of you.
A.    You can point it out but that's, that's a report
      authored by an assistant district attorney that
      said he had a conversation.
Q.    Right.
A.    With an officer that had a conversation with a
      victim.
Q.    Right.  But I'm saying Haynes had the direct
      conversation with the victim --


MAGNA
LEGAL SERVICES

A.    In Haynes' report he discusses that.

Q.    Right.  And in Haynes' report, I'm just saying that it was consistent.

A.    If you're looking to supportive evidence there, offer the report.

Q.    Okay.  But these are, they both identify someone named Junior that lives in Columbia Point, right?

A.    They do.

Q.    Okay.

A.    They do.

Q.    That's all I'm saying.  They're consistent with each other.

      What are the purpose of these interoffice memos?

A.    You'd have to ask Ralph Martin or the assistant district attorney on that.  I don't have any knowledge on their procedures.

Q.    This wouldn't be something that you would have seen?

A.    I don't believe so.

Q.    Okay.  Do you have any idea when the warrant was issued for Ronnie Qualls?

A.    I think it's stated in the prior reports, wasn't



Page 110

it?  The Roxbury District Court warrant was sought on him.

Q.  No.  But do you know what date?

A.  I'm not sure, but the records would reflect that.

Q.  Right.  Do you know if there was ever a warrant sought for Junior Williams?

A.  I don't have a specific memory on that.

Q.  Okay.  So we obviously have testimony from you but you don't -- do you have any memory of testifying in either of those trials?

A.  In testifying what?

Q.  In either of the trials.  There was a trial --

A.  No.  I don't have specific memory.  It was 32 years ago.

Q.  Okay.  So if I put these in we can go through them, but you know, are you going to disagree with any of the testimony that you gave in '93 or '98?

A.  I don't have any reason off the top of my head to disagree with testimony that I've given before.

Q.  Okay.  Do you think it would refresh your memory to go through any of this testimony?



Page 111

A.   32 years later, I doubt it.

Q.   Okay.

          (Discussion off the record.)

          (Exhibits No. 14-15 ID marked.)

Q.   So I'll put these in.  Exhibit 14 is, I'm going to represent to you that this is your testimony from the first trial that was in 1993, and then this is, Exhibit 15 is from the second trial that was in 1998, but, I don't think that I'm going to go through this all of this but you stated that you don't have a specific memory of the testimony and don't think it would be helpful to refresh anything?

A.   I wish I did have that type of memory.  God hasn't been that good to me.

Q.   Okay.  Do you have any recollection of anything that you think would be inconsistent with what you said back in this trial?

A.   I can't say as I do.

Q.   Do you have, have you learned anything in the past 30 years that would change any of your testimony?

A.   No.

Q.   Do you recall any of the physical evidence in


MAGNA
LEGAL SERVICES

Page 112

this case?

A.  I can't say as I do specifically.

Q.  Okay.  Are you familiar with the Shannon report?
It was a report done --

A.  Shannon?

Q.  It's the Shannon report.  It was done back in, I
think it was 1990 but it was -- yeah.  1990.  So
it was a report of the Attorney General's Civil
Rights Division on Boston Police Department
practices.

Do you remember any of that?

A.  No.

Q.  Okay.  Do you remember having any, you know,
meetings or trainings after that report came
out?

A.  No.

Q.  Do you remember anybody talking about any
recommendations they were making?

A.  No.

Q.  Okay.  Was there any specific training that you
got on, you know, civil rights and how to
interact with witnesses or suspects in terms of
civil rights?

A.  None that I recall.



Page 113

Q.   Okay.  Do you remember anyone coming to talk to you when this was going on?

     MR. JOHNSON:  I'm going to object to the form of the question.  When what was going on?

Q.   Yeah.  When the, so --

A.   Are you talking about the Price case?  Someone coming to talk to us about it?

Q.   So the Shannon report, apparently there was an investigation and there was, some officers were, they talked to different officers that would talk to them, but there was a big section on the homicide unit.

     So I'm just asking --

A.   In '90?

Q.   Well, it was published in 1990.  I believe it was, I believe it came out after the Carol Stuart case.  I don't know if you remember that.

A.   No.  I was involved in that.

Q.   Right.  I don't know if you were involved in it or not but it was a big case in Boston, but it came out after that and there was quite a few civil rights or allegations of civil rights violations I think after that, they investigated that.


MAGNA
LEGAL SERVICES

Page 114

But you don't recall anyone coming to talk to you about civil rights?

A. I might have been in homicide then. I don't recall specific any conversations around this, that case, so.

Q. Okay.

A. Any conversations with the AG's office.

Q. Okay. And you didn't get to homicide until '92?

A. Correct.

Q. Do you have any idea when in '92?

A. I don't.

Q. Okay. Do you have any idea, were you feeling pretty experienced by October of 1992?

A. Pardon me?

Q. So this murder happened in October of 1992.

A. Yeah.

Q. You obviously were on the homicide unit by then?

A. Yes.

Q. Do you have any idea how long you were on the job in homicide?

A. I can't remember what I did last week, counselor.

Q. Okay. But this wasn't your first homicide case?

A. I don't know.


MAGNA
LEGAL SERVICES

Page 115

Q.    Okay.  All right.  Do you have any knowledge of what's known as the St. Clair report?

A.    No.

Q.    It's another report of the Boston Police Department by James St. Clair.  And it was published in, I believe in 1992.

But you don't recall anything about that?

A.    No.  I was not involved in that at all or have any knowledge of it.

Q.    Okay.  Are you aware of any other cases that you have investigated or worked on that have ended up with the conviction being overturned later on?

A.    No.

Q.    You're not aware of any of them?

A.    No.

Q.    Have you ever been involved in any other lawsuits that involve a case that was overturned?

A.    Not that I recall.

Q.    Okay.  Have you been a defendant in any other 1983 claims?

A.    I've been a defendant in the past.  I just don't recall where or when.


MAGNA
LEGAL SERVICES

Q.  Okay.  Have they all been related to, you know, your work as an officer or detective?

A.  Yeah.  Probably.

Q.  Do you remember the case of Donnell Johnson?

A.  Not off the top of my head.

Q.  What about Felix Santiago?

A.  No.

Q.  Marlon Passley?

A.  Not off the top of my head.

Q.  Sean Ellis?

A.  Sean Ellis, no.

Q.  Remember there was a murder of William Leyden? L-e-y-d-e-n.

A.  What's his name?

Q.  L-e-y-d-e-n.

A.  No.  Doesn't ring a bell.

Q.  Okay.  Do you recall in March 2001 that you were on a show.  There was a, apparently a, ABC had a news documentary that they ended up putting you on?

A.  A couple of times.  I mean they've been in out of homicide.

I got to be honest with you.  My children are trying to get me to take Prevagen.  I can't



Page 117

remember a lot of stuff.  So it's just, you know, I appear in front of you somewhat of a diminished man.

Q.   Okay.  At the time that you were a, were a detective, did you have any memory issues?  When you were a detective, when you were working as an officer or when you worked for the BPD, did you have any memory issues?

A.   Not that I recall.

Q.   Okay.  Do you remember working on a case with a suspect that was Kyle Bryant?

A.   Kyle Bryant?

Q.   Yeah.

A.   I can't say as I do off the top of my head.

Q.   Okay.  What about James Bush?

A.   No.

Q.   You remember a lawsuit brought by a man, Carlos Panina?

A.   Who?

Q.   Carlos Panina.

A.   No.

Q.   That was a lawsuit in 2003.

A.   I don't recall that.  I'm sorry.

Q.   I know you said you don't remember James Bush



Page 118

but it's my understanding that what happened with that was that there was a sworn statement by you that you had videotaped the crime scene and in the police report you wrote that your partner, Detective Harris, accompanied him to the shooting and helped interview the witnesses.

Do you remember that at all?

A.    No.

Q.    That ended up not being true.

I think I asked you earlier about if you recall ever being disciplined as, when you worked for the BPD, and you said you didn't recall?

A.    Yeah.  I just don't have any specific -- I wish I could be more helpful but I'll tell you, God's blessed me with many things but a good memory wasn't one of them.

Q.    If we had records to show that you were disciplined at some point, do you have any reason to argue with that?

MR. JOHNSON:  I would object just to that.  It's kind of an ambiguous question, any records at all.  If you have specific records you wanted to ask him if he would contest, does


MAGNA
LEGAL SERVICES

Page 119

he contest any internal affairs files received, things like that.

MS. ROSE:  Sure.

MR. JOHNSON:  I think it's just too much of a vague question.

MS. ROSE:  Right.

Q.   So we got your internal affairs file in this case.  There are some discipline and complaints that are sustained in there.  Would you have any reason --

A.   I'm not going to argue with anything that's in a record.

MS. ROSE:  Okay.  Can we take a five-minute break.

(Recess taken.)

Q.   (By Ms. Rose) We have a record back in 2012 when you were working for the Boston police.  There was an incident between you and someone else named Mosher.

Do you remember that?

A.   Who?

Q.   I can get the first name.  It was a physical



Page 120

fight with you and another, another person,
Sergeant Detective Mosher.  I'll find it.

A.    Oh.  Mosher.

Q.    Mosher.  Okay.  Raymond.  I'm sorry.  Sergeant
Detective Raymond Mosher, M-o-s-h-e-r.
       Do you remember?

A.    And your question is what?

Q.    Do you remember an altercation with him?

A.    No, not specifically.  There was, I think
comments made.

Q.    Okay.

A.    You know.

Q.    This was a physical altercation that --

A.    Allegedly I believe, right?

Q.    Okay.  The allegation was physical and he --

A.    He made allegations.

Q.    Okay.  One of the allegations is he took an
ambulance to the hospital.

A.    What?

Q.    There was an allegation that he took an
ambulance to the hospital.

A.    Well, I think he requested one.

Q.    Okay.  Are you aware that he took the ambulance
to the hospital?



A.    Am I aware that he went?  Yeah.

Q.    Okay.  You're not disputing that he took one, whether he requested it or not?

A.    No.  I'm just -- allegedly.

Q.    Allegedly.  Well, he did take one, right?

A.    Well, anyone can take an ambulance.  I can get one out of here now.

Q.    Right.  I'm not asking --

A.    Okay.

Q.    Yeah.  He did take an ambulance?

A.    Yeah.

Q.    Okay.  Can you tell me a little bit about that situation?

A.    I don't have a specific memory of the whole situation.  As I said, you know, I recall it was a dispute there and that Mr. Mosher, Detective, Sergeant Detective Mosher took an ambulance to the hospital.  And I think that the situation speaks for itself.

Q.    Okay.  Do you have any reason to dispute the records that are in the IA file?

A.    Pardon me?

Q.    Do you have any reason to dispute the records that are in your IA file?



Page 122

A.   No, I don't.  I don't, no.

Q.   According to this file, the complaint was
sustained.  It says investigation disclosed
sufficient evidence to support allegations in
the complaint against you.

     Do you remember that?

A.   No.  I don't recall anything being sustained or
anything along those lines.

Q.   Do you understand how that works in terms of the
internal affairs?

A.   Yeah.

Q.   So there's, things can be sustained, not
sustained, exonerated or unfounded?

A.   Right.  Yeah.

Q.   Okay.  In your mind, what does sustained mean in
this context?

A.   I won't dispute, you know, what, if that's in
that files what happened there, sustained it.
If Mosher said something occurred, that's fine.
I have no problem with, you know, the records.
I'm not going to dispute the records.

Q.   Okay.  Do you have a dispute with their finding
that it was sustained?

A.   Oh.  I have no dispute here as I sit in front of



you today.

Q.   Okay.  So you don't think they were wrong to sustain that?

A.   I'm not, I don't, I don't have an opinion on that as we sit here.

Q.   Do you know if you were disciplined or had been suspended at all for this?

A.   I don't, I don't recall anything occurring out of that.

Q.   Do you recall another incident at a store. There was an incident where there was allegations that you stole sunglasses at a store.

         Do you remember that?

A.   Go ahead.

Q.   I'm just asking, do you remember that?

A.   No.  I don't have a specific memory on it.

Q.   Do you remember being suspended as a result of that?

A.   I don't think it was related to that.

Q.   Okay.

A.   And I think if you follow through the records, nothing happened out of that.

Q.   Okay.



Page 124

A. I believe the person that was in it was in the witness protection program with the Feds.

Q. Okay.  So were you suspended or you weren't suspended?

A. No.

Q. You were not suspended related to that?

A. No.

Q. Were you suspended related to something else?

A. Not that I recall.  It was another incident going on but I'd have to go back.  It was a number of years ago.

Q. Do you recall any defamation, well, claims of defamation or lawsuits alleging defamation against you?

A. By whom?

Q. There's two different ones.  There's one in 2000.  There was a Steven Hrones.

A. A defamation lawsuit?

Q. Yeah.

A. Did that go to court or anything?  I don't recall anything like that.

Q. Okay.  I don't know if it went to court or not.

A. No.

Q. Based on the docket.



MAGNA
LEGAL SERVICES

A.    No.

Q.    And then one in 2005.  Plaintiff was William Leyden.

A.    Sorry.  I don't recall that.

Q.    Okay.  I know I asked you about a few different cases.  I think, did you say you didn't work on the Ellis case or you don't recall?

A.    The Ellis case?

Q.    Sean Ellis.

A.    Which one was that?

Q.    Sean Ellis.  It was, I think it was about the same time as the Qualls case, but he, there was an officer that was killed.

A.    Oh.  Was that with Mulligan, Detective Mulligan?

Q.    Yes.

A.    I think everybody was pretty much in on that.

Q.    Yeah.

A.    Yeah.  I would have had -- I don't recall specifically what I did on it.

Q.    Okay.  Do you recall having some --

A.    I remember John Mulligan getting killed.  That's something you wouldn't forget.

Q.    Right.  Are you aware that his, that Sean Ellis' conviction was also overturned?



Page 126

A.    Yes.

Q.    Do you know the details of that?

A.    I do not.  I wasn't the primary on that.

Q.    I know this is way back in 1992 when all of
these documents and this whole file was created.
Was -- you know, some of this looks
computerized.  Some of it looks handwritten.
      Was there a computer system that you guys
would use?

A.    A what?

Q.    A computer system that you would like --

A.    In '92?

Q.    Yeah.  Around '92, '93.

A.    We didn't have cell phones then if I remember.
We're lucky if someone had a computer.

Q.    Okay.  So you know, would your notes be
handwritten or were they typewritten or were
they --

A.    Everything's different.  I mean, you know, it's
hard and, it's hard enough to remember cases,
never mind notes or computers or what was going
on.  It was, I don't want to say back then it
was antiquated, but it was different.

Q.    Yeah.  I mean it looks different but it's not



Page 127

really consistent throughout the file.  So some of it's typed, some of it's not.

So for you personally, if you would go out and take notes, were you taking handwritten notes?

A.    Well, I didn't have a computer with me.

Q.    Right.  Sorry.  I meant like handwritten versus recording.

A.    We didn't even have -- there might have been one or two tape recorders in the office at the time.

Q.    Okay.

A.    I mean they've come light years since then.

Q.    So you would mostly do handwritten notes?

A.    If so, if it involved it, yeah.

Q.    Did those have to be transcribed into these typed reports?

A.    I mean everything was, everything was different, you know.  I mean, the reports, if they were significant, you know, if they were tape recorded we did have people that would transcribe it out there for us.

Q.    Okay.  So you wouldn't be the one typing it up?

A.    No.

Q.    Okay.



MAGNA
LEGAL SERVICES

Page 128

A.   No.

Q.   There's a different case where there's
allegations about you having different notes
that were not part of the actual file.

In this case did you have any separate
notes that were not part of this file?

A.   Not that I recall.

Q.   Okay.  Did you ever have any separate computer
documents or anything like that on this case?

A.   Not that I recall.

Q.   Okay.  Any separate handwritten notes on this
case?

A.   I think I just answered that.  Not that I
recall.

Q.   Okay.  Do you recall any complaints coming
through internal affairs against you alleging
the use of any racist terms?

A.   No.

Q.   You don't recall any of those?

A.   No.

Q.   Okay.  Do you recall if you had any prior
interactions with Ronnie Qualls prior to this,
the Price murders?

A.   Did I?



Q.   Did you have any, you know, prior interactions with him as an officer?

A.   No.  Not that I remember.

Q.   Do you know if anybody on your homicide team did?

A.   I wouldn't --

Q.   You wouldn't know?

A.   I wouldn't remember.

Q.   What about, did you have any personal, have any prior interactions with Junior Williams?

A.   Not that I recall.

Q.   Do you recall having prior interactions with any of the witnesses in this case?

A.   No.

Q.   Okay.  And you wouldn't know if anybody else had prior interactions with any of them?

A.   I wouldn't be able to answer that.

Q.   Okay.  So you didn't have personal relationships with any witnesses or suspects involved in this case?

A.   No.

Q.   Do you know, do you know a woman named Marie Conille?

A.   Who?



Page 130

Q.    Marie Conille.  C-o-n-i-l-l-e.  Bunny Conille?

A.    No.  Not that I remember.

MS. ROSE:  Okay.  All right.  Well, then I don't have any other questions.

MR. JOHNSON:  All right.  I have just a couple of questions.

EXAMINATION BY MR. JOHNSON:

Q.    Mr. Keeler, do you recall if you paid for any hotel rooms for any of the witnesses in this case?

A.    No.

Q.    Do you recall having ever paid for a hotel room for a witness in any of your investigations?

A.    No.  That wouldn't, not be the case.

Q.    Would that be something that your office would handle?

MR. JOHNSON:  Strike that.

Q.    If a witness was being given a hotel room for a trial, would that be something that the homicide unit would handle or something the DA's office would handle?

A.    That would be the DA's office.

Q.    If you knew that a witness was lying on the



Page 131

stand during trial, what would your normal reaction to that be, or response?

A.   I'd probably go to the district attorney.

Q.   And why would you do that?

A.   I'm obliged to do it.

Q.   When you say you're obliged to do it, what do you mean?

A.   If you knew there was an untruth to something and it was going on under oath, I'd have to tell my concern to the district attorney.

Q.   To your knowledge, did any of the witnesses in this case commit perjury or lie on the stand?

A.   Not that I'm aware of.

Q.   Can you give me your best recollection of the layout of the South Boston homicide unit?

A.   You mean the building itself?

Q.   Inside the building.

A.   Oh, okay.  Just think for a second.

It was a brick building and homicide unit would have been on the second floor, up a set of stairs.  And there was a main office where there was some clerical person and a police officer. And then there was several separate offices, you know, for the squads.



Page 132

And then down the back of the building which is, it was like a whole other area. There might have been another unit down there, like a fraud unit or something. I just don't recall. But it was several different officers with the main office.

Q. When witnesses or suspects were being brought in to be interviewed, do you remember where they were interviewed in the homicide unit?

A. Well, you'd come up the set of stairs and if you had, say multiple people in a case, they could be, the witnesses could be in the main office or separated. And then traditionally people would be separated and placed in different offices. Interviews would probably be done in a larger room down the back.

Q. When you had multiple witnesses for the same event, would they be kept waiting in the same room or would they be kept separate?

A. No. Ideally no.

Q. When you say ideally no, are there certain times where people were kept in the same rooms?

A. You know, there could have been instances where the -- there were just so many. It kind of


MAGNA
LEGAL SERVICES

Page 133

overlapped, but you do the best you could with it.

Q. And if witnesses were being moved from one room to the other, is it possible that they would cross paths with another witness from their case?

A. Oh, yes.

Q. And in this particular investigation, do you recall whether or not any of the witnesses were placed in the same rooms?

A. I can't say I have any memory as of that.

Q. Is there a, when you do photo arrays, is there a standard procedure that you had to follow on how to show the photographs to witnesses?

A. I can say the way that I used to do it.

Q. How would you do it?

A. After we spoke to someone, if the interview revealed that they may be able to identify somebody or prior to it you had knowledge that there might be, an array would have been compiled.  Okay.

You would have spoken to them about it and given them an understanding of we're going to show you a photograph array.  And


MAGNA
LEGAL SERVICES

Page 134

traditionally I would say or the detectives would say the person that we've been discussing may or may not be in this array.

I would like you to take your time to look at each and every photograph before making a decision, and we would ask them to turn away when it come out. It would be in a sheet or something turned over, asked to turn away so they didn't see it coming out.

And then after viewing them, is there anyone you recognize in this. And if the -- in some cases they might say yes. Who is that individual, would you point to them.

Q. Do you recall whether or not you were the one who spoke to the witnesses during any of the photo arrays in this case?

A. I would go back to the evidence that we've seen here today, and I believe some of it indicated I was there in one of the arrays.

Q. You don't recall if you were the one who showed the photos?

A. I don't recall. And we would ask them, if they identified, who do you recognize that person to be, what did he do or she do. And then if they



did they would say what they saw and recognize the person to be.

And if they did so we would normally ask them to sign or ask them to sign the back of the photograph and date it.

Q. And you said earlier you don't have an active memory as you sit here today of having done that in this case?

A. I do not.  I'd be lying on the records.  I don't remember that.

Q. But to the best of your knowledge, did you follow that procedure that you just described whenever you did a photo array?

A. Yes.  Yes.

Q. In this investigation Lieutenant Timothy Murray was the commander of your investigation squad?

A. He was in charge.  He was the officer in charge.

Q. Who made the final determination on whether or not to charge a person with a crime, with murder in your unit at this time?

A. Well, in this case the, Lieutenant Murray was in charge.  The procedure would have been after the evidence was compiled he would have met with the captain detective, which would have been McNally



Page 136

and they would have a discussion on the state of the evidence and which way they wanted to go.

Q. You as the sergeant detective in that unit, would you have had any input into when or if to charge a particular person?

A. The ultimate decision would have been between Lieutenant Detective Murray and Captain Detective McNally.

Q. And you're retired now, correct?

A. I am.

Q. And how long have you been retired?

A. I've been out since 2015.

Q. So you've been retired for 10 years?

A. Yes.

Q. Would it be fair to say you put this job behind you?

A. Absolutely.

Q. And would it be fair to say that, or I'll withdraw that question.

Do you relive the events in your mind that you were involved in as a homicide detective on any regular basis?

A. No. I try, absolutely try to -- I'm in Florida. I play golf and relax with my friends. I've


MAGNA
LEGAL SERVICES

Page 137

never gone back, you know, to that unit or I did not socialize with anybody that was involved in that area of my life.

MR. JOHNSON:  Those are all my questions.

MS. ROSE:  I just have a couple quick followups.

FURTHER EXAMINATION BY MS. ROSE:

Q.  You were talking about what your reaction would be if any of these, any one of the witnesses in this case were testifying and you knew it was false.

Why is it important for all the testimony to be truthful in these cases?

A.  You'd hope that anybody that gave testimony under oath would be truthful.  That would be my hope.

Q.  Have you ever given untruthful testimony in a court?

A.  Not that I recall.

Q.  What about, have you ever written anything that's not true in any of your investigative reports?

A.  Not that I recall.


MAGNA
LEGAL SERVICES

Page 138

Q.  Is there anything untruthful in any of the work that you did on this case?

A.  Not that I recall.

Q.  I did find my list of the AI things, but you testified you're not going to argue with anything that's in your IA file, right?

A.  Go ahead.

MR. JOHNSON:  I think what he testified to was that he wouldn't dispute that those things are in the record.

MS. ROSE:  Right.  You're not going to dispute that they're in the record.

Q.  Do you recall there's, there was a case June 18, 1980 which is, well, this --

A.  1980?

Q.  1980, yeah.  A four-day suspension.

A.  Off the top of my head, no.  44 years ago, something.  I don't, I don't have any memory of it.

Q.  That would have been pretty early, right when you got on the force, right?

A.  Yeah.  I don't, I really can't say I recall that.

Q.  Alleging physical and verbal abuse.  Keeler and



Page 139

his partner were drunk and disorderly and went into a bar.  While at the bar Keeler strangled one woman against the wall, groped a woman's breast and threatened two women.

It was later revealed that this was a lesbian bar.  One of the women at the bar wrote to the mayor of Boston at the time.

MR. JOHNSON:  I'm going to object to reading the notes.

Q.    Well, those are my notes on what the complaint was.  Do you recall that at all?

A.    I don't recall it.

Q.    Okay.

A.    You know, specifically I don't have it, you know.

Q.    Okay.  It kind of references -- this is September 25, 1992.  There was a complaint alleging use of a racial slur.  There was a disciplinary hearing but I don't think there was any discipline with that.

Do you recall that at all?

A.    No, I don't.

Q.    Does that refresh your memory?  No.  Okay.

This is November 11, 2004.  The



MAGNA
LEGAL SERVICES

Page 140

allegation is in response to, it was a Boston Herald article about your involvement with wrongful convictions and that, the allegation is that you approached an attorney in a threatening manner and threatened him, followed him to the bathroom.

Do you recall any of that?

A.   Is there a question?  I don't --

Q.   These are just complaints that were made.  You don't?

A.   That was 20 years ago.  No.  I don't recall.

Q.   Right.  Okay.  I'm just asking.

This was December 21, 2007.  The allegation was unreasonable judgment.  This is Keeler took sunglasses from a boutique in the Back Bay.  It said it was sustained.  I know you said that you didn't think that was.

Do you recall that at all?

A.   No, I don't.

Q.   This one is September 23, 2011.  There was a deposition taken in February of 2010.  There's a violation of a Rule 102, Section 4, neglected duty arising from a man selling T-shirts at Fenway.  It said it was sustained for neglected


MAGNA
LEGAL SERVICES

Page 141

duty.

Do you remember that?

A.   No, I do not.

Q.   Okay.  Okay.  I think we covered payment of witnesses.

Did you ever threaten or coerce witnesses in this case?

A.   No.  Not that I know.

Q.   Are you aware of anybody who threatened or coerced any witnesses in this case?

A.   I'm unaware of anyone who may have threatened anyone in this case.

MS. ROSE:  I don't think I have anything else.  Thank you.

THE WITNESS:  Thank you, counsel.

(The deposition concluded at 2:34 p.m.)



CERTIFICATE

Commonwealth of Massachusetts
Essex, ss.

I, Jessica F. Story, Certified Shorthand Reporter, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify:  that DANIEL KEELER, the witness whose deposition is hereinbefore set forth, was satisfactorily identified by his Massachusetts driver's license, then duly sworn by me, and that such deposition is a true record of the testimony given by the said witness.

I  further  certify  that  I  am  not  a relative or employee or counsel or attorney for any of the parties, or a relative or employee of such counsel or attorney, nor am I financially or otherwise interested in the outcome of the action.

IN WITNESS WHEREOF, I have hereunto set my hand and notarial seal this 5th day of May, 2025.

_____
Jessica Fayre Story, CSR, RPR
My commission expires
on August 12, 2027

Page 143

ERRATA SHEET

Instructions:  You are entitled to read and correct your deposition.  Please carefully read your testimony, making any necessary changes or corrections by identifying the page and line number, the change desired and the reason.  Do not mark the actual transcript.  Then date and sign the bottom of this page.

PAGE LINE          REASON FOR CORRECTION

____        ____          _____

____        ____          _____

____        ____          _____

____        ____          _____

____        ____          _____

____        ____          _____

____        ____          _____

____        ____          _____

____        ____          _____

____        ____          _____

____        ____          _____

____        ____          _____

____        ____          _____

____        ____          _____

____        ____          _____

____        ____          _____

____        ____          _____

DATE:  _____   SIGNATURE:  _____


MAGNA
LEGAL SERVICES

CERTIFICATE

I, DANIEL KEELER, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that said transcript is a true and accurate record of said testimony.

Signed under the pains and penalties of perjury this _____ day of                      , 2025.

DANIEL KEELER



# Magna
## Key Contacts

Schedule a Deposition:
Scheduling@MagnaLS.com | 866-624-6221

Order a Transcript:
CustomerService@MagnaLS.com | 866-624-6221

General Billing Inquiries:
ARTeam@MagnaLS.com | 866-624-6221

Scheduling Operations Manager:
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

Customer Care:
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

Director of Production Services:
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

National Director of Discovery Support Services:
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

Billing Manager:
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

Director of Sales Operations:
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)

