CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No.: 1:23-cv-10435-GAO

```
-------------------------------------
RONNIE QUALLS,                        *
         Plaintiff                    *
                                      *
                                      *
vs.                                   *
                                      *
                                      *
FRANCIS ROACHE, DANIEL                *
KEELER, KENNETH TAYLOR,               *
DENNIS HARRIS, TIMOTHY                *
MURRAY, DAVID PEREZ,                  *
JOHN HARDEN, CLIFTON                  *
HAYNES AND                            *
CITY OF BOSTON,                       *
         Defendants                   *
-------------------------------------
```

CONFIDENTIAL, FOR ATTORNEY'S EYES ONLY

REMOTE DEPOSITION of DENNIS PATRICK HARRIS, a Defendant called by and on behalf of the Plaintiff, taken pursuant to the provisions of the Massachusetts Rules of Civil Procedure, before Dawn T. Rabbitt, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Office of Jason Stone Injury Lawyers, 225 Friend Street, Suite 301, Boston, MA 02114, on Friday, June 13, 2025, commencing at 10:42 a.m.

CONFIDENTIAL

(Pages 2 to 5)

Page 2

APPEARANCES

KELSEY R. ROSE, ESQUIRE
Jason Stone Injury Lawyers
225 Friend Street, Suite 301
Boston, MA 02114
(617) 379-3233
KRR@StoneInjury.com
Counsel for the Plaintiff

ADAM D. JOHNSON, ESQUIRE
City of Boston Law Department
City Hall, Room 615
Boston, MA
Butters Brazilian LLP02210
Adam.johnson@boston.gov
Counsel for the Defendants

ALSO PRESENT:  Nicole Gemba, Esquire
        Maurico Vaca, Esquire
        Emily Wu, Intern
        Eric Diaz, Intern

Page 3

INDEX

WITNESS                    EXAMINATION
DENNIS PATRICK HARRIS
(By Ms. Rose)                    4


EXHIBITS
NO.                            PAGE
1      Form 26                    37
2      Handwritten Notes            50
3      Statements from Junior Williams    52
4      Lab Testing                58

Page 4

STIPULATIONS
It is hereby stipulated and agreed by and between counsel for the respective parties that the deponent shall have thirty (30) days in which to read and sign the deposition transcript, after which time it shall be deemed to have been signed, and that the filing and sealing of the deposition transcript are waived.
It is further stipulated and agreed that all objections, except objections as to the form of the question, and all motions to strike shall be reserved until the time of trial.
DENNIS PATRICK HARRIS, being duly sworn, under oath, testifies as follows:
DIRECT EXAMINATION
BY MS. ROSE:
Q. Good morning, Mr. Harris, how are you?
A. Good, thank you.
Q. My name is Kelsey Rose, and I'm an attorney representing the Plaintiff in this case.  I just have a few questions for you this morning, and hopefully we can get you out of here.  I know that we have a hard stop at 1:00; is that accurate?
A. Yes.
Q. Okay.  Can you please state your name for the

Page 5

record?
A. It's Dennis Patrick Harris.
Q. And you were at one point an employee of the Boston Police Department?
A. That's correct.
Q. Can you tell me a little bit about your background there?  When did you start?  What positions did you have?
A. I was hired in March of 1983.  After the academy, I was a uniformed patrolman.  In 1988 I was promoted to the rank of detective.  The next couple of years I did general investigations in the area C-11 district in Dorchester.  In October of 1991 I was asked to join the homicide unit.  From 1991 until 2012, I remained as a detective in this capacity assigned to the homicide unit.
Q. Did you retire in 2012?
A. I did.
Q. Did you grow up in Massachusetts?
A. I did.
Q. In the Boston area?
A. I did.
Q. So, prior to joining in 1983, you went to the academy?

CONFIDENTIAL

Page 6

A. Pardon me.

Q. Prior to joining the police department in 1983, you went through the police academy?

A. Once I joined the police department, I went through the academy.

Q. So, you joined first and then went through the academy?

A. Yes, that's the way that it was done in those days.

Q. At that point how long was your training in the academy?

A. Best memory, maybe sixteen weeks.

Q. And what kind of training was it?

A. There was a constitutional law, criminal law, physical training, motor vehicle training. It's been a while, so I don't quite remember it all.

Q. When you say that there was some legal training, was that like classroom, inside figuring out those things on paper?

A. Inside classroom, yes. There were teachers, instructors that would teach us constitutional law, basic constitutional law, and then criminal law as well.

Q. Okay. What kind of basic constitutional law did you learn?

Page 7

A. I don't know, it's been a long time. I don't remember to start talking about that.

Q. What about due process and that kind of thing?

A. All of that stuff, yes. That's fair to say.

Q. How about things like doing a photo array or that kind of a thing?

A. Photo arrays, I don't believe that that was taught in the academy.

Q. So, when you say that you were training on constitutional law, would it be like, you know, stop and seizure, that kind of thing?

A. That's fair to say, yes.

Q. When you have probable cause, is it that kind of thing as well?

A. Yes.

Q. So, for those kind of more academic things, were there tests? How did you know that you passed?

A. There were tests after a certain period of time. There was a testing process.

Q. A written test?

A. Both the physical an academic portions of the academy. Yes, there were written tests.

Q. Okay. So, for the academic portions there would be a written test. I assume it's not a written test for

Page 8

the physical parts?

A. No.

Q. The physical training, I think that you mentioned vehicle training, anything else?

A. I really don't remember. I'm sure there's a curriculum floating around somewhere.

Q. Okay. Do you recall there being a written curriculum?

A. I believe that there was.

Q. And was there a certain score that you had to get overall? How did you pass the academy?

A. I don't remember what the passing score is. I know that you did have to pass. I forget what it was, it was a long time ago.

Q. Do you recall if it was like a certain score on the written test or was it a pass/fail kind of thing?

A. It was a certain score, I believe.

Q. Do you know with the physical test, were they pass/fail?

A. There was a -- I think it might have been pass/fail with the physical stuff. A certain time limit for the mile, and all of that stuff.

Q. Once you're out of the academy, was there any -- like for lawyers it's called continuing ed or that kind

Page 9

of thing. Do you have anything like that as an officer, as a detective where you had to keep up with certain certifications or keep up with learning?

A. I went to several different training seminars over the years. I don't know if it's fair to say to keep up with anything, but I just went to different courses, different seminars for investigators.

Q. Were these required by the Boston PD?

A. I don't believe so.

Q. All right. I think that you said that 1983 until 1988 you were a patrolman?

A. Correct.

Q. Can you just tell me a little bit about what that entails or what that entailed at the time?

A. A patrolman, yes. Wearing a uniform and riding around in a marked cruiser responding to 911 calls. When you weren't responding to calls, just proactive doing community policing type of work. I was assigned to a two-man patrol car back then and worked both evening sifts and overnights.

Q. What's community policing?

A. Just working with individuals who lived in the community. Just try developing a rapport with certain people that lived in certain sections of the

CONFIDENTIAL

Page 10

neighborhood and see if they needed anything or what their concerns were and that type of stuff.

Q. When you were a patrolman, what area were you in?

A. Let me see, I worked in a couple of different sections. I think that I spent probably a year in the Roxbury section of the city. I went downtown Boston then after that for probably about seven or eight months, and then I was transferred from Area A downtown Boston to District 11 in Fields Corner. I spent a couple of years there as a patrolman in District 11 before being promoted to detective.

Q. Do you know -- are the areas D-11, C-11, are they all the same still or have they changed over the years?

A. They're all the same still. Let me see, 1983 I think they're pretty much the same. Some of them have substations, but yes, they're all pretty much the same, same districts and same layout.

Q. And how were you promoted to detective? What's the process?

A. Well, if I remember correctly, it was I think the year before the City of Boston implemented a detective's test. They took two patrolmen from each district based on merit, from what I understand, and asked us if we would be interested as working as detectives. I agreed

Page 11

to that, and then I was assigned to the second floor detective's office of District 11 as a patrolman. And then after a certain period of time, they promoted me to detective prior to the implementation of a test.

Q. So, you didn't have to take a test to become a detective when you became one?

A. Correct.

Q. Did you ever have to take a test?

A. For detective?

Q. Yes.

A. Did I ever have to take a test?

Q. Yes.

A. There's a promotional test along the way, but I remained a detective for the entirety of my career.

Q. Are there different levels of detectives?

A. No.

Q. It's just you become a detective and then you're just a detective?

A. Correct. There's no -- if you're thinking about New York, there's no first class, second class, it's just a detective.

Q. And I believe that you said that you were a detective in C-11?

A. I was a detective in C-11, yes.

Page 12

Q. Is that the entire time that you were a detective?

A. No.

Q. Sorry, I'm talking about prior to being part of the homicide unit?

A. Yes, once I was promoted to detective, it was in District 11 that I was promoted, and I stayed in District 11 as a working detective, and then I received a call inviting me to join the homicide unit.

Q. And that was in 1991?

A. That was 1991.

Q. And you joined as a detective in the homicide unit?

A. I went up there as a detective, yes.

Q. Were there other roles in the homicide unit or just detective?

A. Other roles. They had sergeant detective, they had lieutenant detectives, they had captain detectives. They had a patrolman or two that may have answered the phone and did some administrative work.

Q. So, when you're saying a sergeant detective, are those different kind of roles amongst detectives?

A. Well, the homicide unit was rather unique. I mean, we were assigned to each squad. We were supposed

Page 13

to have three men, and it varied over the 22, 23 years that I was up there depending on how much help we had. Typically, it was a three-man squad, the sergeant detective and two detectives.

In 1991 I was asked to join the homicide unit and was asked to become a member or the original cold case squad, and that was unique to the other contemporary squads. So, the cold case squad was the first of its kind in the City of Boston 1991 and it was headed by Lieutenant Detective Timothy Murray, Sergeant Keeler, myself, and then eventually I believe that Detective Doyle joined us. It was actually a four-man squad for a while.

Q. You said that it was headed up by Tim Murray?

A. Tim Murray was the lieutenant detective.

Q. And Sergeant Keller?

A. Sergeant Keller.

Q. And he was a Sergeant Detective?

A. He was a sergeant detective, yes.

Q. And yourself?

A. Myself, yes.

Q. And who else?

A. And at some point maybe '92 or '93, maybe 93 Detective James Doyle joined our squad.

CONFIDENTIAL

(Pages 14 to 17)

Page 14

Q. So, that was your squad for how long let's say before James Doyle joined? How long was that your squad with Murray, Keeler and yourself?

A. Maybe a little over a year. Actually, there was another member there too for a while. The original cold case had Detective John McCarthy. So, it was myself, John McCarthy, Lieutenant Murray, and then I believe that Sergeant Keeler joined us. So, it was a four-man squad for a while. McCarthy left, and so I think that Doyle came in.

Q. And then was it the four of you for how long?

A. I think the cold case squad in that capacity I think that Sergeant Keeler may have been the first to leave and go into a contemporary squad leaving myself, Lieutenant Murray and James Doyle as members of the cold case squad probably for about two years. So, from '91, I don't know, the end of '93, maybe '94, and then went and started working in contemporary squad responding to contemporary homicides as opposed to investigating cold cases.

Q. So, contemporary would mean current homicides --

A. Current homicides, yes.

Q. So, when you were in the cold case homicide unit, how long were you and Keller together in that unit?

Page 15

A. I don't remember exactly how long it was. I know that he was asked to take over a squad a good while before I actually left the cold case squad. So, I'm not quite sure how long we were together in that capacity.

Q. So, I'm sure that you're aware that this case is about a double murder that occurred in October of 1992. So, it's something that you worked on and something that Sergeant Keller worked on. Would you have been in the cold case unit at that time?

A. That was the cold case squad, yes. That was Lieutenant Murray, myself and Keeler, I think the three os us. We were the cold case squad and for whatever reason, I mean, this homicide that we were referencing was a contemporary homicide, and we as cold case squad detectives for whatever reason we were asked to take the calls. It may have been because of the caseload in homicide at the time, we were asked to respond to that.

Q. Do you recall why?

A. No.

Q. Okay. Was it the time period that there was a high level of homicides in Boston?

A. Again, from memory I think that 1990 was the high year with 140, 150 homicides. I think that '91, '92 was a little less than that, but there were a huge

Page 16

significant amount of homicides in those years.

Q. Do you think that's a likely reason why you guys were called in on a contemporary homicide because of the number of them?

A. Again, I don't know what the reason why we responded to that homicide, I don't know.

Q. Do you recall other times when you were on the cold case squad that you were called in for a current homicide?

A. Yes. I think over the years we were often called to help out.

Q. Okay. So, that wasn't unusual --

A. I don't remember specific actual homicides. It was a team effort. I think that there were a total of seven squads, six active and one cold case squad I think.

Q. Okay. So, when you say six active, active meaning like current homicide and one cold case squad?

A. Yes.

Q. Do you recall this investigation into this homicide, the double murder of the Price Brothers?

A. Do I recall it, yes.

Q. Do you recall was your squad the only squad that was working on it or was there other squads working on

Page 17

it as well, if you recall?

A. I believe it was our squad under the direction of Lieutenant Detective Murray was the only squad. I know at different times during the course of the investigation James Doyle joined us, but I don't think that there was another squad that was involved.

Q. So, based on what we've seen, it looks like you guys were assigned to it from the start and continued to be on it for the whole time, does that sound accurate?

A. Yes, that's accurate.

Q. Just going back a little bit. When you said -- I think that you said to become a detective that it was based on merit, can you explain that a little bit? What kind of merit things were taken into account?

A. Again, it's my opinion just based on working detectives, active detectives. I'm not 100 percent sure, but based on merit there were only a couple of detectives or patrolmen like working in an anticrime capacity that were out there actually actively pursuing bad guys and working. I think that the department made a decision to pick a couple of guys who meets district that has the makings of a good detective, and asked them if they're interested in joining the ranks.

Q. Do you recall what was the process of deciding

CONFIDENTIAL

(Pages 18 to 21)

Page 18

where someone was qualified to be a detective? Did you have annual reviews or some sort of way that your success or how you guys were ranked?

A. No, I don't know if there were annual reviews. We all had a caseload and you were expected to work your caseload to the best of your ability. I think that a good detectives the way that they were judged is their ability to speak to people and relate to people and develop rapports with victims, suspects all on those lines. I think that that was the makings of a good detective just the ability to communicate and listen and learn.

Q. When you became a detective, was there any further training that they had you going through?

A. As I said earlier, I think that over the course of my career I went to several different training sessions. There was an annual training session and it was held at the academy for detectives that you went, and it was a refresher course based on similar things in the academy, constitutional law, criminal law, you get into interrogation techniques, and I think that that was an annual training that the City put on for detectives. They had annual training for patrolmen and then they had annual training for detectives as well.

Page 19

Q. And that was from the time that you first became a detective, they had that every year?

A. They had that every year, yes.

Q. And it was for all detectives, regular detectives, homicide unit detectives, everybody?

A. Yes, that was everybody. You had to go to the Boston Police Academy for refresher training, yes, about once a year. Then detectives also had the opportunity, depending on the unit that you were in, to go to specialized training sessions. Like for instance, it comes to mind for me I went to the City of Toronto. There was for homicide detectives from around the world it was a 40-hour session where everybody went and talked about different interviewing techniques and investigator techniques and doing different sessions like that. Another session that comes to mind is a 40-hour session on the location of human remains and how to process things such as that. Over the years there was always different things like that.

Q. Were those other sessions that you listed besides the annual training that the academy had, were there any of these other sessions, training sessions, that were required by the BPD?

A. I don't know that they were required, no.

Page 20

MS. ROSE: Yes, Adam, I got your text. Yes, we can agree to the usual stipulations, and I can put them on at the end, if you want.

MR. JOHNSON: Yes, that's fine, thank you. I didn't want to object if I didn't have to.

MS. ROSE: You're good. I just wanted to get us going quickly. All right.

Q. So, when you would go to these other trainings that were not required by the BPD, were they something that you would ask, hey, can I go to this training, and they would say, yes, or you can go to it or you did it on your own?

A. No, it was something that the invitations from whoever was hosting the training sessions would send to the commanders of the units, and then they would select and ask us, hey, what does your schedule look like, would you be interested in attending this training session. It was done along those lines.

Q. And it sounds like that you opted to do some of those trainings?

A. Correct.

Q. Do you know was there incentives to do these trainings, were they trying to get other detectives to do these trainings or was it just kind of up to you?

Page 21

A. I don't know how to answer that. I was asked if I was interested in going, and depending on my schedule and if I didn't have a court case, then I went.

Q. Okay, but you didn't feel like -- sorry. Did you feel like you should go or they wanted you to go, did you have a feeling like that?

A. I was always willing to go once it was offered. You could never learn enough. I was always willing to go whenever it came across.

Q. Do you know during the time that you were working with Detective Keeler, did he ever go to these extra trainings besides the annual one?

A. I'm sure that he did. I think there was specific training for sergeant detectives that would come up once a year. I think that a policeman in New York hosted it, and so I think that I do have a memory of him maybe attending something along those lines.

Q. Was that something that was required by the BPD?

A. Again, I don't know if it was required, but I think that most of the sergeant detectives in the homicide unit probably attended that. I don't know if it was required. I'm not quite sure how those sessions or how that training was dueled up.

Q. Do you have any idea of what was covered in those

CONFIDENTIAL

(Pages 22 to 25)

Page 22

trainings?

A. No.

Q. Did he ever come back and tell you about those trainings?

A. I don't have a memory of that. I'm sure if he had gone and when we came back, we discussed it. I just don't have a memory of what it was.

Q. And what's the difference between just a standard detective and a sergeant detective?

A. The difference between sergeant and detective would be in charge of the squad. Unless it was a lieutenant detective like in a cold case squad, the actual boss was the lieutenant detective, and then the next line beneath the lieutenant detective is a detective bureau now. The patrolman is of a different rank structure. In the detective bureau it's the lieutenant, detective, sergeant detective, and then detective.

Q. So, Tim Murray would run everything as the lieutenant detective?

A. Everything would have been run by him, yes. Then Sergeant Keeler was my immediate supervisor.

Q. As your immediate supervisor, would he decide what you were doing for the day? How did that

Page 23

interaction work?

A. Again, and I think that I had mentioned it briefly, that the homicide unit was a little bit because we worked in teams, and nobody had designated like that's a detective's job, we worked as a team. We went out and we were all capable in processing a crime scene. We were all capable of doing interviews. We were all capable of doing search warrants. So, it was a team effort all along. It wasn't a certain role for the detective. It wasn't like a chain of command type of stuff. So, if you wanted to do anything, you would just have to check with the bosses.

Q. Okay. Was there any kind of on the job training in terms of how you would investigate homicides when you became part of the homicide unit?

A. I can tell you that I had the luxury of being a member of the original cold case squad. So, as far as on the job training, it was an excellent opportunity for a new detective to break out a case that was twenty years old and read it from soup to nuts, and to see how other detectives responded, conducted interviews, showed photos, and to break an entire case down that we worked on for years just that they were unable to solve, and just to see the way that they did that. We worked on

Page 24

several hundreds of unsolved homicides. So, as far as on the job training to be able to look at those examples that were set before me by the way that other detectives over the years worked, it was a great learning tool for me.

Q. Did you solve quite a few of those unsolved cold cases?

A. We did.

Q. So, I'm going to get into the Price Brothers murder a little bit. Can you just tell me what you recall about what happened with that murder?

A. Again, I would just like to qualify as far as a specific memory, it's been like what 33 years. I mean, because of the fact that it was a double homicide and clearly I have some memory of some of the particulars, but other than I had an opportunity to review some reports that were given to me over the last several months. So, my memory is that it was a double shooting, two brothers that lived in the Roxbury area. It all stemmed from a fight that happened in a local barroom.

Q. Do you recall first being called to the scene?

A. I do recall receiving a call and responding, yes.

Q. And do you know if you went to the actual crime scene where the shooting occurred or do you have a

Page 25

memory of where you went?

A. I believe that I went to the actual crime scene for a period of time.

Q. Do you recall if you were with anybody else from your unit at that time?

A. I don't recall actually going with anybody. I believe that all three of us at some point may have been at the scene for a period of time. I'm not quite sure of the particulars. I don't know what the circumstances were as far as getting there and who I went with, but I just know from reviewing some reports that after a period of time that I ended up down at the Boston City Hospital.

Q. What did you do down there?

A. Actually, I was probably looking for witnesses to find out what happened, to speak to some of the responding officers that may have gone to the hospital to see what was going on down there because naturally once the scene is cleared by, you know, witnesses or the victims or the doctors, and you go down to find out to see what the condition of the victims are, are they still alive, what's the deal, is there any family there. It's an opportunity to try to talk to anybody who's at the hospital.

CONFIDENTIAL

Page 26

Q. Do you recall talking to anybody down at the hospital?

A. I don't have a specific memory of speaking to anybody other than looking at some reports. I do remember that I did have an opportunity to refresh my memory saying that I had a conversation with a detective Tommy Montgomery while at the City Hospital.

Q. Do you remember what his role in all of this was?

A. I do.

Q. What was that?

A. He was actually the proprietor of the Biarritz Tavern and he was present when that fight occurred in the Biarritz.

Q. And you talked to him at Boston City Hospital?

A. I bumped into him down there. I guess he was down there from reading the report he was down there in a different capacity. Not as a result of an actual homicide, but he was down there taking a lady friend who was sick to the City Hospital and then while you were there we talked about what happened briefly.

Q. And the Boston City Hospital is now BMC; is that accurate?

A. Yes, the same thing, BMC.

Q. And when you talked to Montgomery -- my

Page 27

understanding is that he was at the bar at the time that there was an altercation with the Price Brothers and some other people, did he tell you what he saw there?

A. I don't know if we got into all the specific details at that time. I don't have a memory of that.

Q. What do you have a memory of talking to him about?

A. Well, I know at some point, months after, we actually did a formal interview and took a statement from him where he also made some identifications of the people that were involved in the fight at the bar. It was some months later by the time that we got back to him.

Q. Do you recall why that statement was taken so long after the initial incident?

A. I don't recall. It was probably the initial communication between Montgomery and I. There was probably an investigative report of some sort that was generated and then for whatever reason. I don't know why it took so long to get back there. All that I know is that it was a couple of months had gone by before we took a statement from him.

Q. Would that have been your call on the night that you talked to him at the hospital, would that have been

Page 28

up to you to say, hey, why don't we do a recorded statement or come down and give us a formal statement?

A. I don't know whose call it would have been. It could have been just the best product is to eventually get a taped statement in their words. I don't how all of that unfolded. I don't have a memory as to how that all unfolded. Maybe he was too busy dealing with his personal issues. I don't remember the specifics as to why it wasn't done that night.

Q. In general, when you're doing any kind of investigation, would you generally like to get the statement from the person as quickly as possible?

A. Yes.

Q. And why is that?

A. Well, the facts are fresh and all of that stuff. If they're available. I mean, that's the ideal situation, but a lot of times in these homicides over the years its been my experience that there's a huge fear factor and people not wanting to get involved. So, sometimes it's not always our call to get things right away.

Q. And Tommy Montgomery was a Boston Police, was he a detective or police at the time?

A. He was a detective.

Page 29

Q. Was he in the homicide squad?

A. No. Actually, I don't think he was -- let me see, I think that he might have been the president of the detectives union at the time.

Q. But he was an active part of the BPD at the time?

A. He was.

Q. So, you recall showing up at the scene. Do you remember what you saw at the scene?

A. And again, I don't know if it's my actual memory of what I see or since then reviewing some photographs and some reports that the scene consisted of a red Geo Tracker that was in the parking lot of Studio 88. The area was Palmer and Washington Street in Roxbury, and again it's not my memory of it, it's probably from looking at photographs. It's been a long time.

Q. Without telling anything that you talked to your attorney about, did you do anything or review documents to prepare for today?

A. I have had an opportunity to review some documents, yes.

Q. And again, without telling me anything that your attorney told you, what kind of documents were those?

A. I had an opportunity to look at some crime scene photographs that we're referencing now. I had an

Dunn Reporting Services, Inc.
617-422-0005

CONFIDENTIAL

Page 30

opportunity to look at some Form 26s that were generated by the responding officers. I had an opportunity to look at some taped statements that were provided to me. I had an opportunity to look at some grand jury statements. Some photo array sheets. Some police reports.

Q. When you say Form 26, what are those?

A. Form 26 it's a Boston Police Department form that officers are required to fill out if and when they respond and if they're asked by a specialized unit to write up a Form 26 detailing what it is that you did when you responded to the scene.

Q. Did you review ones that you were involved in as well as ones that you were not involved in?

A. I don't know that I follow.

MR. JOHNSON: Objection.

Q. Presumably there's some documents that you were apart of right?

A. Well, I mean, as the investigator in the homicide unit. I mean, all of the reports that are generated pertain to the Price Brothers homicides. At some point all of those reports would have came to us.

Q. Right.

A. So, what I'm talking about is what I had an

Page 31

opportunity to review recently. Clearly I don't have the entire file. I did have an opportunity to look at maybe four Form 26s that I was provided with and what comes to mind that I looked at recently. One was from Sergeant Taylor, one was from Michael Osgood, one was from I think it was a report, a combined report from Officers Perez and Harden, H-A-R-D-E-N, maybe.

Q. All right. I'm just trying to pull these up here. So, when you looked at the photographs, did that kind of refresh your memory at all about showing up to the scene at the time?

A. The crime scene photos?

Q. Yes.

A. Not really. As far as actually physically being there, it's a long time ago. I can't tell you honestly that I remember standing in that parking lot that night 33 years ago. I do when I looked at the photographs clearly I'm familiar with the red Geo Tracker and the Escort that was eventually ceased. All of that stuff comes to mind after seeing it recently.

Q. Do you recall if anybody from your unit was there with you at the scene?

A. I don't have a memory as to who was there. I know that they probably were there, but I don't have a

Page 32

memory of it.

Q. So, your recollection is that after you went to the scene, you went to the Boston City Hospital?

A. Yes.

Q. Do you know why you went there? Was it because the victims were taken there?

A. Well, in my capacity as a homicide investigator I mean, there's a few different reasons. As I've already said, Number 1, is to go down and try to ascertain the identity of family members and any other friends of the victim or anybody that's hanging around, concerned parties that are around the hospital. Number two, is try to make sure that any of the clothing of the victims is collected, and then get an update on the condition of the victims that were transported there. So, those are the reasons why one would go there. Exactly what my role was when I was down there that night, I'm not 100 percent sure. I know that from the scene I ended up at the City Hospital and then eventually back at the homicide unit.

Q. When you ended up back at the homicide unit, what were you doing at that point?

A. I believe that we started some interviews.

Q. Do you recall who was interviewed?

Page 33

A. Who was interviewed on the morning of October 3rd. Again, the scene was at 2:00 in the morning and I think by the time we were back at homicide reviewing reports, I believe that the document that identifies the timeline for that morning may have been a Miranda sheet that was read by me to James Williams, and I think that that was about 5 a.m.

Q. And James Williams otherwise known as Junior Williams?

A. Yes. And then after Mr. Williams, I believe Leroyal Holmes was interviewed. After Leroyal Holmes was interviewed, Donna Carrington was also interviewed.

Q. And who is she in terms of this homicide?

A. Donna Carrington was the registered owner of the red Geo Tracker that was in the driver's seat when the shooting occurred, and she was a friend of Mattie Buford, Fred Monroe.

Q. And those were all people that were present at the time of the homicide?

A. Yes.

Q. How did you learn of their involvement? Was that all at the hospital?

A. Yes. Again, I don't have a specific memory, but, yes. I know that Williams was brought to the homicide

Dunn Reporting Services, Inc.
617-422-0005

CONFIDENTIAL

Page 34

unit, and I think he was stopped in the Roxbury area and was brought to the homicide unit. I think that Donna Carrington might have been down at the hospital as was Leroyal Holmes. So, I think at some point they made their way from the hospital to the homicide unit. I don't have a memory as to how they got there.

Q. Did you bring Junior Williams in?

A. No, I think it was a uniformed car that stopped him based on the description of the vehicle. I don't have a specific memory, but I believe that's what happened, that he was in the area of the crime scene and somebody spotted his vehicle and stopped him and brought him in.

Q. Okay.

MS. ROSE: I'm just going to pull together some of these documents for exhibits, but can we just take a quick five minute break so I can share it all. Does that work for everybody?

MR. JOHNSON: Sure.

MS. ROSE: We will come back at 11:26.

(Off the Record)

MS. ROSE: I'm going to share my screen here, and I can actually throw these into the chat so we can mark these as exhibits and so that everybody has

Page 35

copies.

Q. So, I'm just going to share some of these documents from the case that hopefully you had a chance to go over more recently, but if not we can look at them right now.

MR. JOHNSON: You may -- however you want to do it, but you may want to share your screen or some way let Dennis be able to look at them because I think the ones that he has --

MS. ROSE: Oh, yes, I'm definitely going to share my screen.

MR. JOHNSON: Okay, great.

MS. ROSE: But I'm going to put them in the chat so that you guys have them there as well, and she can mark them.

Q. Mr. Harris, can you see that document here that I'm showing you?

A. I can.

Q. And it's my understanding that this is a Form-26, is that accurate?

A. That's correct.

Q. So, this one is from 10/3/92 and the area is B-2. What area is that?

A. Roxbury.

Page 36

Q. Was that the area that you were assigned to at that time?

A. No, I was assigned to the citywide homicide unit.

Q. So, homicide is citywide?

A. Yes.

Q. But this part of the homicide, the Price Brothers homicide, that you were sent to?

A. Yes.

Q. And this was done by Sergeant Kenneth Taylor, do you know who that is?

A. I do.

Q. I don't need to go through the entire thing. So, if you just want to take a read of this and just let me know when you're done, and I can ask you a couple of questions about it.

MR. JOHNSON: If I can just say one thing while Mr. Harris is reading that.

MS. ROSE: Sure.

MR. JOHNSON: For the record, if we can identify the Bates numbers on the pages so we can keep track in the transcript later on.

MS. ROSE: Yes, for sure. This is Bates No. COB3557. Exhibit 1 is four pages, so it will go 3557 to 3560.

Page 37

(The Form 26 was marked as Exhibit No. 1 for identification.)

Q. And so where would these Form 26s go? Would this be something that would be sent up to the detectives that are assigned to the case?

A. I'm sorry, what did you say? Where do they go?

Q. So, does everybody get a copy of this? All of the detectives that are assigned, would they get a copy of the Form 26s?

A. Yes. The procedure is that they would all write a Form 26, and then they would all be forwarded to the supervisor in charge of the squad. So, in this particular case, they would all go to Lieutenant Detective Murray.

Q. Okay. At the top of the form it says Deputy Superintendant Pervis Ryans, do you know who that is?

A. Yes, that actually would have been Sergeant Kenneth Taylor's supervisor at the area B-2 Roxbury station at the time.

Q. And he would have sent it to his supervisor and then the supervisor would send it to Murray?

A. Yes, in this particular case Taylor to Pervis Ryans and Ryans would have made sure that Murray eventually ended up with that report.

CONFIDENTIAL

(Pages 38 to 41)

Page 38

Q. And so just to summarize, they showed up to the scene and they observed Perez assisting a black male identified as Roosevelt Price, is that something that you recall from that case?

A. Yes.

Q. And essentially he was taken to Boston City Hospital?

A. Yes.

Q. Do you recall seeing this report at all?

A. Just recently. I don't have a specific memory of looking at it 33 years ago. However, yes, I would have in my capacity had an opportunity to read it back then, but recently I have had a chance to look at it as well.

Q. Okay. And there was another victim identified as Ronald Price who was apparently dead at Boston City Hospital, do you recall that?

A. Yes.

Q. So, he was already at the hospital, but he was pronounced dead, and then his brother was still at the scene but having been shot?

A. Yes, I know that the brother ended up coming to the hospital later and circum to his injuries a couple of hours later.

Q. So, we will go to Page 2 of Exhibit 1, and it's

Page 39

the City of Boston 3558, and this one is to Deputy Superintendant Pervis Ryans again, and it's from Michael Osgood. Is this another Form-26?

A. Yes.

Q. And this is from Michael Osgood, is that just a police officer or a beat cop?

A. Yes, PO, patrolman.

Q. And he was assigned with Clifton Haynes, do you know who that is?

A. Yes, he's another patrolman that worked in that Roxbury district at the time.

Q. Did you ever have any face to face interactions with any of these patrolmen that were investigating this?

A. I don't have a specific memory as to speaking to them in October of 1992; however, I know both of those officers in my capacity as a detective that works several homicides in that area. So, I know both of those guys, yes.

Q. Okay. So, this is another report that would have come to Murray and then your unit, your homicide unit?

A. Eventually part of the file, yes.

Q. Okay. So, essentially this says that Osgood and Haynes arrived and they observed two unidentified

Page 40

females screaming that someone was shot. Officer Haynes and myself, meaning Officer Osgood, observed a black male walking out of 1111 Harrison Ave. bleeding from his right side. Does that sound consisted with what you recall from this?

A. Yes.

Q. And that was one of the Price Brothers that was still at the scene bleeding?

A. Yes.

Q. Did you ever see him personally? Do you recall that?

A. See Roosevelt or see who?

Q. Roosevelt?

A. No.

Q. So, when you showed up at the scene, he was already gone?

A. Yes, I believe so. I don't even remember seeing him either at the scene or at the hospital, yes.

Q. Okay. So, he was bleeding from his right side and he said that he had been shot, and Officer Haynes attempted to gather information on him about the incident, and Detective Osgood attempted to ascertain the location of the crime scene. Does that sound consistent as to what they're supposed to do on the

Page 41

scene, get statements from people?

A. Yes.

Q. Would you agree that it's important to get a statement from somebody that's a victim of a crime?

A. Yes. If they can, sure.

Q. So, this next one is Page 3 of Exhibit 1 and it's the City of Boston 3559, and this is from Clifton Haynes and again to Deputy Superintendent Pervis Ryans, and this one states that -- I'm probably going to read this whole thing in, and it says, "I respectfully submit that on Saturday 10/03/92 at about 2:19 a.m., Officer Osgood and myself in Unit B, 103A responded to a radio call at 1111 Harrison Ave. to assist the B637 & 638A for someone shot in the hallway. On arriving at the scene I observed two unidentified females screaming that someone was shot. I observed a black male walking from inside 1111 Harrison Ave bleeding from the right side. He stated that he was shot by a guy named Junior, who was the passenger of a black Escort. He also stated that Junior lives in Columbia Point. I also spoke to a Jackie Greer who lives at 1106 Harrison Ave. Apt #10." There's a phone number that I'm not going to put in. "She stated that she heard about four or five shots, and when she looked outside she observed Tony on the

CONFIDENTIAL

Page 42

sidewalk and a Red and White Jeep pulling off. Also I tried to interview a Leroyal Holmes who might have been the operator of the Jeep about 6'4" with purple and black coat and dark pants address unknown at this time." Did I read that all correctly?

A. Yes.

Q. Okay. Do you recall learning about this statement from one of the victims that had been shot?

A. Learning from one of the victims?

Q. Well, learning about the statements. So, Roosevelt from my understanding also went by the name Tony. So, Roosevelt Price, Tony Price, are the same person, do you recall that?

A. Yes, I recall that, but I didn't learn it from the victim. I learned it from the form once I had an opportunity to read it.

Q. Right. So, this information was transferred over to the homicide unit and the homicide unit was aware that Tony had identified Junior Williams as the shooter?

A. Yes.

Q. Do you recall when you got that information?

A. When did I get that information?

Q. Yes.

A. I have no specific memory. Exactly when the

Page 43

report was provided, we had probably heard those statements at some point in the first few hours that they were obtained, but I don't know when the report was generated. I'm sure that that information about what was in the report was shared with us at some point that first morning.

Q. It's my understanding that Junior Williams was taken from the street down to the station for questioning a couple of hours after the shooting had happened, and so presumably people were out looking for him after this had happened?

A. Yes.

MR. JOHNSON: Objection to form.

Q. Would that make sense to you that if one of the officers got a statement from the victim that was shot saying exactly who this was, that you guys would look for that person?

MR. JOHNSON: Objection to form.

A. Again, no clear memory of how it all evolved, but I would probably believe that the way that it unfolded was that a description of the vehicle was put out at some point that morning, and then the vehicle when it was observed in the area of I think it was Popeye's Chicken on Washington Street, that the uniformed

Page 44

vehicles and patrolmen saw it, stopped it, and then brought Williams to the homicide unit.

Q. So, this description of a guy named Junior was a passenger of a black Escort, so would it have been looking for that vehicle?

A. That possibly could have been put out to those areas led by the dispatchers probably, yes.

Q. And the victim also stated that Junior lived at Columbia Point, were you personally aware of who Junior Williams was before this shooting?

A. No.

Q. If somebody had, you know, a record, would that be something that the police could have looked up if they were looking for somebody specific?

A. Yes. At some point if they knew that Junior Williams of Columbia Point -- at some point they probably started a search to find out who it was.

Q. Are you familiar with Columbia Point Dogs, it was a gang over there?

A. Columbia Point Dogs, yes, probably. Let me see, if it was a gang in the 90's or the late 80's or all of that stuff, I do remember hearing the name.

Q. That would just be for people that live in Columbia Point; right? If you didn't live in Columbia

Page 45

Point, you can't really join the Columbia Point Dogs; is that accurate?

A. Again, I don't know how all of that gang initiation works. I have no idea.

Q. Okay. And then this last page, it would be Page 4 of Exhibit 1. It's the City of Boston 3560, and it's directly to Timothy Murray from Officer Perez and Officer Harden. It kind of reiterates what the prior Form 26 said, and again states that Mr. Price was suffering from a gunshot wound to the right side of the chest. Mr. R. Price stated to the above officers that he was shot by a man named Junior who drives a blue Ford Escort that lives at Columbia Point and has a sister who lives on Ruggles Street. Did I have read that correctly?

A. You did.

Q. And this was obviously something that was transferred or given over to the homicide unit?

A. Yes.

Q. And do you recall if you knew this information when Junior came in for questioning?

A. I don't know if I knew verbatim what's contained in these reports, but I'm sure that it was probably shared with us at some point that Roosevelt made a

CONFIDENTIAL

Page 46

statement along the lines that Junior shot him. I'm sure that we probably had some information along those lines.

Q. Okay, great. Do you recall ever getting any information from any either witnesses --

MS. ROSE: Sorry, strike that.

Q. Do you recall getting any information from either of the victims that Ronnie Qualls was at all involved in this?

A. From either of the two victims?

Q. Yes.

A. I didn't speak to the victims. I mean, one was dead shortly after he was shot, and the other one died a couple of hours later. I did not have a conversation with the victims.

Q. Right, but this statement is from one of the victims to a different officer again about who shot him. Do you recall ever getting any information from any officers that Ronnie was identified by either victim?

MR. JOHNSON: Objection.

A. Are you saying as far as the early morning hours whether anybody if it was passed on by the guys who were shot whether or not Ronnie Qualls was the shooter?

Q. Right. I'm just asking if either of these

Page 47

victims as far as you know identified Ronnie Qualls as having any involvement.

A. In reading the reports it can go both ways. It's kind of convoluted, and they're saying that at one point there's Junior, and then another one that he was a passenger in the Escort, but we all know that Junior was the driver and not the passenger. So, all of that information was part of the case at some point. It was extremely fluid as you all know in those early morning hours. So, our job is to gather as much information as we can and start to build the case.

Q. Right, but what I'm asking is, was there ever a victim, either victim, that identified Ronnie as having any involvement in this?

MR. JOHNSON: Objection?

A. Well, yes, the two victims, one was dead, and I don't think he had an opportunity to say anything, and the other one relayed to the responding officer that it was Junior. I don't know that any of them ever said that it was Ronnie.

Q. Okay. So, you don't have any information that would lead you from those victims that would lead to Ronnie?

MR. JOHNSON: Objection. It's a misstatement

Page 48

as to what he testified to.

Q. I mean, neither of those victims identified Ronnie as having any involvement, correct?

MR. JOHNSON: Objection. If you know the answer, you can testify.

A. I don't know. Unless you want to infer when you said the passenger --

Q. Well, no, I'm not inferring anything. I'm saying from information that you got either from documents or from talking to other officers, did the information that you have in this case, did either of the victims ever identify Ronnie as having any involvement in this shooting?

A. No.

Q. And that's all that I'm asking.

A. No.

MR. JOHNSON: I'm going to make an objection as to the way that you rephrased the question because again, it was a misstatement of earlier testimony, but you can move on.

Q. I'm just going to show you this because it may not be yours. Do you see this handwritten note here?

A. Yes. Is that one of many several pages?

Q. Yes. Is this yours?

Page 49

A. It is.

Q. And these get darker. Are these still you? This is page --

A. After looking at all of those -- I actually had the opportunity to second seat the prosecutor Ros Miller during the first trial and these are all of the notes that I took in my capacity as working as a second seat officer.

Q. So, this would have been during the trial, all of these notes?

A. Yes, during the trial. Those are notes from the witnesses that were testifying daily, and something to do as I was sitting in the courtroom for eight hours a day.

Q. So, these were not written at the time of the investigation, these were written at the time of the first trial?

A. These would have been notes taken in my capacity as the second chair during trial number one.

Q. And so this goes --

MS. ROSE: I will put these in, and we're not going to go through all of the pages, but we will put these in as Exhibit 2 and it's the City of Boston 3739 all the way through --

Dunn Reporting Services, Inc.
617-422-0005

13

CONFIDENTIAL

Page 50

Q. Actually, is that yours as well, this last one?

A. That's mine as well, but it's not involved with that group of notes.

MS. ROSE: I can take that one off then and will just keep it to the notes on this. So, these handwritten notes end here. So, this will be Exhibit 2 going from the City of Boston 3739 all the way to 3883.

(The handwritten notes were marked as Exhibit No. 2 for identification.)

Q. These are all of your handwritten notes from second chair of the first trial?

A. Well, as I look at this now, this to-do list is from the second trial obviously in March of 1998. So, that was a to-do list obviously preparing for the second trial.

Q. But you think --

A. I don't know without looking at each one of these sheets whether they were all -- I mean, that one was taken in '92 right there. When was the trial? Was the trial the end of '93, wasn't it?

Q. I would have to look it up?

A. The trial was in '93. It was 11 of '93, I believe. What does that say up there?

Q. These are just dates and this is 10/29 --

Page 51

A. Okay, something that they were referencing. All of those notes were taken obviously during trials, and they're not like case notes or anything.

Q. Okay. We won't go through all of them, but they're yours and they're from the trials?

A. Yes.

Q. One or two, and we're not totally sure, but most likely you think that these first pages are from the first trial?

A. Yes.

Q. Were you assisting the prosecution when you were second chairing?

A. Yes. In those days, again, an excellent learning tool was that you had a three or four-man squad, and one of them would have an opportunity unless there was an objection by the Court to second chair a prosecutor from the pretrial motions all the way through the trial, and then another one of us would have be testifying and the other one would have been coordinating witnesses, along those lines.

Q. Okay. So, this next exhibit is the statements from Junior Williams. It's all three of his statements combined into one document. This goes from the City of Boston 3483 and I will put this in as Exhibit 3.

Page 52

(The statements of Junior Williams were marked as Exhibit No. 3 for identification.)

Q. Do you know if you were present for all of Junior William's statements?

A. I was not.

Q. Okay. Do you know which ones that you were present for?

A. I do.

Q. And which ones were those?

A. The first one and the night that he was arrested on the third one.

Q. So, the first one was the night that he was arrested?

A. The first one was the night -- the morning of the homicide, October 3rd. He was arrested as a result of an indictment warrant at the end of December 1st, I believe it was.

Q. An indictment warrant because of this murder?

A. Yes, Junior Williams is indited and charged and then ultimately arrested.

Q. So, this first page, and this is Page 1 of Exhibit 3, City of Boston 3399. So, yes, Saturday, October 3rd, 1992 at 11:07 a.m., and conducting this interview is Detective Dennis Harris Boston Police

Page 53

homicide unit. Present is Detective Timothy Murray, Boston Police Homicide Unit; is that all accurate?

A. Yes.

Q. So, this was at 11:07 a.m. It's my understanding that he was brought in just a couple hours after the shooting. So, in the early morning hours, you know, two or three o'clock in the morning. Do you know what was going on between that time if he was brought into the station and then wasn't questioned or wasn't questioned on a recording until 11 a.m.?

A. According to the sheet that I had recently reviewed, the Miranda sheet, that he was read his rights at 5 a.m.

Q. Okay.

A. And then at some point I'm sure that there's a pretapped interview because we just did not break open a tape and say let's talk, it would have been a pretaped portion of this particular interview, but I know between that timeframe of 5 a.m. and 11 a.m. there were other things going on. For instance, I believe that Donna Carrington, I interviewed Donna Carrington I think at some point that morning also. I also interviewed Leroyal Holmes in between that timeframe, and I think that at some point that somebody assembled a

Dunn Reporting Services, Inc.
617-422-0005

CONFIDENTIAL

Page 54

photographic array in between the time. So, there was a lot of stuff going on before we actually went on and took a taped statement from Mr. Williams.

Q. So, let's talk about the prerecorded statement, why wouldn't everything just be recorded?

A. Well, the bottom line I think that I mentioned it when I first started was there's a lot of barriers as you know of people not wanting to be involved from the outset. Nobody just wants to come in, hey, let me tell you what happened here, it's nice to meet you, here is exactly what happened. It takes a series of back and fourths in developing a rapport. I mean, a lot of times we don't even break out a pen or a notepad because they're obstacles. Our objective is to get a statement. So, a lot of times then once a Miranda sheet in this particular case was read, the individual agreed to speak to us. We would then have a conversation slowly, but surely trying to get all of the facts that unfolded. He would have been provided an opportunity then once he agreed to speak to us to tell us in his own words in like a narrative version as to what happened and then we would go back and ask a series of questions, but we would never just walk in and start. Like in today there's video cameras as soon as you walk in the door.

Page 55

Back in the 90's there were no notes, no pens, no cameras, no tapes until such time that we obtained a statement, and then the individual being interviewed would agree then to what his version of the events on the record.

Q. Okay. Do you recall doing that preinterview with Williams that night?

A. Yes, I would have. I don't have a specific memory. Again, 33 years ago, but I know that that was my practice that always I would try to obtain a statement and get as many facts as you can and then you know once we have some sort of chronological breakdown of the events, then just ask, please, the best product is your words, give us a taped statement. So, yes, a pretapped proportion would have happened. I just don't have a specific memory of it taking place because its been so long.

Q. And when you would bring people in, would you look them up in the system to see if they had a record or outstanding warrants or that kind of thing?

A. I mean, that's a practice, but it doesn't always happen. I mean, sometimes it does happen. I mean, if you have the luxury of conducting an investigation and you have days in advance in anticipating interviewing

Page 56

somebody, it's nice to get a little background on who you're approaching and how you approach it, but a lot of times these things are so happening at the moment, that you really don't have enough time to sit down and find out who they are and what they're all about. It's just take the statement, and we can always revisit when necessary.

Q. There was in the file that I got there was quite a few basically searches on everybody involved like Fred Munroe, his criminal history searches, is that something that the police would do when somebody would come in and give a statement or if somebody came in as a suspect?

A. Again, and I don't know exactly when the search would have been conducted; however, with all of the witnesses in a homicide investigation at some point clearly you're going to want to know all of their background and just as far as assessing all of their credibility. So, yes, you're right at some point there would have been searches done, background checks, yes.

Q. Okay. And I can put in this document that talks about the sweatshirt, but it's my understanding that Mr. Williams was wearing a sweatshirt that had blood on it when he was picked up, do you recall that?

MR. JOHNSON: Objection.

Page 57

A. I do recall as a result -- again, let me just clarify that. I have no specific memory; however, reviewing reports I recall that he was wearing a grey sweatshirt and it was ultimately taken from him, and then submitted to the crime lab, yes.

Q. Did you have any personal involvement in saying, hey, let's take that sweatshirt or was that something that was done by other people?

A. No, that was probably done by us during that interview that at some point, hey, before you leave we're taking that sweatshirt.

Q. Okay. Why would that be important to do?

A. I don't know. Again, I don't have a specific memory. I don't know if it was apparent to us while we interviewed him that there were redish brown stains. I don't have a specific memory of that, but it would have been important because actually it was evidence of a crime and we wanted to make sure that we had it.

Q. And I assume at this point you have been made aware that much later, many years later, there was DNA testing done on that sweatshirt and the blood on it was one of the Price brothers?

A. I was made aware of that, yes.

Q. I'm going to put this in and I know we're still

CONFIDENTIAL

Page 58

looking at that statement of Junior Williams, but this sweatshirt -- let's see, I can stop sharing this. Is that typically how things would go, is that the detectives would identify things that needed to get tested for a blood match or DNA or whatever it was?

MR. JOHNSON: Objection to form.

A. Yes, sorry.

Q. You can answer even when he objects unless he says, objection, don't answer it, but generally you can answer. So, we're looking at this is the City of Boston 3666 and 3667, and let's put this in as Exhibit 4.

(The lab testing was marked as Exhibit No. 4 for identification.)

Q. So, the first page, the file is Ronald Price and Roosevelt Price and then investigator it says Lieutenant Detective Murray, et al., and then items submitted to crime lab, and this is on 10/3/92 and the murder happened either late night 10/2/92 or early morning hours on 10/3/92. There's a couple of items from the victims and then this fourth item, bag number four, containing the following items: A. One grey sweatshirt belonging to James Earl Williams. Do you see that?

A. Yes.

Q. And did I read that all correctly?

Page 59

A. You did.

Q. And it says, "Please test this garment for the following: Presence of human blood on visible spots; blood typing of the blood spots; matching of this blood to the blood of victim Roosevelt Price and/or Ronald Price; location of these blood spatterings on garment; if garment was in proximity of gun shot blast, any test to see if there is presence of gunshot residues on garment." Did I read that all correctly?

A. You did.

Q. And at the bottom it says Detective Dennis Harris, that's you?

A. That's me.

Q. So, you would have been submitting all of these items for testing?

A. Yes.

Q. So, presumably when you have two people murdered and one of the victims identifies Junior as the shooter, it would make sense to take his sweatshirt and test it for blood?

MR. JOHNSON: Objection.

A. Yes.

Q. Is there a reason why he didn't get arrested that night?

Page 60

MR. JOHNSON: Objection.

A. Again, it was extremely fluid. What we had and I believe that I said it to you that the investigation, our job is to gather all of the facts based on the information that we had from the officers is that statement that came that Junior did it. Our responsibility is to gather as much information as possible and see where the truth lies. So, he was the first of many witnesses that was interviewed.

Q. Okay. Well, he would have been a suspect at that point; is that right?

A. It's fair to say that at that point, yes, that his name was mentioned as a possible shooter, yes. As the shooter, yes.

Q. And in your years of experience as a homicide detective, do you have any knowledge of the reliability of witness testimony when your understanding is if somebody knows somebody, it's much more likely that they will be able to identify them, is that consistent with your knowledge?

MR. JOHNSON: Objection to form.

A. Yes. I mean, history helps other than a one time sighting in my experience if that's what you're saying, yes.

Page 61

Q. Right. So, if somebody was able to say, that's Junior, like someone knew their name, they had seen them before, that's going to be a more reliable witness statement then somebody that gives you a description; is that accurate?

A. Well, if it was factual, and again it was too premature in the investigation at that point to arrest him based on what we had.

Q. So, you thought that it was too premature based on the fact that you had a victim giving a dying declaration of who the shooter was and then you had that shooter picked up with blood on his sweatshirt, and you thought that it was premature to arrest him?

A. Again, the case was so fluid, and you have someone that makes a statement like that. And as we all know now he was not correct, there was an incident involving two people. I mean, who's to say the only name he knew was Junior. I mean, there was also information that the shooter was a passenger in a black Escort, and we knew that in the early morning hours that Junior was not a passenger, he was in fact the driver. So, again, it was a little sketchy to say the least. So, the best course of action was to let the investigation follow itself in the days to come and

Dunn Reporting Services, Inc.
617-422-0005

CONFIDENTIAL

Page 62

develop. There were a lot of witnesses that needed to be spoken to.

Q. Right.

A. That's the way that it all unfolded.

Q. But a driver or a passenger, they would have been involved in the shooting if you're a driver or a passenger you would want to --

A. Right.

Q. So, is there a reason why Junior wasn't arrested at this point?

A. There is no specific reason that I have as to why he wasn't arrested. Again, it was very fluid and there was nothing to prevent us from going back and just keep developing more information, and that's the way that it all unfolded.

Q. And then looking at Junior Williams' statement, is that the first time that Ronnie Qualls name is brought up?

A. In Junior Williams' statement --

MR. JOHNSON: Objection to being a vague question. Which statement?

Q. The first statement? I can share it again.

A. Well, obviously this statement began -- number one statement began at 11:07 a.m. So, the name was

Page 63

brought up a lot earlier than that in either Williams' pretapped portion of that interview because then again at some point there was an array assembled and there was an identification made of Ronnie Qualls. So, it was before that 11:07 timeframe that his name was brought up.

Q. Do you know who brought it up first?

A. I'm not quite sure if it was Williams or not. I don't have a specific memory if it was Williams. I know that at 7 a.m. I believe that Leroyal Holmes was interviewed. I think that I may have been involved in that with Sergeant Keeler. I believe that it may have been Leroyal Holmes that named him first. I'm not quite sure. I don't have a specific memory, it's been a long time ago.

Q. Okay. I'm going to bring up Leroyal Holmes' statement, but he doesn't name Ronnie Qualls. Would that surprise you that he doesn't give a name?

A. That's correct. And that refreshes my memory after reviewing the reports, he just describes him. He does not name him. So, yes, without bringing it up, it's fair to say that Junior Williams in that pretapped portion identified Ronnie for the first time, yes.

Q. And at that point Junior Williams was a suspect

Page 64

with blood on his sweatshirt?

A. Yes. He was always a suspect, yes.

Q. And once Ronnie's name was brought up, do you recall what happened at that point in terms of investigating Ronnie?

A. I know that at some point after he mentioned, and it must have been Junior, an array was assembled. I believe that that morning Williams identified Ronnie Qualls as the person that was in the car and involved in the fight, yes.

Q. But Junior Williams as your initial suspect identified by the victim was the first person that morning to mention Ronnie at all?

A. Yes, that sounds fair. That's correct.

Q. Okay. Do you know what Ronnie and Junior looked like?

A. Do I know what they look like?

Q. Yes.

A. Yes.

Q. Because it's my understanding that Junior is a very dark black man?

A. One is light and one is dark, yes.

Q. So, it would be difficult to confuse them; is that accurate?

Page 65

MR. JOHNSON: Objection.

A. I don't know. It depends on who's looking at them. As you well know everybody looks at witnesses differently. Everybody sees something different.

Q. So, if you were putting together a photo array, would you put the pictures of the two of them in a photo array together?

A. No, I would not.

Q. Did they not look similar enough to put in a photo array together?

A. No, one was light skin and the other was dark skin.

Q. Okay. So, after this morning -- let's say after the statement of Junior Williams when you're doing all these other statements of other witnesses, it's my understanding that nobody has shown a photo array of Junior Williams' photo until months later; is that consistent with your recollection?

A. I'm trying to remember when Junior Williams's photograph was first --

Q. I can pull it up for you. There's an array shown to a number of different witnesses with Ronnie's photo, but there's no array shown with Junior Williams' photo for quite a few months?

CONFIDENTIAL

Page 66

A. Yes, that's fair to say. I think with some of the reports that I read that, yes, it would have been months later.

Q. Do you have any idea of why that was?

A. No. I mean, we have statements from Junior Williams, three different statements, admitting to it to being there. I'm not quite sure whether it was the district attorney's office or who it was that suggested to putting an array together on Williams. I have no memory as to how that all unfolded.

Q. Right. So, as a homicide detective if you have two suspects, wouldn't it make sense to show a photo array of each suspect to every witness?

MR. JOHNSON: Objection.

A. I mean, again, from my memory of looking at these reports, they had a black Escort, they had a description of one person arriving at the back of the Jeep who was a light skinned individual wearing a dark hoodie. Our guy Williams had a grey hoodie. He was not seen at the scene of the shooting. He was seen at the Biarritz and identified subsequently by people who were at the Biarritz for being involved in that piece of it, but at the scene the shooting witnesses Mattie Buford, Fred Munroe, Leroyal Holmes, and they go to Leroyal Holmes'

Page 67

very first statement, and he's the one that puts out light skinned, dark purple or blue jacket. So, it was a completely different description of the shooter.

Q. A different description of the shooter than the victim?

A. Yes.

Q. Would it surprise you to know that Carrington's initial statement was a dark skinned black man?

A. I don't remember seeing that.

Q. And then you were present for Williams' second statement; is that right?

A. No, I was not present for the second, I was present for the third.

Q. So, the second one I'm pulling it up here and it's COB3427, and it was an interview on October 10, 1992 at 1:10 a.m. It says that Detective Murray, Boston Police Homicide Unit present and Detective Daniel Keeler. So, you were not present for the second one?

A. No.

Q. Do you know if you reviewed the second one at any point?

A. I have looked at it recently.

Q. And then you were present for the third one; is that right?

Page 68

A. Correct.

Q. And so you've read all three of his statements. The next one is December 1, 1992 and this is COB3453 at 7:40 p.m., and it's Daniel Keeler and Dennis Harris. Did his story change throughout these statements.

MR. JOHNSON: Objection.

A. Yes. After reviewing them in the last few weeks, yes. There were some inconsistencies as far as after the fact as to where he hooked up with Ronnie Qualls after the shooting.

Q. There were inconsistencies as well about what happened from the Biarritz Bar and getting in touch with Ronnie and what Ronnie did, right?

MR. JOHNSON: Objection. The statements can speak for themselves. I don't think that we need to go through every interview that Mr. Harris wasn't present at.

Q. Well, he reviewed them, and I'm getting at whether or not it's concerning to have --

A. My memory is after looking at them is that the inconsistencies primarily involved where they met up after the shooting. There were some back and fourths as far as the weapon and whether he called the weapon a strap or did he not or did he show the weapon, but I

Page 69

think that the major inconsistencies were the second time when he came in on his own to pick up his vehicle, he said that he needed to add a little bit more and that he had something else to say, and he talked about meeting Qualls somewhere in Quincy. Then the third time he came back when he was arrested, he changed it up again. I think that he said that he was in the area where he picked him up, in the area of Ruggles and Shawmut. Those are the inconsistencies that jump out at me when I read the reports.

Q. So, I mean the inconsistencies about whether Ronnie had a gun, whether Williams saw the gun, did that stand out to you as concerning?

A. Yes. Well, concerning whether of not he was willing to share it, yes.

Q. So, are you aware of what or if Williams was ever charged with a crime in connection to this case?

A. Williams was charged with accessory before and accessory after as a result of a Suffolk Superior Court indictment.

Q. Okay. Generally it would make sense that he would have -- there would be a benefit to him to make some sort of deal where if he told the police something that helped them catch a different person, that he might

CONFIDENTIAL

Page 70

get preferable treatment on whatever he was charged with, does that make sense?

MR. JOHNSON: Objection.

A. When he came in that night, the bottom line is that we read him his rights and he agreed to speak to us. There's never any promises or inducements or rewards or anything along those lines from us. The second time that he came in on his own to pick up his vehicle, he then provided information on his own. After the third time, again he knew that he was being charged, and clearly at some point he said, hey, what can you do for me, but that's all in the district attorney hands at that point.

Q. Right. So, when you're getting a statement, though, obviously there's people that are more reliable than other people, right?

MR. JOHNSON: Objection.

A. Yes.

Q. And one of the reasons that somebody might be a more reliable witness could be that they had a part in the crime, right?

MR. JOHNSON: Objection.

A. Conversely. I mean, the most reliable people is the -- that just come in and want to do the right thing

Page 71

and speak from their heart and do the right thing with no motivation whatsoever. A lot of these homicides happen in areas where people have some issues.

Q. Right. But in this case, Williams was not just a bystander that wanted to come in and do the right thing; is that right?

MR. JOHNSON: Objection to the mental impressions of another person.

A. That's correct.

Q. He was pulled off the street because he was a suspect; isn't that accurate?

A. Right.

MR. JOHNSON: Objection.

Q. And he was brought in as a suspect that night?

MR. JOHNSON: Objection.

A. There was a description of his vehicle put out and so he was brought in in that capacity as a person of interest, yes.

Q. Well, it wasn't just his vehicle, it was his name and his sister, right?

A. He was brought in -- what did you say, his sister?

Q. His name, his location and his sister. He lives in Columbia Point, he has a sister that lives at

Page 72

Ruggles. I mean, there was a description of him specifically not just his physical description, but Junior --

MR. JOHNSON: Objection as to the form and combination of questions. You can answer, if you understand.

A. Yes. I mean, when we were dealing with him, yes, he was clearly a suspect, a person of interest, whatever you want to call him, and our job was to obtain as much possible information as we could once we signed -- once he agreed to speak to us post Miranda, and that's exactly what we did. We gathered as many facts as we possibly could and allowed the investigation to take shape. That was Day 1, the morning of.

Q. Right. And if you're getting a statement from somebody that's involved with the crimes, does it ever happen that the person involved in the crime will minimize their role and maximize the role of someone else, has that happened.

MR. JOHNSON: Objection?

A. Sure, that happens.

Q. Is that a risk of getting statements from people that are involved in a crime?

A. I mean, there's always a risk. There's always

Page 73

people that give self-serving statements, that's a human condition. You know, and then at some point all the facts prove them right or wrong.

Q. Right. And in this case you found blood on his sweatshirt, and you obviously thought that it was important enough to test and it turned out that it was very important to test. Did you think in your head at that time, you know, some of the things that he's saying might not be true.

MR. JOHNSON: Objection to form. Can we ask one question at a time, please?

MS. ROSE: Yes.

A. I did gauge the veracity of his statement at the point. It was so premature that I think the fact that he actually spoke to us post Miranda and provided all of that information was very beneficial to the investigation as it unfolded.

Q. Right. So, when you're getting a statement from someone, you don't try to weigh the veracity of it or you do try to weigh the veracity of it?

A. I didn't have a whole lot of information other than there was a statement made at the scene about Junior did it, and that's all that we have at that point. We have two people shot, a horrendous set of

CONFIDENTIAL

Page 74

facts, and then the very next witness that we speak to that same morning kind of corroborates the information that was put on the table initially.

Q. And who was that?

A. That would have been Leroy's statement by describing a light skinned individual passenger in a black Escort, and then as all of that unfolded as you read that statement.

Q. Do you know why Williams didn't testify at the trial?

A. I do not know the answer to that.

MR. JOHNSON: Objection.

Q. And you were second chair in both trials?

A. I believe both trials, yes.

Q. Okay. Did you have any part in trying to get witnesses there or help them?

A. Well, as a team we would have all been involved in the case prep. So, yes, we collectively would have been checking in on witnesses and their availability and scheduling and all of that, yes.

Q. And as the team, you meant --

A. I was squad. It was our case and our squad would have been directly responsible for coordinating with the witnesses and getting them in for case prep and trial

Page 75

prep.

Q. Did you ever talk to anyone besides Tommy Montgomery at the hospital?

A. I do not have a memory of that.

Q. There's some reference to someone at the hospital mentioning Junior as the shooter, but there's no specific notice to who they talked to?

A. I think that came from Montgomery saying that he heard from somebody, but I don't know where it came from.

Q. Okay. Did you hear that Junior was the shooter directly from Montgomery?

A. Montgomery said that he heard -- I believe that he made a statement along the lines that he heard that it could have been Junior.

Q. Did you ask him who he heard that from?

A. I don't remember that.

Q. Did you take his statement?

A. That night, I don't know. I didn't see the entire file. I would imagine that there was a report drafted on a conversation with Montgomery, like an investigative report, because of the fact that he was at the hospital with a personal issue. I would imagine when he came up with the name Junior as the shooter, he

Page 76

probably had a conversation with Perez or Ottoman or the first responders at the hospital. All that I'm doing is surmising, and I'm sorry. No, I didn't ask him, and I don't remember talking to him.

Q. But you did hear that Montgomery had heard that Junior was the shooter?

A. Yes, and only that I remember reading it recently. I don't have a specific memory of hearing it that night or how that unfolded, but I do remember it.

Q. So, getting ready for trial, and pulling in witnesses. What does witness prep entail for this case?

A. I'm sorry.

Q. So, when you said that your squad would have a role in witness prep for trial and specifically talking about this first trial, what did that entail for your squad?

A. Well, this particular case and all of the cases -- I mean, there's a huge fear factor. Number one, to get them to cooperate and provide a taped statement which flies against their upbringing and conditioning. Now reality is here, it's trial time. It's one thing to go into the grand jury, but it's another thing at trial time. It's talking them through it, they're scared to death, and it's just essentially holding their hands and

Page 77

just trying to walk through the fear and do the right thing.

So, there's a lot of that type of conversations going on, and to get them there and keep them safe. In this particular case as you well know there was some intimation involved between trials. So, I mean, all of that stuff, and they grew up in the same neighborhood and the same community. It's one of the most difficult things to be is a witness in a homicide case because of everything that goes with it. So, it's not easy, and it was never easy getting witnesses prepared. So, to stay on track, we would round them up, bring them in, and have an opportunity to sit down with the prosecutor. And the prosecutor would have been able to say, hey, we need to talk about the statements that you provided and whether it's a, you know, initial investigator report or the initial taped statement, any photographs shown, any grand jury transcripts, and we would discuss that and what to expect during testimony. It's just typical case prep that I'm sure you're all aware of.

Q. Did you personally do a lot of witness prep for this case?

A. As a second chair, I probably was involved in a lot of that.

Dunn Reporting Services, Inc.
617-422-0005

CONFIDENTIAL

Page 78

Q. Do you have a specific memory of it or are you just assuming?

A. Counsel, I can't sit here and tell you that I remember the morning that Mattie Buford came in or I remember the morning that Fred Monroe came in and that this is what it was like. I'm just talking the way things are and the natural course of business as a homicide investigator for homicide trials that occurred in the city. It was never easy.

Q. Was there ever anything provided to any of these witnesses in return for their statements?

A. Anything provided, no.

MR. JOHNSON: Objection.

Q. I know that there were a couple of witnesses that stayed at a hotel at one point, was that something that was typical to happen for witnesses?

A. Any out-of-state witnesses, yes. The district attorney's office would have provided lodging for anybody that traveled from out of state, yes.

Q. But what if they were not out of state?

A. Again, there's all kinds of circumstances, everything is different. I don't have a specific memory whether anybody that was not out of state was actually given a hotel room. So, I don't have any specific

Page 79

memory.

Q. What about the spin allegations that certain people that had pending charges, those charges were either dropped or were gotten rid of after they testified in return for testifying. Do you have any recollection of that?

A. I don't have any specific memory of that.

Q. Is that something typical that would happen?

A. Again, sometimes depending on their level of cooperation if the district attorney's office got involved and waited and said, hey, maybe to take this person into consideration because of their cooperation. Again, I'm surmising that that stuff does happen and could happen.

Q. Are you aware of Detective Keeler driving certain witnesses to the court where they had pending cases and helping that case get dropped?

MR. JOHNSON: Objection.

A. Are we talking about witnesses in this particular case?

Q. Yes.

A. I have no specific memory of that.

Q. Is that something that you're aware of happening at any point?

Page 80

MR. JOHNSON: Objection.

A. I don't have any memory of that.

Q. During the time that you worked with Detective Keeler, were there ever things that he did that you thought were not consistent with what you were taught to do as a detective?

MR. JOHNSON: Objection to the form.

A. Can you repeat that please?

Q. When you were working with Keeler, was there anything -- was there ever a time where you felt like things that he was doing were not consistent with what you should be doing as a detective?

MR. JOHNSON: Objection.

A. No.

Q. Do you recall a case where you and Keeler had worked -- let me get the name of it here. There was a 1994 killing of Germaine Goffigan, a nine-year-old boy, that was hit by a stray bullet, and that was investigated by you and Keller.

A. Okay.

Q. And the person that was identified to police was Darnell Johnson.

A. Okay.

Q. Do you recall that case at all?

Page 81

A. Vaguely, yes.

Q. And there was testimony from Keeler that he wrote false statements in the police report and a sworn affidavit --

MR. JOHNSON: Objection.

Q. He said that there was a videotape of the crime scene and that you had been there, and you testified that you had not been there and you were off duty that night. Do you recall that?

MR. JOHNSON: Objection. There's three objections there. One, to the ambiguity of testimony that was given without showing the testimony or clarifying what the testimony is. Two, is to the form of the question. That covers all three of them. The question is vague and ambiguous, and you're referencing testimony from this witness without clarifying what that testimony is if it was in court or deposition what we're talking about.

Q. I can clarify. Do you recall this situation?

MR. JOHNSON: Objection to what situation.

Q. Do you recall the situation where Keeler had lied about a videotape?

A. I can tell you assuredly that it was not a lie. It was a mistake in an affidavit that he stated that I

Dunn Reporting Services, Inc.
617-422-0005

CONFIDENTIAL

Page 82

was present at the scene when in fact I wasn't. There's a big difference between a lie and a mistake.

Q. Okay. So, you're saying that it was a mistake and not a lie?

A. Yes, a mistake that other defense attorneys expounded upon and took it to the next level by suggesting it was an outright lie when in fact it was a mistake that human beings are all capable of. If you think about it, to what end. It was a mistake, Counselor.

MR. JOHNSON: Wait for a question, Mr. Harris.

Q. Do you recall that he said that there was a videotape that day?

MR. JOHNSON: Objection as to who said there was a videotape, Mr. Keeler?

MS. ROSE: Yes.

A. I'm sorry.

Q. Do you recall that Mr. Keeler said that there was a video of the scene?

A. A videotape taken of the scene?

Q. Yes.

A. I don't recall that.

Q. Okay. So, you don't recall that there actually

Page 83

was no video of the scene?

MR. JOHNSON: Objection. That's not what he just testified.

A. I don't recall a video. In my experience at some point video cameras were handed out, but then it just didn't work out. Limited memory as far as using video cameras at homicide scenes. So, I don't remember the particulars that you're referencing whether or not there was one.

Q. It's all from the same case. So, you're aware that in your opinion Keeler made a mistake that you were there and you were not there, right?

A. I remember that because that involved me as far as being there. I know that in my heart that that was a mistake. I do not have a memory of a video camera as it pertains to that case. I don't remember.

Q. Okay. Because you weren't there for that, right?

A. I wasn't there for what?

Q. For that night? The night that we're talking about?

A. That night at the scene if he videotaped the scene, I wasn't there. He made a mistake by saying that I was.

Q. Okay. Are you aware of any other issues with

Page 84

Detective Keeler involving investigations of murders?

MR. JOHNSON: Objection, vague.

A. Can you be a little bit more specific?

Q. I mean, any other untruthful things that he did or said while investigating murders?

A. No. I mean, clearly there were local defense attorneys that would like to paint a picture of being untruthfulness, but I don't have any specific facts that in fact he was untruthful.

Q. Okay. Are you aware there's a few different -- actually, I don't remember what year it was -- you started in 1988 -- '83 you started as a patrolman, right?

A. Yes.

Q. And then in '88 you started as a detective?

A. Correct.

Q. Were you an officer working or working for the BPD when the Carol Stuart case happened?

A. Carol Stuart, was that 1990? I think that I was a detective in District 11 when that incident occurred.

Q. Okay. So, my understanding is that because of -- this was in October 24, 1989, and so 1989 I guess it was started. So, after that murder and that murder investigation, there were quite a few allegations from

Page 85

people living in that area that the Boston police had overstepped and tried to coerce different things. Are you aware of any of those allegations?

A. Yes, I'm aware of what you're speaking of, yes.

Q. Are you aware of it just learning about it in general or were you personally aware of any of those incidents?

A. Well, I wasn't personally involved in it, but I was aware of it. Mission Hill is a section of the City of Boston where the people were complaining about the way that the Boston Police responded, and again if I remember the facts at the time, there was somebody on the loose that was capable of killing a woman that was nine months pregnant, and the description that was provided to the Boston Police Department was that of a black male that lived in that area. So, the response I think at the time it was adequate, and that's my personal opinion from what I remember of it.

MR. JOHNSON: I just want to make one objection and one note. It's not necessarily to the form of the question, but there is a Monell claim in this case, and so unless it's relevant to the claims against Mr. Harris or the surviving claims, I would object.

CONFIDENTIAL

(Pages 86 to 89)

Page 86

MS. ROSE: I'm getting into it, but I'm not trying to get into Monell in general.

Q. Do you know if Sergeant Keeler was involved in that case at all?

A. I don't believe that he was.

Q. And after that it's my understanding that there were a couple of different reports. There was the Shannon Report, are you familiar with the Shannon Report?

A. No.

Q. Okay. When you were in the homicide division, did anyone come and interview you or talk to you for that report?

A. No.

Q. Just so you're aware, the Shannon Report was a report for the Attorney General's civil rights division on Boston Police Department practices. So, you weren't aware of that happening, that report at all?

A. When you speak of it, I'm aware of the fact that there was a report, an investigation done based on the reaction. There was a report afterwards with some suggestions, but I don't have any memory of the particulars.

Q. Okay. It looks like it was published December

Page 87

18, 1990. So, you would have been a detective at that point, but not in the homicide unit yet, right?

A. Yes, correct.

Q. Have you ever read the Shannon report?

A. I may have, but I don't have any memory of it, though.

Q. Do you recall there being discussions with detectives after this report came out about there were findings that some of the detectives might be unconstitutional?

A. I don't remember any of that, no.

Q. So, you don't recall the Boston Police ever doing any retraining or anything like that for detectives after this report came out?

A. They may have, but I have no specific memory of that, though.

Q. And you don't have any specific memory of anyone coming to interview you or trying to interview you for this?

A. No.

Q. One of the things that was discussed in the report was coerce of interrogation practices. Have you witnessed any coerce of interrogation practices while you were at the homicide division?

Page 88

A. Of a witness?

Q. Yes.

MR. JOHNSON: Objection to the form of the question, and to vagueness and ambiguity of the topic.

A. I have not witnessed in the 22 plus years that I spent in the homicide unit in doing tons of interrogations. I have not anticipated or witnessed any coercive interrogation technicians at the Boston Police homicide unit.

Q. All right. And then after the Shannon Report there was the St. Clair report, are you familiar with that?

A. I'm familiar with the name of it, yes.

Q. Do you know if anybody ever interviewed you for that report?

A. Not to my memory, no. I don't believe that it ever happened, no.

Q. Let me just find a date on that. It looks like it was published January 14, 1992, and so you would have been in the homicide unit at that point. Did you ever read through the St. Clair report?

A. Yes, I'm sort of remembering maybe that I spoke to individuals that are promoted and not qualified -- I'm not quite sure. I don't have a memory of it.

Page 89

Q. There was a section about promotions that were not made on merit. There was another part that had high complaint rates for certain officers and not enough follow-up. Do you recall anything like that?

MR. JOHNSON: I'm going to object to the generalization as to the St. Clair Report. If you want to show specific portions of it to Mr. Harris and ask what he thinks about it, that's fine, but to ask about dozens of pages and asking him what he knows about it when he has already said that he doesn't know the content, I think is inappropriate.

MS. ROSE: Well, I mean, he said something about not being promoted on merit, and so I would ask that he respond to that. I don't have much else on this actually at all actually.

MR. JOHNSON: Just note my objection, thank you.

Q. Do you recall after -- let's say after the Shannon Report, do you recall any changes to how things were done in the detective unit?

MR. JOHNSON: Objection.

A. No.

Q. What about after the St. Clair Report, do you recall any changes in the homicide unit?

Dunn Reporting Services, Inc.
617-422-0005

CONFIDENTIAL

Page 90

A. What type of changes were suggested?

Q. So, I guess I have to go back into it. So, in the Shannon Report it was more about civil right violations. So, after that came out in 1990, do you recall any changes that you were aware of in terms of the civil rights violations?

MR. JOHNSON: Objection.

A. I'm not aware of any changes that pertain to me or my course of business or any of that stuff, and so, no.

Q. And no additional trainings or anything that was done as far as you know?

A. As far as violating people's rights?

Q. Yes.

A. No, I don't have a memory.

Q. Okay. Are you familiar with the term testilying? It's not a real word, like a proper word.

MR. JOHNSON: And I'm going to object to the use of something that's not a real word in an attempt to make some -- I don't know a better way to use this, so I apologize if it sounds offensive, but to make some cheap phrase about a fake word, and so I would object to the use of the term. You can ask your question if he knows about it.

Page 91

Q. It's not a term that I made up and it's not really a cute term, it's kind of a terrible term, but have you heard that term before testilying?

A. I have.

Q. In what context have you heard it?

A. People would naturally, the public, the press, the defense attorneys would like to use it more often than not. Speaking from myself in the 22 plus years I spent in homicide, I took great pride in the product that I produced, and it was always factual. You can speak to anyone and even the individuals that were incarcerated for life sentences, they can speak to the veracity that I had. So, testilying never pertained to me. It was a word that was picked up by a few local defense attorneys that like to throw that around to the extent that they could.

Q. And who would it pertain to?

A. Defense attorneys?

Q. No, no the testilying, what does it mean?

A. Testilying clearly it was floated around that police officers would not tell the truth when on the stand. Clearly -- again, at my level up at the Suffolk Superior Courthouse it was crazed by some of the defense attorneys just to paint police officers with a bad brush

Page 92

just to benefit themselves.

Q. You stated that you've always been truthful in what you said, but have ever witnessed any other officers being untruthful in what they said?

MR. JOHNSON: Objection.

A. I have not witnessed police officers lying in a case.

Q. I'm almost done. I just want to check that I have everything that I need. Just going back to this case and the initial investigation. We've already talked about the interviews the night and gathering that information. Do you recall when an arrest warrant was first issued for Ronnie?

A. Yes.

Q. When was that?

A. I believe that it was the 5th of October. A couple of days later.

Q. Do you remember when an arrest warrant was first issued for Junior Williams?

A. Yes.

Q. When was that?

A. He was indited as a result of a grand jury investigation and the warrant was issued December 1st of '92.

Page 93

Q. Okay. Is there a reason why he wasn't arrested at the same time as Qualls?

A. I don't know the answer to that.

Q. At that time was it your understanding that they were both in the vehicle and both involved in the crime?

A. Yes.

Q. Would it make sense to arrest both of them at the same time.

MR. JOHNSON: Objection.

A. Well, it depends. Clearly, it's not the homicide unit's call, it's the district attorney's call. We were presenting all of the facts as we were obtaining, and it was a very fluid investigation. So, it just unfolded the way that it did. I don't remember having any decision, well, let's not arrest Williams today. I don't remember any of that. It just happened when it did.

Q. So, you're saying that the DA's office would decide when you would issue an arrest warrant?

A. Well, the way that the process was in the homicide unit is that we would gather the information, and the investigation -- we would conduct the investigation when we had a product that was ready to be presented to the grand jury. We would introduce it to

Dunn Reporting Services, Inc.
617-422-0005

CONFIDENTIAL

Page 94

the prosecutor, but if there was probable cause for the outset, the commanding officer would cooperate and communicate with the district attorney's office about making -- issuing an arrest warrant when it came to homicide because the district attorney's office has the jurisdiction over homicides.

Q. And you said when there's probable cause at the outset?

A. I mean, that it's a smoking gun when you respond and all the facts are right there, and then the calls are made to the district attorney's office requesting a warrant issue. It's not like a crime of burglary or something where the district detective makes the call himself and then gets a complaint. All arrest warrants for the homicides go through the district attorney's office.

Q. So, at the time that -- well, let's back it up. So, when one of the victims of the shooting identified Junior as the shooter, would that have given you probable cause to arrest him at that point?

MR. JOHNSON: Objection. Calls for a legal opinion.

A. Not really. You want to get some more information. I mean, could we have, probably, but we

Page 95

didn't, we decided to just obtain more facts and let the investigation unfold.

Q. And as a detective in the BPD, one of the things that you do is decide whether you have probable cause or not, correct?

A. Correct.

Q. Okay. So, that's not out of the scope of something that you can decide?

A. In the homicide unit it's different. What I think and then you have to have conversations with your superiors who then in turn gets ahold of the district attorney's office because it's all going to be a grand jury investigation, and warrants issued out of the Court. So, it's not just -- it would not have been my call.

Q. Right, but in general officers need to know what probable cause is and when they have probable cause to make an arrest, right?

A. Right.

Q. And that's part of how you ensure that you don't violate someone's constitutional rights; isn't that accurate?

A. Right, exactly.

Q. So, if you had a victim of a murder who gave a

Page 96

dying declaration of who the murderer was, would that give you probable cause to arrest that person?

MR. JOHNSON: Objection.

A. Again, you have to sort out the veracity of the statement and whether or not it was factual. You want some corroborating evidence locking somebody up for the murder. So, you want the case to unfold and develop some corroborating evidence.

Q. How about in this case you have the victim stating that it was Junior and then you find Junior with blood on his sweatshirt, at that point would you have probable cause?

MR. JOHNSON: Objection.

A. No, there was blood all over the place. There was blood splattered all over the Biarritz, all over the black Escort. During that ride to get a strap and return to the scene. The weapon was pulled out of the bushes, wiped off. There's a host of different reasons as to why blood ended up on Junior Williams' sweatshirt. It wasn't a given, Counsel.

Q. I'm not saying it's a given, but I'm saying at that point did you have probable cause to arrest Junior Williams based on those two items?

A. Could we have, sure. Was it a solid case, no.

Page 97

That's why you let the case build itself. You want to get as much evidence that you can especially in the murder business, get as much evidence as you can. He wasn't going anywhere.

Q. How did you know that he wasn't going anywhere?

A. He cooperated with us. We had his vehicle and he was willing to cooperate, and so it was fluid. In our job the more that he wanted to talk, the better it was for us.

Q. So, when you're deciding if you have probable cause to make an arrest, is there a process that you go through where you weigh the veracity of the evidence?

A. Well, in the homicide unit what would happen is that the squad commander, and in this case it would be Lieutenant Murray, who then would have a conversation with who's the commander in '93, Captain McNully, who in turn would have reached out to the head of the Boston DA's office homicide unit who may have been Phyllis Broker at the time, I don't know. And then those collective conversations would determine whether or not there's probable cause, go get a warrant. I mean, that's the way it was done in those days, and it's still done today.

Q. Was that communication verbal, was it e-mails?

Dunn Reporting Services, Inc.
617-422-0005

CONFIDENTIAL

(Pages 98 to 101)



Page 98

A.  Those would probably be all verbal communications and phone calls.  I know that the conversation between the squad commander would have been in-person with the unit commander and then he probably would have made a call to the district attorney's office.

Q.  Do you recall having any prior interaction with Ronnie Qualls prior to this case?

A.  No.

Q.  Did you know if anyone else in your homicide squad had interactions with Qualls before this case?

A.  I don't know the answer to that.

MS. ROSE:  I don't think that I have anything else.  I think that's it.

MR. JOHNSON:  I don't have any questions, but I do want to put two things on the record.  I think first, Ms. Rose and I had talked about putting and using the usual stips, and I don't know if we can put that in the transcript somewhere in the beginning.  Second is the exhibits that we produced here are all covered by a protective order.  Generally depositions are not covered by protective orders, but I would just ask that the exhibits at a bare minimum, and I would prefer the entire deposition be covered by the protective order.  I just wanted to put that on the record.  I think that the

Page 99

exhibits have to be because they were not redacted and so marked.

MS. ROSE:  Right.  Do you want me to -- well, I don't have the stickers to mark them.  Do you want me to keep the Exhibits?

MR. JOHNSON:  If you're fine just saying that the deposition is covered by a protective order and then we can confer on redacting appropriate parts when we use the exhibits at trial --

MS. ROSE:  That's fine.

MR. JOHNSON:  I'm fine just saying that we can mark the whole deposition subject to the order and deal with that later.

MS. ROSE:  I will agree to that.  There are obviously I have other versions of some of these documents that are not -- like the Williams' statements, I have versions that are not protective.  So, if there are versions that are not protected.  So, if there are versions that are not protected, obviously those wouldn't be covered by the protective order because they are out there in another way.  I think that I don't have the handwritten notes another way or whatever.  I've only gotten through that, sure.

And then we can just put on the record the usual

Page 100

stipulations everything except as to form.  Do you want to do a read and sign?

MR. JOHNSON:  Yes, since summary judgment is due by July 25th could we just say 30 days.

MS. ROSE:  That's fine.  Thank you.

(Deposition concluded at 12:58 p.m.)

Page 101

C E R T I F I C A T E

I, DAWN T. RABBITT, a Certified Shorthand Reporter and Notary Public duly commissioned and qualified in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 13th day of June, 2025 at 10:42 a.m., the person hereinbefore named, DENNIS PATRICK HARRIS, who provided satisfactory evidence of identification as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts, was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that this is a true record of the testimony given by the witness to the best of my ability.

My Commission Expires:  September 23, 2033

_____
Dawn T. Rabbitt, Notary Public

Dunn Reporting Services, Inc.
617-422-0005

CONFIDENTIAL

Page 102

ERRATA SHEET DISTRIBUTION INFORMATION

DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS

ERRATA SHEET DISTRIBUTION INFORMATION

The original of the Errata Sheet has been delivered to Attorney Adam D. Johnson, Esquire. When the Errata Sheet has been completed by the deponent and signed, a copy thereof should be delivered to each party of record and the ORIGINAL forwarded to Attorney Kelsey R. Rose, Esquire, to whom the original deposition transcript was delivered.

INSTRUCTIONS TO DEPONENT

After reading this volume of your deposition, please indicate any corrections or changes to your testimony and the reasons therefor on the Errata Sheet supplied to you and sign it.  DO NOT make marks or notations on the transcript volume itself.  Add additional sheets if necessary.  Please refer to the above instructions for Errata Sheet distribution information.

Page 103

PLEASE ATTACH TO THE DEPOSITION OF:  Dennis Patrick Harris

CASE:  Ronnie Qualls vs. Francis Roache, Daniel Keeler, et al.

DATE TAKEN:  June 13, 2025

ERRATA SHEET

Please refer to Page 102 for Errata Sheet instructions and distribution instructions.

PAGE        LINE        CHANGE        REASON

_____

_____

_____

_____

_____

_____

_____

I have read the foregoing transcript of my deposition, and except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.

Executed this_____day of_____, 2025.

_____

(Dennis Patrick Harris)

Dunn Reporting Services, Inc.
617-422-0005