1-1

Volume: 1
Pages: 1-63
Exhibits: See Index

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                          SUPERIOR COURT DEPARTMENT
                                     OF THE TRIAL COURT

*******************************
                              *
COMMONWEALTH OF MASSACHUSETTS *
                              *
vs.                           *    Docket No. 9284CR11850
                              *
RONALD QUALLS                 *
                              *
*******************************

RE: MOTION HEARING
BEFORE THE HONORABLE CHRISTINE M. ROACH

APPEARANCES:

For the Commonwealth:
Suffolk County District Attorney's Office
By: David Lewis, Assistant District Attorney
One Bulfinch Place
Boston, Massachusetts 02114
617.619.4161

For the Defendant:
Boston College Law School Innocence Program
By: Charlotte Haldeman Whitmore, Esquire
885 Centre Street
Newton Center, Massachusetts 02459
610.761.2712

Boston, Massachusetts
Courtroom 906
February 5, 2020

Court Transcriber:  Lisa Marie Phipps, Certified Shorthand
Reporter, Registered Professional Reporter, Certified
Realtime Reporter

*LMP*

*Serving:  Massachusetts  Rhode Island*
*Connecticut  New Hampshire*
*LMPREPORTING@GMAIL.COM*
*(508) 641-5801*

I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

(None.)

EXHIBITS:

(None.)

FOR IDENTIFICATION:

(None.)

P R O C E E D I N G S

(Court called to order.)

(Defendant present.)

(11:02 a.m.)

THE CLERK:  We are on the record.

THE COURT OFFICER:  Court.  All rise. This court is now back in session.  Please be seated.

THE CLERK:  Good morning.  For the record, before the Court is the matter of the Commonwealth versus Ronald Qualls on Indictment No. 9284CR11850.

Mr. Qualls is in custody, present, represented by counsel.  The matter here is for a motion hearing.

Identify yourselves for the record, please.

MR. LEWIS:  David Lewis for the Commonwealth, your Honor.

THE COURT:  Good morning.

MR. LEWIS:  Good morning.

MS. WHITMORE:  Good morning.  Charlotte Whitmore representing Mr. Qualls; and with me at counsel table is Attorney Sharon Beckman and third-year law student, Rachel Feit.

THE COURT:  Good morning, everyone.  Good morning, Mr. Qualls.

THE COURT:  And are there new people with us this morning that I didn't meet last time?

MS. WHITMORE:  Yes.

THE COURT:  Is there anyone you want me to meet?

MS. WHITMORE:  We have a large number of Mr. Qualls's friends and family.  Maybe, perhaps, if they could just stand for your Honor, to identify who's here on behalf of Mr. Qualls to support him.

His mother is here.  His Aunt Delores; another, Aunt Carla is here, a number of cousins, his son's mother.

THE COURT:  Welcome, everyone.

UNIDENTIFIED SPEAKER:  Thank you.

UNIDENTIFIED SPEAKER:  Welcome.

MS. WHITMORE:  Your Honor, before we begin, can I just request the Court's permission for my client's handcuffs to be removed for the hearing?

THE COURT:  No.  They have to stay the way they are.  Thank you.

MS. WHITMORE:  Thank you, your Honor.

THE COURT:  First, let me thank the defense for filing the trial transcripts last week.  I received them on January 27th.  That was very helpful to the Court.

I want you to know, though, that I am missing a page that I would like to see.  It is Volume IV, it's page 248.  The date is 3/26/98. I believe I have everything else, but for some reason that page just wasn't -- it seems like it wasn't copied.

It would be helpful for me to have that, because it's -- it is a portion of the transcript.

It says something about sweatshirts, so I think it would be helpful for me to see it.

Also, I received last week, on the 29th, defendant's supplemental memo of law, which was also very helpful to me.

I assume that all of you were involved in working on that brief.  So I want to thank you for that.

There was a new case from the SJC on Monday.  It doesn't change the law at all; but I just wanted to acknowledge that the *Perez* case came down on February 3rd, which I've read, so I

may be relying on that in some part; but I wanted to be sure everyone else had seen it as well.

So I have read the entire record, and I've read all of pleadings that have been filed most recently.

And I think the place to begin is probably with the Commonwealth, so let me hear from you, Mr. Lewis.

MR. LEWIS:  I would start out with the question your Honor asked in your January 3rd order, I believe it was, where you had a question about the intimidation witness charges that would happen between the trials.

THE COURT:  Yes, and there's -- certainly there's some evidence presented in the second trial on that question.

MR. LEWIS:  Right.  So that person was -- it was Leroyal Holmes.  He was one of the alleged eyewitnesses to the crime.

THE COURT:  Um-hum.

MR. LEWIS:  That charge was dismissed following the second trial.  We have indications that --

THE COURT:  Excuse me, can you just slow down for one minute?

There was a charge brought against Mr. Qualls --

MR. LEWIS:  So he was already --

THE COURT:  -- because that's not -- that's not clear from the record that I've seen so far.

MR. LEWIS:  He was out between -- he was out on bail between --

THE COURT:  Yes.

MR. LEWIS:  -- the trials.

THE COURT:  Yes.

MR. LEWIS:  Right?

THE COURT:  Yes, I remember that.

MR. LEWIS:  And then the charge of intimidation of a witness was made so that the bail was revoked prior to the second trial occurring.

THE COURT:  Okay.  I don't think I had that information, but go ahead.

MR. LEWIS:  It -- it appears that it was a conversation on the courthouse steps, essentially.  And that charge was dismissed.

THE COURT:  No, no.  Okay.  That's helpful for me to know.

MR. LEWIS:  All right.

THE COURT:  I do not read the transcript as saying it was a single conversation, nor do I read the transcript as saying it was on the courthouse steps.

I think it was --

MR. LEWIS:  Crossing.

THE COURT:  -- Downtown Crossing, somewhere near a T stop, right?

MR. LEWIS:  Right.  There was also -- I should say, there was also an indication that -- you say there was more than one instance.

There was -- one of the instances involved an exchange that I believe was on the courthouse steps.

And there's an indication that Mr. Holmes came to the Commonwealth and told him he was neither threatened nor intimidated by the exchange.

And there's -- it -- there's an indication in the record that was not turned over to defense at the time that let them know that.

That charge did not go forward; and it was the second interaction, apparently, the conversation that happened in Downtown Crossing, that resulted in the charge and the bail

revocation, but that was ultimately dismissed.

THE COURT:  Thank you.  That's helpful.

I notice that neither -- well, we have joint filings here -- but nor in the defendant's supplemental filing was there any reference to this issue.

MR. LEWIS:  Well --

THE COURT:  So that's what -- why I questioned.

MR. LEWIS:  So it appears that from the record that we've seen that there was a strong inclination to revoke that bail and bring him back in.

And based on the witnesses -- so Leroyal Holmes, Fred Monroe, Mattie Buford were witnesses.  Right?

And those three witnesses all had some variation of criminal liability, warrants, charges outstanding.

THE COURT:  That's almost always the case in these kinds of cases, so --

MR. LEWIS:  Well, the fourth -- well --

THE COURT:  -- what -- how does that reflect opinion the question that I asked?

MR. LEWIS:  Well, the four -- the

fourth -- oh, this is -- so I'm getting to this.

THE COURT:  Okay.

MR. LEWIS:  So the four -- the fourth witness that was present was a woman named Donna Carrington.

And she did not have any criminal liability or exposure in any way.  And she did not identify Mr. Qualls.

The other three --

THE COURT:  So, I'm sorry, can we slow down?

MR. LEWIS:  Sure.

THE COURT:  Are we still talking about the intimidation of witness issue?

MR. LEWIS:  Yeah, I'm getting back to that.

THE COURT:  Okay.  I'm lost.  I'm sorry.

MR. LEWIS:  I will -- I will provide -- we will get back to it.

THE COURT:  Okay.  No.  I think the identification question is sort of, to my mind at least, is separate from -- and I'm not saying -- I'm not overplaying this as a concern; I'm just saying that it seemed to be part of the SJC decision and it seemed to be -- it took up some

of the trial time.

MR. LEWIS:  Right.

THE COURT:  And so I just wondered why the parties did not mention it in any of their pleadings.

MR. LEWIS:  All three of those ID witnesses, including Mr. Holmes, made -- were the identification witnesses in this case.

THE COURT:  Right.  I'm aware of that.

MR. LEWIS:  Right?

Mr. Holmes -- all three of them, because of the criminal liability and because of the nature of their identifications, and because how it's directly contradicted by the DNA evidence in this case --

THE COURT:  The new DNA evidence?

MR. LEWIS:  Correct.  -- we place less reliability on those claims than they did at the time.

And one --

THE COURT:  Slow -- slow down for a minute.  When you say, "those claims," you are saying currently, you, representing the Commonwealth, place less reliability on what Mr. Holmes was concerned about back at the time

than the Commonwealth did at the time.

MR. LEWIS:  We have -- I mean, based -- especially on the first instance, but -- I don't place a lot of reliability that -- you say concern -- that that concern existed at all. Because especially --

THE COURT:  But which concern existed at all for whom?

MR. LEWIS:  Intimidation of witness of Mr. Holmes, of what you just said, that there was any real, real concern at all.

Because everything -- indication that we've seen in the record is that he didn't feel intimidated, and he didn't feel threatened.

THE COURT:  Well, so I don't know what record you're talking about.

MR. LEWIS:  Right.  Right.

THE COURT:  All I have to go on, as you know --

MR. LEWIS:  Right.

THE COURT:  -- is the SJC decision --

MR. LEWIS:  Sure.

THE COURT:  -- and the transcripts that everyone has given me.

MR. LEWIS:  Correct.

THE COURT:  So that's all I know about it.

MR. LEWIS:  All right.  As -- as to that, as to his, as to the intimidation, as to the identification, all of that evidence is given less reliability now than it is then.

That we feel it's not a concern based on our review of the record, based on everything else.

THE COURT:  Okay.  I understand.

MR. LEWIS:  All right.

THE COURT:  Now I understand.

MR. LEWIS:  All right.

THE COURT:  But you still talk -- you are talking about the identification, which is a separate argument, which I'm happy to hear you on.

MR. LEWIS:  Right.  Right.  Well, actually, I'd like to -- if possible, I'd like to cede to counsel.

THE COURT:  Well, the reason I'm asking you first is --

MR. LEWIS:  Right.

THE COURT:  -- as you know, this is somewhat an unusual proceeding, where the

Commonwealth is joining in all the defense arguments.

So I think it's important, certainly for the Court, and for the public, to understand why that is.

MR. LEWIS:  Right.

THE COURT:  So that's why I'm calling upon you first.

MR. LEWIS:  Right.

THE COURT:  Now, I'm definitely going to hear --

MR. LEWIS:  Okay.

THE COURT:  -- from anything that they want to tell me, of course.

MR. LEWIS:  So the facts are not in dispute.  A car matching Junior Williams was seen driving up to the scene of the accident.

It was a single gun -- gunfire, a single, lone-gunman crime.  It was never argued as joint venture.

It was a lone gunman, gunman approaches the Jeep, Geo Tracker, that the Price brothers were seated in, fired in the back window, walked around the passenger's side window, which was down, fired two more shots; left the scene.

Junior -- and --

THE COURT:  He got there somehow or another, right, and left somehow or another; but on foot as far as --

MR. LEWIS:  Junior Williams's car is seen immediately before the crime.

Prior to -- prior to dying, Tony Price said, on two different occasions, it was Junior Williams; his sister lives on Columbia Point.  On two different occasions.

Junior Williams, approximately two hours after the crime -- I think the crime -- the shooting occurred approximately 2:00; a.m. Junior Williams is in his car stopped about 4:00 a.m.

Detective Kuler (phonetic) and Dennis -- and Detective Harris are called.  They came in as investigating officers.

They take him into custody, the car is impounded; they take him to the station.

His sweatshirt is taken as evidence, because it has some spots on it that look like blood to them.

He is interviewed later that morning. He's interviewed after Mr. Holmes was, who just,

coincidentally, happened to be walking by when Mr. Williams was taken to the station.

Subsequently, fast forward to -- well, a little bit, they test those three -- three or four spots --

THE COURT:  Please slow down for one minute.

MR. LEWIS:  All right.

THE COURT:  Mr. Williams was interviewed three times, right, over the sequence of months?

MR. LEWIS:  Correct.  And if you look in the exhibits that were provided with --

THE COURT:  Um-hum.  I did.

MR. LEWIS:  -- the supplement, his story charitably could be described as evolving.

THE COURT:  It changed.

MR. LEWIS:  Significant -- yeah.

THE COURT:  In some important details.

MR. LEWIS:  In some very important details.

THE COURT:  Um-hum.

MR. LEWIS:  And never in Mr. Qualls's favor.  So those spots were tested.

At the time they were only -- because of the size of the -- because of the size of the

stains, or spots, they were only able to do blood typing on them.

The typing matched -- but I believe it was type B --

THE COURT:  Um-hum.

MR. LEWIS:  -- matched Junior Williams and matched the Price brothers.  Mr. Qualls, if my memory is correct, is type A, so it don't match him.

THE COURT:  No, correct.  Absolutely.

There's equivocal testimony in the record about -- I appreciate that the tests that have recently been done were not done.

What I can't quite tell from the record comparing the transcript and what's been done since is what tests were actually done back then and what was the state of DNA testing at the time?

MR. LEWIS:  My understanding, and my sort of background on this, from when I was at that table --

THE COURT:  Yes.

MR. LEWIS:  -- is that at the time of this trial, this type of testing -- that ability was not yet --

THE COURT:  So let's, for the record, though, articulate what has been done recently, the type of testing that's been done recently and how it changes.

MR. LEWIS:  What is --

MS. WHITMORE:  It's STR testing using a kit called GlobalFiler.

THE COURT:  Um-hum.  Thank you.

And those proceedings are able to identify much more precisely whose blood, as opposed to a type of blood, is that --

MR. LEWIS:  It's a -- it's a more -- it's a DNA test.  It's not a blood type test.

THE COURT:  Right.

MR. LEWIS:  So -- because the test, as you know, as this has evolved over time, the tests have become much more sensitive.

So they are going to -- the samples that you give them can be much smaller and the results can be much more accurate with that size of a sample.

THE COURT:  So we've always had blood samples from the -- I am assuming -- from the two victims?  From Mr. Qualls?

MR. LEWIS:  I think -- for this test, at

least, I think it was a swab to do this current DNA test in issue.

THE COURT:  Right.  I mean, that -- that material was taken at the time?

MR. LEWIS:  It had to have been, yes.

THE COURT:  It was available at the time?

MR. LEWIS:  Yes.  It had to have been, yep.

THE COURT:  But this level of testing was not available at the time?

MR. LEWIS:  Correct.  Yeah, correct.

THE COURT:  Understood.  Thank you.

MR. LEWIS:  All right.  So the testing is done, and the blood that is on Junior Williams's sweatshirt that was seized that night is a 21 out of 21 low sign match to Tony Price.

THE COURT:  Right.  And I understand -- I think I'll hear more from the defense, but I think I understand the theory of the motion based on that fact.

But that's the -- that's the new evidence fact, right?

MR. LEWIS:  And he was -- and Mr. Qualls was up -- and because he's 21 out of 21, he was absolutely excluded.

THE COURT:  Right.

MR. LEWIS:  Fully, yeah.

THE COURT:  Right.  Okay.  Well, also, because he's type A?

MR. LEWIS:  And he's type A as well, yep. Exactly.

THE COURT:  No, I follow that part.

MR. LEWIS:  And then that -- that is why we are here.

THE COURT:  All right.  What I -- the other piece of information that I don't have record -- you have each given me pieces of it, but not the complete picture -- is what exactly happened to Mr. Williams?

I see information suggesting that he was charged as accessory.  I don't know if it was before and after or one and the other.

I see information that suggests he may have pleaded.

I have no information from that record of his plea; what facts he pleaded to.

Can you help me with that?

MR. LEWIS:  My -- I'd have to double check it to be -- to give you a completely accurate response.

My recollection is that had nothing to do with this. And that it was -- that it was completely separate.

I don't know --

THE COURT: Well, it has something to do with this in my mind, as the outsider trying to recreate what happened, because, as I understand it, the position is Boston Police Department and the District Attorney's Office for Suffolk County got the wrong guy.

MR. LEWIS: Correct.

THE COURT: And they were supposed to get Williams and instead they got Qualls.

So I'm trying to understand, because there are allegations about -- and I don't think this is central to the motion, but there are allegations about ineffective investigation or police misconduct hovering in the background here.

And so I'm trying to understand how Mr. Williams was treated in the end.

MR. LEWIS: I'd have to double-check.

MS. WHITMORE: Your Honor --

MR. LEWIS: It --

MS. WHITMORE: I'm sorry to interrupt.

MR. LEWIS:  No, no, go ahead.

MS. WHITMORE:  I can answer this question if -- if --

THE COURT:  I'm happy to have an answer to the question.  But I'm also -- but go ahead.

MS. WHITMORE:  So the murder happened in October of 1992.

As your Honor has noted, Mr. Williams was interviewed three times.  He was arrested that night -- or that morning at 4:00 a.m. with the sweatshirt that had the blood on it.  He was let go that night.

He was re-interviewed again in October and again in December.

THE COURT:  Um-hum.

MS. WHITMORE:  It was not until December he was charged with anything in relation to this case.

THE COURT:  And what was he charged with?

MS. WHITMORE:  I believe he was initially charged with accessory before and after the fact.

But he did not -- he was not convicted of that.

He pled guilty to a charge that was in the record as accessory after the fact to

manslaughter.

And there is an indication in the Commonwealth's file, some emails back and forth, that this was essentially a charge that was made up to -- that was the phrase used in those files -- to get a conviction on some type of lesser charge having to do with this.

And I believe he served around six years.

THE COURT:  So the -- and correct me if I am wrong about this, but shouldn't we have records available from the case file itself for Mr. Williams and perhaps -- been a long time -- but perhaps a record of the plea colloquy.

MS. WHITMORE:  So there is testimony as to what he pled guilty to in the trial transcripts.  And I can get your Honor the cite to that.

I have never seen any --

THE COURT:  Well, excuse me for a moment.  I read the interchange at sidebar with Judge Brady when he asked this very same question.

MS. WHITMORE:  Exactly.

THE COURT:  But it -- the full information is not there.  It doesn't tell me

when -- and there's some ambiguity about what he pleaded to or -- and when it happened.

And, you know, a plea colloquy is supposed to include facts that tell us exactly which facts the defendant is pleading to.

And I would think that would be interesting to everyone, if it existed.

MS. WHITMORE:  If it existed -- I do not have any of Mr. Williams's case files, so I can't speak to what was in -- in -- I have never seen the plea colloquy or any documents having to do with his charging, other than what's in the transcript.

THE COURT:  Well, someone should have -- be able to locate -- I don't know if the Court can, but I would think the parties could locate the docket number, right, and then we can see if we have any files.

MS. WHITMORE:  Yes, your Honor.

MR. LEWIS:  Yep.

THE COURT:  Okay.  Thank you.  But we interrupted Mr. Lewis.

MR. LEWIS:  It's quite all right.

So I'm not sure exactly where we were, but just to circle back to --

THE COURT:  I think you were talking about -- I think you were going to talk about the identifications.

MR. LEWIS:  Correct.

So I wanted to let the Court now that as to Mr. Holmes, Mr. Monroe, Ms. Buford and Ms. Carrington, we made an attempt to reach out to all of them; not just Mr. Holmes.

We checked phone numbers, email addresses, basically everything we could find.

Probably because of the age of the case, and maybe some other factors, the victim witness advocate -- basically every phone number was either out of service or disconnected.

Emails were sent to all of the addresses we had with a message to contact us.

THE COURT:  Um-hum.  This is -- so you are talking about -- when did this happen?

MR. LEWIS:  This week.  And there was no response.  As of -- as of today there's been -- as of this morning --

THE COURT:  From the witnesses?

MR. LEWIS:  -- or Mr. Holmes.  There's been nothing.

THE COURT:  Okay.  But I think you also

began to tell me last time we met what type of diligence had been done with respect to victims' families?

MR. LEWIS:  Yes.  The initial report we had, and we looked into it, was that the Price brothers' parents were deceased.

We were unable to find siblings or children.  We sort of kept at it.

I'm not sure what the relation was -- possible -- there was only -- only relayed to me as possible family members.  I don't know how remote that relation is.  The victim witness advocate was not sure herself.

But an attempt was made for the two -- the two contacts that we came up with and neither of those -- there was -- the numbers we got were, again, disconnected or, no longer in service.

THE COURT:  Okay.

MR. LEWIS:  We've been trying.

THE COURT:  That's helpful.  Thank you.

MR. LEWIS:  Right.

THE COURT:  Anything else from the Commonwealth's point of view that you would like the Court to be aware of?

MR. LEWIS:  I don't believe so at this

point.

The only thing I would add is -- based on the information we have is that Mr. Holmes lives in New Jersey, is the last address we had.

Mr. Monroe appears to be out of state as well.

Ms. Carrington and Ms. Buford appear to be in the Boston metropolitan area; but, obviously, we weren't able to determine exactly where.

THE COURT:  Thank you.

MR. LEWIS:  You're welcome.  Thank you.

THE COURT:  Who is going to argue on behalf of the defense?

MS. WHITMORE:  I am, your Honor.

THE COURT:  Thank you.  I'm happy to hear anything you want to tell me.  I have read all of your pleadings very carefully.

And I'll interrupt and ask questions if I don't understand some point; but why don't you tell me this time, as opposed to last time you were here, what you'd like me to hear and think about.

MS. WHITMORE:  Thank you, your Honor.

I'm prepared to argue the joint motion

for post-conviction relief that was filed.

THE COURT:  Um-hum.

MS. WHITMORE:  As your Honor is aware, in January in 2019 we filed, along with the Commonwealth, a motion for post-conviction testing in this case --

THE COURT:  Yes.

MS. WHITMORE:  -- submitting that DNA testing of the physical evidence had the potential to result in evidence that was material to the identity of the perpetrator.

THE COURT:  Um-hum.

MS. WHITMORE:  And that the testing could not have previously been done, for the enumerated reasons in Section 7, by a preponderance of the evidence.

Your Honor considered that motion and granted it on January 28th and ordered the DNA testing that the defendant requested.

We are now before your Honor on a joint motion for post-conviction relief, submitting that the results of that DNA testing conducted in 2019 would have been a real factor in the jury's deliberations at Mr. Qualls's trial.

THE COURT:  Um-hum.

MS. WHITMORE:  The issue before this Court is whether that newly discovered DNA evidence proving that the victim's blood was on Junior Williams's sweatshirt would have been a real factor in the jury's deliberations.

The question before the Court is not whether the verdict would have been different, and the question before the Court is not whether the Commonwealth could have still convicted Mr. Qualls despite having this DNA evidence or could have convicted him on some other theory of guilt even with the DNA evidence.

The question is, only would this jury that convicted Mr. Qualls under the instructions that they were given at the time have substantially considered these DNA results in their deliberations.

To decide if this evidence should be a real -- would have been a real factor in the jury's deliberations, the Court can consider -- should consider two things.

One is the strength of the Commonwealth's case against the defendant at trial, and the second is what the defense theory of the case was at the trial.

THE COURT:  So we are assuming, for purposes of this discussion, that it's newly discovered evidence, right?

MS. WHITMORE:  Correct.  And I'd be happy to address that further.

THE COURT:  No, that's okay.  I just want to be clear that we are not talking about those elements at the moment.

MS. WHITMORE:  At the moment, no.

And so -- in other words, what the Court's -- the Court's analysis is, is the evidence against Mr. Qualls at trial so overwhelming that the jury would not have even considered this DNA evidence in their deliberations.

And, in this case, we're fortunate because the SJC after the 1992 conviction already did this analysis for us in determining whether the improperly admitted hearsay evidence would have been -- would have been substantial to the jury or would have been prejudicial to Mr. Qualls.

And in that opinion, the SJC looked at a number of factors, and those factors that were present in the first trial were all present in

the second trial.

And those were that, first, the only disputed issue at trial was the identity of the gunman.

Second, the Commonwealth replied on identifications of the defendant by Holmes, Buford, and Monroe, who all testified that they were familiar with the defendant; but who also had their -- had their credibility impeached by evidence of prior convictions, outstanding warrants against them at the time of the murders, and felony charges against them at the time that their testimony was given.

THE COURT: And that impeachment process also occurred in the second trial, right?

MS. WHITMORE: Correct.

The SJC noted that there was no physical or scientific evidence at the trial that decisively resolved the question of the killer's identity.

The defendant presented at the trial numerous statements made by Tony Price to police officers as he was dying from the gunman bullet -- gunman's bullet where he said, Junior Williams shot me.

THE COURT:  Two, right?  Am I missing -- are there more than two?

MS. WHITMORE:  Sorry, two statements; three officers.  One of the statements was given to two officers -- or they both testified that he said that.

There was evidence that Dallas Price and Junior Williams had had a confrontation at the Biarritz Lounge early on the evening of the murders.

And --

THE COURT:  Right.  There's evidence that each of the alleged suspects at the time had confrontations before --

MS. WHITMORE:  Correct, your Honor, correct.

THE COURT:  -- the shootings, right?

MS. WHITMORE:  And I am just going through the factors that the SJC was pointing to in concluding that the evidence was not so overwhelming that the improp --

THE COURT:  No.  I understand.  And I have read that decision carefully.

MS. WHITMORE:  Yes.  Thank you.

THE COURT:  I focused more for purposes

1-33

of today on the second decisions to try to understand if I was missing -- that was before I had the transcripts.

Now I've read all the transcripts, so I think I'm comfortable understanding what happened at the second trial.

But, you are right, in order to understand what happened at the first trial, we really have to rely on the SJC decision.

MS. WHITMORE: Right. And the benefit of that decision after the first trial is that the SJC was essentially in the position that your Honor is in now in analyzing how overwhelming the evidence -- the Commonwealth's evidence against Mr. Qualls was at the first trial to decide if this new evidence would have been a real factor --

THE COURT: I understand that argument. Thank you.

MS. WHITMORE: Here the Court is presented with the same record that the SJC analyzed, but here we have scientific physical and new evidence that would have had even more of an impact on the jury than improperly admitted hearsay evidence.

The DNA evidence is --

THE COURT:  Well, I'm not sure we can say that, exactly.

We don't know what has an impact on jurors; but I appreciate that it's -- it's important evidence.

MS. WHITMORE:  Um-hum.  This - this DNA evidence is -- is the physical scientific evidence connecting Junior Williams to the shooting that the SJC noted in that 1992 opinion that they didn't -- that the Commonwealth didn't have against Mr. Qualls.

THE COURT:  Right.  It's -- it's -- right.  Understood.  I mean --

MS. WHITMORE:  And I would argue that this DNA evidence that puts Tony Price's blood on Junior Williams's sweatshirt two hours after the killing is more credible than any other evidence that there is in this case as to who the shooter was.

Next, after considering the strength of the Commonwealth's case at trial, the Court can consider the defendant's theory of the defense at trial.

Defense counsel argued in his closing

argument repeatedly to the jury that Junior Williams was the shooter.

THE COURT:  Yes.

MS. WHITMORE:  The defense argued that that type B blood on Junior's sweatshirt belonged to the victims; but he couldn't prove that at the time, because they only had the results of the serology testing, which indicated that the blood was type B.

Both victims were type B, but Mr. Williams was also type B blood.

THE COURT:  Which is similar to some of the facts in some of the new evidence cases that have come since, right?

MS. WHITMORE:  Absolutely, your Honor. In both -- in all three of those cases, so in *Sullivan*, *Cameron*, and *Cowels*, the DNA that results did not positively identify the perpetrator, nor did they conclusively exclude the defendant as the perpetrator.

Nonetheless, the SJC found that the DNA evidence in all three of those cases would have been a real factor in the jury's deliberations because they either corroborated a key defense witness, or it further impeached the credibility

of already impeached prosecution witnesses.

In other words, in each --

THE COURT:  Right.

MS. WHITMORE:  Sorry.

THE COURT:  *Cowels* is more complicated, as the SJC points out, because of the different ways in which the evidence could be used by either side.  But it's --

MS. WHITMORE:  Exactly.

THE COURT:  So it seems to me that in some ways *Cameron* is the closest on point because it's -- it's more straight forward in terms of what the jury -- the first jury heard about the supposed evidence and then what actually was found afterwards, right?

MS. WHITMORE:  I would agree.  In all three of those cases, what the SJC determined was that the DNA results were material to the -- to who the perpetrator was without conclusively determining that.

THE COURT:  Right.  And that's really the important question, right?

MS. WHITMORE:  Exactly, your Honor.

THE COURT:  Is if you have something new that could be material.

MS. WHITMORE:  Precisely.

And, I mean, here, these DNA results corroborate Tony Price's dying declaration.  They also corroborate that --

THE COURT:  Well, what they tell us. Now, let me just -- I mean, let's just not go too far with this.

What they tell us, it seems to me, is that Williams was very close to the victims and the shooting, right, as opposed to what Williams wanted everyone to believe, which was that he wasn't there.

MS. WHITMORE:  Correct.  And it's undisputed both at trial and now that there was only one gunman, only one person --

THE COURT:  I appreciate that.

MS. WHITMORE:  -- who came anywhere near the car.

THE COURT:  Right.

MS. WHITMORE:  And -- and this also corroborates the off-duty -- off-duty police officer, Tommy Montgomery, testified that when he went to the hospital after the shooting, a -- a witness told him or a person told him that Junior Williams was the shooter, and he relayed that

information to homicide detectives.

He couldn't remember who that person was, but that's also corroborated by this DNA evidence.

And just as in *Sullivan* and *Cameron* --

THE COURT:  Well, let's stop for a minute.

This so-called Tommy Montgomery information is not part -- was not part of the second trial, right, the jurors didn't hear that?

MS. WHITMORE:  I believe Officer Montgomery testified.

THE COURT:  Well, he -- I don't -- I don't remember reading about it, but I'm happy to go back and look.

MS. WHITMORE:  I apologize if I'm incorrect.  I've read police statements and testimony --

THE COURT:  Yes.  No, understood.

MS. WHITMORE:  -- and sometimes it -- it's in my head.  I know that's what was in his police statement, which I'm happy to provide the court with.

I -- I thought that he testified, but, again, I don't want to misstate the facts.

THE COURT:  No.  That's all right.  I can check.  Thank you.

MS. WHITMORE:  I'm not positive.  And again, I have a copy -- I think I have -- if not, I can get the Court a copy of Mr. -- of Officer Montgomery's police statement.

THE COURT:  Since I have the other statements, I think that would be helpful.  Thank you.

MS. WHITMORE:  Yes, your Honor.

Here, just as in *Sullivan* and *Cameron*, we have conflicting witness accounts; and the newly discovered evidence corroborates the defense theory of the case, and clearly would have been used by defense counsel in his closing argument.

Just as the Court noted in *Sullivan*, here we have new DNA evidence that goes to a central issue in the case.  Who was the shooter?

We have physical evidence indicating that someone was in the presence of the victim during the killing, and the SJC held that that would be a real factor for the jury.

We have new physical evidence that would have bolstered the defense's closing argument.

The SJC noted in *Sullivan* that that, too,

would be a real factor for the jury.

And we have a case in which the evidence against the defendant was not so compelling as to render the new evidence completely immaterial.

Further, the SJC noted in *Sullivan* that physical evidence that corroborates a key witness whose credibility was challenged, and physical evidence that challenges the credibility of the prosecution's witnesses, all go to the Court's determination of whether this would have been a real factor in the jury's deliberations.

THE COURT:  So is it fair to say that *Cameron*, *Cowels,* and *Sullivan* are the three cases that you are relying on most?

MS. WHITMORE:  Yes, because those are DNA cases that are on point.

THE COURT:  Right.

MS. WHITMORE:  I also think that the SJC's analysis in *Ellis* is --

THE COURT:  Um-hum.

MS. WHITMORE:  -- is instructive, because that was a case in which the newly discovered evidence indicated that the defendant was not the shooter regardless of whether, as the prosecution argued, the defendant may have been involved in

some other way.

THE COURT:  Regardless of what kind of evidence it was, you're saying that it --

MS. WHITMORE:  Exactly.  That wasn't DNA evidence --

THE COURT:  -- still tells us what the analysis is?

MS. WHITMORE:  Exactly, your Honor.

Here, just as in *Cameron*, *Cowels* and *Sullivan*, we have physical evidence that was inconclusive at the time of trial, but was still a big part of the trial.

Both the Commonwealth and the defense argued that the blood on the sweat -- or discussed the blood on the sweatshirt.

The defense obviously argued that it was very important, but they didn't have enough information to make the case to the jury that counsel would be able to make today.

And this newly discovered DNA testing results that are the basis of this motion add crucial information to the different theories that both the defense and the prosecution put forth at trial; that the jury would have certainly considered in their deliberations.

THE COURT:  So let me stop you for one more second.

I take from what Mr. Lewis told me, which I could not completely understand from what I had here, that this sweatshirt -- that there's no dispute about who was wearing this particular sweatshirt and that it was seized from Mr. Williams that first evening when he was arrested?

MS. WHITMORE:  That is correct.  It was seized at -- he was arrested around 4:00 a.m.

THE COURT:  Um-hum.  Because, as you know, there's a lot -- there seems to be a fair amount of confusion, inconsistency, among the witnesses about who was wearing what.

MS. WHITMORE:  Exactly.  So Leroyal Holmes said that this shooter was wearing a light blue Members Only zip-up jacket.

THE COURT:  Um-hum.

MS. WHITMORE:  Donna Carrington said that the shooter was wearing a blue or purple Champion sweatshirt.

I believe Mr. Monroe said a black hoodie.

And Mr. Williams was wearing a Champion sweatshirt when he was arrested two hours after

the murder.

THE COURT:  But it was gray, not --

MS. WHITMORE:  I believe, your Honor, is correct.  It was gray, yes.

THE COURT:  Okay.

MS. WHITMORE:  And so there is no dispute that that is the sweatshirt that Junior Williams was wearing less than two hours after the shooting when he was arrested by Boston Police.

The -- as your Honor is aware, we've discussed the fact that the victim, Tony Price, made an unequivocal identification of his shooter as he was dying.

And the three eyewitnesses put forth by the prosecution at trial contradict this identification, but their credibility was impeached by a number of factors that we've discussed.

This newly discovered DNA evidence that the victim's blood was on Junior Williams's sweatshirt when he was arrested, corroborates Tony Price's dying declaration that Junior Williams was his shooter, just as the DNA evidence in *Sullivan*, *Cowels,* and *Cameron* supported the defense theory of the case.

THE COURT:  Thank you very much.

Does anyone else at the defense table want to be heard?

MS. FEIT:  No, your Honor.

MS. BECKMAN:  No, your Honor.

THE COURT:  Okay.

Back to you, Mr. Lewis.  I want to make sure I understand what happens next.

In other words, I'm assuming, based on my experience, that if I deny this motion, there will be an appeal.

If I allow this motion, what happens next?

MR. LEWIS:  If you allow this motion, that would require the requested relief as to vacate the convictions related to the shooting.

And I believe the one remaining conviction is related to the altercation earlier in the evening; and the sentence for that was, I believe, 9 to 10, something like that.

THE COURT:  That was the stabbing?

MR. LEWIS:  Yeah.  And that has been served almost three times over.

So, yeah, then, I believe the -- any remaining charges would be nolle prossed.

THE COURT:  Any remaining charges, what do you mean?

MR. LEWIS:  Well, that's if you vacate those convictions, those charges would be nolle prossed against Mr. Qualls.

THE COURT:  Okay.  That's what I'm --

MR. LEWIS:  Yeah.  Yeah.

THE COURT:  I saw different references in the different pleadings, so I want to be sure that I understand what everyone is requesting by way of relief.

MR. LEWIS:  Correct.

THE COURT:  So that's the Commonwealth's request?

MR. LEWIS:  Yes.  Yes.

THE COURT:  And the defense's request is the same?

MS. WHITMORE:  Yes, your Honor.

MR. LEWIS:  And I would add, just so make sure the record is clear on it --

THE COURT:  Um-hum.

MR. LEWIS:  -- based on my experience as -- doing this as a defense counsel, now here, I would say I find it difficult to imagine it, I know jury's consider lots of things; I would

consider it pretty much to the point of

impossibility that this would not be a real

factor in a jury's deliberations on the case.

THE COURT:  Thank you.

So let's see what we've talked about that

what be helpful.

Detective Montgomery's statement; and the

page that I'm missing, which, again, is

Volume IV, Page 248 from the transcript 3/26/98.

I don't think we mentioned anything else.

Is there anything else that either side

thinks I should have?  The William's docket

number?

MR. LEWIS:  You had -- you had mentioned,

yeah.  I'll dig into that.

THE COURT:  All right.  All of this

information can be provided through Clerk

Fentress as soon as you have it.

I am just -- I'm curious about what

happened to Mr. Williams.

MR. LEWIS:  Understood.

THE COURT:  And how and why it happened.

MR. LEWIS:  Sure.  Understood.

THE COURT:  Anything else we can do

today?

MS. WHITMORE:  Your Honor, at this time I would also like to file a renewed motion for the stay of execution of sentence and admission to bail.

I'm happy to argue it today.  I understand, of course, your Honor has not had time -- has not been able to read it, as I am handing to you at this moment.

So in -- in the alternative, if we would set a -- I understand your docket is very full; your Honor is very busy, but if we could set a date as soon as possible to be heard on this.

THE COURT:  Well, what I intend to do. Assuming that I have this new information that I've asked for as soon as possible, is I intend to issue an opinion as soon as possible.

So it is likely that you will have an answer to all of these questions before I could schedule another bail hearing.

But, of course, we will take the filing; and I will speak with the clerk about a possible bail hearing date.

MS. WHITMORE:  Okay.  Thank you.  Your Honor.

THE COURT:  But I know that this has been

going on for some time now, and that everyone is looking for expedited relief and expedited review.

And it seems to me expedited relief would be a resolution of the motion as opposed to another bail hearing.

MS. WHITMORE:  Yes, your Honor.

THE COURT:  So that's the way I'm thinking about it at the moment.

MS. WHITMORE:  Thank you.

THE COURT:  Is there anything else we can do today?

MS. WHITMORE:  No, your Honor.

THE COURT:  Thank you very much for being here everyone.

Court's in recess on this case.

THE COURT OFFICER:  All rise.

(At 11:40 a.m. court in recess.)



## The Commonwealth of Massachusetts
### OFFICE OF COURT MANAGEMENT, Transcription Services

### <u>AUDIO ASSESSMENT FORM</u>

> *For court transcribers:  Complete this assessment form for each volume of transcript produced, and include it at the back of every original and copy transcript with the certificate page, word index, and CD PDF transcript.*

**TODAY'S DATE:** 3/15/2020      **TRANSCRIBER NAME:** Lisa Phipps

**CASE NAME:** COMM. V. QUALLS    **DOCKET NUMBER:** 9284CR11850

**RECORDING DATE:** 2/5/2020     **TRANSCRIPT VOLUME:** 1 OF 1

(Circle one) TYPE:  CD  TAPE QUALITY: EXCELLENT (GOOD) FAIR POOR

(Circle all that apply) ISSUES (include time stamp):

background noise X             time stamp:_____
low audio X                    _____
low audio at sidebar           _____
simultaneous speech X          _____
speaking away of microphone X  _____
other:_____        time stamp:_____
_____      _____
_____      _____
_____      _____

COMMENTS: No log notes, spellings, or speaker IDs provided.

1-50

C E R T I F I C A T E


        I, LISA MARIE PHIPPS, AN APPROVED COURT TRANSCRIBER, DO
HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND ACCURATE
TRANSCRIPT FROM THE AUDIO RECORDING PROVIDED TO ME OF THE
PROCEEDINGS IN THE MATTER OF  COMMONWEALTH OF MASSACHUSETTS
V. RONALD QUALLS HELD ON FEBRUARY 5, 2020


        I, LISA MARIE PHIPPS, FURTHER CERTIFY THAT THE
FOREGOING IS IN COMPLIANCE WITH THE ADMINISTRATIVE OFFICE OF
THE TRIAL COURT DIRECTIVE ON TRANSCRIPT FORMAT.

        I, LISA MARIE PHIPPS, FURTHER CERTIFY THAT I NEITHER AM
COUNSEL FOR, RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES
TO THE ACTION IN WHICH THIS HEARING WAS TAKEN, AND FURTHER
THAT I AM NOT FINANCIALLY NOR OTHERWISE INTERESTED IN THE
OUTCOME OF THE ACTION.


*Lisa Marie Phipps*
NAME OF THE APPROVED COURT TRANSCRIBER
PROCEEDINGS RECORDED BY FTR AUDIO RECORDING
TRANSCRIPT PRODUCED STENOGRAPHICALLY FROM COMPUTER


March 15, 2020
DATE


LMP Court Reporting
347 Eliot Street
Ashland, Massachusetts 01721
BUSINESS ADDRESS


(508) 641-5801
BUSINESS TELEPHONE


lmpreporting@gmail.com
EMAIL ADDRESS

| 0 |
|---|
| 01721 [1] - 50:18 |
| 02114 [1] - 1:15 |
| 02459 [1] - 1:18 |

| 1 |
|---|
| 1 [4] - 1:1, 1:1, 49:12 |
| 10 [1] - 44:20 |
| 11:02 [1] - 3:4 |
| 11:40 [1] - 48:18 |
| 15 [1] - 50:15 |
| 1992 [3] - 22:7, 30:17, 34:10 |

| 2 |
|---|
| 2/5/2020 [1] - 49:12 |
| 2019 [2] - 28:4, 28:23 |
| 2020 [3] - 1:22, 50:4, 50:15 |
| 21 [4] - 19:15, 19:16, 19:24 |
| 248 [2] - 5:7, 46:9 |
| 27th [1] - 5:3 |
| 28th [1] - 28:18 |
| 29th [1] - 5:16 |
| 2:00 [1] - 15:13 |

| 3 |
|---|
| 3/15/2020 [1] - 49:10 |
| 3/26/98 [2] - 5:7, 46:9 |
| 347 [1] - 50:17 |
| 3rd [2] - 5:25, 6:10 |

| 4 |
|---|
| 4:00 [3] - 15:15, 22:10, 42:11 |

| 5 |
|---|
| 5 [2] - 1:22, 50:4 |
| 508 [1] - 50:20 |

| 6 |
|---|
| 610.761.2712 [1] - 1:19 |
| 617.619.4161 [1] - 1:15 |
| 641-5801 [1] - 50:20 |

| 7 |
|---|
| 7 [1] - 28:15 |

| 8 |
|---|
| 885 [1] - 1:18 |

| 9 |
|---|
| 9 [1] - 44:20 |
| 906 [1] - 1:21 |
| 9284CR11850 [3] - 1:7, 3:12, 49:11 |

| A |
|---|
| a.m [6] - 3:4, 15:13, 15:15, 22:10, 42:11, 48:18 |
| ability [1] - 17:24 |
| able [6] - 17:1, 18:9, 24:15, 27:9, 41:19, 47:7 |
| absolutely [3] - 17:10, 19:25, 35:15 |
| accessory [3] - 20:16, 22:21, 22:25 |
| accident [1] - 14:17 |
| accounts [1] - 39:12 |
| accurate [2] - 18:20, 20:25 |
| ACCURATE [1] - 50:3 |
| acknowledge [1] - 5:24 |
| ACTION [2] - 50:9, 50:10 |
| add [3] - 27:2, 41:21, 45:19 |
| ADDRESS [2] - 50:18, 50:22 |
| address [2] - 27:4, 30:5 |
| addresses [2] - 25:10, 25:15 |
| ADMINISTRATIVE [1] - 50:6 |
| admission [1] - 47:3 |
| admitted [2] - 30:19, 33:24 |
| advocate [2] - 25:13, 26:13 |
| afterwards [1] - 36:15 |
| age [1] - 25:11 |
| agree [1] - 36:16 |
| ahead [3] - 7:19, 22:1, 22:5 |
| allegations [2] - 21:15, 21:17 |

| (A continued) |
|---|
| alleged [2] - 6:18, 32:13 |
| allow [2] - 44:12, 44:14 |
| almost [2] - 9:20, 44:23 |
| altercation [1] - 44:18 |
| alternative [1] - 47:9 |
| AM [2] - 50:8, 50:9 |
| ambiguity [1] - 24:1 |
| amount [1] - 42:14 |
| AN [1] - 50:2 |
| analysis [4] - 30:11, 30:18, 40:19, 41:7 |
| analyzed [1] - 33:22 |
| analyzing [1] - 33:13 |
| AND [2] - 50:3, 50:9 |
| answer [3] - 22:2, 22:4, 47:18 |
| ANY [1] - 50:8 |
| apologize [1] - 38:16 |
| appeal [1] - 44:11 |
| appear [1] - 27:7 |
| APPEARANCES [1] - 1:12 |
| apply [1] - 49:16 |
| appreciate [3] - 17:12, 34:5, 37:16 |
| approaches [1] - 14:21 |
| APPROVED [2] - 50:2, 50:12 |
| area [1] - 27:8 |
| argue [4] - 27:13, 27:25, 34:15, 47:5 |
| argued [6] - 14:19, 34:25, 35:4, 40:25, 41:14, 41:16 |
| argument [5] - 13:16, 33:18, 35:1, 39:15, 39:24 |
| arguments [1] - 14:2 |
| arrested [6] - 22:9, 42:9, 42:11, 42:25, 43:9, 43:21 |
| articulate [1] - 18:2 |
| Ashland [1] - 50:18 |
| ASSESSMENT [1] - 49:4 |
| assessment [1] - 49:7 |
| Assistant [1] - 1:14 |

assume [1] - 5:19
assuming [4] - 18:23, 30:1, 44:9, 47:14
attempt [2] - 25:7, 26:14
Attorney [2] - 1:14, 3:24
Attorney's [2] - 1:13, 21:9
audio [2] - 49:18, 49:18
AUDIO [3] - 49:4, 50:3, 50:13
Aunt [2] - 4:13, 4:14
available [3] - 19:6, 19:10, 23:11
aware [4] - 11:9, 26:24, 28:3, 43:10

### B

background [3] - 17:20, 21:18, 49:17
bail [8] - 7:8, 7:16, 8:25, 9:12, 47:4, 47:19, 47:22, 48:6
based [8] - 9:14, 12:2, 13:7, 13:8, 19:19, 27:2, 44:9, 45:22
basis [1] - 41:21
Beckman [1] - 3:24
BECKMAN [1] - 44:5
become [1] - 18:17
BEFORE [1] - 1:11
began [1] - 26:1
begin [2] - 4:20, 6:6
behalf [2] - 4:11, 27:14
belonged [1] - 35:5
benefit [1] - 33:10
between [3] - 6:13, 7:7, 7:8
Biarritz [1] - 32:9
big [1] - 41:12
bit [1] - 16:4
black [1] - 42:23
blood [16] - 15:23, 17:1, 18:10, 18:11, 18:13, 18:22, 19:14, 22:11, 29:3, 34:16, 35:5, 35:8, 35:11, 41:14, 41:15,

43:20
blue [2] - 42:18, 42:21
bolstered [1] - 39:24
Boston [6] - 1:15, 1:17, 1:21, 21:8, 27:8, 43:9
Brady [1] - 23:21
brief [1] - 5:20
bring [1] - 9:12
brothers [2] - 14:22, 17:7
brothers' [1] - 26:6
brought [1] - 7:1
Buford [4] - 9:15, 25:6, 27:7, 31:7
Bulfinch [1] - 1:14
bullet [2] - 31:24
BUSINESS [2] - 50:18, 50:20
busy [1] - 47:11
BY [2] - 50:8, 50:13

### C

Cameron [7] - 35:17, 36:11, 38:5, 39:11, 40:13, 41:9, 43:24
car [5] - 14:16, 15:5, 15:14, 15:19, 37:18
carefully [2] - 27:18, 32:23
Carla [1] - 4:14
Carrington [4] - 10:5, 25:7, 27:7, 42:20
case [23] - 5:22, 5:24, 9:20, 11:8, 11:15, 22:18, 23:11, 24:9, 25:11, 28:6, 29:23, 29:24, 30:16, 34:19, 34:22, 39:14, 39:18, 40:2, 40:22, 41:18, 43:25, 46:3, 48:16
CASE [1] - 49:11
cases [7] - 9:21, 35:13, 35:16, 35:22, 36:17, 40:13, 40:16
CD [2] - 49:8, 49:15
cede [1] - 13:20
Center [1] - 1:18

central [2] - 21:16, 39:17
Centre [1] - 1:18
certainly [3] - 6:14, 14:3, 41:25
certificate [1] - 49:8
Certified [2] - 1:23, 1:23
CERTIFY [3] - 50:3, 50:6, 50:8
challenged [1] - 40:7
challenges [1] - 40:8
Champion [2] - 42:21, 42:24
change [1] - 5:23
changed [1] - 16:16
changes [1] - 18:4
charge [9] - 6:21, 7:1, 7:14, 7:22, 8:22, 8:25, 22:24, 23:4, 23:7
charged [4] - 20:16, 22:17, 22:19, 22:21
charges [6] - 6:12, 9:19, 31:12, 44:25, 45:1, 45:4
charging [1] - 24:12
charitably [1] - 16:15
Charlotte [2] - 1:17, 3:22
check [3] - 20:24, 21:22, 39:2
checked [1] - 25:9
children [1] - 26:8
CHRISTINE [1] - 1:11
circle [3] - 24:25, 49:15, 49:16
cite [1] - 23:16
claims [2] - 11:18, 11:22
clear [3] - 7:5, 30:7, 45:20
clearly [1] - 39:14
CLERK [2] - 3:5, 3:9
Clerk [1] - 46:17
clerk [1] - 47:21
client's [1] - 4:21
close [1] - 37:9
closest [1] - 36:11
closing [3] - 34:25, 39:15, 39:24
coincidentally [1] - 16:1

College [1] - 1:17
colloquy [3] - 23:13, 24:3, 24:11
Columbia [1] - 15:9
comfortable [1] - 33:5
COMM [1] - 49:11
COMMENTS [1] - 49:22
COMMONWEALTH [3] - 1:3, 1:6, 50:4
Commonwealth [14] - 1:13, 3:11, 3:19, 6:7, 8:16, 11:24, 12:1, 14:1, 28:5, 29:9, 31:5, 34:11, 41:13, 49:3
Commonwealth's [6] - 23:3, 26:23, 29:22, 33:14, 34:22, 45:13
comparing [1] - 17:15
compelling [1] - 40:3
complete [1] - 20:13
Complete [1] - 49:7
completely [4] - 20:24, 21:3, 40:4, 42:4
COMPLIANCE [1] - 50:6
complicated [1] - 36:5
COMPUTER [1] - 50:13
concern [6] - 10:23, 12:5, 12:7, 12:11, 13:7
concerned [1] - 11:25
concluding [1] - 32:20
conclusively [2] - 35:19, 36:19
conducted [1] - 28:22
conflicting [1] - 39:12
confrontation [1] - 32:8
confrontations [1] - 32:14
confusion [1] - 42:14
connecting [1] - 34:9
consider [5] - 29:20, 29:21, 34:23, 45:25, 46:1
considered [4] - 28:17, 29:16, 30:14, 41:25
considering [1] - 34:21
contact [1] - 25:16
contacts [1] - 26:15

contradict [1] - 43:15
contradicted [1] - 11:14
conversation [3] - 7:21, 8:2, 8:24
convicted [4] - 22:22, 29:9, 29:11, 29:14
conviction [6] - 23:6, 28:1, 28:5, 28:21, 30:17, 44:18
convictions [3] - 31:10, 44:16, 45:4
copied [1] - 5:10
copy [3] - 39:4, 39:5, 49:8
correct [18] - 11:17, 12:25, 16:11, 17:8, 17:10, 19:11, 21:11, 23:9, 25:4, 30:4, 31:16, 32:15, 32:16, 37:13, 42:10, 43:4, 45:12
corroborate [2] - 37:3, 37:4
corroborated [2] - 35:24, 38:3
corroborates [4] - 37:21, 39:13, 40:6, 43:21
COUNSEL [1] - 50:8
counsel [7] - 3:14, 3:24, 13:20, 34:25, 39:15, 41:19, 45:23
County [2] - 1:13, 21:9
course [3] - 14:14, 47:6, 47:20
Court [18] - 1:23, 3:2, 3:6, 3:10, 5:4, 14:4, 24:15, 25:5, 26:24, 29:2, 29:6, 29:8, 29:20, 33:20, 34:22, 39:5, 39:16, 50:17
COURT [154] - 1:4, 1:4, 3:6, 3:20, 4:1, 4:3, 4:6, 4:16, 4:23, 5:1, 6:14, 6:20, 6:24, 7:4, 7:9, 7:11, 7:13, 7:18, 7:23, 8:1, 8:7, 9:2, 9:8, 9:20, 9:23, 10:2, 10:10, 10:13, 10:17, 10:20, 11:3, 11:9,

11:16, 11:21, 12:7, 12:15, 12:18, 12:21, 12:23, 13:1, 13:10, 13:12, 13:14, 13:21, 13:24, 14:7, 14:10, 14:13, 15:2, 16:6, 16:9, 16:13, 16:16, 16:18, 16:21, 17:5, 17:10, 17:22, 18:1, 18:8, 18:14, 18:22, 19:3, 19:6, 19:9, 19:12, 19:17, 20:1, 20:3, 20:7, 20:10, 21:5, 21:12, 22:4, 22:15, 22:19, 23:9, 23:19, 23:24, 24:14, 24:21, 25:1, 25:17, 25:22, 25:25, 26:18, 26:20, 26:22, 27:11, 27:13, 27:16, 28:2, 28:7, 28:12, 28:25, 30:1, 30:6, 31:14, 32:1, 32:12, 32:17, 32:22, 32:25, 33:18, 34:2, 34:13, 35:3, 35:12, 36:3, 36:5, 36:10, 36:21, 36:24, 37:5, 37:16, 37:19, 38:6, 38:13, 38:19, 39:1, 39:7, 40:12, 40:17, 40:20, 41:2, 41:6, 42:1, 42:12, 42:19, 43:2, 43:5, 44:1, 44:6, 44:21, 45:1, 45:6, 45:8, 45:13, 45:16, 45:21, 46:4, 46:16, 46:22, 46:24, 47:13, 47:25, 48:8, 48:11, 48:14, 48:17, 49:3, 50:2, 50:7, 50:12
court [4] - 3:7, 38:23, 48:18, 49:7
Court's [5] - 4:20, 30:11, 40:9, 48:16
courthouse [3] - 7:21, 8:4, 8:14
Courtroom [1] - 1:21
cousins [1] - 4:14
Cowels [5] - 35:17, 36:5,

40:13, 41:9, 43:24
credibility [5] - 31:9,
35:25, 40:7, 40:8, 43:16
credible [1] - 34:18
crime [5] - 6:19, 14:19,
15:6, 15:12
criminal [3] - 9:18, 10:6,
11:12
CROSS [1] - 2:2
crossing [1] - 8:6
Crossing [2] - 8:7, 8:24
crucial [1] - 41:22
curious [1] - 46:19
current [1] - 19:1
custody [2] - 3:13, 15:19

## D

Dallas [1] - 32:7
date [3] - 5:7, 47:12, 47:22
DATE [3] - 49:10, 49:12,
50:15
David [2] - 1:14, 3:18
deceased [1] - 26:6
December [2] - 22:14,
22:16
decide [2] - 29:18, 33:16
decision [5] - 10:25, 12:21,
32:23, 33:9, 33:11
decisions [1] - 33:1
decisively [1] - 31:19
declaration [2] - 37:3,
43:22
Defendant [2] - 1:16, 3:3
defendant [10] - 24:5,
28:19, 29:23, 31:6, 31:8,
31:21, 35:20, 40:3,
40:23, 40:25
defendant's [3] - 5:17, 9:4,
34:23
defense [18] - 5:2, 8:21,
14:1, 19:18, 27:14,
29:24, 34:23, 34:25,
35:4, 35:24, 39:13,
39:15, 41:13, 41:16,
41:23, 43:25, 44:2,

45:23
defense's [2] - 39:24,
45:16
definitely [1] - 14:10
deliberations [9] - 28:24,
29:5, 29:17, 29:20,
30:15, 35:23, 40:11,
41:25, 46:3
Delores [1] - 4:13
Dennis [1] - 15:16
deny [1] - 44:10
DEPARTMENT [1] - 1:4
Department [1] - 21:8
described [1] - 16:15
despite [1] - 29:10
details [2] - 16:18, 16:20
detective [2] - 15:16, 46:7
Detective [1] - 15:17
detectives [1] - 38:1
determination [1] - 40:10
determine [1] - 27:9
determined [1] - 36:17
determining [2] - 30:18,
36:20
different [7] - 15:8, 15:10,
29:7, 36:6, 41:22, 45:8,
45:9
difficult [1] - 45:24
dig [1] - 46:15
diligence [1] - 26:2
DIRECT [1] - 2:2
DIRECTIVE [1] - 50:7
directly [1] - 11:14
disconnected [2] - 25:14,
26:17
discovered [6] - 29:2, 30:3,
39:13, 40:22, 41:20,
43:19
discussed [3] - 41:15,
43:11, 43:18
discussion [1] - 30:2
dismissed [3] - 6:21, 7:22,
9:1
dispute [3] - 14:16, 42:6,
43:6

disputed [1] - 31:3
District [3] - 1:13, 1:14,
21:9
DNA [27] - 11:14, 11:16,
17:17, 18:13, 19:2, 28:8,
28:18, 28:22, 29:2,
29:10, 29:12, 29:16,
30:14, 34:1, 34:7, 34:16,
35:17, 35:21, 36:18,
37:2, 38:3, 39:17, 40:15,
41:4, 41:20, 43:19,
43:23
DO [1] - 50:2
docket [3] - 24:17, 46:12,
47:10
DOCKET [1] - 49:11
Docket [1] - 1:7
documents [1] - 24:11
done [9] - 17:13, 17:15,
17:16, 18:2, 18:3, 19:14,
26:2, 28:14
Donna [2] - 10:4, 42:20
double [2] - 20:23, 21:22
double-check [1] - 21:22
down [6] - 5:25, 6:25,
10:11, 11:21, 14:25,
16:6
Downtown [2] - 8:7, 8:24
driving [1] - 14:17
during [1] - 39:20
duty [2] - 37:21
dying [5] - 15:7, 31:23,
37:3, 43:13, 43:22

## E

early [1] - 32:9
either [4] - 25:14, 35:24,
36:8, 46:11
elements [1] - 30:8
Eliot [1] - 50:17
Ellis [1] - 40:19
email [1] - 25:9
EMAIL [1] - 50:22
emails [2] - 23:3, 25:15
EMPLOYED [1] - 50:8

end [1] - 21:21
entire [1] - 6:3
enumerated [1] - 28:14
equivocal [1] - 17:11
especially [2] - 12:3, 12:6
Esquire [1] - 1:17
essentially [3] - 7:22, 23:4, 33:12
evening [3] - 32:9, 42:8, 44:19
evidence [52] - 6:15, 11:14, 11:16, 13:5, 15:21, 19:21, 28:9, 28:10, 28:16, 29:3, 29:10, 29:12, 29:18, 30:3, 30:12, 30:14, 30:19, 31:10, 31:18, 32:7, 32:12, 32:20, 33:14, 33:16, 33:23, 33:25, 34:1, 34:6, 34:8, 34:9, 34:16, 34:18, 35:13, 35:22, 36:7, 36:14, 38:4, 39:13, 39:17, 39:19, 39:23, 40:2, 40:4, 40:6, 40:8, 40:23, 41:3, 41:5, 41:10, 43:19, 43:24
evolved [1] - 18:16
evolving [1] - 16:15
exactly [12] - 20:6, 20:13, 23:23, 24:4, 24:24, 27:9, 34:3, 36:9, 36:23, 41:4, 41:8, 42:16
EXCELLENT [1] - 49:15
exchange [2] - 8:13, 8:18
exclude [1] - 35:19
excluded [1] - 19:25
excuse [2] - 6:24, 23:19
execution [1] - 47:3
exhibits [1] - 16:12
EXHIBITS [1] - 2:5
Exhibits [1] - 1:2
existed [4] - 12:5, 12:7, 24:7, 24:8
expedited [3] - 48:2, 48:4

experience [2] - 44:10, 45:22
exposure [1] - 10:7
eyewitnesses [2] - 6:19, 43:14

F

fact [5] - 19:20, 19:22, 22:21, 22:25, 43:11
factor [9] - 28:23, 29:5, 29:19, 33:17, 35:23, 39:22, 40:1, 40:11, 46:3
factors [5] - 25:12, 30:24, 32:19, 43:17
facts [6] - 14:15, 20:21, 24:4, 24:5, 35:13, 38:25
FAIR [1] - 49:15
fair [2] - 40:12, 42:13
familiar [1] - 31:8
families [1] - 26:3
family [2] - 4:9, 26:11
far [3] - 7:6, 15:4, 37:7
fast [1] - 16:3
favor [1] - 16:23
FEBRUARY [1] - 50:4
February [2] - 1:22, 5:25
FEIT [1] - 44:4
Feit [1] - 3:25
felony [1] - 31:12
Fentress [1] - 46:18
file [3] - 23:3, 23:11, 47:2
filed [3] - 6:4, 28:1, 28:4
files [3] - 23:6, 24:9, 24:18
filing [3] - 5:2, 9:5, 47:20
filings [1] - 9:4
FINANCIALLY [1] - 50:9
fired [2] - 14:23, 14:25
first [11] - 5:1, 12:3, 13:22, 14:8, 30:25, 31:2, 33:8, 33:11, 33:15, 36:13, 42:8
focused [1] - 32:25
follow [1] - 20:7
following [1] - 6:22
foot [1] - 15:4

FOR [2] - 2:8, 50:8
FOREGOING [2] - 50:3, 50:6
FORM [1] - 49:4
form [1] - 49:7
FORMAT [1] - 50:7
forth [3] - 23:3, 41:24, 43:14
fortunate [1] - 30:16
forward [3] - 8:22, 16:3, 36:12
four [3] - 9:25, 10:3, 16:5
fourth [3] - 9:22, 10:1, 10:3
Fred [1] - 9:15
friends [1] - 4:9
FROM [2] - 50:3, 50:13
FTR [1] - 50:13
full [2] - 23:24, 47:10
Fully [1] - 20:2
FURTHER [3] - 50:6, 50:8, 50:9

G

Geo [1] - 14:22
given [6] - 12:24, 13:5, 20:12, 29:15, 31:13, 32:4
GlobalFiler [1] - 18:7
GOOD [1] - 49:15
granted [1] - 28:18
gray [2] - 43:2, 43:4
guilt [1] - 29:12
guilty [2] - 22:24, 23:15
gun [1] - 14:18
gunfire [1] - 14:18
gunman [6] - 14:19, 14:21, 31:4, 31:23, 37:15
gunman's [1] - 31:24
guy [1] - 21:10

H

Haldeman [1] - 1:17
handcuffs [1] - 4:21
handing [1] - 47:8
happy [7] - 13:16, 22:4,

27:16, 30:4, 38:14, 38:22, 47:5
Harris [1] - 15:17
head [1] - 38:21
hear [7] - 6:7, 13:16, 14:11, 19:18, 27:16, 27:22, 38:10
heard [3] - 36:13, 44:3, 47:12
hearing [5] - 3:15, 4:22, 47:19, 47:22, 48:6
HEARING [2] - 1:10, 50:9
hearsay [2] - 30:19, 33:25
held [1] - 39:21
HELD [1] - 50:4
help [1] - 20:22
helpful [9] - 5:4, 5:11, 5:15, 5:18, 7:24, 9:2, 26:20, 39:8, 46:6
HEREBY [1] - 50:3
herself [1] - 26:13
Holmes [14] - 6:18, 8:15, 9:15, 11:7, 11:11, 11:25, 12:10, 15:25, 25:6, 25:8, 25:23, 27:3, 31:6, 42:17
homicide [1] - 38:1
Honor [31] - 3:19, 4:10, 4:19, 4:25, 6:10, 21:23, 22:8, 23:16, 24:19, 27:15, 27:24, 28:3, 28:17, 28:20, 32:15, 33:13, 35:15, 36:23, 39:10, 41:8, 43:3, 43:10, 44:4, 44:5, 45:18, 47:1, 47:6, 47:11, 47:24, 48:7, 48:13
HONORABLE [1] - 1:11
hoodie [1] - 42:23
hospital [1] - 37:23
hours [4] - 15:11, 34:17, 42:25, 43:8
hovering [1] - 21:18
hum [15] - 6:20, 16:13, 16:21, 17:5, 18:8, 22:15, 25:17, 28:2, 28:12,

28:25, 34:7, 40:20, 42:12, 42:19, 45:21

**I**

ID [1] - 11:6
IDENTIFICATION [1] - 2:8
identification [6] - 10:21, 11:8, 13:5, 13:15, 43:12, 43:16
identifications [3] - 11:13, 25:3, 31:6
identify [5] - 3:16, 4:11, 10:8, 18:10, 35:18
identity [3] - 28:11, 31:3, 31:20
IDs [1] - 49:22
imagine [1] - 45:24
immaterial [1] - 40:4
immediately [1] - 15:6
impact [2] - 33:24, 34:4
impeached [4] - 31:9, 35:25, 36:1, 43:17
impeachment [1] - 31:14
important [6] - 14:3, 16:18, 16:19, 34:6, 36:22, 41:17
impossibility [1] - 46:2
impounded [1] - 15:20
improp [1] - 32:21
improperly [2] - 30:19, 33:24
IN [4] - 50:4, 50:6, 50:9, 50:9
inclination [1] - 9:12
include [3] - 24:4, 49:7, 49:16
including [1] - 11:7
inconclusive [1] - 41:11
inconsistency [1] - 42:14
incorrect [1] - 38:17
index [1] - 49:8
Index [1] - 1:2
indicated [2] - 35:8, 40:23
indicating [1] - 39:19
indication [5] - 8:10, 8:15,

8:20, 12:12, 23:2
indications [1] - 6:22
Indictment [1] - 3:11
ineffective [1] - 21:17
information [13] - 7:19, 20:11, 20:15, 20:18, 20:20, 23:25, 27:3, 38:1, 38:9, 41:18, 41:22, 46:17, 47:14
initial [1] - 26:4
Innocence [1] - 1:17
instance [2] - 8:11, 12:3
instances [1] - 8:12
instead [1] - 21:13
instructions [1] - 29:14
instructive [1] - 40:21
intend [2] - 47:13, 47:15
interaction [1] - 8:23
interchange [1] - 23:20
INTERESTED [1] - 50:9
interesting [1] - 24:7
interrupt [2] - 21:25, 27:19
interrupted [1] - 24:22
interviewed [5] - 15:24, 15:25, 16:9, 22:9, 22:13
intimidated [2] - 8:17, 12:14
intimidation [5] - 6:12, 7:15, 10:14, 12:9, 13:4
investigating [1] - 15:18
investigation [1] - 21:17
involved [3] - 5:19, 8:13, 40:25
IS [2] - 50:3, 50:6
issue [7] - 9:6, 10:14, 19:2, 29:1, 31:3, 39:18, 47:16
ISSUES [1] - 49:16
itself [1] - 23:11
IV [2] - 5:7, 46:9

**J**

jacket [1] - 42:18
January [4] - 5:3, 6:10, 28:4, 28:18

Jeep [1] - 14:22
Jersey [1] - 27:4
joining [1] - 14:1
joint [4] - 9:4, 14:19,
 27:25, 28:20
Judge [1] - 23:21
Junior [17] - 14:16, 15:5,
 15:8, 15:11, 15:14, 17:6,
 19:14, 29:4, 31:24, 32:8,
 34:9, 34:17, 35:1, 37:24,
 43:7, 43:20, 43:22
junior [1] - 15:1
Junior's [1] - 35:5
jurors [2] - 34:5, 38:10
jury [11] - 29:13, 30:13,
 30:21, 33:24, 35:1,
 36:13, 39:22, 40:1,
 41:18, 41:24
jury's [7] - 28:23, 29:5,
 29:20, 35:23, 40:11,
 45:25, 46:3

### K

kept [1] - 26:8
key [2] - 35:24, 40:6
killer's [1] - 31:19
killing [2] - 34:18, 39:21
kind [1] - 41:2
kinds [1] - 9:21
kit [1] - 18:7
Kuler [1] - 15:16

### L

large [1] - 4:8
last [6] - 4:4, 5:2, 5:16,
 26:1, 27:4, 27:21
Law [1] - 1:17
law [3] - 3:25, 5:17, 5:23
least [2] - 10:22, 19:1
left [2] - 14:25, 15:3
Leroyal [3] - 6:18, 9:14,
 42:16
less [4] - 11:17, 11:24,
 13:6, 43:8
lesser [1] - 23:7
level [1] - 19:9

LEWIS [89] - 3:18, 3:21,
 6:9, 6:17, 6:21, 7:3, 7:7,
 7:10, 7:12, 7:14, 7:20,
 7:25, 8:6, 8:9, 9:7, 9:10,
 9:22, 9:25, 10:3, 10:12,
 10:15, 10:18, 11:2, 11:6,
 11:10, 11:17, 12:2, 12:9,
 12:17, 12:20, 12:22,
 12:25, 13:3, 13:11,
 13:13, 13:18, 13:23,
 14:6, 14:9, 14:12, 14:15,
 15:5, 16:8, 16:11, 16:14,
 16:17, 16:19, 16:22,
 17:6, 17:19, 17:23, 18:5,
 18:12, 18:15, 18:25,
 19:5, 19:7, 19:11, 19:13,
 19:23, 20:2, 20:5, 20:8,
 20:23, 21:11, 21:22,
 21:24, 22:1, 24:20,
 24:23, 25:4, 25:19,
 25:23, 26:4, 26:19,
 26:21, 26:25, 27:12,
 44:14, 44:22, 45:3, 45:7,
 45:12, 45:15, 45:19,
 45:22, 46:14, 46:21,
 46:23
Lewis [6] - 1:14, 3:18, 6:8,
 24:22, 42:3, 44:7
liability [3] - 9:18, 10:7,
 11:12
light [1] - 42:17
likely [1] - 47:17
LISA [3] - 50:2, 50:6, 50:8
Lisa [2] - 1:23, 49:10
lives [2] - 15:9, 27:3
LMP [1] - 50:17
lmpreporting@gmail.com
 [1] - 50:22
locate [2] - 24:15, 24:16
log [1] - 49:22
lone [2] - 14:19, 14:21
lone-gunman [1] - 14:19
look [3] - 15:22, 16:11,
 38:15
looked [2] - 26:5, 30:23

looking [1] - 48:2
lost [1] - 10:17
Lounge [1] - 32:9
low [3] - 19:16, 49:18,
 49:18

### M

MANAGEMENT [1] - 49:3
manslaughter [1] - 23:1
March [1] - 50:15
MARIE [3] - 50:2, 50:6,
 50:8
Marie [1] - 1:23
MASSACHUSETTS [3] - 1:3,
 1:6, 50:4
Massachusetts [5] - 1:15,
 1:18, 1:21, 49:3, 50:18
match [2] - 17:9, 19:16
matched [3] - 17:3, 17:6,
 17:7
matching [1] - 14:16
material [4] - 19:4, 28:10,
 36:18, 36:25
matter [2] - 3:10, 3:14
MATTER [1] - 50:4
Mattie [1] - 9:15
ME [1] - 50:3
mean [6] - 12:2, 19:3,
 34:14, 37:2, 37:6, 45:2
meet [2] - 4:4, 4:7
members [1] - 26:11
Members [1] - 42:18
memo [1] - 5:17
memory [1] - 17:8
mention [1] - 11:4
mentioned [2] - 46:10,
 46:14
message [1] - 25:16
met [1] - 26:1
metropolitan [1] - 27:8
microphone [1] - 49:19
mind [2] - 10:21, 21:6
minute [4] - 6:25, 11:22,
 16:7, 38:7
misconduct [1] - 21:18

missing [4] - 5:6, 32:1, 33:2, 46:8
misstate [1] - 38:25
moment [5] - 23:20, 30:8, 30:9, 47:8, 48:9
Monday [1] - 5:23
Monroe [5] - 9:15, 25:6, 27:5, 31:7, 42:23
Montgomery [3] - 37:22, 38:8, 38:12
Montgomery's [2] - 39:6, 46:7
months [1] - 16:10
morning [10] - 3:9, 3:20, 3:21, 3:22, 4:1, 4:2, 4:4, 15:24, 22:10, 25:21
most [2] - 6:5, 40:14
mother [2] - 4:13, 4:15
motion [13] - 3:15, 19:19, 21:16, 27:25, 28:5, 28:17, 28:21, 41:21, 44:10, 44:12, 44:14, 47:2, 48:5
MOTION [1] - 1:10
MR [89] - 3:18, 3:21, 6:9, 6:17, 6:21, 7:3, 7:7, 7:10, 7:12, 7:14, 7:20, 7:25, 8:6, 8:9, 9:7, 9:10, 9:22, 9:25, 10:3, 10:12, 10:15, 10:18, 11:2, 11:6, 11:10, 11:17, 12:2, 12:9, 12:17, 12:20, 12:22, 12:25, 13:3, 13:11, 13:13, 13:18, 13:23, 14:6, 14:9, 14:12, 14:15, 15:5, 16:8, 16:11, 16:14, 16:17, 16:19, 16:22, 17:6, 17:19, 17:23, 18:5, 18:12, 18:15, 18:25, 19:5, 19:7, 19:11, 19:13, 19:23, 20:2, 20:5, 20:8, 20:23, 21:11, 21:22, 21:24, 22:1, 24:20, 24:23, 25:4, 25:19, 25:23, 26:4, 26:19,

26:21, 26:25, 27:12, 44:14, 44:22, 45:3, 45:7, 45:12, 45:15, 45:19, 45:22, 46:14, 46:21, 46:23
MS [66] - 3:22, 4:5, 4:8, 4:19, 4:25, 18:6, 21:23, 21:25, 22:2, 22:6, 22:16, 22:20, 23:14, 23:23, 24:8, 24:19, 27:15, 27:24, 28:3, 28:8, 28:13, 29:1, 30:4, 30:9, 31:16, 32:3, 32:15, 32:18, 32:24, 33:10, 33:20, 34:7, 34:15, 35:4, 35:15, 36:4, 36:9, 36:16, 36:23, 37:1, 37:13, 37:17, 37:20, 38:11, 38:16, 38:20, 39:3, 39:10, 40:15, 40:18, 40:21, 41:4, 41:8, 42:10, 42:16, 42:20, 43:3, 43:6, 44:4, 44:5, 45:18, 47:1, 47:23, 48:7, 48:10, 48:13
murder [2] - 22:6, 43:1
murders [2] - 31:11, 32:10

### N

NAME [3] - 49:10, 49:11, 50:12
named [1] - 10:4
nature [1] - 11:13
near [2] - 8:8, 37:17
NEITHER [1] - 50:8
never [4] - 14:19, 16:22, 23:18, 24:10
new [12] - 4:3, 5:22, 11:16, 19:21, 33:16, 33:23, 35:13, 36:24, 39:17, 39:23, 40:4, 47:14
New [1] - 27:4
newly [6] - 29:2, 30:2, 39:12, 40:22, 41:20, 43:19
Newton [1] - 1:18

next [3] - 34:21, 44:8, 44:13
night [3] - 19:15, 22:10, 22:12
noise [1] - 49:17
nolle [2] - 44:25, 45:4
None [3] - 2:3, 2:6, 2:9
nonetheless [1] - 35:21
NOR [2] - 50:8, 50:9
NOT [1] - 50:9
noted [6] - 22:8, 31:17, 34:10, 39:16, 39:25, 40:5
notes [1] - 49:22
nothing [2] - 21:1, 25:24
notice [1] - 9:3
NUMBER [1] - 49:11
number [7] - 4:8, 4:14, 24:17, 25:13, 30:24, 43:17, 46:13
numbers [2] - 25:9, 26:16
numerous [1] - 31:22

### O

obviously [2] - 27:9, 41:16
occasions [2] - 15:8, 15:10
occurred [2] - 15:13, 31:15
occurring [1] - 7:17
October [2] - 22:7, 22:13
OF [12] - 1:3, 1:4, 1:6, 49:3, 49:12, 50:3, 50:4, 50:6, 50:8, 50:10, 50:12
off-duty [2] - 37:21
OFFICE [2] - 49:3, 50:6
Office [2] - 1:13, 21:9
OFFICER [2] - 3:6, 48:17
officer [1] - 37:22
Officer [2] - 38:11, 39:5
officers [4] - 15:18, 31:23, 32:4, 32:5
ON [2] - 50:4, 50:7
One [1] - 1:14
one [14] - 6:18, 6:25, 8:11, 8:12, 11:20, 16:6, 20:17, 29:22, 32:4, 37:15, 42:1,

44:17, 49:15
opinion [4] - 9:24, 30:23, 34:10, 47:16
opposed [4] - 18:11, 27:21, 37:10, 48:5
order [3] - 3:2, 6:11, 33:7
ordered [1] - 28:18
original [1] - 49:8
OTHERWISE [1] - 50:9
OUTCOME [1] - 50:10
outsider [1] - 21:6
outstanding [2] - 9:19, 31:10
overplaying [1] - 10:23
overwhelming [3] - 30:13, 32:21, 33:13

**P**

Page [1] - 46:9
page [5] - 5:6, 5:7, 5:9, 46:8, 49:8
Pages [1] - 1:1
parents [1] - 26:6
part [6] - 6:1, 10:24, 20:7, 38:9, 41:12
particular [1] - 42:6
PARTIES [1] - 50:8
parties [2] - 11:4, 24:16
passenger's [1] - 14:24
PDF [1] - 49:8
people [1] - 4:3
Perez [1] - 5:24
perhaps [3] - 4:9, 23:12, 23:13
permission [1] - 4:20
perpetrator [4] - 28:11, 35:19, 35:20, 36:19
person [4] - 6:17, 37:15, 37:24, 38:2
Phipps [2] - 1:23, 49:10
PHIPPS [3] - 50:2, 50:6, 50:8
phone [2] - 25:9, 25:13
phonetic [1] - 15:16
phrase [1] - 23:5

physical [9] - 28:9, 31:17, 33:22, 34:8, 39:19, 39:23, 40:6, 40:7, 41:10
picture [1] - 20:13
piece [1] - 20:11
pieces [1] - 20:12
place [4] - 6:6, 11:17, 11:24, 12:4
Place [1] - 1:14
plea [4] - 20:21, 23:13, 24:3, 24:11
pleaded [3] - 20:19, 20:21, 24:2
pleading [1] - 24:5
pleadings [4] - 6:4, 11:5, 27:18, 45:9
pled [2] - 22:24, 23:15
point [6] - 26:23, 27:1, 27:20, 36:11, 40:16, 46:1
Point [1] - 15:9
pointing [1] - 32:19
points [1] - 36:6
Police [2] - 21:8, 43:9
police [6] - 21:18, 31:22, 37:21, 38:17, 38:22, 39:6
POOR [1] - 49:15
portion [1] - 5:12
position [2] - 21:8, 33:12
positive [1] - 39:3
positively [1] - 35:18
possible [7] - 13:19, 26:10, 26:11, 47:12, 47:15, 47:16, 47:21
post [3] - 28:1, 28:5, 28:21
post-conviction [3] - 28:1, 28:5, 28:21
potential [1] - 28:10
precisely [2] - 18:10, 37:1
prejudicial [1] - 30:21
prepared [1] - 27:25
preponderance [1] - 28:15
presence [1] - 39:20
present [5] - 3:3, 3:13,

10:4, 30:25
presented [3] - 6:15, 31:21, 33:21
pretty [1] - 46:1
previously [1] - 28:14
Price [8] - 14:22, 15:7, 17:7, 19:16, 26:5, 31:22, 32:7, 43:11
Price's [3] - 34:16, 37:3, 43:22
prior [4] - 7:16, 15:7, 31:10
proceeding [1] - 13:25
PROCEEDINGS [2] - 50:4, 50:13
proceedings [1] - 18:9
process [1] - 31:14
produced [1] - 49:7
PRODUCED [1] - 50:13
Professional [1] - 1:23
Program [1] - 1:17
prosecution [4] - 36:1, 40:24, 41:23, 43:15
prosecution's [1] - 40:9
prossed [2] - 44:25, 45:5
prove [1] - 35:6
provide [2] - 10:18, 38:22
PROVIDED [1] - 50:3
provided [3] - 16:12, 46:17, 49:22
proving [1] - 29:3
public [1] - 14:4
purple [1] - 42:21
purposes [2] - 30:2, 32:25
put [2] - 41:23, 43:14
puts [1] - 34:16

**Q**

QUALITY [1] - 49:15
QUALLS [3] - 1:8, 49:11, 50:4
Qualls [18] - 3:11, 3:13, 3:23, 4:2, 4:11, 7:2, 10:8, 17:7, 18:24, 19:23, 21:13, 29:10, 29:14,

30:12, 30:22, 33:15, 34:12, 45:5
Qualls's [3] - 4:9, 16:22, 28:24
questioned [1] - 9:9
questions [2] - 27:19, 47:18
quite [2] - 17:14, 24:23

R

Rachel [1] - 3:25
re [1] - 22:13
RE [1] - 1:10
re-interviewed [1] - 22:13
reach [1] - 25:7
read [11] - 5:25, 6:3, 6:4, 8:1, 8:3, 23:20, 27:17, 32:23, 33:4, 38:17, 47:7
reading [1] - 38:14
real [12] - 12:11, 28:23, 29:5, 29:19, 33:17, 35:23, 39:22, 40:1, 40:11, 46:2
really [2] - 33:9, 36:21
Realtime [1] - 1:24
reason [2] - 5:9, 13:21
reasons [1] - 28:15
received [2] - 5:3, 5:16
recently [4] - 6:5, 17:13, 18:2, 18:3
recess [2] - 48:16, 48:18
recollection [1] - 21:1
record [19] - 3:5, 3:10, 3:16, 6:3, 7:5, 8:20, 9:11, 12:13, 12:16, 13:8, 17:11, 17:14, 18:1, 20:12, 20:20, 22:25, 23:13, 33:21, 45:20
RECORDED [1] - 50:13
RECORDING [3] - 49:12, 50:3, 50:13
records [1] - 23:11
recreate [1] - 21:7
RECROSS [1] - 2:2
REDIRECT [1] - 2:2

reference [1] - 9:5
references [1] - 45:8
reflect [1] - 9:24
regardless [2] - 40:24, 41:2
Registered [1] - 1:23
related [2] - 44:16, 44:18
RELATED [1] - 50:8
relation [3] - 22:17, 26:9, 26:12
relayed [2] - 26:10, 37:25
reliability [4] - 11:18, 11:24, 12:4, 13:6
relief [6] - 28:1, 28:21, 44:15, 45:11, 48:2, 48:4
rely [1] - 33:9
relying [2] - 6:1, 40:14
remaining [3] - 44:17, 44:25, 45:1
remember [3] - 7:13, 38:2, 38:14
remote [1] - 26:12
removed [1] - 4:21
render [1] - 40:4
renewed [1] - 47:2
repeatedly [1] - 35:1
replied [1] - 31:5
report [1] - 26:4
Reporter [3] - 1:23, 1:24
Reporting [1] - 50:17
represented [1] - 3:14
representing [2] - 3:23, 11:23
request [3] - 4:20, 45:14, 45:16
requested [2] - 28:19, 44:15
requesting [1] - 45:10
require [1] - 44:15
resolution [1] - 48:5
resolved [1] - 31:19
respect [1] - 26:2
response [2] - 20:25, 25:20
result [1] - 28:10
resulted [1] - 8:25
results [8] - 18:19, 28:22,

29:16, 35:7, 35:18, 36:18, 37:2, 41:21
review [2] - 13:8, 48:3
revocation [1] - 9:1
revoke [1] - 9:12
revoked [1] - 7:16
rise [2] - 3:6, 48:17
ROACH [1] - 1:11
Ronald [1] - 3:11
RONALD [2] - 1:8, 50:4

S

sample [1] - 18:21
samples [2] - 18:18, 18:23
saw [1] - 45:8
scene [2] - 14:17, 14:25
schedule [1] - 47:19
School [1] - 1:17
scientific [3] - 31:18, 33:22, 34:8
seated [2] - 3:8, 14:23
second [12] - 6:15, 6:22, 7:16, 8:23, 29:24, 31:1, 31:5, 31:15, 33:1, 33:6, 38:10, 42:2
Section [1] - 28:15
See [1] - 1:2
see [6] - 5:6, 5:15, 20:15, 20:18, 24:17, 46:5
seized [3] - 19:15, 42:7, 42:11
sensitive [1] - 18:17
sent [1] - 25:15
sentence [2] - 44:19, 47:3
separate [3] - 10:22, 13:16, 21:3
sequence [1] - 16:10
serology [1] - 35:8
served [2] - 23:8, 44:23
service [2] - 25:14, 26:17
Services [1] - 49:3
session [1] - 3:7
set [2] - 47:10, 47:11
Sharon [1] - 3:24
shooter [9] - 34:19, 35:2,

37:25, 39:18, 40:24, 42:17, 42:21, 43:12, 43:23
shooting [6] - 15:13, 34:10, 37:10, 37:23, 43:9, 44:16
shootings [1] - 32:17
Shorthand [1] - 1:23
shot [1] - 31:25
shots [1] - 14:25
siblings [1] - 26:7
side [3] - 14:24, 36:8, 46:11
sidebar [2] - 23:20, 49:18
sign [1] - 19:16
significant [1] - 16:17
similar [1] - 35:12
simultaneous [1] - 49:19
single [3] - 8:2, 14:18
sister [1] - 15:9
six [1] - 23:8
size [3] - 16:25, 18:20
SJC [17] - 5:22, 10:24, 12:21, 30:17, 30:23, 31:17, 32:19, 33:9, 33:12, 33:21, 34:10, 35:21, 36:6, 36:17, 39:21, 39:25, 40:5
SJC's [1] - 40:19
slow [5] - 6:24, 10:10, 11:21, 16:6
smaller [1] - 18:19
so-called [1] - 38:8
someone [2] - 24:14, 39:20
sometimes [1] - 38:20
somewhat [1] - 13:25
somewhere [1] - 8:8
son's [1] - 4:15
soon [4] - 46:18, 47:12, 47:15, 47:16
sorry [5] - 10:10, 10:17, 21:25, 32:3, 36:4
sort [3] - 10:21, 17:19, 26:8
speaker [1] - 49:22

SPEAKER [2] - 4:17, 4:18
speaking [1] - 49:19
speech [1] - 49:19
spellings [1] - 49:22
spots [4] - 15:22, 16:5, 16:23, 17:1
SS [1] - 1:4
stabbing [1] - 44:21
stains [1] - 17:1
stamp [3] - 49:16, 49:17, 49:20
stand [1] - 4:10
start [1] - 6:9
state [2] - 17:17, 27:5
statement [3] - 38:22, 39:6, 46:7
statements [5] - 31:22, 32:3, 32:4, 38:17, 39:8
station [2] - 15:20, 16:2
stay [2] - 4:23, 47:3
STENOGRAPHICALLY [1] - 50:13
steps [3] - 7:21, 8:4, 8:14
still [5] - 10:13, 13:14, 29:9, 41:6, 41:11
stop [3] - 8:8, 38:6, 42:1
stopped [1] - 15:14
story [1] - 16:14
STR [1] - 18:6
straight [1] - 36:12
Street [2] - 1:18, 50:17
strength [2] - 29:22, 34:21
strong [1] - 9:11
student [1] - 3:25
submitting [2] - 28:8, 28:21
subsequently [1] - 16:3
substantial [1] - 30:20
substantially [1] - 29:16
SUFFOLK [1] - 1:4
Suffolk [2] - 1:13, 21:9
suggesting [1] - 20:15
suggests [1] - 20:18
Sullivan [9] - 35:17, 38:5, 39:11, 39:16, 39:25,

40:5, 40:13, 41:10, 43:24
SUPERIOR [1] - 1:4
supplement [1] - 16:14
supplemental [2] - 5:17, 9:5
support [1] - 4:12
supported [1] - 43:25
supposed [3] - 21:12, 24:4, 36:14
suspects [1] - 32:13
swab [1] - 19:1
sweat [1] - 41:14
sweatshirt [13] - 15:21, 19:15, 22:11, 29:4, 34:17, 35:5, 41:15, 42:5, 42:7, 42:22, 42:25, 43:7, 43:21
sweatshirts [1] - 5:14

T

table [3] - 3:24, 17:21, 44:2
TAKEN [1] - 50:9
TAPE [1] - 49:15
TELEPHONE [1] - 50:20
terms [1] - 36:12
test [6] - 16:4, 18:13, 18:15, 18:25, 19:2
tested [1] - 16:23
testified [5] - 31:7, 32:5, 37:22, 38:12, 38:24
testimony [4] - 17:11, 23:14, 31:13, 38:18
testing [13] - 17:17, 17:24, 18:3, 18:6, 19:9, 19:13, 28:6, 28:9, 28:13, 28:19, 28:22, 35:8, 41:20
tests [3] - 17:12, 17:16, 18:17
THAT [4] - 50:3, 50:6, 50:8, 50:9
THE [164] - 1:4, 1:11, 3:5, 3:6, 3:9, 3:20, 4:1, 4:3, 4:6, 4:16, 4:23, 5:1,

6:14, 6:20, 6:24, 7:4, 7:9, 7:11, 7:13, 7:18, 7:23, 8:1, 8:7, 9:2, 9:8, 9:20, 9:23, 10:2, 10:10, 10:13, 10:17, 10:20, 11:3, 11:9, 11:16, 11:21, 12:7, 12:15, 12:18, 12:21, 12:23, 13:1, 13:10, 13:12, 13:14, 13:21, 13:24, 14:7, 14:10, 14:13, 15:2, 16:6, 16:9, 16:13, 16:16, 16:18, 16:21, 17:5, 17:10, 17:22, 18:1, 18:8, 18:14, 18:22, 19:3, 19:6, 19:9, 19:12, 19:17, 20:1, 20:3, 20:7, 20:10, 21:5, 21:12, 22:4, 22:15, 22:19, 23:9, 23:19, 23:24, 24:14, 24:21, 25:1, 25:17, 25:22, 25:25, 26:18, 26:20, 26:22, 27:11, 27:13, 27:16, 28:2, 28:7, 28:12, 28:25, 30:1, 30:6, 31:14, 32:1, 32:12, 32:17, 32:22, 32:25, 33:18, 34:2, 34:13, 35:3, 35:12, 36:3, 36:5, 36:10, 36:21, 36:24, 37:5, 37:16, 37:19, 38:6, 38:13, 38:19, 39:1, 39:7, 40:12, 40:17, 40:20, 41:2, 41:6, 42:1, 42:12, 42:19, 43:2, 43:5, 44:1, 44:6, 44:21, 45:1, 45:6, 45:8, 45:13, 45:16, 45:21, 46:4, 46:16, 46:22, 46:24, 47:13, 47:25, 48:8, 48:11, 48:14, 48:17, 50:3, 50:3, 50:4, 50:6, 50:6, 50:7, 50:8, 50:9, 50:9, 50:10, 50:12
theories [1] - 41:22
theory [6] - 19:19, 29:11,

29:24, 34:23, 39:14, 43:25
thinking [1] - 48:9
thinks [1] - 46:12
third [1] - 3:25
third-year [1] - 3:25
THIS [1] - 50:9
threatened [2] - 8:17, 12:14
three [15] - 9:17, 10:9, 11:6, 11:11, 16:4, 16:10, 22:9, 32:4, 35:16, 35:22, 36:17, 40:13, 43:14, 44:23
TO [3] - 50:3, 50:8, 50:9
today [6] - 25:20, 33:1, 41:19, 46:25, 47:5, 48:12
TODAY'S [1] - 49:10
Tommy [2] - 37:22, 38:8
Tony [7] - 15:7, 19:16, 31:22, 34:16, 37:3, 43:11, 43:22
took [1] - 10:25
Tracker [1] - 14:22
Transcriber [1] - 1:23
TRANSCRIBER [3] - 49:10, 50:2, 50:12
transcribers [1] - 49:7
TRANSCRIPT [4] - 49:12, 50:3, 50:7, 50:13
transcript [9] - 5:13, 8:1, 8:3, 17:15, 24:13, 46:9, 49:7, 49:8, 49:8
Transcription [1] - 49:3
transcripts [5] - 5:2, 12:23, 23:16, 33:3, 33:4
treated [1] - 21:21
TRIAL [2] - 1:4, 50:7
trial [29] - 5:2, 6:16, 6:22, 7:16, 11:1, 17:24, 23:15, 28:24, 29:23, 29:25, 30:12, 30:25, 31:1, 31:3, 31:15, 31:18, 31:21, 33:6, 33:8, 33:11, 33:15,

34:22, 34:24, 37:14, 38:10, 41:11, 41:12, 41:24, 43:15
trials [2] - 6:13, 7:10
TRUE [1] - 50:3
try [1] - 33:1
trying [4] - 21:6, 21:14, 21:20, 26:19
turned [1] - 8:20
two [15] - 14:25, 15:8, 15:10, 15:11, 18:23, 26:14, 26:15, 29:21, 32:1, 32:2, 32:3, 32:5, 34:17, 42:25, 43:8
type [14] - 17:4, 17:8, 17:24, 18:3, 18:11, 18:13, 20:4, 20:5, 23:6, 26:1, 35:5, 35:9, 35:10, 35:11
TYPE [1] - 49:15
typing [2] - 17:2, 17:3

### U

ultimately [1] - 9:1
um-hum [15] - 6:20, 16:13, 16:21, 17:5, 18:8, 22:15, 25:17, 28:2, 28:12, 28:25, 34:7, 40:20, 42:12, 42:19, 45:21
unable [1] - 26:7
under [1] - 29:14
understood [5] - 19:12, 34:14, 38:19, 46:21, 46:23
undisputed [1] - 37:14
unequivocal [1] - 43:12
UNIDENTIFIED [2] - 4:17, 4:18
unusual [1] - 13:25
up [6] - 10:25, 14:17, 19:24, 23:5, 26:15, 42:18

### V

vacate [2] - 44:16, 45:3
variation [1] - 9:18

venture [1] - 14:20
verdict [1] - 29:7
versus [1] - 3:11
victim [4] - 25:12, 26:12, 39:20, 43:11
victim's [2] - 29:3, 43:20
victims [4] - 18:24, 35:6, 35:10, 37:9
victims' [1] - 26:2
view [1] - 26:23
Volume [3] - 1:1, 5:7, 46:9
volume [1] - 49:7
VOLUME [1] - 49:12
vs [1] - 1:7

### W

walked [1] - 14:23
walking [1] - 16:1
warrants [2] - 9:18, 31:11
WAS [1] - 50:9
ways [2] - 36:7, 36:11
wearing [6] - 42:6, 42:15, 42:17, 42:21, 42:24, 43:8
week [3] - 5:3, 5:16, 25:19
welcome [2] - 4:16, 27:12
Welcome [1] - 4:18
WHICH [1] - 50:9
Whitmore [2] - 1:17, 3:23
WHITMORE [64] - 3:22, 4:5, 4:8, 4:19, 4:25, 18:6, 21:23, 21:25, 22:2, 22:6, 22:16, 22:20, 23:14, 23:23, 24:8, 24:19, 27:15, 27:24, 28:3, 28:8, 28:13, 29:1, 30:4, 30:9, 31:16, 32:3, 32:15, 32:18, 32:24, 33:10, 33:20, 34:7, 34:15, 35:4, 35:15, 36:4, 36:9, 36:16, 36:23, 37:1, 37:13, 37:17, 37:20, 38:11, 38:16, 38:20, 39:3, 39:10, 40:15, 40:18, 40:21, 41:4, 41:8,

42:10, 42:16, 42:20, 43:3, 43:6, 45:18, 47:1, 47:23, 48:7, 48:10, 48:13
William's [1] - 46:12
Williams [25] - 14:16, 15:9, 15:11, 15:14, 16:2, 16:9, 17:6, 20:14, 21:13, 21:21, 22:8, 23:12, 31:25, 32:8, 34:9, 35:2, 35:10, 37:9, 37:10, 37:25, 42:8, 42:24, 43:7, 43:23, 46:20
Williams's [6] - 15:5, 19:14, 24:9, 29:4, 34:17, 43:20
window [2] - 14:23, 14:24
WITH [1] - 50:6
witness [11] - 6:12, 7:15, 10:4, 10:14, 12:9, 25:12, 26:12, 35:25, 37:24, 39:12, 40:6
WITNESS [1] - 2:2
witnesses [9] - 9:14, 9:16, 9:17, 11:7, 11:8, 25:22, 36:1, 40:9, 42:15
woman [1] - 10:4
wondered [1] - 11:3
word [1] - 49:8
words [3] - 30:10, 36:2, 44:9

### Y

year [1] - 3:25
years [1] - 23:8
yourselves [1] - 3:16

### Z

zip [1] - 42:18
zip-up [1] - 42:18