# REPORT OF THE ATTORNEY GENERAL'S CIVIL RIGHTS DIVISION

## ON BOSTON POLICE DEPARTMENT PRACTICES

JAMES M. SHANNON
ATTORNEY GENERAL

STEPHEN A. JONAS
CHIEF, PUBLIC PROTECTION
   BUREAU

MARJORIE HEINS
CHIEF, CIVIL RIGHTS
   DIVISION

December 18, 1990

MR
340.62M3
R46
1990
c.1

MR 340.62M3 R46 1990 c.1

Massachusetts. Civil Rights
Division.

Report of the Attorney
General's Civil Rights
Division on Bos Police Dept

MR
340.62 M3
R46
1990
c. 1

## CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SCOPE OF THE INVESTIGATIONS . . . . . . . . . . . . . . . . . 6

   (1)  Allegedly Unlawful Stops and Searches . . . . . . . . 6

   (2)  Allegedly Coercive Interrogation Practices . . . . . 10

   (3)  Staffing of Investigations . . . . . . . . . . . . . . 11

FINDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

   (1)  Stop and Frisk Policies:  1989-90 . . . . . . . . . 12

   (2)  Complaints Received by the Attorney
       General's Office . . . . . . . . . . . . . . . . . . . 20

      (a)  Stop and Frisk . . . . . . . . . . . . . . . . . 20

      (b)  More Intrusive Searches . . . . . . . . . . . . 26

      (c)  Strip Search Complaints . . . . . . . . . . . . 36

   (3)  Investigation of Alleged Coercive Interrogations in
       Connection with Stuart Homicide . . . . . . . . . . 46

CONCLUSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . 60

   (1)  Stop and Frisk . . . . . . . . . . . . . . . . . . . . 60

   (2)  Alleged Coercive Interrogations . . . . . . . . . . . 63

RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . . . . . 66

State Library of Massachusetts
State House, Boston

## INTRODUCTION

This is the report of the Civil Rights Division of the Department of the Attorney General concerning allegations of civil rights violations by members of the Boston Police Department (BPD), particularly officers assigned to the Roxbury, Dorchester and Mattapan areas of Boston. Two sets of allegations were addressed in two parallel investigations by the Division. The first concerned the manner in which officers were conducting "threshold inquiries," stops and frisks on the public streets, particularly of young black males. The second set of allegations was that the BPD's homicide unit employed coercive interrogation techniques designed to implicate a black suspect, Willie Bennett, in the killing of Carol Stuart on October 23, 1989. The Division investigated both sets of allegations thoroughly and presents its findings, conclusions and recommendations in this report.

The report has been written to make it as accessible as possible to those concerned with these issues. To that end, we have structured it as follows:

- o   A description of background events leading up to the investigations

- o   Scope of the investigations (including a chronology of the stop and search investigation)

- o   A discussion of information gathered by the Division from other cases concerning the BPD's stop and frisk policies and practices

o    A detailed description of the many complaints reviewed and investigated by the Division concerning the BPD's stop and frisk practices

o    The findings on alleged coercive interrogations in connection with the Stuart homicide

o    Conclusions

o    Recommendations

## BACKGROUND

In a 1968 case entitled Terry v. Ohio, the United States Supreme Court set forth the constitutional requirements for a so-called "threshold inquiry" or "stop and frisk."  To stop an individual, a police officer must have "reasonable suspicion," based on objective articulable facts, not just hunches, that the person has engaged or is about to engage in criminal activity.  The threshold inquiry may include only a pat-frisk of the suspect's outer clothing to discover weapons if objective facts lead the officer to believe that the suspect may be armed.  The officer may not extend the frisk into pockets or conduct a full scale search unless he feels a weapon, or has probable cause to believe a crime has been committed and, therefore, sufficient evidence to justify an arrest.  The "reasonable suspicion" necessary to justify a stop and frisk is a less rigorous standard than the "probable cause" standard needed to justify an arrest and search.

Two criminal prosecutions in 1989 were dismissed because the Suffolk Superior Court found that the BPD had violated Terry principles in connection with the events leading to those prosecutions.  In particular, in its September 17, 1989 decision in Commonwealth v. Phillips & Woody the court found that the BPD had engaged in a policy:

> that henceforth all known gang members and their associates (whether known to be gang members or not) would be searched on sight.  [Deputy Superintendent William] Celester's announcement [of the policy] was, in effect, a proclamation of martial law in Roxbury for a narrow class of

-3-

> people, young blacks, suspected of membership in
> a gang or perceived by the police to be in the
> company of someone thought to be a member.

The court referred its findings in the <u>Phillips & Woody</u> case to the Attorney General for appropriate action.

As a result of this referral, the office reviewed the policies of the BPD with respect to stops and frisks. In a statement of October 13, 1989, Attorney General Shannon announced his conclusion that no "search-on-sight" policy existed in the Boston Police Department. He also stated that if such a policy were to exist it would clearly be unconstitutional. Finally, he stated that despite the absence of a policy if a pattern of such conduct were shown to exist, he would not hesitate to stop it.

On October 23, 1989, Carol Stuart was murdered. In the aftermath of the murder, complaints intensified from individuals and community leaders, particularly in the Mission Hill area, that the BPD had used unconstitutional police practices in searching for Stuart's killer. Moreover, reports of unconstitutional stops and searches in other parts of Boston continued through the fall of 1989 and into January of 1990.

There were also new allegations in the months after the Stuart killing that the BPD's homicide unit had used coercive interrogation techniques in the investigation. The original focus of the homicide investigation on a black man, Willie Bennett, and the subsequent revelations linking Charles Stuart to the killing, coupled with Stuart's apparent suicide on

-4-

January 4, 1990, fueled allegations that the Department had ignored signs pointing to Stuart as a suspect.  Instead, some believed, the BPD singlemindedly pursued a black suspect, and had, in the course of that investigation, improperly coerced potential witnesses to implicate Bennett.

On January 16, 1990, Attorney General Shannon announced that his Civil Rights Division would open investigations of both the stop and search allegations and the allegations of coercive interrogations.  He noted that the office had not directly received complaints about stop and search practices. For that reason, coupled with the persistence of the allegations, the Attorney General stated that his staff would conduct a full-scale and aggressive investigation by meeting with community leaders, making themselves available within the community to receive complaints, and otherwise providing a setting that would encourage those claiming they had been subjected to unlawful stop and search practices to come forward.

## SCOPE OF THE INVESTIGATIONS

(1) Allegedly Unlawful Stops and Searches.  In the course of its investigation, the Civil Rights Division interviewed more than 50 individuals who alleged that they had been unlawfully stopped and searched by Boston police officers, often on multiple occasions.  The complaints ranged from allegations that officers stopped and frisked individuals without any basis for suspecting them of wrongdoing, to allegations that officers exceeded the constitutionally permissible scope of a "stop and frisk" by putting their hands in individuals' pockets or underwear, or in some instances by forcing them to lower their trousers on public streets and submit to strip searches.  The Division also interviewed a number of individuals who said that they had witnessed such searches.

In addition, the Division reviewed television footage of police activities in the period after the Stuart homicide.  We contacted reporters who might have further leads, and conducted or spoke at four community meetings.  (We also attempted, unsuccessfully, to set up meetings at Mission Extension and Orchard Park developments, and Lena Park Neighborhood Center, and we attended a community meeting on January 25, 1990 conducted by the U.S. Attorney's office.)  Division investigators visited five high schools to speak with and interview students about their experiences with the police, and attempted to, but were unsuccessful in, arranging sessions at six other area high schools.  We made numerous contacts with

-6-

community leaders and attorneys in an attempt to uncover additional witnesses or complainants; reviewed pleadings and other documents in the civil action, Carr v. City of Boston;[1] examined documents regarding complaints received by the Internal Affairs Division of the BPD; and reviewed the testimony and court decisions in two cases, Commonwealth v. Phillips and Commonwealth v. Phillips & Woody, where the superior court dismissed prosecutions because of unlawful searches and seizures by the BPD.

These portions of the investigation took place between January 1990 and May 1990.

On May 31, 1990 Marjorie Heins, Chief of the Civil Rights Division, wrote to Superintendent Joseph Saia of the Boston Police Department seeking further information and documents regarding 56 separate search incidents that had been reported in the course of the investigation.  On October 10, 1990,[2]

---

[1]  Carr was a civil suit for damages and injunctive relief brought by five individuals who alleged that they had been subjected to unconstitutional searches; one of them was shot after he apparently failed to heed an officer's order.  The case settled in October 1990, before the trial was completed, for $100,000 in damages.

[2]  After receiving no response to the May 31 letter, Marjorie Heins placed calls to BPD officials on June 12, 26, 27 and 29. None of those calls was successful in eliciting more than a promise to respond to the request.  On July 25, 1990, she wrote to James Hart, Legal Counsel to the BPD.  Again, no documents were received.  On August 2, 1990, the Attorney General wrote to Commissioner Roache requesting a meeting to discuss the tentative results of the stop and search investigation.  At that meeting, which took place on October 10, 1990, the BPD supplied the material described in detail below.  Much of the information provided on October 10 was in the form of an unsigned memorandum from Deputy Superintendent Ann Marie Doherty to Superintendent Paul F. Evans dated August 6, 1990.

-7-

the Department supplied documents referring to 10 of these incidents, as well as tape recordings made during seven of the incidents.  However, for many incidents radio dispatch tapes for the dates in question had already been destroyed, or tapes and written records could not be located because the Division could not specify the date and time of the incident.  In addition, the BPD simply did not have documentation for many of these incidents because at the time they occurred, there was no requirement that officers document a search that did not result in an arrest.

When the Division sought to interview the officers who had been identified as having participated in one or more of the incidents, counsel for the Boston Police Patrolmen's Association and the Police Detectives Union responded that the officers did not wish to make themselves available.

A more precise chronology of events in the investigation is as follows:

| | |
|---|---|
| 1/16/90 | Attorney General Shannon initiates investigation. |
| 1/18/90 to 5/15/90 | Interviews with complainants and witnesses; contact with community leaders and other interested persons; review of materials from <u>Carr v. City of Boston, Commonwealth v. Phillips,</u> and <u>Commonwealth v. Phillips & Woody;</u> review of television footage. |
| 1/24/90 | Community meeting at Roxbury Boys & Girls Club. |
| 2/1/90 | Investigators spoke with students at Jeremiah Burke High School. |
| 2/1/90 | Division staff spoke at Dorchester Task Force conference. |
| 2/6/90 | Community meeting at Massachusetts College of Art. |

-8-

3/13/90    Investigators spoke with students at Madison Park High School.

3/13/90    Community meeting with Franklin Field Task Force.

3/13/90    Investigators spoke with students at Dorchester High School.

3/15/90    Investigators at South Boston High School to speak with students.

3/20-      Investigators at Hyde Park High School to speak
30/90      with students.

3/27/90    Division presentation at Roxbury Youthworks.

5/31/90    Division writes to BPD requesting information and documentation regarding 56 separate search incidents.

6/90       Division makes follow-up calls to BPD requesting information and documentation.

7/25/90    Division writes to BPD again requesting information and documentation.

8/2/90     Attorney General writes BPD Commissioner requesting meeting to discuss tentative results of investigation.

10/10/90   Meeting between representatives of Attorney General and BPD regarding tentative results of investigation.

10/90      Division makes follow-up calls to BPD requesting its position on possible changes in policy to prevent recurrence of unlawful searches.

(2)  Allegedly Coercive Interrogation Practices.  The Civil Rights Division attempted to interview every individual whom it was able to identify as having been questioned by police in connection with the Carol Stuart homicide.  The following people were reached and interviewed:  Dereck Jackson, a 17-year-old black high school student; Melba Jackson, Dereck's aunt; staff members at McKinley Technical High School who had knowledge of police contacts with Dereck; Eric Whitney, an 18-year-old black high school student; Angela Briddle, a friend of Eric's; Leroy Cox, a 17-year-old black high school student; Ronald Ferguson, a 16-year-old black high school student; Michael Williams, a friend of Dereck's, Leroy's, and Ronald's; and Mary Smith, a black woman who resided in the Mission Hill area of Boston.

In addition, the Division reviewed relevant material supplied by the Suffolk County District Attorney's office, tapes and tape transcripts supplied by the BPD homicide unit, search warrant affidavits, and police reports.  The Division sought to interview four officers who were identified as responsible for or involved in some of the interrogations: Detectives Peter O'Malley and Miller Thomas, and Officers William Dunn and Trent Holland.[3/]  However, counsel for the officers' unions stated that these officers would not be available for questioning.

---

3/  Holland was promoted to detective after the events about which the Division sought to question him.

-10-

(3)  <u>Staffing of Investigations.</u>

The investigations were supervised by the Chief of the Public Protection Bureau and the Chief of the Civil Rights Division.  Two attorneys from the Civil Rights Division assisted.  Three investigators in the Investigative Division of the Public Protection Bureau worked almost continuously on this matter and an additional eight conducted interviews with complainants and witnesses.

## FINDINGS

(1) <u>Stop and Frisk Policies: 1989-90.</u>  In May 1989, Boston Police Department Deputy Superintendent William Celester (commander of Area B) and Captain Robert Johnson, also of Area B, made statements to the media to the effect that the Department had adopted an aggressive policy of harassing "known gang members" by stopping and searching them on sight.  Johnson was quoted in the <u>Boston Herald</u> as saying, "[p]eople are going to say we're violating their constitutional rights, but we're not too concerned about that ... If we have to violate their rights -- if that's what it takes -- then that's what we're going to do."  Johnson acknowledged, during his testimony at a hearing on a motion to dismiss in <u>Commonwealth v. Phillips,</u> that he had made this statement, but asserted that the statement was merely a "psychological ploy."

Johnson admitted, however, in his <u>Phillips</u> testimony, that in May 1989 the Department did conduct "sweeps" in "the high-crime area of Roxbury, Dorchester and Mattapan."  The sweeps "sometimes" included searches if the "kids" were "in a high-crime area, if they are in an area known to be frequented by drug dealers, by kids that have guns ..."  Johnson believed such searches were lawful under chapter 41, §98 of the Massachusetts General Laws (police officers "may examine all persons abroad whom they have reason to suspect of unlawful

design ...").[4]

Elaborating on the standards for the sweeps, Deputy Celester testified in Phillips that he had instructed his officers to:

> stop and frisk any known gang members in a gang location where there has been high-crime problems ..., and if there are other kids with the gangs that are not known to us, that we will search them too for the protection of my officers.
>
> That was the policy.  If they were hanging out with gang members and they were not known to us but they were with that gang, they would also be searched.

A fair conclusion from Celester's testimony is that he believed the Terry v. Ohio standard would be satisfied where known gang members or those associated with them are seen in a "high-crime" area.

Celester, at the hearing in the Phillips case, also acknowledged that he had publicly stated that police would stop and search gang members and others associated with them.  He testified, however, that he had not meant to say that the police would do so without an articulable basis to suspect criminal activity, as required by Terry.

---

[4]  This provision was declared unconstitutional 23 years ago to the extent it purported to create a substantive criminal offense of being "abroad," arousing the "suspicion" of a police officer, and subsequently failing to "give a satisfactory account of themselves."  Alegata v. Commonwealth, 353 Mass. 287 (1967).  The authority given police by c. 41, §98 to conduct threshold inquiries does not extend beyond that authorized by Terry.  Commonwealth v. Anderson, 366 Mass. 394 (1974).

In a second case involving Lamar Phillips and a co-defendant, Melvin Woody, Justice Cortland Mathers found that:

As early as March and not later than May of this year [1989] the Boston Police Department at a level below that of the Commissioners Office began the systematic application of a Policy in the general area of Roxbury that had not previously been formalized although it may well have had intermittent use for a much longer time. The Policy was developed in conjunction with the formulation of a secret list of "known gang members" which was initially 150 in number but has now grown to around 750.

The Policy to which reference is made took official form in May when Deputy Superintendent William R. Celester, Commander to 230 officers in the Roxbury District, announced that henceforth all known gang members and their associates (whether known to be gang members or not) would be searched on sight. Celester's announcement was, in effect, a proclamation of martial law in Roxbury for a narrow class of people, young blacks, suspected of membership in a gang or perceived by the police to be in the company of someone thought to be a member.

Apparently taken aback by these candid pronouncements, the Police Commissioner, on May 23, 1989 issued a memorandum paying due deference to the principles of the first, fourth, sixth and fourteenth amendments and suggesting the "Police Department has a profound responsibility to ensure that every citizen is guaranteed the exercise or enjoyment of rights secured by the Constitution and laws of the Commonwealth." Nothing more than that was done. Mr. Celester's Machiavellian approach to the problems of Roxbury has continued to be implemented.

As recently as September 10, at 2:00 a.m. Anthony Thomas, who resides in a van on a lot in Roxbury, was rousted out by uniformed police with flashlights, placed in a police cruiser while his van was searched and then released. The Commonwealth has offered no affidavit or search warrant application to justify such an intrusion.

-14-

> I have taken and credit testimony from blacks in
> the Egleston Square area that they, as individuals
> and in groups, are forced to open their mouths,
> placed spread eagle against walls, required to drop
> their trousers in public places and subjected to
> underclothing examinations.  Deputy Celester stated
> to a reporter for the <u>Boston Herald</u> that his policy
> has resulted in "hundreds of searches but few
> arrests."
>
> The Court finds a tacit understanding exists in the
> Boston Police Department that constitutionally
> impermissible searches will not only be
> countenanced but applauded in the Roxbury area.

The practices Judge Mathers found to exist contrasted sharply with announced BPD policy as early as May 23, 1989, when Commissioner Roache issued a memorandum entitled "Department's Role as Guardian of Civil Rights," announcing the Department's commitment to constitutional standards in conducting searches and interrogations.

On August 31, 1989 Deputy Superintendent Celester issued a somewhat more ambiguous memo to all Area B personnel expressing his "intense[] concern[] with the delicate balance between the civil rights of citizens on one hand and lawful, aggressive street patrol on the other."  A week later, on September 7, Captain Paul Farrahar of Area B informed Celester by memo that he had reminded Area B officers at various roll calls "that they should constantly be cognizant of all citizens' civil rights and adhere to the BPD guidelines set forth regarding Threshold Inquiry and 'Stop and Frisk' of persons and vehicles."

On October 10, 1989, a black man named Rolando Carr was shot by a Boston police officer during a stop of Carr and three of his companions at the Franklin Field housing development in

Dorchester.  On October 12 Commissioner Roache issued another memorandum, entitled "Boston Police Department and Constitutional Rights," and reiterating the Department's policy of abiding by the constitutional standards laid out for threshold inquiries in Terry v. Ohio.

The Carr incident led to a lawsuit, filed in December 1989, with four plaintiffs in addition to Rolando Carr: Kenneth Lowe, Malik Staten, Darren Borden, and Howard Borden.

Kenneth Lowe, a 25 year-old black male, alleged that he was stopped three times while visiting relatives at the Franklin Hill housing development in Dorchester. The first incident was in September 1989 when two officers ordered him to freeze and put his hands up against the wall "before I blow your fuckin' head off," according to Lowe.  Lowe was wearing his work clothes -- paint-covered overalls and workboots -- and a New York Giants baseball cap.  One officer asked if he was a member of the Giants gang and said he would be frisked again if he continued to wear the cap.  The officer looked inside Lowe's overalls and down inside his pants.

The second alleged incident occurred a few days later. Lowe was in his mother's apartment when he heard a noise.  When he went into the hallway, three BPD officers required him to remove his shoes, pull down his pants and underpants, and then bend over.  He was then ordered to lie on the floor with his pants down.  The third incident involved Rolando Carr and led to the shooting of Carr.

-16-

Malik Staten, a 16 year-old black youth, alleged that he and groups of his friends had been stopped and searched by BPD officers on three separate occasions in 1989. The first incident occurred in July 1989. Staten was walking with two friends down Boylston Street when a police car pulled up and an officer emerged with a gun drawn. He ordered Staten up against a fence with legs spread, frisked him, searched inside his pockets, and shook out some clothing he was carrying. The second alleged incident was in August 1989. Police stopped a car in which Staten was a passenger; the occupants as well as the car were searched. The third incident occurred near Egleston Square when a number of officers stopped and questioned Staten and his friends as they were walking on Walnut Street. The youths were patted down and their pockets searched.

Darren Borden, a 15 year-old black youth, alleged that he had been stopped and searched on several occasions in 1989 and 1990. During one incident he was held in a headlock, patted down on his genitals, and told to remove his shoes. Another search, in the area of Tremont and Warwick Streets, involved an officer putting his hands in Borden's pockets, unbuttoning his pants, and feeling around inside his pants.

Howard Borden, a 16 year-old black youth, alleged that he had been stopped four times without justification, usually when wearing one of a number of baseball caps that he owns. On one of these occasions he was photographed for what an officer

-17-

described to him as the "gang file."  On another occasion he and his friends were told, "you're not supposed to be on the corner like this."

Carr, Lowe, Staten, and the Bordens testified about these events under oath by deposition in the course of the <u>Carr</u> lawsuit.

In 1989 and 1990, the Boston Police Department also received a number of complaints alleging unlawful searches from members of the community.  The Civil Rights Division reviewed documents relating to these complaints which had been produced during the <u>Carr</u> litigation.

One complaint, dated July 11, 1989, was from a parent living in Dorchester who alleged that his 16 year-old son was continually being harassed and threatened by three officers for no apparent reason.  This complaint was sent for investigation to Area B, where Sergeant William Slavin spoke by telephone with the complainant, interviewed the officers in question, and recommended that they be exonerated.  Subsequently, Deputy Superintendent Celester wrote to the Internal Affairs Division stating that the complaint had been resolved because the parent did not want formal charges brought against the officers.

The Internal Affairs Division received at least eight other citizen complaints alleging unlawful stops or searches between July and December 1989.  One complainant alleged that during a September 1989 search, four plainclothes officers drove him to an isolated area of Franklin Park.  One officer

-18-

then placed a nightstick to his neck and demanded the names of drug dealers, saying, "We know you know where the drugs are, nigger." In his deposition in the Carr case, Deputy Celester stated that he remembered this complaint was investigated but did not recall the result of the investigation. The documentation produced during the Carr litigation does not indicate any resolution of the complaint.

Another complaint, regarding an incident that occurred on September 3, alleged that three officers stopped the individual while seated in his car, without identifying themselves, demanded his license and registration, and then searched inside the complainant's underwear. Deputy Celester testified in his Carr deposition that the officers involved in this incident were probably part of the citywide anti-crime unit, who were not under his command.

The Division also examined documents relating to complaints received by the BPD in 1990 and referred to its Internal Affairs Division. In one instance, a City of Boston employee related that a young man in the Egleston Square area told him that he had been strip-searched during a drug arrest in February 1990. The investigating officer in the Internal Affairs Division attempted to contact the young man but apparently received no response.

Another complaint in 1990 came from a businessman complaining about strip searches of drug suspects on the public street outside his market. According to a January 11, 1990

-19-

report from Deputy Superintendent Roy Hechavarria, the complainant stated that he had observed officers on several occasions ordering suspects to drop their trousers in public. Hechavarria concluded that there was insufficient identifying information to bring charges against any particular officers, but that he had "no reason to doubt" the complainant's allegations. Some months later, the investigation was closed. According to an April 6, 1990 memo, the complainant declined to view a photo array because he said he would be unable to identify any of the officers involved. There is no indication that the Department took other steps to identify the officers.

It does not appear that any of the complaints received by the BPD in the 1989-90 period regarding unlawful searches has resulted in disciplinary action. At his deposition in the Carr case, Deputy Superintendent Celester acknowledged that in one case involving a complainant who claimed he was brutalized while being searched for no reason, the officers did not have sufficient evidence to conduct a threshold inquiry. However, because the complainant did not wish to pursue the matter, it was dropped after the officers were reminded, according to Police Department documentation, "of their responsibilities when dealing with the public and to always exercise restraint and professionalism when interrogating persons."

(2) Complaints Received by the Attorney General's Office.

(a) Stop and Frisk. Ten of the complaints received by the Civil Rights Division concerned threshold inquiry or stop and

-20-

frisk type searches that were conducted, according to the complainants, without any basis for suspicion.  The complaints are described below.  Where the BPD supplied documentation relating to an incident, the contents of that documentation is also provided.

1.   A 17 year-old black female, a 10th grader at Hyde Park High School, stated she was stopped about 5:30 p.m. on Tremont Street downtown in mid-March 1990.  The officer asked her name.  When the girl asked, "Why?" she was patted down. When two companions, who were standing nearby, questioned the officer's conduct, they were also frisked.  The officer then explained that there were some girls in the area carrying a gun.

2.   An 18 year-old black male (a junior at Jeremiah E. Burke High School) stated that he was stopped at least 30 times in 1989.  Two incidents he described were in October 1989 on Brunswick Street in Roxbury, and in December 1989 on Intervale Street, Roxbury.  In the October incident, a detective drove up in an unmarked car, ordered the complainant up against the wall, and began to search his pockets.  In the second incident, the teenager was ordered up against the wall by another detective and his partner, and frisked.

3.   A black male taxidriver stated that in mid-February 1990 he was driving home in his own car when a police cruiser pulled him over and frisked him.  When the complainant asked why, he was arrested for disorderly conduct.  The judge dismissed the charge and reportedly scolded the officer.

-21-

4.    A black male 11th grader at Jeremiah E. Burke High School stated he was stopped with his friends in January 1990 at about 9:00 p.m. while walking home on Bowdoin Street, Dorchester.  Two detectives asked the youths their names and where they were going.  When they did not respond, the detectives searched the complainant and others.  One detective told the youths not to say anything or he would arrest them for "mouthing off."

5.    A 20 year-old black male reported two incidents in February 1990.  In the first, two officers approached him while he was parked outside Jamaica Plain High School waiting to pick up a friend, and began to search his car.  When he asked a question he was told to "shut the fuck up."  The second incident was in Mission Hill when he was stopped by police but not searched.

6.    A 52 year-old black male complained that in October 1989 he found a police officer searching the hallway of his building on Washington Street in Roxbury.  As the officer left, the complainant saw two other officers frisking two friends.  This incident was also reported by another complainant, who stated that an unmarked vehicle with three detectives pulled up and shined flashlights on him and his friend as they sat on the front steps.  When the complainant said, "Hi, what can we do for you?" one officer replied, "Just doing our job," and began to search them.  Another officer began looking around the area and a third opened the front door and searched the hallway.

7.    A 17 year-old black male (a 10th grader at Cathedral High School) stated that he was stopped and questioned about a week after the Stuart murder, while walking along Huntington Avenue in the Mission Hill area.  The officer asked, "What are you doing here?" to which complainant responded, "We live around here."  When his companion then said, "What's the problem?  I don't have to take this shit," the officer grabbed the complainant, threw him against the car and "felt him up." After the search, the companion asked the officers for their badge numbers.  One of them responded, "You don't need no motherfucking badge numbers," adding, "I better not see you around anymore.  If I do, I'll take you in."

8.    A 30 year-old black male stated he was stopped in August 1989 while driving down Normandy Street with a friend. A police cruiser began to follow them, then pulled them over. One officer said, "Get out of the motherfucking jeep and don't let me have to tell you twice."  When the complainant said, "Excuse me?", the officer reportedly responded, "Oh, you're a fucking tough guy.  Give me your registration."  The complainant was taken out of the jeep, handcuffed, and placed in the cruiser.  He was arrested on a nonsupport warrant.

A police report dated July 12, 1989, appears to refer to this incident.  The report indicates that in the course of responding to a report of a shooting, officers noticed a car driving down Normandy Street at a speed greater than posted. The report notes that when the car was stopped and the driver

-23-

asked for license and registration, he became "loud and questioning." The driver was then asked to exit the vehicle, but the report does not indicate that he actually did so. Instead, according to the report, he produced his license and registration, and when the license check indicated a default warrant, he was arrested.

9.    A 33 year-old black male stated that he witnessed the search of two black youths who were sitting in a jeep near the intersection of Dudley and Warren Streets on January 24, 1990. Two police officers emerged from a cruiser. One grabbed the driver out of the jeep, threw him roughly against the police car, and frisked him. Another officer grabbed the passenger and frisked him. Two other officers searched the jeep. After the search was completed, no arrests were made and the youths were permitted to drive away.

This incident is documented by a BPD tape revealing that a unit was dispatched to Dudley and Warren Streets at about 2:24 p.m. to respond to a call about "two black men who dragged another man into a white jeep and are assaulting him." When the officers arrived, they found a white Suzuki occupied by two black males. The BPD response to the Division's document request indicated that the "occupant was the victim and does not wish to pursue the matter." The tape does not indicate whether force was used against the individuals, they were frisked, or the jeep was searched, as the complaining witness alleged.

10.    A 20 year-old black male (a senior at Jeremiah Burke High School) stated he was stopped in March 1990 in the hallway of a friend's apartment in Dorchester.  Two officers ordered the complainant and four companions up against the wall and patted them down.  One officer yelled, "I found something," but never indicated what it was.  The father of one of the youths arrived and asked the officers what they were doing with his son.  They then allowed the youths to leave.

The Department supplied an incident report corresponding to the events described above.  The report indicates that four officers, "acting on information received from concerned citizens, obtained a hidden vantage point" from which they observed suspicious transactions, then arrested two individuals, one for suspected marijuana possession and one for "A/B P/O" and "disorderly."  This second arrest appears to confirm that an altercation occurred, but the report does not give details, nor does it describe the scope of the search.

In the three incidents in the "stop and frisk" category for which the BPD was able to supply documentation, that documentation indicated a basis for at least a threshold inquiry.  Aside from disputes about the bases for the stops, however, unanswered questions remain:  whether the searches conducted were unduly rough, and whether the language and behavior of the officers was appropriate.  In incident #9, an apparently disinterested witness observed what appeared to be inappropriate conduct by the officers.

(b) <u>More Intrusive Searches.</u>  The Division received 19 complaints regarding searches more intrusive than pat-frisks. Several of these complaints involve multiple incidents:

1.    A 25 year-old black male reported that he was driving with his friends on Blue Hill Avenue in August 1989 on their way to a concert when they were stopped by several police cars and told to exit their vehicles.  The police searched the cars and the individuals, putting their hands in the individuals' pockets.  When the complainant asked what the search was about, an officer said, "Shut the fuck up, it will be over soon." And, in response to another question, he said, "Shut the fuck up ... You have been through this before.  You know the routine."  This officer later said that the two cars in which the complainant and his friends were driving fit the description of two jeeps that had just been involved in a robbery.  No arrests were made and the individuals were permitted to leave.

2.    A 20 year-old black male stated he was searched and arrested by Boston police detectives on Intervale Street, Roxbury in February or March 1990.  Two detectives approached the complainant, one saying,  "Come here, you wise-ass."  Then, according to the complainant, this detective threw him up against the police car and searched him.  After the two detectives roughed up the complainant, one of them placed his hands in the complainant's coat pocket and then arrested him.

In an incident several weeks later in the vicinity of Warren Street, this complainant saw the same two officers and evidently offered to be searched. A fight ensued and he was again arrested. A witness to this incident stated that the officers grabbed the complainant by the throat and threw him against the car. When the witness protested, he was also struck; and both young men were arrested.

These incidents are documented in two police reports. The first report describes the suspect as "known to both detectives," and as having fled on foot after observing them. After a chase, he was searched and arrested for possession of a class B substance. The other incident report describes an arrest for possession of a class B substance with intent to distribute, and assault and battery on a police officer, after the individual was observed "making what appeared to be drug transactions." The report states that the suspect attacked and struck both officers. District court documents reflect that the complainant was charged with assault and battery against the two officers as well as possession of a class B substance.

3. An 18 year-old black male (a Hyde Park High School senior) stated that he and about four friends were searched in mid-July 1989 by two Boston police officers on Norfolk Street in Dorchester. The officers searched the youths' coats, pants pockets, and hats. Charges were brought but later dismissed. This incident appears to be documented by an August 1989 police report regarding an arrest of four youths for cocaine possession.

4.    A 19 year-old black male (a senior at Hyde Park High School) stated he was searched twice:  in November 1989 and March 1990.  The first incident occurred on Wildwood Street, Dorchester when the complainant and his companion were stopped by two uniformed Metro police officers who questioned them and ordered them to take everything out of their pockets.  One officer then said, "Don't let me catch you on this corner again."  The Metro police were not able to provide any documentation regarding this incident.[5]

The March incident occurred on Blue Hill Avenue when the complainant and two friends were ordered up against the wall by four plainclothes officers.  One officer opened the complainant's coat, went through his coat pockets, and ordered him to empty his pants pockets.  The other officer searched his two friends.  No arrest resulted and all were allowed to leave.

5.    A 17 year-old black male (a junior at Boston English High School) stated he was stopped in December 1989 with two friends in the Brigham Circle area.  The officers ordered all three to lie on the ground and then put guns to their heads as one officer said, "We received a call that you three have guns on you."  The police reportedly searched the youths' pockets, and subsequently one officer, according to the complaint, picked up a beer bottle off the street and said, "All three of you are arrested for drinking in public."

---

[5]  Although involving Metro police, this complaint is included here because it was received in the course of the investigation.

-28-

6. An 18 year-old black male (a freshman at Hyde Park High School) reported that he was walking with a friend up Woodbole Avenue in Mattapan in January 1990 when they were stopped by two officers, questioned, and ordered up against the wall. Complainant was placed in a cruiser (ostensibly while the officers checked for outstanding warrants), driven around for about five minutes, and then let go.

7. A 17 year-old black male (a Hyde Park High School junior) stated he was stopped by a BPD detective on Intervale Street, Roxbury, with a friend, in December 1989. The detective reportedly ordered both young men up against the wall and searched their pockets, then allowed them to leave. This complainant says that he and his friends are constantly being harassed without cause by other BPD detectives.

8. A 17 year-old black male (a Hyde Park High School sophomore) stated he was searched twice in March 1990 in the Mattapan Square area. In the first incident, the officer ordered him to take his jacket off, searched him, and then let him go. In the second incident, two officers stated they had a suspect who looked like the complainant, searched him, and told him they did not want to see him in the square again.

9. An 18 year-old black male (a senior at Boston Tech High School) stated he was stopped and searched in April 1989 while waiting for a bus at the corner of Crawford and Warren Streets in Roxbury. An unmarked police cruiser pulled up with four detectives in it. They began to question and search him,

-29-

and when the complainant asked why, one officer replied, "Because you look like a gang member." One officer reached into his pockets. When the complainant mentioned that he was planning to go to college and had already received recruitment contacts from three universities, the officers became more friendly and left.

10. A 16 year-old black male stated he had been searched several times. In August 1989 he and two friends were stopped by two BPD officers. The police searched the pockets and backpacks of all three. One officer stated, "We're responding to shots being fired," and "We're taking you for a ride." While the three youths were in the police car, one officer stated over the radio, "We have a known gun carrier here." (The complainant had been arrested on a gun charge earlier in the month.) The police released the youths on Walk Hill Street.

Shortly after this incident, the complainant and a friend were stopped again by two officers on the Wellington Hill Footpath in Mattapan while returning from work. One of the officers recognized the complainant, asked where he was coming from, searched his bag, and radioed, "We have a known gun carrier." The youths were ordered to sit on the ground while the policemen continued their search. One officer said he was responding to a call of shots being fired. After about 30 minutes, the youths were permitted to leave. In a third incident, in December 1989, the complainant and a friend were searched on the corner of Blue Hill Avenue and Almont Street.

-30-

After nothing was found, one officer said, "We're gonna get you sooner or later."

11.   A 19 year-old black male (a junior at Jeremiah Burke High School) stated he was searched in January 1989 while walking home on Warren Street, Roxbury after a visit with his girlfriend.  The officers asked him where he was going, and why he was out so late.  They then searched his coat and pants pockets.  When the complainant asked why this was happening, one officer replied, "This is a drug restricted area; you shouldn't be out this late."  The other officer said, "Why do you want to be a wise-ass?  You want to be a wise-ass I can lock you up for being disorderly."  This officer then reportedly handcuffed the complainant, punched him in the stomach and face, and put him in the cruiser.  The complainant stated he did not do anything to provoke this arrest or beating, he was simply asking why he had been stopped.  The complainant was taken to the Area B station and booked on a disorderly conduct charge.  He states the case was later dismissed.  A court docket sheet indicates this complainant was charged with disorderly conduct, admitted to sufficient facts, and had the case dismissed upon payment of $25 in court costs.

The Department produced an incident report concerning this arrest.  The narrative states:

> Approximately 12:30 am [two] officers ... while on random patrol observed [the suspect] running down Warren St. from Elm Hill Ave. towards Grove Hall.  Due to the drug activity in that area combined with the time and fact [that suspect] was running [the] officers ... detained him to conduct a threshold inquiry.  [Suspect] refused to answer any questions regarding his name, address or business in the

above area.  Furthermore, [he] began to yell and scream obscenities in a hostile manner.  To preserve the peace for the surrounding residents [he] was arrested and transported to B-2.

The report does not mention any search of the individual's coat or pants pockets and contains a radically different version of the incident than the complainant's.  However, even accepting as true the facts supplied in the report, it is questionable whether the officers' observations (a young man running, an area of drug activity) justified a Terry stop.

12.  A 32 year-old black male stated he was stopped in December 1989 while on his way to work in Wilmington.  He was walking towards Jackson Square, Roxbury in order to catch the first Lowell train, which leaves North Station at about 5:00 a.m.  Two officers shined their flashlights at him, asked where he was going, and asked if they could look in his bag. He consented, and they then searched his bag and frisked him. As a result of the incident, the complainant missed his train and was late for work.

13.  A 17 year-old black male (a sophomore at Cathedral High School) stated he was searched on October 24, 1989, the day after the Carol Stuart murder.  The complainant and four friends were approaching a bus stop on Washington Street when a marked cruiser pulled up and two officers rushed towards them. They were questioned and frisked, then thrown to the ground. The police then searched their gym bags and told them not to be seen in the area again.

14.  A 17 year-old black male (a sophomore at Madison Park High School) stated he had been searched three times.  The first incident was in July 1989 at the corner of Martin Luther King Boulevard and Walnut Avenue.  A shooting had occurred nearby; the complainant and his friends were walking toward Walnut Street when three cruisers came up.  One officer began to question the complainant and his friends, then searched their bags and found nothing.

The second incident occurred in November 1989 at the corner of Warren and Copeland Streets.  The complainant and two friends had just left a store when a cruiser pulled up and officers began to question the youths.  The three were searched; a small knife was found on one of the two friends; and an officer then used this knife to rip apart the complainant's jacket and search the inside.  The complainant asked, "Why are you ripping my jacket?" to which the officer replied, "Get out of here before I lock you up."

In the third incident (January 1990), the complainant stated he was hanging up a pay phone when a cruiser pulled up and an officer began to question and frisk him.  The officer remarked that the complainant "shouldn't be staying around here late."  (It was about 10:30 p.m.)

15.  A black female 12th grader at Jeremiah Burke High School stated she was questioned by two Boston police officers in May 1989 while waiting for a bus on Blue Hill Avenue.  A female officer told the complainant to come into a nearby

-33-

hallway to be searched but she refused and at that point a bus arrived, which she boarded.  The officers appeared concerned that she had been waiting at the bus stop for an excessive period of time.  When she got off the bus the same officer approached again and insisted on searching her.  The complainant was frisked and her purse was searched.

16.  On March 8, 1990, two Public Protection Bureau investigators went to the Mission Hill area to see if they could observe any searches occurring.  At about 11:15 a.m. while driving down Parker Street, they observed two white males exit from an unmarked vehicle and begin to search a white male by going through his pants and jacket pockets.  The two officers then returned to their vehicle and drove off.  The investigators then followed the man who was searched and asked if he knew the men who had stopped him.  He said he did not, and knew of no reason why he had been stopped, but cooperated with the detectives because he had nothing to hide.

This incident is partially confirmed by a BPD tape for March 8, 1990 revealing a plainclothes unit on a surveillance at Parker and Horadan Streets from 9:51 to about 11:09 a.m. The BPD was unable to produce any written incident report.

17.  On May 4, 1990 at about 10:30 p.m. a Public Protection Bureau investigator was driving on Blue Hill Avenue in the direction of Franklin Park when she observed a police officer talking with three black youths on the corner of Mattapan Street and Blue Hill Avenue.  The investigator asked

-34-

the three youths why they had been stopped and they said they had not done anything.  One of the three, age 16, a resident of Mattapan and a student at West Roxbury High School, said the officer had searched his pants pocket.

18.  A 19 year-old black male (a senior at Hyde Park High School) stated he was stopped in September 1989 while driving his car on Norfolk Street in Dorchester.  The officer first checked his license and registration, then reportedly ordered him out of the car, searched his pockets, lifted up his pants legs, and searched the glove compartment of his car.  The officer then returned his license and registration, said, "This is your lucky day," and left.

19.  A 17 year-old black male (a junior at Hyde Park High School) reported that he was riding with his friends down Blue Hill Avenue in April 1990 when stopped by a BPD cruiser at the corner of Talbot Avenue in Dorchester.  The officers asked the driver for license and registration and when asked why he was stopped, one replied it was none of his business.  Two additional officers then arrived and ordered all four youths to stand up against the wall and take everything out of their pockets.  The officers then searched the vehicle, pulling out seats and emptying ashtrays.  The youths were allowed to leave after the search and warrant checks were completed.

For most of the incidents in this category of more intrusive searches, the BPD was not able to supply any documentation.  In part this was because the complainants were

-35-

often not sure of the dates and times of the incidents.  In addition, as noted earlier, where a search but no arrest occurred, the BPD did not require that officers create any documentation.  Finally, the BPD has informed us that it maintains its radio tapes for only six months.

(c) <u>Strip Search Complaints.</u>  The Division received information or complaints regarding 18 strip search incidents on public streets:[6]/

1.    A minister reported that in July 1989 while driving down Dudley Street in Roxbury, he observed about 15 male teenagers lined up spread-eagled against a wall, with two plainclothes police officers searching them.  One officer was standing near the corner of Dudley Street and Howard Avenue, holding a gun in the air.  The other was going down the line frisking each youth in turn, emptying their pockets, then making them drop their pants and undershorts.  After about 15 minutes there were 15 bare bottoms displayed on the street.  In some instances the officer spread open the person's buttocks. No one was arrested and after the search was completed the officers drove away.

2.    On January 16, 1988 a 39 year-old black man was strip-searched in a school parking lot across the street from his home by officers of the Boston Municipal Police.  One officer stated to him, "We have a smart-ass nigger here," and "Three

---

6/  This does not include Kenneth Lowe's and Darren Borden's accounts of strip searches, described above, in the litigation <u>Carr v. City of Boston.</u>

-36-

blacks in a car at this time of night gotta be doing something wrong."  The man was forced to lower his pants and undershorts in full view of observers.  (There were at least three witnesses, all of whom were interviewed by the Civil Rights Division in response to a complaint shortly after the incident occurred.)[7]

Under BPD Rule 400, officers of the Municipal Police are appointed by the BPD, subject to BPD disciplinary procedures, governed by BPD rules on excessive force, firearms, and other equipment, and required to file arrest reports and certain incident reports with the BPD.

3.    A middle-aged black male reported that he was stopped in June 1989 while walking down Humboldt Street at about 8:00 p.m.  An unmarked car pulled up and two officers exited and approached him.  According to the complainant, one asked, "Hey you, what are you doing walking here?" and "Where are you going?"  He then asked what was in the complainant's bag.  The complainant consented to the officer's searching the bag. Another officer then pushed him against a wall and patted him down, finding nothing.  The police then reportedly searched the complainant's pockets, removed his wallet, and questioned him

---

[7]  This complaint was investigated in 1988, well before the "search on sight" investigation began.  It is included here because of the serious allegations regarding an unlawful strip search.  The individual involved has filed a lawsuit against the City of Boston arising out of this incident.

about its contents.  One officer then told him to unbuckle his trousers and drop them.  The complainant stated that he refused to do so, saying that if they had a reason to arrest him, they could arrest him and then search him at the station.  The officers conferred among themselves, questioned the complainant further, and finally let him go.

4.    A Hispanic male who lives in the Mission Hill housing development reported that he was searched in early January 1990 near his home on Horadan Way.  A cruiser came by and two officers emerged.  The complainant was holding his daughter, and one officer told him to put her down, which he did.  He was then asked what he had in his car and where he was coming from.  He replied that he was returning from work and his car contained some boxes and old clothes.  One officer tried to open the car doors, but they were locked.  The complainant offered him the keys, but the officer declined.  Another officer then placed his hands inside the complainant's front pants pockets.  After that, the officer reportedly grabbed the elastic waistband of the complainant's pants, pulled it forward, and looked inside.  The complainant was then patted down.  No arrest resulted.

5.    A 17 year-old black male stated he was strip-searched in late February or early March 1990 on Dale Street.  The complainant alleged that this officer continually harassed him.  He reportedly made the complainant drop his pants, then pulled his undershorts and looked inside.  He then made the

complainant sit in the cruiser while he walked up the street. The complainant alleged that the officer later returned carrying a brown paper bag, and arrested him for marijuana possession.

This incident corresponds to a February 28, 1990 arrest report for possession of a class D substance. The report does not mention any search of the individual's underwear.

6. A 16 year-old black male (a 9th grader at Charlestown High School) stated that he had been stopped by Boston police officers two or three times per week, usually in the Copeland Street area, and that he had been strip-searched approximately seven times. Each time he was told to drop his drawers. The officers looked in his mouth and all other body cavities. Often the officers emerged from cruisers with guns drawn, put the guns right to his face, and said that if he moved, they would shoot him or "blow [his] flattop off." The complainant reported that sometimes he and other youths were told to lie face down on the ground.

7. An 18 year-old Hispanic male (a senior at Jeremiah Burke High School) stated he was searched in September 1989 while with his friends on Geneva Avenue in Dorchester. Three officers reportedly approached the group and one stated, "Gentlemen, how are you doing?  Got any drugs?  Put your hands up against the wall." One of the officers told the complainant to pull down his pants, then proceeded to grab the waistband of his undershorts, pull them back, and look inside. The

-39-

complainant stated that the officer then told everyone, "If I catch you here again, I'll lock you up."  The complainant added that this officer stops and searches many youths in the neighborhood.  (He is also the subject of other complaints recounted in this report.)

8.    A 17 year-old black male (an 11th grader at Hyde Park High School) stated he was strip-searched by Boston police in September 1989 on Morton Street in Mattapan.  The complainant and companions had just left a funeral home where they had attended a wake.  They walked to a Chinese restaurant and ordered some food.  As they were waiting outside for the food, two officers, who had been part of a group searching a car down the street, approached the complainant and pushed him and his five friends against the wall.  One officer stated that they were all wearing Adidas T shirts.  This officer then reportedly searched the complainant's pants pockets, told him to remove his shoes, searched the shoes, and told him to remove his pants.  When he refused, the officer pushed him against the wall again.  After this, the complainant pulled down his pants.  His underwear was also searched.  He observed that about 12 other individuals were up against the wall being searched.  After the searches were completed, the officers told the youths to go home and change before picking up the food, and not to wear Adidas shirts again in that area.

Another person (20 years old) corroborated this incident, which he stated involved both Boston and Metro police.  He

-40-

reported that approximately 14 youths were lined up against a wall and searched in their pants pockets as well as inside their pants.

9.    A 17 year-old black male (a freshman at Hyde Park High School) stated he was strip-searched in March 1990 during an arrest for larceny of a motor vehicle.  About a month earlier he had been standing with two friends on Wachusett Street in Hyde Park when two police officers drove down the street and yelled "Niggers!" at them.

10.    A 19 year-old black male (a senior at Hyde Park High School) stated he was searched by Registry of Motor Vehicles police on Blue Hill Avenue in September 1989.  He and a companion had just left a car wash when a Registry cruiser pulled them over and officers ordered them to put their hands on the dashboard.  An officer then ordered the complainant to take his boots and pants off.  The officer searched the complainant's pants and went through his wallet.  When he asked why he was stopped, the officer reportedly told him to shut up.  The youths were permitted to leave after receiving a citation for failure to stop for a police officer.  An interview with the complainant's companion corroborated these allegations.

The Division requested documentation on this incident from the Chief of Registry Inspectors, but he was unable to supply

any tapes or incident reports.[8/]

In his September 8, 1989 testimony in <u>Commonwealth v. Woody & Phillips,</u> Deputy Celester acknowledged stating to the media that people are more afraid of the Registry police than the BPD, but he denied that the Registry police were involved in targeting gang members for searches or harassment.

11.  A 46 year-old female Mission Hill resident described two strip search incidents that she witnessed.  The first occurred in the summer or fall of 1989.  A black male teenager was stopped on Alton Court and searched while standing behind a police vehicle.  His pants were down around his ankles.  After the search was completed, the police officers departed.  The second incident occurred in the fall of 1989 on Smith Street.  She observed two officers frisking a Hispanic male whose pants were pulled down.  This witness also stated that her son had been strip-searched.

12-13.  Two individuals who identified themselves on a TV program (the "Mission Hill Speaks" segment of "Say Brother," rebroadcast on January 28, 1990) stated that they had witnessed or been subjected to strip searches.  The Division was unable to interview these individuals, despite our attempts to do so. The first, age 17, stated that he was strip-searched on the street in front of his mother while they were on their way to

---

8/  This complaint does not involve Boston Police Department officers but is included here because it was received as part of our investigation.

the grocery store.  It was a visual anal cavity search.  The second, a Mission Hill resident, said that she witnessed a strip search of three men.  When she indicated to the police officer that the procedure might violate the men's rights, he told her to mind her own business and moved the men behind a dumpster.  She stated she had also witnessed other body cavity searches on the street conducted by officers wearing rubber gloves.

14.  A 21 year-old black male stated he was searched with three friends while walking on Prentiss Street, Roxbury in August 1989.  Two BPD detectives approached and one said, "How are you, gentlemen?" and attempted to search the complainant's pockets.  He told the officer not to go into his pockets and that he would produce anything requested.  The officer then asked the complainant to pull down his pants.  He refused, saying, "Just because you have a badge doesn't make you better than me; I have a job too."  The officers again insisted on a strip search, this time telling the complainant to go into the hall of a nearby building.  He again refused.  One detective said that since he wanted to be a smart-ass they would take him to the police station so they could pull down his pants.  A struggle ensued; one detective called the complainant a "faggot and a baby."  At the police station the complainant was held on an outstanding warrant and released the next morning after paying a fine in Roxbury District Court.  Court documents disclose that this complainant was arrested for disorderly

conduct and that the charge was dismissed after assessment of a $50 fine.

15.  An 18 year-old black male (a senior at Hyde Park High School) stated that he and his friend were approached by two plainclothes officers while standing on Copeland Street in Roxbury.  The officers ordered the complainant up against the police car, went through his coat and pants pockets, and ordered him to open his mouth.  The officers then asked him for his driver's license, checked for outstanding warrants, and let him go.  As he and his companion were proceeding down Warren Street, however, the officers made a u-turn and one of them emerged from the vehicle, stating, "I have to kill my curiosity."  He then took the complainant behind a gas station and ordered him to drop his pants.

16.  A 17 year-old black male (a freshman at Jeremiah Burke High School) reported that in January 1990, he and a friend were standing on a sidewalk on Savin Street in Dorchester when a BPD vehicle stopped in front of them and two officers got out.  One of them said, "You fucking niggers, get [out].  We don't want you hanging on the street anymore."  He asked the complainant what was in his mouth, then hit him and threw him to the ground.  Both youths were then searched.  One of the officers grabbed the complainant's mouth, pulled it open, and shined a flashlight inside.  The complainant was told to open his pants and drop them to his knees.  After the search, the officer told the youths to leave the area or they

-44-

would be arrested for disorderly conduct.  The complainant identified himself to us as a member of a gang and said he was wearing a Giants hat on the day of the incident.

17.  A 20 year-old black male (currently serving a prison term) reported that in Feburary 1989 he and three friends were driving near the Orchard Park development when they were stopped by two Boston police officers, who approached them with weapons drawn.  During the ensuing search (which took place in a hallway of Woodrow Wilson Court) the complainant was told to pull down his pants and take off his sneakers, and grabbed in the groin area.  The complainant was not arrested.

18.  A 16 year-old black male (a 10th grader at Hyde Park High School) reported that on an evening in late January 1990 he and four friends were stopped and searched on Norfolk Street in Dorchester by four BPD officers who told them to get up against the wall, saying, "You know the procedure."  The youths were patted down and told to unzip their coats.  The complainant was told to open his mouth, whereupon an officer searched inside his mouth with a flashlight.  The officers then told the complainant to unbuckle his belt and drop his pants. After he dropped his pants, an officer pulled open his shorts and searched inside with his flashlight.

This young man stated that he had been searched frequently in the Norfolk Street area and had been strip-searched once before in 1989, in the vicinity of Warren and Savin Streets, Roxbury.

-45-

The Division did not ask the BPD to supply documentation for all of the above incidents.  For example, the 1988 search by Boston Municipal Police, referred to in paragraph 2 above, has already been documented and is currently the subject of a private lawsuit.  The Division was never able to interview the witnesses referred to in paragraph 12-13, and no dates were available, making it virtually impossible for the Department to search for documentation.  The allegations in paragraphs 6, 9 and 11 were likewise too vague in terms of time to justify a document request to the Department.  As noted, of the incidents for which the Division requested documentation only #5 was documented.

(3)  Investigation of Alleged Coercive Interrogations in Connection with Stuart Homicide.

This portion of the report is necessarily incomplete because some of the materials reviewed, grand jury transcripts and related tapes and documents, are not yet available to the public.[9/]  Moreover, as noted earlier, none of the BPD detectives or officers was willing to give the Division his version of events.  The following narration is therefore based almost entirely on interviews with the potential witnesses.

---

9/  WBZ-TV sought access to some of these documents from the BPD and the Suffolk County District Attorney in January 1990. When the requests were denied, WBZ filed suit.  The Supreme Judicial Court recently denied WBZ's request for access.  At this writing, as well, the grand jury investigating the death of Carol Stuart is still sitting, and a federal grand jury has been convened to investigate possible criminal acts committed by police officers in the course of the Stuart investigation.

-46-

Dereck Jackson. Dereck Jackson is a 17 year-old black youth. At the time that he was first picked up for questioning by the Boston police in connection with the Stuart case, he was attending McKinley Technical High School. Dereck recounted the following:

On October 24, 1989, the day after the murder of Carol Stuart, he was in the apartment of Joey Bennett (the nephew of Willie Bennett), with their friends Ronald Ferguson, David Brimage, and Michael Williams. Joey laughingly said that he thought Willie did the killing. Dereck recounted this comment the following day (October 25) to his friend Eric Whitney.

The following Friday, November 3,[10]/ while at school, Dereck was informed by his counselors that the police wanted to question him. After he told Officer William Dunn that he didn't wish to speak to the police, Dunn called Homicide Unit Detective Peter O'Malley, in Dereck's presence, and then told Dereck, "Peter said you can come now or you can come down later and you won't have a choice."

After school, Dereck saw his friend Leroy Cox, who told him that the police had taken him (Leroy) to the homicide headquarters in South Boston and that Detective O'Malley had threatened Leroy with 20 years if he did not say what he knew about the Stuart killing. In subsequent conversations that day, Eric Whitney told Dereck that O'Malley wanted to question

---

10/ Dereck stated that this visit and the subsequent questioning occurred on October 27, but all other witnesses give the date as November 3.

them, and that they had to say that they had heard Willie Bennett confess to the killing.  Eric said:  "Dereck, you gotta say this or you're not leaving.  Tell them Willie came in high with a .38 in his hand and told how he shot the Stuarts."

The police picked up Dereck and Eric that evening and brought them to the South Boston police station where Dereck was separated from Eric and put in a room with O'Malley and five other officers (among them William Dunn and Trent Holland).  Dereck stated a number of times that he needed a lawyer.  He felt that he was not free to leave.  According to Dereck, O'Malley refused his requests for an attorney, saying, "You don't need no lawyer.  You're not under arrest."

Under questioning by O'Malley, Dereck said, he told the truth:  he recounted Joey Bennett's joking comment on October 24, but O'Malley shook his head and said he was lying. Dereck said he would take a lie detector test, to which O'Malley replied that the only lie detector test is this guy (indicating Dunn) in a dark room.  Dunn at this point got up and left, saying he was going to get the room ready.  O'Malley had Dereck's criminal file out (two charges were then pending), and said he was "going to pin [your] fucking ass for 20 years in Walpole and you'll never get out," because he (Dereck) was lying.  O'Malley repeated this threat three times.  He said he knew Dereck had two open cases.  O'Malley was yelling and swearing.  Dereck believed that if he did not change his story, he would have been put in a dark room with Officer Dunn, who had, in the past, roughed him up on the street.

-48-

Eric was then brought in and Dereck was told to repeat what he had told O'Malley about Bennett. Eric listened and said, "No Dereck, remember," reminding him of the story he had asked Dereck to tell. Dereck then embellished what had actually happened at Joey Bennett's apartment, in accordance with his earlier agreement with Eric. He said that Willie Bennett had admitted shooting the Stuarts. Dereck's statement was then tape recorded, after which O'Malley gave him $20 to spend at McDonalds, and said, "we can throw in a couple of words for your court case."

Later that night, Dereck decided he had to retract the false story he had told, and the following day he persuaded Eric to join him. (He also told his aunt, Melba Jackson, that he had lied because he was threatened with 20 years in prison.) Eric contacted Officer Trent Holland (a friend of his mother), who picked up Dereck and Eric and drove them back to the South Boston station. Dereck was then made to wait while Eric was interviewed. While Dereck was waiting, Officer Holland said to him that Walpole was pretty hard for young men; "they do not play in there." Another officer said, "don't drop the soap in jail." A third told him that you cannot go back on your word, and you can get 20 years for lying, in a homicide case.

Dereck was brought into the room with Eric, who was sweating and had a booking sheet with him. Eric said, "Dereck, they are going to arrest us right now and stick us in Charles Street ... they are not playing. They are going to book us

-49-

right now." Dereck decided at this point not to retract his statement of the night before and the youths were driven home.

On November 15, 1989, Dereck testified falsely before the grand jury. He subsequently reappeared before the grand jury and retracted his earlier testimony.

Melba Jackson (Dereck's aunt). Melba Jackson confirmed the essence of Dereck's statement. She telephoned Dereck after hearing from his counselors at McKinley Tech that he had been questioned by the police. Dereck told her that the police had taken him and Eric to the South Boston police station and told him that if he did not say what they wanted to hear, he would get 20 years in Walpole. He told her that the police were yelling at him and that he was very frightened.

Staff at McKinley Technical High School. The Division interviewed the principal and two staff members at McKinley Technical High School. The principal confirmed that on November 3, 1989, Trent Holland called and told her that two officers wanted to question Dereck Jackson. At about 1-1:30 p.m., two officers arrived at school and met with the principal and a counselor. The principal advised them that it was up to Dereck whether he wanted to talk to them. Dereck was called in and said he didn't wish to speak with the police. One of the officers told Dereck that he didn't have to go with them but if he didn't they could call him before the grand jury and he would be in trouble.

-50-

Two special needs advisors at McKinley Tech corroborated Dereck's description of the interview at the school with the two officers, who insisted that Dereck go with them.  Dereck did not want to.  One of the officers made a phone call and then said if Dereck didn't go, he would have to go to the grand jury later.

About a week later one of these officers called the principal asking for attendance information about Dereck.  The principal told him she could not comply without a subpoena.  The officer then said, "You know, you could be in trouble.  We could arrest you for obstruction of justice."

On Monday, November 6, Dereck told one of his advisors that he and Eric had been questioned at the police station the previous Friday and that they had lied, but that when they returned to retract their statements the police would not listen to them, but instead told Dereck he would get 20 years in prison.

Some weeks later Dereck told one of his advisors that he had been before the grand jury, had been advised to take the fifth amendment, and had been told he could not do so; they would go to a different court and have his fifth amendment rights taken away from him.  Dereck told the advisor that at this point, he figured, "What's the use?" and told the grand jury the false story that he felt the police had wanted to hear.  Subsequently Dereck told the advisor that he had returned to the grand jury and recanted the false testimony.

Eric Whitney, age 18, was a student at Dorchester High School at the time of the Division's interview. Eric's rendition of the events generally corroborated Dereck's:

On October 25, Dereck told Eric that the previous day Joey Bennett had passed around a news clipping about his uncle being involved in a shooting. In answer to a question from Dereck whether his uncle had anything to do with shooting the Stuarts, Joey Bennett had laughed. Eric later told his mother he knew something about the killing; he did not tell her the substance. The next day, his mother told him that Trent Holland wanted to speak with him. Holland called the next day (Friday, October 27) and Eric told him that Dereck had said he had been at Joey's apartment smoking pot when Joey showed him clippings about Willie being in a shooting with a cop.

The following Wednesday, November 1, Holland interviewed Eric, asking him to write down what he had told Holland the previous week. On Thursday, November 2, Eric's friend Angela Brittle was interviewed at the South Boston police station; she subsequently told Eric that the police had said Eric must come to the station and tell what he knew or else they would "have his ass nailed to the wall so fast he would not know what had happened." She gave Eric Detective O'Malley's telephone number.

Eric telephoned O'Malley and said, "I don't know what you're trying to do to me, but you're scaring me." O'Malley replied: "Just come down here and tell me what you know." Eric was then driven by Angela's uncle, Sergeant Wilbur

-52-

Brittle, to the South Boston station where he was interviewed by O'Malley, Brittle, and Detective Miller Thomas. O'Malley told Thomas to get the warrants on Whitney; Thomas left and returned with three outstanding warrants. O'Malley pinned the warrants to a board where Eric could see them. Eric then told O'Malley the same story he had previously told Holland -- that on October 25, Dereck Jackson had described to him a pot-smoking session at Joey Bennett's on October 24; that Joey had passed around some clippings about Willie, and had laughed when Dereck asked whether Willie was involved in the shooting. O'Malley started yelling, "You're fucking lying, kid. You know more than you are telling. ... Don't give me that shit or I'll give you 20 years with the same person who did the killing." O'Malley said he had interviewed other kids, "so we know the real story."

According to Eric, Officer Dunn then walked in with brass knuckles on one hand. O'Malley had a form in his hand and said, "if you don't tell me the truth, I will fill this paper out and you will go to Charles Street right now." At this point Eric was frightened and finally started to tell O'Malley what he thought the police wanted to hear: that he had been with Dereck (and others) at Joey's on October 24, and that Willie had confessed to the killing, saying he had been standing at the Station Cafe when a car pulled up at the light and that he jumped into the car, demanded money and watches, told the occupants not to look in the rearview mirror, and then

-53-

"busted them."  O'Malley told Eric to have Dereck call him and then had Eric taken home.

Eric told Dereck the next day that the police were looking for him, and if he didn't come in, he would get 20 years. Dereck came over and Eric told him that O'Malley hadn't believed the truth, so he made up a story.  Eric called O'Malley and the two youths, with Angela Brittle, were taken to the South Boston station.  Dereck was questioned while Eric and Angela waited in another room.  After a while, O'Malley took Eric into the room with Dereck, and said to Eric, "Didn't I tell you not to fuck me over?  Jackson's telling me a different story."  O'Malley then had Dereck repeat his story, and told Dereck, "You're fucking lying."  Dereck asked to take a lie detector test and O'Malley replied, "the only lie detector I have is right there," pointing to Officer Dunn.  At this point, Dereck lied and told the same story that he and Eric had agreed upon the day before.

After they were driven back to Eric's home, Dereck said they had to retract the false story but Eric disagreed, saying, "I'm not going to jail."

The next day (November 4, 1989) Eric told Trent Holland that he and Dereck wanted to go back to the station and tell the truth.  Holland took them back to South Boston and Eric (having been separated from Dereck by O'Malley) told O'Malley that his statement from the previous night (which had been taped) was false.  O'Malley said, "I'm tired of fucking with

-54-

you," and began filling out a form to have Eric sent to Charles Street Jail. Eric became frightened and told O'Malley, "Stop, stop. I'm lying again. The tape is true." Holland drove Eric and Dereck home.

On November 15, Eric testified falsely before the grand jury that he had been at Joey Bennett's apartment on October 24 and heard Willie Bennett confess. On November 17 O'Malley summoned Eric back to the courthouse where they met with Dereck, attorney William Crowe, and two Suffolk County assistant district attorneys. Upon being told that Dereck intended to retract his grand jury testimony, Eric admitted that his testimony was also false. On November 22 he returned to the grand jury and told them that he had lied because Detective O'Malley had threatened him with 20 years in prison.

Angela Brittle. Angela Brittle, age 19, stated that on either November 2 or 3, 1989, Eric Whitney was visiting her home when her uncle, Sergeant Wilbur Brittle, arrived. Sgt. Brittle took Angela to the South Boston police station where she was interviewed by Detectives O'Malley and Thomas. O'Malley asked Angela if Eric had told her anything about the Stuart case. Angela replied that Eric had told her he knew who shot the Stuarts. O'Malley asked Angela to bring Eric in to the homicide office. He told her that if Eric did not come in, he, O'Malley would "nail Eric's ass to the wall so fast [he] would not know what had happened," that Eric could get 20 years with Willie Bennett, and that if Eric cooperated, O'Malley would take Eric to court and clean up his outstanding warrants.

-55-

Angela recounted all this to Eric, whereupon they both were driven to the South Boston station by Sgt. Brittle. Angela was present for O'Malley's interview with Eric.

After Eric sat down, Detective Thomas took out some warrants and put them on the wall where Eric could see them. When Eric stated that he knew nothing about the Stuart shooting, O'Malley said, "Don't give me that shit. I will put you away for 20 years with Willie." O'Malley repeated this threat three or four times during the interview. Angela stated that O'Malley was abusive -- yelling, swearing, and otherwise acting in a threatening manner to Eric.

Later that day, according to Angela, she and Eric were brought back to the homicide office with Dereck Jackson. This time she stayed in an outer office. After some time Dereck emerged with $20 which he stated O'Malley had given him to get something to eat.

Leroy Cox, age 17, recounted the following:

Some days or perhaps a week after the Stuart homicide, William Dunn and another police officer came to Leroy's home and asked him to come with them to South Boston. At the police station, Leroy was interviewed by Detective O'Malley. O'Malley said Leroy had been present at Joey Bennett's apartment on October 24; Leroy said this was not true. O'Malley refused to believe him.

About two days later, Trent Holland and another officer came to Leroy's apartment, woke him up, and took him back to

-56-

South Boston.  At this second interview, O'Malley said that he was going to offer Leroy a "proposition": if Leroy told him something, he would "get off easy"; if he refused, and subsequently lied before the grand jury, he would be arrested for perjury.  O'Malley then began filling out a booking sheet, telling Leroy he would be arrested as an accessory after the fact to murder.  When Leroy continued to maintain that he knew nothing, Officer Dunn said, "I'm going to warm up my car to drive to Charles Street Jail."

Leroy was not arrested but instead driven to the Wentworth Institute parking lot.

Ronald Ferguson, age 16, recounted the following:

On the afternoon of either October 24 or 25, 1989, while Ronald was at Joey's Bennett's apartment, Joey had a handgun which Ronald believed he gave to Willie Bennett at some point in the afternoon.  Later that day Ronald's friend David Brimage told Ronald that Joey had jokingly said he thought Willie had done the killing.  Ronald recalled no mention of the murder while he was at Joey's apartment.

A few days after the murder William Dunn and another BPD officer came to Ronald's place of employment and took him to the homicide unit in South Boston.  A detective asked Ronald if he had been at Joey's apartment on October 25.  Ronald said he did not remember.  The detective said that a number of other youths had already placed Ronald in the apartment on that date, and that he should so testify before the grand jury or he would go to jail for five years for perjury.

-57-

<u>Michael Williams.</u>  Michael Williams, age 16, stated that he was with Dereck Jackson, Leroy Cox, and David Brimage at Joey Bennett's apartment on the afternoon of October 24, 1989, but he did not hear any discussion about Willie Bennett.  Two days later, Michael was placed in a DYS detention center for violation of probation.  While he was there, Detective O'Malley came and questioned him about what had happened on October 25 at Joey Bennett's home.  Michael said he was not at the Bennett apartment on the 25th.  O'Malley asked if Michael was afraid of Willie Bennett, then said, "Don't be.  Once we get him, he will never get out."

After Michael testified before the grand jury, O'Malley said to him that he had lied, and that "we are going to try you as an adult for not telling the truth and you will get 20 years for withholding information."

<u>Mary Smith.</u>  Mary Smith stated that she had seen Willie Bennett with a gun on the night of the murder or thereabouts in the Mission Hill area, and she so testified to the grand jury. Bennett was wearing a white turtleneck with the hood hanging outside a short black leather jacket.  (Charles Stuart's description had the killer wearing a black jogging suit.)

On the evening of November 7, 1989, the police took Ms. Smith to South Boston where she was interviewed by Lieutenant Edward McNelley with Detective Miller Thomas and three or four others present.  On the way to the station, a detective told her, "If you cooperate you can get your son out of DYS."  This

promise was repeated by McNelley over the phone to Ms. Smith's son in Ms. Smith's presence.

McNelley tried to get Ms. Smith to say that Bennett was wearing a black sweatsuit. He persisted for about half an hour, yelling, but she insisted it was a white turtleneck and black leather jacket. A few days later she was brought back to the station, questioned in the presence of two assistant district attorneys, and again accused of not cooperating and not telling everything.

## CONCLUSIONS

(1) Stop and Frisk.

We conclude that Boston police officers engaged in improper, and unconstitutional, conduct in the 1989-90 period with respect to stops and searches of minority individuals in the Roxbury, Dorchester, and Mattapan communities. Virtually all of the information made available to us supports this conclusion: interviews of the complainants and witnesses, testimony from the Carr, Phillips, and Woody & Phillips cases, statements of BPD command officers, documented complaints received by the BPD, and television footage.

We recognize that often we have been presented with only one side of the story of each incident. The BPD has been unable or unwilling to provide us with its version of the vast majority of the incidents. We are left to assess the credibility of the complainants, the strength of their memories, and any independent support for their stories. We do not credit all of the allegations of all of the complainants. However, these allegations are widespread, common in nature, in some cases supported by witnesses, and consistent with the other information we have reviewed. Although we cannot say with precision how widespread this illegal conduct was, we believe that it was sufficiently common to justify changes in certain Department practices.

Perhaps the most disturbing evidence is that the scope of a number of Terry searches went far beyond anything authorized

-60-

by that case and indeed, beyond anything that we believe would be acceptable under the federal and state constitutions even where probable cause existed to conduct a full search incident to an arrest. Forcing young men to lower their trousers, or otherwise searching inside their underwear, on public streets or in public hallways, is so demeaning and invasive of fundamental precepts of privacy that it can only be condemned in the strongest terms. The fact that not only the young men themselves, but independent witnesses complained of strip searches, should be deeply alarming to all members of this community.

We also conclude that this illegal conduct was, at least in part, a product of statements of commanding officers in Area B that minority youths, particularly those believed to be associated with gangs, or others seen with them, should be stopped and frisked or searched regardless of whether they were engaging in illegal activity. After the fact, these commanding officers attempted to explain away their public announcements. The court in the <u>Phillips</u> and <u>Phillips & Woody</u> cases did not find these explanations credible. Whatever the credibility of the explanations, the initial statements apparently sent a signal to officers that continued to have an effect throughout the 1989-1990 period.<u>11</u>/

---

<u>11</u>/ It is unfortunate that no officers were willing to speak with the Division. If they had, we could have learned directly from them precisely how and to what extent the stated and appropriate policy of the BPD regarding searches was undermined by these statements.

Compounding these explicit signals is the implicit one arising from the BPD's treatment of complaints regarding stops and searches.  There is no indication that the Department or its Internal Affairs Division vigorously pursued those complaints or reprimanded or disciplined any officer for an unlawful search during this period.

All of this points to a situation in which the commands coming from the Commissioner's office were not fully translated into constitutionally acceptable behavior on the streets.

Two questions naturally arise from these conclusions.  The first is the precise extent of these unlawful stops and searches.  The BPD is a large department and necessarily conducts tens of thousands of stops, searches and arrests each year.  The incidents described here represent but a small portion of those activities.  However, this particular investigation and others of this nature confront a common and insuperable problem:  many individuals with legitimate complaints about police tactics will not present those complaints to law enforcement officials (whether from a police department, or from the civil rights division of an attorney general's office) even when those officials take steps, as here, to make themselves available within the community.  In short, reported incidents can often be only the tip of the iceberg.  Here, the statements of a significant number of complainants and witnesses, the testimony from other cases, and the statements of officials themselves, strongly support a finding of substantial unlawful stops and searches by the BPD.

-62-

The second question is why we chose to issue a report rather than file a lawsuit against the BPD for a pattern of civil rights violations.  Part of the answer is that the majority of complainants are either unwilling to testify against the police department or have, since the initial interviews, become unavailable for further interviews or testimony.  Moreover, the form of relief in any claim by the Attorney General would be injunctive -- i.e. to cease the illegal stops and searches and, perhaps, to set up a mechanism to ensure that they do not continue.  However, courts are generally reluctant to impose sweeping administrative changes on police departments.  The type of systemic change we believe is needed here requires leadership from officials within the law enforcement community, city government, the BPD and the affected communities.  Particularly given the difficulty in presenting witnesses,[12/] we believe that meaningful change in the short run in BPD practices is more likely to come from this report and the public dialogue that we hope will result from it than from protracted and uncertain litigation.

(2) Alleged Coercive Interrogations.

The investigation of alleged coercive interrogations in connection with the BPD'S Carol Stuart homicide investigation was based almost entirely on interviews with the complainants

---

12/  It should be noted that the Carr complaint sought injunctive relief of the sort described here.  That request was dropped prior to trial and the case ultimately settled for damages only.

-63-

and documentary material, some of which is not publicly available at this time.  All of the homicide detectives and other officers involved in the investigation declined to be interviewed, with the single exception of Lieutenant McNelley, who had a general conversation with the Division but did not respond to specific allegations.  The investigation is thus necessarily incomplete.

Nevertheless, the statements of the witnesses, despite minor inconsistencies, generally corroborate each other. Repeatedly, the police appear to have threatened, coerced, and offered favors to obtain testimony that would implicate Willie Bennett.[13/]  The homicide unit used threats of immediate detention in Charles Street Jail (presumably on outstanding warrants) to coerce testimony.  Detective O'Malley also appears to have threatened 20 years' imprisonment for false statements, or for other offenses, without (to say the least) clear explanation that the 20 year maximum penalty for perjury only applies if false statements are knowingly made under oath. Finally, on at least one occasion Detective O'Malley apparently denied an individual (Dereck Jackson) access to an attorney despite his request, while essentially engaging in bargaining with Jackson about the disposition of his pending criminal charges.  (O'Malley had Dereck's criminal file on display

---

13/  It should be noted that, according to the search warrant affidavits, the police had additional evidence implicating Bennett from a woman named Toni Jackson, whom the Division was unable to interview.  Ms. Jackson reportedly told the police that Willie Bennett had confessed to shooting the Stuarts.

-- an apparent threat that he could be arrested immediately if he did not cooperate with O'Malley.)

Whether or not the threats, the arguably coercive detentions in South Boston, and the refusal (if true) to permit a witness to consult with an attorney, amounted to violations of specific constitutional rights, the operation of the homicide unit during this investigation is disturbing as a matter of both community relations and good police practice. Its fruit, in the Stuart case, was a false story concocted by Dereck Jackson and Eric Whitney to satisfy Detective O'Malley, which did not ultimately advance the pursuit of truth in the Stuart case.

As with the "search on sight" investigation, so with the Stuart investigation, we decided to issue this report rather than bring civil or criminal action to redress possible unlawful conduct by Boston police officers.  Our reasons for this decision include:  serious questions whether, even accepting the allegations, any criminal conduct occurred; problems with the credibility of the two main witnesses, given their admissions that they fabricated stories to satisfy Detective O'Malley; and doubts whether civil injunctive relief, even if obtainable, would cure the problem with Departmental investigative techniques.  Nonetheless, the tactics apparently employed in this case are sufficiently troublesome to warrant the release of our findings.  The Department should take all appropriate steps to ensure that these tactics are not used in future cases.

-65-

## RECOMMENDATIONS

The Boston Police Department has been the focus of considerable controversy over a range of law enforcement issues in the last year or two.  Criticism of its stop and frisk policies and its handling of several major homicide investigations have put it under fire.  In response, many have staunchly defended the Department and its officers, particularly at a time when violent crime is at record or near-record levels in Boston.  All too often these debates polarize public opinion and forestall meaningful discussion and needed change in Department practices.

There is a common issue at the core of both of these investigations -- can a major city's police department scrupulously honor all of its citizen's civil rights during a period of increased crime?  Will the desire to stem a seemingly endless tide of guns, drugs and violence in Boston translate into random, highly intrusive and illegal searches as well as coercive interrogations?  The answer must be "no."  Aggressive law enforcement and scrupulous honoring of civil rights are compatible.

It is particularly important now to demonstrate that compatibility.  The communities hardest hit by crime must not be forced to accept the harassment of their young people as the price for aggressive law enforcement.  Many of those very same young people are the key to reversing the disturbing trends toward violence.  It is hardly an object lesson in respect for

-66-

the law and for the police to be searched for no other reason than that you are young, black and wearing a baseball cap.

It is, therefore, vital that the Department install a permanent mechanism to prevent improper stops and searches as well as to address them effectively when they do occur.  That mechanism does not currently exist.

The Department's sole response to these issues thus far appears to have been the commissioning of an advisory committee, headed by former Chief Justice Edward F. Hennessey,[14]/ to make recommendations with respect to "Boston Police Training and Education re:  Searches of Persons."[15]/

The Hennessey committee issued a report on March 21, 1990 which contains several useful suggestions for change.  In brief, the committee recommended:  (1) enhanced training for BPD officers on search and seizure standards; (2) implementation of a proposed Department policy of recording stop and frisk incidents in Field Interrogation and/or Observation Reports (so-called FIO Reports), and informing citizens why they are being stopped; (3) establishment of neutral locations for receiving citizen complaints of police misconduct, and supplying the police commissioner,

---

14/  The other members of the committee were Harvard Law School Professor Charles Ogletree, Northeastern University Professor Norman Rosenblatt, and Luis Velez, Executive Director of Roxbury Youthworks.

15/  As to the issue of interrogation techniques, we are not aware that the Department has initiated any internal investigation of the allegations.

the U.S. Attorney, and the Attorney General of Massachusetts with copies of all such complaints; (4) increasing community education projects; (5) creating a standing advisory committee to review the Department's training, education, and practices and procedures for monitoring police performance; and (6) improving police-community relations through a variety of measures, including establishment of a joint police/civilian relations committee.

Unfortunately the Department is being unduly selective in adopting these recommendations.[16/] Specifically, the Department has established a schedule for receiving citizen complaints at neutral locations in Dorchester, Roxbury, Charlestown, South Boston, the South End, Roslindale, Jamaica Plain, the Fenway, East Boston, the North End, Brighton, and West Roxbury. (A complete list of times and locations is available from the Department.) Although the times when officers will be available to receive complaints at these neutral locations are very limited, the effort at community outreach is important. However, the Department has not accepted the Hennessey committee's suggestion that the U.S. Attorney and state Attorney General's offices receive copies of these complaints.

---

16/ In an effort to solicit the Department's cooperation in responding to the results of our investigation, we met with representatives of the Department on October 10, 1990. The BPD's unwillingness to adopt major features of the Hennessey committee's recommendations was communicated at and as a result of that meeting.

Similarly, new FIO report forms are being prepared which will require officers to record all stop and frisk incidents, and officers will be instructed to inform citizens why they are being stopped.  However, the BPD has stated that it will not share these forms, when completed, with the Attorney General's office or any other outside agency.  This means that the BPD will be the only agency reviewing the propriety of stops and frisks conducted by its own officers.  (The Hennessey Committee did not recommend that the FIO reports be shared but this report does so recommend.)

As to the committee's other recommendations, it appears that the Department views its current training and community relations programs as adequate.

Although the establishment of neutral locations for receiving citizen complaints and the documentation requirement for stop and frisk incidents are important improvements, they are not adequate to address the problems that have been identified in these investigations.  We believe that not only outside review by other government agencies, but some measure of independent civilian control over the police, is essential if Boston is to avoid a recurrence of the excesses documented in this report.  Our specific recommendations are as follows.

First, the Department should supply copies of all FIO reports that indicate a search has occurred to the Civil Rights Division of the Attorney General's office, and to the U.S. Attorney as well if that office is interested in reviewing

-69-

them.[17]

Second, the Department should supply copies of all citizen complaints regarding allegedly unlawful searches or coercive interrogations to the Civil Rights Division of the Attorney General's office, as well as to the U.S. Attorney's office. Both of these outside agencies should be kept apprised of the progress of the internal investigation, and the resolution of the complaint, and should be permitted to participate in the investigatory process if they so request.

Third, the Department should support the creation of a police-civilian review board, and should assist community leaders and other agencies of government in reviving proposals for such an independent body.[18]  Most major cities across the country have instituted some such mechanism enabling citizens to monitor the performance of the police.  Boston appears to be one of the few holdouts.

Civilian police review agencies vary widely in structure and authority.  New York and Chicago both have "internal" models, in which civilians work within the police department

---

17/  Because the Suffolk County District Attorney's office is primarily responsible for prosecuting the cases that begin with these searches and because of its continuous relationship with BPD officers in prosecuting most of its cases, that office is not appropriate to fill this role.

18/  The last such proposal of which we are aware, for an Office of Municipal Investigation within Boston city government, was developed in 1984 and 1985, largely through the initiative of the Lawyers' Committee for Civil Rights of the Boston Bar Association.  The proposal was opposed by the Police Patrolmen's Association and rejected by the City Council.

-70-

structure and report directly to the commissioner or superintendent.  These "self-policing" systems are criticized for lacking independence from the departments they are intended to monitor, yet they represent an improvement over Boston's system, in which officers are responsible for policing each other.

Some cities have Offices of Municipal Investigation in which civilian review authority is separate from the police department.  Cincinnati and New Orleans both have such OMIs, which are staffed by paid civilian city employees who conduct investigations of citizen complaints.  The police departments in these cities maintain parallel jurisdiction to investigate complaints.

Finally, some cities, including Cambridge, Massachusetts, Detroit, Oakland, San Francisco, the District of Columbia, Berkeley, and Flint, Michigan, have oversight mechanisms composed exclusively of civilians, who formally investigate complaints.  While these bodies may make recommendations regarding discipline, none has the authority actually to discipline officers.  Nevertheless, their impact on the disciplinary process, as well as their positive effect on police-community relations, can be considerable.

The Boston Police Department must improve the way it safeguards constitutional rights with regard to stops and

searches.    These recommendations would do just that and should be adopted by the commissioner and, where appropriate, city officials, as soon as possible.


                            JAMES M. SHANNON
                            ATTORNEY GENERAL

                            STEPHEN A. JONAS
                            CHIEF, PUBLIC PROTECTION BUREAU

                            MARJORIE HEINS
                            CHIEF, CIVIL RIGHTS DIVISION


December 18, 1990


-72-

STATE LIBRARY OF MASSACHUSETTS

3 6855 0002 6641 6