UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RONNIE QUALLS,

   Plaintiff,

    v.                             C.A. NO: 1:23-CV-10435-GAO

FRANCIS ("MICKEY") ROACHE,
DANIEL KEELER, KENNETH TAYLOR,
DENNIS HARRIS, TIMOTHY MURRAY,
DAVID PEREZ, JOHN HARDEN,
CLIFTON HAYNES, AND
THE CITY OF BOSTON

   Defendants.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff, Ronnie Qualls, hereby submits Plaintiff's Opposition to Defendants' Motion for Summary Judgment filed by Defendants Keeler & Harris, and Haynes & John Harden. In support of Plaintiff's Opposition, Plaintiff states as follows:

I. **DEFENDANTS FAILURE TO PURSUE EXCULPATORY EVIDENCE IS A VIOLATION OF QUALLS' DUE PROCESS RIGHTS**

I. **QUALIFIED IMMUNITY DOES NOT APPLY; MA CIVIL RIGHTS ACT CLAIM SURVIVES SUMMARY JUDGMENT**

II. **GENUINE ISSUES OF MATERIAL FACT REMAIN, SUMMARY JUDGMENT MUST BE DENIED**

1

## STANDARD OF REVIEW

In reviewing a Motion for Summary Judgment, the Court can only determine whether a material issue of fact exists but may not make a factual determination on such issue. *Old Colony Bank of Hampden County, N.A. v. Wallas*, 78 Mass. App. Div. 282, 285 (1978). The party moving for Summary Judgment maintains the burden of proving the absence of any genuine material issue of fact. *Niemi v. Gen Rad, Inc*. 20 Mass. App. Ct 948, 949, 479 N.E.2d 742, 744 (1985 rescript). If Defendant fails to establish the absence of any genuine material issue of fact, its Motion must be denied "without more from the opponent". *Community National Bank v. Dawes,* 369 Mass. 550, 554 (1974). In the instant case, there are far too many disputes of material facts for Summary Judgment to be appropriate.

When the Court considers the material accompanying the Motion, "the inferences to be drawn from the underlying facts contained in such material must be viewed in the light most favorable to the party opposing the Motion. *Hub Associates, Inc., v. Goode*, 357 Mass. at 451, at 735, *citing United States v. Diebold Inc.*, 369 U.S. 654, 8 L.Ed. 2d 176 (1961). In addition to assuming that all facts are true within the opposing party's affidavits and evidence, the Court must also consider any inferences favorable to the opposing party to be drawn from the evidence. *Coveney v. President and Trustees of College of Holy Cross*, 388 Mass. 116, (1983).

In reviewing a Motion for Summary Judgment, the moving party bears the burden of affirmatively demonstrating both the absence of a triable issue and that the moving party is entitled to judgment as a matter of law. *Pederson v. Time, Inc.,* 404 Mass. 14, 17 (1989). "The moving party bears the burden of affirmatively demonstrating the absence of a genuine issue of material fact on every relevant issue, regardless of which party would have the burden on that issue at trial." *Arcidi v. Nat'l Assoc. of Gov 't Employees, Inc.,* 447 Mass. 616, 619 (2006). "Any doubts as to the existence of a genuine issue of material fact are to be resolved against the party moving for Summary Judgment." *Lev v. Beverly Enterprises-Massachusetts, Inc.,* 929 N.E.2d 303, 307 (2010).

"In deciding a motion for Summary Judgment, a court does not resolve issues of material fact, assess credibility, or weight evidence." *Coviello v. Richardson ,* 76 Mass. App. Ct. 603, 607 (2010). When responding to a Motion for Summary Judgment, the non-moving party is not required to prove its case but must merely raise a genuine issue of material fact. *Lawrence v. City of Cambridge,* 422 Mass. 406,410 (1996). "The movant is held to a stringent standard... any

doubt as to the existence of a genuine issue of material fact will be resolved against [him]. Because the burden is on the movant, the evidence presented ... always is construed in favor of the party opposing the motion and he is given the benefit of all favorable inferences that can be drawn from it." *Foley v. Matulewicz,* 17 Mass. App. Ct. 1004, 1005 (1984).

The Court may not concern itself with the credibility of opposing affidavits, conflicting testimony or the weight of the evidence. *Hub Associates, Inc., v. Goode,* 357 Mass. 449, 258 N.E.2d 733 (1970). Similarly, summary judgment does not recognize the principle which may permit a Court to direct a verdict when, even though some slight evidence favors one party, the contrary evidence is so overpowering that the Court cannot permit the party to maintain a verdict. *Morrissey v. Proctor & Gamble, Co*., 379 F.2d 675 (1st Cir. 1967).

## **LEGAL ARGUMENT**

Police officer negligence or inadvertence in failing to turn over evidence is not actionable under 42 U.S.C. § 1983, but a plaintiff can prevail by showing that the officer acted in bad faith, or with the intent to violate the plaintiff's constitutional rights, or with deliberate indifference to those rights *Reid v. Simmons*, 2001 DNH 65. The evidence here goes beyond mere negligence and into deliberate misconduct in the face of exculpatory evidence. Defendants deliberately ignored and failed to pursue exculpatory evidence in order to build a case against an innocent person.

## II.  DEFENDANTS FAILURE TO PURSUE EXCULPATORY EVIDENCE IS A VIOLATION OF QUALLS' DUE PROCESS RIGHTS

Pursuant to 42 U.S.C. §1983, law enforcement officers violate a defendant's constitutional right to due process when they deliberately withhold, conceal, or fail to preserve exculpatory evidence, thereby causing an unfair criminal prosecution or conviction. See *Drumgold v. Callahan*, 707 F.3d 28, 38–39 (1st Cir. 2013); *Limone v. Condon*, 372 F.3d 39, 44–45 (1st Cir. 2004). This duty extends not only to existing reports but also to investigative steps reasonably necessary to ensure that material forensic evidence is accurately developed and disclosed and witnesses are shown photo arrays for all suspects. Officers cannot insulate themselves by refusing to show a photo array of the primary suspect, halting testing or suppressing results that undermine their preferred theory of guilt.

On it the night/early morning of the shooting, the record establishes that Defendants Keeler and Harris collected the Champion sweatshirt Junior Williams was wearing because they observed blood stains on it.  Harris submitted the sweatshirt to the BPD Crime Laboratory with instructions to test the blood. Laboratory testing revealed that the sweatshirt contained human blood of Type B—the same blood type as both homicide victims and Williams himself, but inconsistent with Mr. Qualls's blood type. Despite the obvious exculpatory potential of this evidence, no further testing was ever performed or requested.

The defendants now claim that the blood on Junior's sweatshirt "was too small," to test but that assertion is unsupported by the evidence in this case. There is no lab report states that the sample was exhausted, nor is there any communication between detectives and the lab regarding No witness testified that further testing was attempted and failed. The only evidence on point is Hayes's equivocal statement that he was "not sure" about the sample's sufficiency. That is a statement of uncertainty—not a conclusion. It cannot serve as the factual predicate for excusing the failure to conduct additional testing. In the absence of such proof, the undisputed facts show that police and prosecutors simply chose not to pursue forensic testing that could have exonerated Mr. Qualls.

During Qualls criminal trial, Criminalist Donald Hayes, the Commonwealth's own expert during the first trial testified:

> "Q. And is it possible to know or is it possible to do more testing on that blood to give a more specific type of blood that it may be?
>
> A. In this particular case I'm not sure that there is enough of a sample to do additional testing. Generally speaking there are other types of tests that can be done to narrow it down.
>
> Q. Do you know if any test was *attempted* on the samples that you received to narrow it down to – to narrow down the type of blood?
>
> A. No, there is no additional testing other than to identify this group B blood."[1]

There is no dispute that Defendant Harris and Keeler collected Junior's sweatshirt on 10/3/92, during their interview of Williams. There is also no dispute that Harris submitted Junior's sweatshirt as evidence to the lab for analysis.[2] In this case, the crime lab did not collect

---

[1] Exhibit A (56.1) at 174:8 – 174:16. (emphasis added)
[2] Def Ex. L, pg. 1 (56.12), Ex. 3 Harris Dep. P. 57, 14–2, P. 60-61

4

the evidence or decide what tests to perform. The lab performed specific testing at the request of Detective Harris, on items submitted by Detective Harris. Harris confirmed that detectives not only identify evidence to be tested but also prepare written instructions to the lab specifying what tests to perform. (Id). It is clear from the documentary evidence and testimony of Keeler and Harris, that they were responsible for determining what evidence to collect, collecting that evidence, and submitting it to the crime lab for testing with specific instructions of what to test. It's clear that the detectives in this case were in control of the physical evidence and any testing was done at their request. Despite the

Detectives have an obligation to disclose or preserve evidence that could materially exculpate the defendant. See *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Here, the failure to conduct further testing on the sweatshirt deprived Mr. Qualls of evidence with clear exculpatory value. The absence of any follow-up or documentation showing the sample's insufficiency demonstrates that BPD Detectives simply stopped testing once they reached a result that was not inculpatory but inconvenient to their theory of Qualls's guilt.

After the lab determined that the blood type was type B[3], Detectives never requested further testing nor did they ask that the lab to attempt further testing. There is no documentary or testimonial evidence that any ever confirmed that the sample was too small to test. Detectives simply stopped pursuing further testing of this evidence at the point where it may have been exculpatory if further testing could have been completed.

Defendants knowingly failed to pursue or document further forensic testing of the sweatshirt recovered from James Earl Williams, despite existing blood-type results excluding Mr. Qualls as the source. Detectives were aware that additional testing—such as enzyme typing, antigen sub-grouping, or advanced serological analysis—could have identified the blood as belonging to one of the victims which would have exculpated Qualls but Defendants failed to pursue any further testing, despite the availability of additional tests.

The deliberate failure to conduct or preserve additional testing deprived Mr. Qualls of material, exculpatory evidence that would have undermined the Defendants' theory and strengthened his defense. By abandoning the forensic inquiry once results proved inconsistent

---

[3] Def Ex. L (56.12)

with their narrative, Detectives engaged in investigative suppression that violated clearly established due process protections and directly contributed to Mr. Qualls's wrongful conviction.

Defendants argue that expert testimony is required for DNA testing issues, this argument misses the mark. The constitutional violation alleged is not the failure to conduct additional testing, but rather the deliberate decision to ignore exculpatory evidence and pursue the wrong suspect. The crime lab testimony actually supports Plaintiff's position, as it shows that the available evidence pointed to Junior Williams, not Plaintiff.

The failure to pursue obvious exculpatory leads and forensic testing constitutes a deprivation of liberty without due process under 42 U.S.C. §1983. Courts recognize that officers violate due process when they "intentionally or recklessly fail to investigate evidence that would have exculpated the accused." *Limone v. Condon*, 372 F.3d 39, 44 (1st Cir. 2004); *Brady v. Dill*, 187 F.3d 104, 114 (1st Cir. 1999). The record here shows exactly that. Detectives Keeler and Harris seized the sweatshirt, confirmed it contained blood inconsistent with Qualls, and then simply stopped. They never followed up with the lab, never requested additional testing, and never confirmed whether more could be done. Their own depositions confirm they "did not recall" any further steps. Ex 2. - Keeler Dep. 28:9–16; Ex. 3 - Harris Dep. 58:2–7.

**Defendants Only Showed Photo Arrays for Qualls, Not Primary Suspect Williams**

Despite the overwhelming evidence against Williams at the time, Keeler and Harris chose to show witnesses a photo array with Qualls photo included. Despite being named by the victim, Defendants refused to show a photo array with a Photo of Junior Williams to witnesses until over nine (9) months later. Donna Carrington, the only eyewitness that did not have an open criminal case or warrant, did not identify Qualls from his photo array. Despite the fact that she could not identify Qualls, she was not shown a photo array with Junior Williams' photo included. (Ex. 1 – Photo Array Identifications)

Defendants chose to pursue Qualls despite all evidence pointing to Williams. Defendants cherry picked evidence and halted if further investigation might show that Qualls was innocent. Defendants actions in investigating this case show deliberate and reckless violations of Plaintiff's constitutional rights. Investigators had a duty to ensure that available scientific methods were exhausted before building a murder case against another man. See *Drumgold v. Callahan*, 707 F.3d 28, 38–42 (1st Cir. 2013)

**Evidence of Keeler's & the BPD Homicide Unit's Established Pattern of Similar Constitutional Violations**

The evidence in this case cannot be viewed in isolation. Detective Sergeant Daniel Keeler's conduct toward Mr. Qualls is part of a long, well-documented pattern of unconstitutional investigative behavior by Detective Keeler and the BPD Homicide Division in the early 1990's. (Ex. 6)  Keeler and the Homicide Division have repeatedly deprived citizens of their liberty and due process. Courts and juries throughout Massachusetts have recognized the same hallmarks in Keeler's cases: suppression of exculpatory evidence, fabrication of police reports, coercive interrogations, and manipulation of witnesses. This history of misconduct, substantiated through exonerations, acquittals, and judicial findings, demonstrates that Keeler's violations in the present case were not aberrations but consistent with his established pattern of disregarding constitutional limits.

Defendant Keeler's history within the Boston Police Department's Homicide Unit reveals a consistent pattern of investigative misconduct that violates the most fundamental guarantees of due process under the Fourteenth Amendment. His repeated suppression of exculpatory evidence, fabrication of investigative reports, coercive interrogation tactics, and disregard for truth and fairness in homicide investigations demonstrate not isolated negligence, but a deliberate pattern of unconstitutional behavior. The courts have long recognized that law enforcement officers who conceal, fabricate, or distort material facts to secure convictions "violate the accused's right to a fair trial." *Drumgold v. Callahan*, 707 F.3d 28, 38–39 (1st Cir. 2013); *Limone v. Condon*, 372 F.3d 39, 44–45 (1st Cir. 2004).

Keeler was the lead detective in the 2001 murder of Stephen Jenkins. Keeler kept electronic notes that he did not produce to prosecutors or defense counsel. *Commonwealth v. Shaun Jenkins*, 0384CR10364, Doc 133, P 1. Keeler's secret notes memorialized witness interviews and stated that Keeler paid Craig Jenkins $100 the day that Craig testified before the grand jury. Id at 20. Craig Jenkins had initially invoked his right to remain silent and declined to answer questions but later changed his mind and provided testimony against Jenkins, only after Keeler had provided him with funds. Paying or otherwise coercing witnesses and concealing exculpatory evidence, constitute knowing violations of the Fourteenth Amendment's due process guarantees and are directly actionable under *Brady*, *Drumgold*, and *Limone*.

In the 1994 shooting death of nine-year-old Jermaine Goffigan, Keeler and Detective William Maloney arrested 16-year-old Donnell Johnson, despite Johnson's verifiable alibi that he was home with family. Keeler personally interviewed Johnson in the presence of his parents and recorded that statement — but never disclosed the interrogation or the alibi to prosecutors or defense counsel. Johnson was wrongfully convicted and later exonerated after two men confessed. Federal investigators confirmed that Keeler's suppression of the exculpatory interview violated departmental policy and due process. Concealment of recorded exculpatory evidence and false representation of a suspect's refusal to cooperate violates due process under *Drumgold* and is a clear violation of constitutional rights.

Keeler authored the lead affidavit and police report in the 2002 murder of three-year-old Malik Andrade-Percival in an attempt to convict James Bush of the murder. At trial, Keeler admitted under oath that he falsified material facts — claiming he videotaped the scene (he had not) and that Detective Harris assisted him (he had not). Jurors later stated that Keeler "messed this entire case up." Knowingly submitting false statements in sworn documents constitutes a due process violation under *Napue v. Illinois*, 360 U.S. 264 (1959), and *Limone*, 372 F.3d 39.

Keeler's investigation of the 2001 beheading of Jackie Leyden, resulted in the wrongful indictment of the victim's brother, Billy Leyden. Keeler relied on speculation and ignored leads pointing to the real killer, Eugene McCollum, who later confessed. Fabricating a theory of guilt while ignoring exculpatory evidence constitutes deliberate indifference to truth, actionable under *Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002) and *Limone*, 372 F.3d 39.

In the 1999 murder of 14-year-old Chauntae Jones, Keeler's recorded interrogation of suspect Kyle Bryant was described by jurors as "heavy-handed and coercive." They cited his conduct as a reason for acquittal. Coercive interrogation tactics violate the Fifth and Fourteenth Amendments by undermining voluntariness. *Rogers v. Richmond*, 365 U.S. 534 (1961); *Miller v. Fenton*, 474 U.S. 104 (1985).

The First Circuit recognizes that "a pattern of similar constitutional violations by an officer" is admissible to prove both motive and deliberate indifference. *Drumgold*, 707 F.3d at 43–44. Keeler's long history of cumulative misconduct establishes a pattern of due process violations sufficient to support Plaintiff's claim. Defendant Keeler's conduct across decades reflects a consistent and deliberate disregard for constitutional limits. The same unconstitutional investigative methods—concealment of exculpatory evidence, fabrication of facts, coercion of

witnesses, and falsification of reports—appear again in Plaintiff case. This pattern is powerful corroboration that Keeler's actions were not isolated mistakes but deliberate, unconstitutional choices by Keeler.

### III. QUALIFIED IMMUNITY DOES NOT APPLY; MA CIVIL RIGHTS ACT CLAIM SURVIVES SUMMARY JUDGMENT

To state a claim under the Massachusetts Civil Rights Act, a plaintiff must show that: (1) his exercise or enjoyment of rights secured by the constitution or laws of either the United States or the Commonwealth of Massachusetts, (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation or coercion.

The Massachusetts legislature intended to provide a remedy under M.G.L. c. 12, § 11I, coextensive with 42 U.S.C. § 1983, except the federal statute requires state action while its state counterpart does not Priestley v. Doucette, 1 Mass. L. Rep. 415, Adams v. Vose, 1996 Mass. Super. LEXIS 73. This means that the same conduct that violates federal civil rights can also violate the state statute.

The Massachusetts Civil Rights Act specifically addresses police misconduct. The statute provides that conduct by a law enforcement officer acting under color of law that results in decertification constitutes interference with a person's right to bias-free professional policing ALM GL ch. 12, § 11H. While decertification is not alleged here, the statute demonstrates the legislature's intent to hold police officers accountable for constitutional violations. Public officials are not liable under Mass. Gen. Laws ch. 12, §§ 11H, 11I, for their discretionary acts, unless they have violated a right under Federal or State constitutional or statutory law that was clearly established at the time *Greene v. Cabral*, 323 F. Supp. 3d 96. Massachusetts essentially incorporates the qualified immunity doctrine stated in Greene. Plaintiff's Due Process rights were clearly established at the time of the investigation and Courts have consistently held that fabricating evidence violates clearly established constitutional rights, and officers are not entitled to qualified immunity for such conduct USCS Const. Amend. 14.

### III. GENUINE ISSUES OF MATERIAL FACT REMAIN, SUMMARY JUDGMENT MUST BE DENIED

Summary Judgment should be denied because several genuine issues of material fact still exist. The evidence, viewed in the light most favorable to Plaintiff, demonstrates that Defendants engaged in conduct that violated clearly established constitutional rights, precluding summary judgment on both the federal and state civil rights claims.

The evidence demonstrates that Defendants engaged in conduct that violated Plaintiff's constitutional rights. Specifically, the record shows that despite victim Tony Price gave a dying declaration to Haynes and Hanes, identifying in detail who Junior Williams was and the fact that Williams was the sole shooter responsible for murdering both Price brothers (SMF 5-6). Shortly after the shooting, Junior Williams was brought in by police for questioning and was found to have the victim's blood on his sweatshirt. Despite the overwhelming evidence that Williams was the killer, Defendants chose to build a case against Qualls.

Statements during trial reveal concerning conduct and favors by the investigating officers towards eyewitnesses. The trial transcript shows that witnesses were "driven by the police" to court to remove defaults on pending cases. (SMF 13-14) While Detective Keeler testified had no specific memory of driving witnesses to court, he acknowledged that it could have occurred.

The evidence, including the victim's dying declaration, the physical evidence linking Junior Williams to the crime, unconstitutional photo arrays, bribery/coercion of witnesses, failure to pursue or develop clear exculpatory evidence, and Plaintiff's subsequent exoneration, creates triable issues that must be resolved by a jury. Both the federal and state civil rights claims should proceed to trial.

### CONCLUSION

For the reasons stated above, Defendants' Motions for Summary Judgment should be denied because genuine issues of material fact exist regarding whether they violated Plaintiff's clearly established constitutional rights.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td></td><td>The Plaintiff, Ronnie Qualls,<br>By his attorney</td></tr>
<tr><td></td><td>  s/Kelsey R. Rose<br>Kelsey R. Rose, BBO # 692102<br>BALLIN & ASSOCIATES, LLC<br>16 Chestnut Street, Suite 130<br>Foxborough, MA 02035-1464<br>(508) 543-3700</td></tr>
<tr><td>Date: 10/16/2025</td><td>KRose@ballinlaw.com</td></tr>
</table>

### CERTIFICATE OF SERVICE

I, Kelsey R. Rose, hereby certify that on this 15th day of October, I served a copy of the foregoing document via ECF and electronic mail to all counsel of record in this action.

*/s/ Kelsey R. Rose*
Kelsey R. Rose