UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 23-10435-GAO

RONNIE QUALLS,
Plaintiff,

v.

DANIEL KEELER, DENNIS HARRIS, JOHN HARDEN, and CLIFTON HAYNES
Defendants.[1]

OPINION AND ORDER
March 31, 2026

O'TOOLE, D.J.

Ronnie Qualls, the plaintiff in this civil action, challenges the conduct of several former Boston Police Department ("BPD") officers involved in the initial response or ensuing homicide investigation into the 1992 shooting deaths of brothers Ronald "Dallas" Price and Roosevelt "Tony" Price. That investigation ultimately led to Qualls' conviction in the Massachusetts Superior Court on two counts of first-degree murder for the Price brothers' deaths. More than two decades later, in 2020, the Superior Court vacated those convictions by granting Qualls' joint motion for a new trial based on newly discovered evidence. Qualls was never retried, however, because shortly after the Superior Court's ruling, the Commonwealth entered a nolle prosequi as to the underlying indictment, resulting in Qualls' release.

By this present action Qualls now seeks damages under 42 U.S.C. § 1983 and under the Massachusetts Civil Rights Act, Massachusetts General Laws Chapter 12, Section 11*I* ("MCRA"), from individual defendants Clifton Haynes, John Harden, Dennis Harris, and Daniel Keeler—all

---

[1] Other originally named defendants have never been served or joined in this action. They are therefore dismissed as defendants.

former BPD officials. Qualls claims that all four individual defendants violated his federal due process rights by failing to pursue what he describes as exculpatory evidence arising from BPD's homicide investigation. He further asserts that defendants Keeler and Harris used "unconstitutional" identification procedures during their investigation, and finally, that Keeler sought to "coerce" eyewitnesses' testimony at trial by offering illegal "favors."

Before the Court are defendants Haynes and Harden's and Harris and Keeler's respective Motions for Summary Judgment on Qualls' claims under § 1983 (Count I) and the MCRA (Count IV). All defendants assert that they are entitled to qualified immunity as to both counts. According to them, discovery has not produced evidence to substantiate Qualls' contention that the defendants violated his federally protected rights. Qualls opposes both motions in a single opposition brief arguing, in effect, that the unlawfulness of the conduct he challenges was clearly established at the time it occurred, which would foreclose the possibility of qualified immunity for the defendants.

After a motion hearing on the merits and careful consideration of the parties' submissions, the Court holds that Qualls has not met his burden to show that the defendants' conduct violated clearly established law. The defendants are entitled to qualified immunity against both claims. The motions for summary judgment are granted in full for the reasons set forth herein.

## I.    **Background**

### A.    Procedural History

Following a 1993 jury trial in the Massachusetts Superior Court, Qualls was convicted of, among other charges, two counts of first-degree murder for the Price brothers' deaths. The Supreme Judicial Court of Massachusetts ("SJC") later ordered a new trial, ruling that the first one had been prejudiced by erroneously admitted hearsay statements. See Commonwealth. v. Qualls, 680 N.E.2d 61, 67 (Mass. 1997). Qualls was re-tried in1998, and a different jury of the Superior

Court found him guilty of the same charges. The SJC denied Qualls' direct appeal of this second conviction. See Commonwealth v. Qualls, 800 N.E.2d 299, 301 (Mass. 2003).[2]

More than two decades after the 1998 jury trial, Qualls and the Commonwealth of Massachusetts filed a joint motion in the Superior Court seeking a new trial based on newly discovered evidence. The Superior Court granted the motion, thereby vacating Qualls' 1998 convictions. The Commonwealth then entered a nolle prosequi as to the underlying indictment, which resulted in Qualls' release.

After his release, Qualls commenced this action seeking damages from the City of Boston and individual defendants. The Court previously dismissed Qualls' claim of civil conspiracy to violate § 1983 against the individual defendants (Count II), as well as his § 1983 and MCRA claims against the City of Boston (Counts III and IV).[3]

B.    Facts

To the extent the following facts are disputed, the Court adopts as true the plaintiff's version.[4] The Price brothers were shot near Harrison Avenue in Boston, Massachusetts, in the early morning hours of October 3, 1992. Defendants Harden and Haynes were uniformed BPD patrol officers on duty that night. They, along with other BPD patrol officers, were dispatched to an emergency call for service at the scene of the shooting. Upon arrival, they encountered Tony Price who told Haynes, Harden, and others that he had been "shot by a man named Junior who drives a blue Ford Escort, that lives at Columbia Pt., and has a sister who lives on Ruggles Street." (Pl.'s

---

[2] Qualls later sought collateral review of the SJC's second decision and was denied post-conviction relief. See Qualls v. Russo, 443 F. Supp. 2d 140, 145 (D. Mass. 2006).

[3] Harden was served after the Court entered this Order. The Court now dismisses Count II as to him as well.

[4] The Court provides an overview of only the facts that are relevant to the merits of the pending motions for summary judgment. The SJC's decision rejecting Qualls' direct appeal recites the facts as the jury in the 1998 trial "could have found" them. Qualls, 800 N.E.2d at 301.

Resps. to Defs. Daniel Keler, Dennis Harris, John Harden, and Clifton Haynes' Statement of Material Facts ¶ 5 (dkt. no. 63) ("Pl.'s SOMF").) Harden and Haynes "memorialized" Tony's statement in their respective police reports of the incident. (Id. ¶ 6; see Defs.' L.R. 56.1 Statement of Material Facts as to Which There is No Genuine Issue ("Defs.' SOMF"), Ex. G (copies of reports) (dkt. no. 58-7).)

Defendants Harris and Keeler, who at that time were BPD detectives in the homicide unit, were assigned to the case that same morning. Harris and Keeler responded to the scene and a local hospital where both Price brothers had been brought. Both eventually succumbed to their wounds from the shooting. A few hours after the shooting, a uniformed BPD patrol officer at the crime scene stopped a vehicle that fit the description that Tony Price had given to Harden and Haynes. The car was driven by James Earl "Junior" Williams. Harris and Keeler interviewed Junior at around eleven o'clock the morning of the shooting.

There were visible blood stains on the sweatshirt that Junior was wearing during the interview.  Harris accordingly collected Junior's sweatshirt as evidence and submitted it to BPD's crime laboratory for testing, which occurred two days later, on October 5, 1992. The crime laboratory's report reflects that there were "two small Reddish-Brown stains on the front" of the sweatshirt and another "on the back." (Defs.' SOMF, Ex. L at 4 (dkt. no. 58-12).) BPD's forensic testing "identified" "Group 'B' human blood . . . in the stains," which according to the laboratory report was the same blood "Group" as Junior and both of the Price brothers. (Id.) At Qualls' criminal trial, a BPD criminologist testified on cross-examination that "no additional testing" had been conducted on the sweatshirt "other than to identify this group B blood." (Defs.' SOMF, Ex. A at 3 (dkt. no. 58-1).)

## II.  Standard of Review

"Summary judgment is appropriate where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" River Farm Realty Tr. v. Farm Fam. Cas. Ins. Co., 943 F.3d 27, 36 (1st Cir. 2019) (quoting Fed. R. Civ. P. 56). "A dispute is 'genuine' if the 'evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.'" Cherkaoui v. City of Quincy, 877 F.3d 14, 23–24 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)) (abrogated on other grounds). A fact is "material" if it "need[s] to be resolved before the related legal issues can be decided." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (alteration in original) (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). "Summary judgment is also appropriate if the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to [their] case' with respect to which they 'bear the burden of proof.'" Axis Ins. Co. v. Barracuda Networks, Inc., 160 F.4th 1, 6 (1st Cir. 2025) (alteration in original) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

In ruling on a motion for summary judgment, the Court "must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor." Clifford v. Barnhart, 449 F.3d 276, 280 (1st Cir. 2006). This "favorable presumption," however, does not relieve the nonmoving party of any burden. Burt v. Bd. of Trs. of the Univ. of R.I., 84 F.4th 42, 59 (1st Cir. 2023). Quite the contrary: "the nonmoving party must adduce specific facts showing that a trier of fact could reasonably find in his favor." Brader v. Biogen Inc., 983 F.3d 39, 53 (1st Cir. 2020)). "[C]onclusory allegations, improbable inferences, and unsupported speculation" are not enough. Johnson v. Johnson, 23 F.4th 136, 141 (1st Cir. 2022) (quoting Brader, 983 F.3d at 53); see, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Flanders-Borden,

11 F.4th 12, 25 (1st Cir. 2021) (affirming entry of summary judgment where party with burden failed to "produc[e] specific facts, in suitable evidentiary form" (quoting Triangle Trading Co. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999))). Relevant here, when deciding a motion for summary judgment on qualified immunity grounds, if the Court "accept[s] as true and in its entirety the plaintiff's account of the facts," and the record "nevertheless supports a grant of qualified immunity, [then] summary judgment is appropriate." Moses v. Mele, 711 F.3d 213, 216 (1st Cir. 2013).

### III.    Discussion

#### A.    Substitution under Rule 25

The Court first addresses the defendants' argument that Rule 25 of the Federal Rules of Civil Procedure requires dismissal of all claims against Clifton Haynes. Haynes died on May 3, 2024, and counsel notified the Court of the death on the record in October of 2024. (See Electronic Clerk's Notes for Oct. 8, 2024, Hr'g (dkt. no. 35).) Haynes' counsel argues that Counts I and IV must be dismissed as to Haynes because Qualls did not move for substitution under Rule 25 after the notice was made, and according to the defendants, the time for substitution has elapsed.

Contrary to the defendants' suggestion, there is more to the analysis. The ninety-day substitution period under Rule 25 begins only once service on parties *and* nonparties is complete. Marcus v. Am. Cont. Bridge League, 80 F.4th 33, 44 (1st Cir. 2023) ("[F]or the 90-day clock to begin running under Rule 25, the suggesting party must properly serve both the other parties and a nonparty successor or personal representative of the deceased with a notice of death." (emphasis in original)); see also Universitas Educ., LLC v. Granderson, 98 F.4th 357, 375 (1st Cir. 2024) (rejecting argument that Fed. R. Civ. P. 25(a)(1)'s "requirements should differ when the decedent is the defendant, as opposed to the plaintiff"). Here, the defendants do not address whether "a

6

nonparty successor or personal representative of the deceased" has been served with a notice of death. Marcus, 80 F.4th at 44; accord Fed. R. Civ. P. 25(a)(3) (requiring, in relevant part, service "on nonparties" of "statement noting death"). What is more, the parties do not analyze the predicate question whether Haynes' death extinguished the plaintiff's claims against him.

The Court accordingly assumes without deciding that both the § 1983 and the MCRA claims survive Haynes' death. Moreover, because the Court ultimately concludes that the defendants are entitled to qualified immunity, any motion to substitute would be futile at this stage in the litigation. Cf. Pearson v. Callahan, 555 U.S. 223, 237 (2009) ("Qualified immunity is 'an immunity from suit rather than a mere defense to liability.'" (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985))).

B.      Qualified-Immunity Framework

"Section 1983 provides a cause of action for a plaintiff to seek money damages from a defendant who acted under color of state law to deprive plaintiff of a right guaranteed by the Constitution or by federal law." Kelley v. LaForce, 288 F.3d 1, 6 (1st Cir. 2002); see 42 U.S.C. § 1983.[5] The plaintiff in a § 1983 case must "prove not only a deprivation of federal right, but also that the defendant's conduct was a cause in fact of the alleged deprivation." Soto v. Flores, 103 F.3d 1056, 1062 (1st Cir. 1997) (citing Maldonado Santiago v. Velazquez Garcia, 821 F.2d 822, 831 (1st Cir.1987)). Further, an individual defendant can be liable under § 1983 for his or her "own individual actions" only. Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).

Here, the defendants argue that they are entitled to qualified immunity against Qualls' § 1983 claim. "Qualified immunity is a doctrine that shields government officials from individual-capacity suits for damages under § 1983 . . . ." Lachance v. Town of Charlton, 990 F.3d 14, 20 (1st

---

[5] The defendants do not dispute that they acted under color of state law at all relevant times.

Cir. 2021). "When a defendant invokes qualified immunity, the burden is on the plaintiff to show that the defense is inapplicable." Escalera-Salgado v. United States, 911 F.3d 38, 41 (1st Cir. 2018). That burden is a "heavy" one, Johnson v. City of Biddeford, 92 F.4th 367, 375–76 (1st Cir. 2024), because the doctrine is "intended to protect all but the plainly incompetent or those who knowingly violate the law," Jakuttis v. Town of Dracut, 95 F.4th 22, 30 (1st Cir. 2024) (cleaned up) (quoting White v. Pauly, 580 U.S. 73, 79 (2017)).

To meet his burden, Qualls must show: (1) that each defendant "violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time'" it occurred. Eves v. LePage, 927 F.3d 575, 582–83 (1st Cir. 2019) (quoting District of Columbia v. Wesby, 583 U.S. 48, 63 (2018)). Here, the Court begins with the second step—that the unlawfulness of the challenged conduct was "clearly established" when it occurred. See, e.g., Alfano v. Lynch, 847 F.3d 71, 75 (1st Cir. 2017) (explaining that courts may begin with either step of the analysis).

To be clearly established, the "[u]nlawfulness" of the official action "must be apparent at the time of the alleged violation 'in the light of pre-existing law.'" Mlodzinski v. Lewis, 648 F.3d 24, 33 (1st Cir. 2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Thus, Qualls' burden at this step has two parts, "each of which must be satisfied" to defeat the defendants' motion for summary judgment. Johnson, 92 F.4th at 375. First, he must "identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." Alfano, 847 F.3d at 75 (quoting Wilson v. Layne, 526 U.S. 603, 617 (1999)). The focus is on federal precedents that existed at the time of the challenged conduct. Id. at 76. Second, Qualls "must show that an

objectively reasonable officer would have known that [the challenged] conduct violated the law." Conlogue v. Hamilton, 906 F.3d 150, 155 (1st Cir. 2018).

It is a "longstanding principle that 'clearly established law' should not be defined 'at a high level of generality'" but rather "must be 'particularized' to the facts of the case." Pauly, 580 U.S. at 79 (first quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011); then quoting Anderson, 483 U.S. at 640). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate," though "there need not be 'a case directly on point.'" Eves, 927 F.3d at 583 (quoting al–Kidd, 563 U.S. at 741). Hence, "[i]mmunity exists even where the abstract 'right' invoked by the plaintiff is well-established, so long as the official could reasonably have believed 'on the facts' that no violation existed." Mlodzinski, 648 F.3d at 33 (quoting Dirrane v. Brookline Police Dep't, 315 F.3d 65, 69 (1st Cir. 2002)).

C.     Count I – Section 1983

Qualls seems to argue that the defendants' conduct violated clearly established law in three ways: First, he contends that each of the defendants "deliberate[ly] deci[ded] to ignore exculpatory evidence and pursue the wrong suspect." (Pl.'s Opp'n to Defs.' Mots. for Summ. J. at 6 ("Pl.'s Opp'n") (dkt. no. 64).) Second, he claims that Keeler and Harris used "unconstitutional photo arrays" during BPD's homicide investigation. (Id. at 10.) Third, Qualls asserts that Keeler engaged in "bribery" or "coercion" by providing "favors" to "eyewitnesses." (Id.) The Court addresses each argument in turn.

i.     Exculpatory Evidence

Qualls has failed to meet his burden to show that Haynes and Harden would be liable to him for, as he puts it, "deliberate[ly] deci[ding] to ignore exculpatory evidence and pursue the wrong suspect." (Id. at 6.) As an initial matter, Qualls makes only passing references to Haynes

9

and Harden in his opposition brief. More importantly, he never identifies what part of the record shows that those defendants did anything other than accurately memorialize Tony Price's at-the-scene statement in their official police reports. To be sure, the record is clear that they were involved in the initial, emergency response to the shooting in the early morning hours of October 3, 1992. But at the time, they were uniformed patrol officers, not detectives with one of BPD's investigative units, and Qualls fails to point to any evidence that Haynes or Harden had even a minimal role in BPD's ensuing homicide investigation. In fact, Harden's contemporaneous report suggests that they had no role at all: it states, in relevant part, that the shooting would "be further investigated by Area Detectives and Homicide." (Defs.' SOMF, Ex. G at 2.)

Thus, Qualls has failed to adduce facts to support his contention that Haynes or Harden deliberately decided to ignore *any* evidence from the homicide investigation, much less "exculpatory evidence" as he postulates. Further, he does not cite a single case, pre-1992 or otherwise, signaling that the mere act of authoring a police report—the accuracy of which is undisputed—violates a federally protected right. That is not surprising. Cf. Calvi v. Knox Cnty., 470 F.3d 422, 428 (1st Cir. 2006) ("[An officer's] mere presence at the scene, without more, does not by some mysterious alchemy render him legally responsible under section 1983 for the actions of a fellow officer.").

In short, Qualls' record citations demonstrate that Haynes and Harden engaged in routine police work at the scene of an emergency call for service. For that, they cannot be liable to him under § 1983. They are entitled to qualified immunity against Count I.

Qualls has similarly failed to meet his burden with respect to defendants Harris and Keeler. The record establishes that Harris collected the bloodstained sweatshirt that Junior had been wearing during an interview with detectives on the morning of the shooting. Harris later submitted

10

the sweatshirt to BPD's crime laboratory with a written request for forensic testing including, as is relevant here, for the "[p]resence of human blood on visible spots; blood typing of the blood spots; matching of this blood to the blood of victim Roosevelt Price and/or Ronald Price; location of these blood spatterings on garment." (See Pl.'s SOMF, Ex. 3 at 56:20–59:22 (dkt. no. 63-3).) The results of BPD's forensic testing "identified" "Group 'B' human blood . . . in the stains." (Defs.' SOMF, Ex. L at 4.) According to the crime laboratory report that memorializes the results of BPD's forensic analysis, "Group B" is the blood type of both Price brothers, as well as Junior himself. Qualls' defense counsel later used that report to cross-examine a BPD criminalist at trial. According to the criminalist's testimony, BPD did not conduct any forensic testing of the bloodstains beyond those that are catalogued in the report.

Based on these undisputed facts in the summary-judgment record, Qualls posits that Harris and Keeler "engaged in investigative suppression that violated clearly established due process protections." (Pl.'s Opp'n at 6.) That is so, he contends, because those defendants knew that the "existing blood-type results" of BPD's forensic testing "exclude[ed] [him] as the source" of the bloodstains on Junior's sweatshirt. (Id. at 5.) He further asserts that despite what he sees as "the obvious exculpatory potential of this evidence," neither Harris nor Keeler ordered any additional forensic analysis of the bloodstains. (Id. at 4.) Further, though in this instance without a record citation, Qualls avers that Harris and Keeler "were aware that additional testing—such as enzyme typing, antigen sub-grouping, or advanced serological analysis—could have identified the blood as belonging to one of the victims[,] which would have exculpated Qualls." (Id. at 5.) Therefore, Qualls concludes, Harris and Keeler's "deliberate failure to conduct or preserve additional testing deprived [him] of material, exculpatory evidence" and thereby violated his due process rights. (See id. at 5–6.)

In an attempt to meet his burden to identify authority that clearly established the unlawfulness of this conduct at the time it occurred, Qualls cites two Supreme Court cases: Kyles v. Whitley, 514 U.S. 419, 437 (1995), and Arizona v. Youngblood, 488 U.S. 51, 58 (1988). Those cases involve due process challenges based on evidence that the government either suppressed (Kyles) or failed to preserve (Youngblood).

Kyles involved a criminal defendant's post-conviction challenge to the suppression of material impeachment evidence in the form of written or tape-recorded witness statements. The police knew of and possessed the statements but failed to turn them over to the prosecution; unaware that it existed, the prosecution did not disclose that material evidence to the defendant. In holding that this conduct violated due process, the Kyles Court established that under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, prosecutors have a duty to learn of and turn over material "evidence known to the others acting on the government's behalf in the case, including the police." Kyles, 514 U.S. at 437. A prosecutor's breach of that duty—whether "in good faith or bad faith"—violates due process. See id. at 437–38 (citing Brady, 373 U.S. at 87).

Youngblood, in turn, involved evidence that the government possessed but negligently failed to preserve. Relevant here, the Court characterized the evidence at issue as, at best, only potentially exculpatory. See Youngblood, 488 U.S. at 57. The Court explained that the evidence's potential to exculpate the defendant lay exclusively in the fact that, but for its negligent destruction by the government, it "could have been subjected to tests, the results of which might have exonerated the defendant." Id. Youngblood clarified that, unlike the Brady standard governing facially exculpatory evidence—the suppression of which violates due process regardless of the government's intent—the failure to preserve *potentially* exculpatory evidence violates due process only if the "criminal defendant can show bad faith on the part of the police." Id. at 57–58.

12

In rejecting the <u>Youngblood</u> defendant's due process challenge, the Court reasoned that the police appeared to be acting according to standard policy, so the challenged conduct could "at worst be described as negligent." <u>Id.</u> at 58. Further, among other things, there was no indication that the defendant had been denied access to the evidence at issue, or that the police concealed or suppressed the information they gleaned before its negligent destruction. Finally, as is relevant here, the Court rejected the notion that the Due Process Clause required the police "to use a particular investigatory tool." <u>See</u> <u>id.</u> at 59. Rather, the Court explained that a criminal defendant "is free to argue to the finder of fact that [an investigatory] test might have been exculpatory, but the police do not have a constitutional duty to perform any particular tests." <u>Id.</u>

Here, Qualls seems to argue that <u>Kyles</u> and <u>Youngblood</u> clearly established that Harris and Keeler engaged in "investigative suppression" of forensic evidence related to the bloodstains. (Pl.'s Opp'n at 6.) According to him, the "investigative suppression" occurred when Harris and Keeler "abandon[ed] the forensic inquiry" into the bloodstains after receiving the results in the crime laboratory report. (<u>Id.</u> at 5.) Under that theory, the evidence that Harris and Keeler purportedly "suppress[ed]" was any potentially exculpatory result that may have been uncovered by further forensic testing of the bloodstains. (<u>Id.</u> at 5–6.) With this argument, Qualls fails to meet his burden for several reasons.

To begin, that theory renders <u>Kyles</u> inapposite. As discussed above, Qualls does not claim that the government suppressed BPD's crime laboratory report. <u>See</u> <u>Kyles</u>, 514 U.S. at 434 (explaining that <u>Brady</u> applies to "favorable but *undisclosed* evidence" (emphasis added)). That fact is beyond dispute because his defense counsel at the murder trial used the report to cross-examine a BDP criminalist about the bloodstains. The uncontested trial testimony of that criminalist, moreover, supported that the crime laboratory did not conduct any forensic tests of the

bloodstains beyond those that are catalogued in the report. Further, the parties agree that neither Harris nor Keeler ever ordered additional testing of the bloodstains. Indeed, that perceived inaction may be fairly characterized as the gravamen of this part of Qualls' claim against those defendants.

In effect, Qualls has not adduced facts demonstrating that Harris or Keeler possessed material evidence related to the bloodstains beyond what was disclosed to him. His theory of "investigative suppression" therefore lacks a necessary factual predicate of any Brady violation: that the "favorable, material evidence actually exists." United States v. Alverio-Meléndez, 640 F.3d 412, 424 (1st Cir. 2011) (quoting United States v. Garvin, 270 Fed. App'x. 141, 144 (3d Cir. 2008)). Instead, he attempts to rest his due process claim entirely on hypothetical—that is, non-existent—material evidence. He reveals as much by describing its asserted exculpatory value in counterfactual terms. (See, e.g., Pl.'s Opp'n at 4 ("exculpatory *potential*"); id. ("*chose not to pursue* forensic testing that *could have* exonerated Mr. Qualls"); id. at 5 ("*may have been* exculpatory if further testing *could have been* completed") (emphases added).)

The summary-judgement record thus does not support the theory that Keeler or Harris suppressed any evidence that actually existed regarding the bloodstains. Because neither Harris nor Keeler ever possessed the hypothetical evidence that Qualls claims was suppressed, they "did not commit a Brady violation in failing to turn [it] over." See Alverio-Meléndez, 640 F.3d at 424 (finding no Brady violation where government did not turn over report of forensic analysis that was never conducted). Kyles therefore did not clearly establish the unlawfulness of Harris and Keeler's challenged conduct at the time it occurred.

For the following reasons, neither did Youngblood. Qualls asserts that Harris and Keeler failed to "preserve" material evidence related to the bloodstains. (See Pl.'s Opp'n at 5.) But he never identifies what material evidence was lost as a result. Instead, his opposition merely asserts

14

that Harris and Keeler "were aware" of "additional testing" that "could have" been performed on the bloodstains, but they "simply chose not to pursue" it. (Id. at 4–5.) When considered with the fact that the bloodstain evidence consisted of three "small" stains on Junior's sweatshirt, (Defs.' SOMF, Ex. L at 4), Qualls' argument that more testing could have been done to that evidence belies his claim that Harris or Keeler failed to "preserve" it, (Pl.'s Opp'n at 5). Thus, unlike the negligent conduct in Youngblood—which made further testing impossible yet did not violate due process—the conduct at issue here did not foreclose the possibility of additional forensic testing. In that respect, Youngblood militates *in favor of* qualified immunity, not against it.

Qualls next asserts that the conduct he challenges "is not the failure to conduct additional testing, but rather the deliberate decision to ignore exculpatory evidence." (Id. at 6.) This argument, too, fails. Because under Youngblood the police do not have a constitutional duty to conduct certain tests, it follows that "[t]he failure to create exculpatory evidence does not constitute a Brady violation." Alverio-Meléndez, 640 F.3d at 424 (citing Youngblood, 488 U.S. at 59); see United States v. Nguyen, 98 F. App'x 608, 609 (9th Cir. 2004) ("Brady does not require the government to interview witnesses or otherwise create exculpatory evidence not then in existence."). Qualls has thus failed to meet his burden to identify authority sufficient to put a reasonable officer in Harris and Keeler's shoes on notice that the decision not to pursue further testing of the bloodstains on Junior's sweatshirt would violate due process. See Alverio-Meléndez, 640 F.3d at 424.

To summarize, on this record, Qualls has not demonstrated that Kyles or Youngblood clearly established that Harris or Keeler's challenged conduct violated his due process rights.

> ii.    *Photo Arrays*

Qualls further claims that Harris and Keeler violated clearly established law when they "chose to show witnesses a photo array with Qualls['] photo included," notwithstanding

"overwhelming evidence against [Junior] at the time." (Pl.'s Opp'n at 6.) As Qualls sees it, Harris and Keeler's decision "to pursue [him] despite all evidence pointing to [Junior]" amounted to "deliberate and reckless violations of [his] constitutional rights." (Id.) Critically, his opposition does not point to any evidence in the record suggesting that Harris or Keeler engaged in any other unlawful conduct related to the arrays. In effect, Qualls appears to argue that Harris and Keeler violated his due process rights through the sheer act of including his photograph in an array shown to witnesses. But he does not explain why that is so. Nor does he cite any authority to support his position that the inclusion of his photograph, per se, renders an array unlawful. Qualls has therefore failed to meet his burden.

His assertion that "the only eyewitness that did not have an open criminal case or warrant . . . did not identify [him] from his photo array," (id.), does not compel a different result. A criminal defendant may challenge the reliability of an array only if he has shown that it is "impermissibly suggestive." United States v. Maguire, 918 F.2d 254, 263 (1st Cir. 1990). Federal precedent from the relevant period did not clearly establish that Harris and Keeler's decision merely to include Qualls' photograph rendered the challenged arrays unduly suggestive. In 1990, for example, the First Circuit reaffirmed its view that police could permissibly "bas[e] a photo array on suspicion regarding a particular defendant." Id. at 264 (citing Gullick v. Perrin, 669 F.2d 1, 4 (1st Cir. 1981)). Because he has not established that the arrays in question were unduly suggestive, Qualls' reliability argument is not material to the question whether a reasonable officer in Harris or Keeler's shoes would have understood the challenged conduct to be unlawful. Accordingly, Qualls has failed to demonstrate that the unlawfulness of the conduct he challenges was clearly established at the time it occurred.

16

>                *iii.*    *Witness Favors*

Finally, the Court reaches Qualls' assertion that the record "reveal[s] concerning conduct and favors by the investigating officers towards eyewitnesses." (Pl.'s Opp'n at 10.) The only such "favor" arguably developed in Qualls' opposition is his contention that Keeler drove witnesses to court "to remove defaults on pending cases." (Id.) Qualls argues that there remains a genuine issue of material fact on this issue because although "Keeler testified [that he] had no specific memory of driving witnesses to court, he acknowledged that it could have occurred." (Id.) The relevant portion of Keeler's deposition testimony reads:

> [Counsel:] Q. Okay. Why wouldn't you want someone appearing in court with a default?
>
> [Witness:] A. Because they'd be subject to arrest, right, if you have a default in front of you in the court. But on the other hand, if someone's going to testify and you know there was a default, that would be just a procedural matter where you'd come into the court, be recognized by the Court, and agree to appear in a future date.
>
> [Counsel:] Q. Okay. Okay. So removing the default just means that the default is removed. It doesn't dismiss the whole case?
>
> [Witness:] A. Well, it is – I'm reading what it says.
>
> [Counsel:] Q. Yes.
>
> [Witness:] A. A default was removed. There was nothing about a dismissal in there.
>
> [Counsel:] Q. Right. So at this point we're just talking about driving someone to court and removing a default, but you don't have any memory of that?
>
> [Witness:] A. No.

(Pl.'s SOMF, Ex. 2 at 61:7–62:2 (dkt. no. 63-2).) At this point in his deposition, Keeler was answering counsel's questions about an excerpt of the record from Qualls' murder trial. The excerpt in question reflects that the assistant district attorney prosecuting the case informed the Superior Court and Qualls' defense counsel in open court that:

17

[W]hile the case has been pending, Ms. Buford was taken, driven by the police to Roxbury District Court where she removed a default and Mr. Fred Monroe was driven to Boston Municipal Court where he removed a default. I might add that he was locked up when he removed that default[,] but I just wanted to make sure that the record reflects that [Qualls' defense counsel] has been so informed.

(Defs.' SOMF, Ex. E at 3 (dkt. no. 58-5).)

Even assuming for purposes of the present motion that Keeler did in fact drive those witnesses to court to remove pending default warrants, Qualls has failed to meet his burden to establish that Keeler's conduct violated clearly established law.

As an initial matter, default warrants are issued by a court, not by the police or the district attorney. See Mass. Gen. Laws ch. 276, § 36 ("If the recognizor does not appear according to his recognizance, *the court or justice may issue process* to bring him into court for trial." (emphasis added)). Thus, only a court, not the police or the district attorney, may "remove" them. It follows that any purported favor to the witnesses here necessarily arose from the mere fact of being driven to court. To the extent a ride from the police to appear in court pursuant to a default warrant can be characterized as a favor to a witness—as opposed to merely the duty of the police to act upon a pending warrant—that information was conveyed to Qualls' counsel in open court. Thus, this is not a case in which the police purportedly suppressed evidence of a reward or inducement provided to a government witness. See, e.g., United States v. Bagley, 473 U.S. 667, 676 (1985) (explaining that the government must disclose favors promised to government witnesses (citing Giglio v. United States, 405 U.S. 150, 153 (1972)).

Moreover, Qualls never says what part of Buford or Monroe's testimony he claims was induced or coerced. Thus, even assuming that Keeler drove Buford and Monroe to appear in court pursuant to a default warrant and that such conduct qualifies as an reward or inducement, Qualls has failed to identify any portion of the summary-judgment record demonstrating that Keeler (1) suppressed evidence regarding the ride or (2) otherwise used the ride to induce any testimony from

those witnesses, let alone false testimony. On this record, therefore, Qualls has failed to establish that "it would be clear to a reasonable officer that [Keeler's] conduct was unlawful in the situation he confronted." See Brosseau v. Haugen, 543 U.S. 194, 199 (2004).

To summarize, Qualls has failed to meet his burden to demonstrate that the unlawfulness of the defendants' challenged conduct was clearly established at the time it occurred. Because he has failed to satisfy step two of the qualified immunity analysis, the Court need not consider step one. See, e.g., Rivera-Corraliza v. Morales, 794 F.3d 208, 215 (1st Cir. 2015). For the foregoing reasons, the defendants are entitled to qualified immunity against Count I.

D.      Count IV – Massachusetts Civil Rights Act

Finally, there remains Count IV, Qualls' MCRA claim. The qualified immunity principles developed under § 1983 apply equally to claims under the MCRA. See Duarte v. Healy, 537 N.E.2d 1230, 1232 (Mass. 1989); Howcroft v. City of Peabody, 747 N.E.2d 729, 746 (Mass. App. Ct. 2001). Thus, where, as here, a § 1983 claim and a MCRA claim are both "premised on the same right," the qualified immunity analysis is identical. Jakuttis, 95 F.4th at 35 (incorporating "the same analysis" of qualified immunity against § 1983 claim to also find qualified immunity against MCRA claim predicated on same constitutional right); Raiche v. Pietroski, 623 F.3d 30, 40 (1st Cir. 2010) (same). As explained in the preceding sections, defendants Haynes, Harden, Harris, and Keeler are entitled to qualified immunity as to Count I because the plaintiff has failed to establish that their conduct violated clearly established law at the time it occurred. For these same reasons, the Court holds that Haynes, Harden, Harris, and Keeler are also entitled to qualified immunity against Count IV.

**IV.**      **Conclusion**

For the foregoing reasons, defendants Haynes, Harden, Harris, and Keeler are entitled to qualified immunity against the plaintiffs' remaining claims. Accordingly, the defendants' motions for summary judgment (dkt. nos. 54 & 56) are GRANTED. Judgment shall enter in favor of the defendants as to Counts I and IV.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge

20